**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION**

| | |
|---|---|
| VIRGINIA ELECTRIC AND POWER COMPANY, D/B/A DOMINION ENERGY VIRGINIA; OSW PROJECT LLC,<br>                 Plaintiffs,<br>v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR; BUREAU OF OCEAN ENERGY MANAGEMENT; DOUGLAS BURGUM, Secretary of the Interior, in his official capacity; MATTHEW GIACONA, Acting Director, Bureau of Ocean Energy Management, in his official capacity,<br><br>      Defendants. | Case No. |

**COMPLAINT**

Virginia Electric and Power Company, d/b/a Dominion Energy Virginia, and OSW Project, LLC (collectively "DEV" unless otherwise specified herein) bring this civil action against the above-listed Defendants for declaratory and preliminary and permanent injunctive relief and allege as follows:

**INTRODUCTION**

1. On December 22, 2025, the Bureau of Ocean Energy Management ("BOEM") abruptly issued a one-page Director's order directing DEV to immediately stop work on the Coastal Virginia Offshore Wind Commercial Project ("CVOW"), which has been fully permitted and under construction on the Outer Continental Shelf ("OCS") and onshore since early 2024,

and is projected to begin generating electricity in early 2026. CVOW will be capable of supplying 9.5 million megawatt ("MW") hours of energy per year, enough to power approximately 660,000 homes.

2.      BOEM's order sets forth no rational basis, cannot be reconciled with BOEM's own regulations and prior issued lease terms and approvals, is arbitrary and capricious, is procedurally deficient, violates the Outer Continental Shelf Lands Act ("OCSLA"), and infringes upon constitutional principles that limit actions by the Executive Branch. This Court must therefore vacate the Order and enjoin BOEM from taking further action with respect to that Order.

3.      CVOW has received all federal, state, and local approvals necessary for its construction and operation. Those approvals were the result of multiple, multi-year national security and environmental reviews. BOEM and myriad other federal, state, and local agencies conducted extraordinarily thorough reviews of CVOW and carefully considered its potential impacts. The overwhelming consensus of scientific organizations is that offshore wind's impacts on national security and the environment are neither appreciable nor unmanageable, and DEV has adopted and adhered to a robust suite of environmental safeguards to ensure that outcome. Courts to date have uniformly acknowledged and upheld these measures for CVOW and other offshore wind projects with similar conditions. Indeed, the United States has vigorously defended, and the U.S. District Court for the District of Columbia has denied, a motion to preliminarily enjoin CVOW construction and operation. *Comm. for a Constructive Tomorrow v. U.S. Dep't of the Interior*, No. 24-774 (LLA), 2024 WL 2699895 (D.D.C May 24, 2024).

4.      DEV has spent approximately $8.9 billion to develop CVOW to date, which is over two-thirds of the total projected cost of $11.2 billion. These costs are already being paid by

DEV's customers. Certainty, predictability, and efficiency are of critical importance in conducting capital-intensive energy and infrastructure projects, as the current Administration has repeatedly recognized elsewhere. Congress's intent in enacting OCSLA was to encourage development of the OCS, and BOEM has adopted regulations that establish a predictable legal framework facilitating and supporting the billions of dollars in capital investments needed for such development.

5. BOEM's arbitrary and illegal order is fundamentally inconsistent with this legal framework and BOEM's carefully considered prior actions. Our Nation is governed by laws, and a stable legal and regulatory environment is essential to allow regulated public utilities like DEV, as well as other businesses, contractors, suppliers, and workers, to invest and support our Nation's energy needs and associated jobs. Sudden and baseless withdrawal of regulatory approvals by government officials cannot be reconciled with the predictability needed to support the exceptionally large capital investments required for large-scale energy development projects like CVOW critical to domestic energy security. That is true regardless of the source of energy.

6. BOEM's order is inconsistent with BOEM's own regulations, the CVOW lease that BOEM issued to DEV, and the BOEM-approved CVOW Construction and Operations Plan ("COP") and its associated terms and conditions. BOEM approved the COP pursuant to its regulations, which are designed to facilitate and support OCS investment. *See* 30 C.F.R. 595 Subpart G. The approved COP in turn authorizes DEV to construct and operate the CVOW project. BOEM's order does not allege, and DEV has not committed, any violation that could enable BOEM to order a work stoppage. 30 CFR § 585.106(b).

7. BOEM's illegal order is causing serious, irreparable harm to DEV and its customers, and must be immediately, and then permanently, vacated and enjoined. CVOW

construction has proceeded according to approved conditions and detailed plans undertaken with full transparency to BOEM and other relevant agencies.  All of CVOW's offshore wind turbine and substation foundations are already in place, construction of other offshore and onshore components is ongoing or complete.  There is a strict timeline for remaining CVOW construction activities, and any delay will affect the availability of specialized vessels, equipment, and labor. BOEM's order has compromised this construction timeline and is imposing extensive costs on DEV and on the electric service customers who will benefit from CVOW and whose investment in CVOW is now at risk.

8. BOEM issued concurrent suspension orders for four other wind projects, including Revolution Wind.  *See* https://www.doi.gov/pressreleases/trump-administration-protects-us-national-security-pausing-offshore-wind-leases (Press Release).  These other orders are not the subject of the action, but serve to highlight the arbitrariness of BOEM's Order to halt CVOW activities divorced from any CVOW-specific findings.  They also underscore that the Order for CVOW is the latest in a series of irrational agency actions attacking offshore wind and then doubling down when those actions are found unlawful.  For example, just three months before the Order, a court preliminarily enjoined a recent BOEM order to stop work on another offshore wind project, including on claimed national security grounds.  And just two business days before the Order, another court vacated BOEM's and other agencies' blanket ban on federal permitting for wind projects nationwide.  The current CVOW Order is likewise unlawful.

## JURISDICTION AND VENUE

9. This Court has subject-matter jurisdiction over this case because it arises under the Constitution and laws of the United States.  28 U.S.C. §§ 1331, 2201; 5 U.S.C. §§ 701-706; 43 U.S.C. § 1349.

10.     This Court is authorized to award the requested relief under 5 U.S.C. § 706; 28 U.S.C. §§ 1361, 2201, 2202; 43 U.S.C. § 1349; and the Court's inherent equitable powers.

11.     Venue is proper in this District.  Defendants are United States agencies or officers sued in their official capacities.  A substantial part of the events giving rise to this complaint occurred in this District, which is also "the judicial district of the State nearest the place the cause of action arose."  28 U.S.C. § 1391(e)(1); 43 U.S.C. § 1349(b)(1).  Within this District, this case is properly heard in the Norfolk Division, as CVOW's onshore components are under construction in the Norfolk Division, CVOW's wind turbine towers are now under construction in waters offshore of the Norfolk Division, and the components of those turbines and towers are located at the Portsmouth Marine Terminal in the Norfolk Division.

## PARTIES

12.     DEV, a wholly-owned subsidiary of Dominion Energy, Inc., is a regulated public utility that provides electricity to approximately 2.8 million residential, commercial, industrial, and governmental customers in Virginia and North Carolina.  DEV is headquartered in Richmond, Virginia.  DEV and other Dominion Energy, Inc. subsidiaries are among the country's largest producers and distributors of energy.  DEV is the holder of all required federal permits and approvals for and the approved operator of the CVOW project.

13.     OSW Project LLC is jointly owned by DEV and by Stonepeak Partners.  OSW Project LLC is the lessee of offshore commercial lease area OSC-A 0483.  BOEM approved the assignment of the lease by DEV (the original lessee) to OSW Project LLC on October 10, 2024.

14.     The Department of the Interior ("DOI") oversees BOEM.

15.     Douglas Burgum is the Secretary of the Interior.  He is sued in his official capacity.

16.    BOEM is authorized to grant leases and permits for renewable energy development on the Outer Continental Shelf under 42 U.S.C. § 1337 and 30 C.F.R. Part 585.

17.    Matthew Giacona is the Acting Director of BOEM. He is sued in his official capacity.

## BACKGROUND

### A.    Wind Is a Critical Component of the Nation's Energy Supply.

18.    Wind is America's largest source of renewable energy, providing more than 10 percent of the nation's electricity, and one of its largest sources of total energy. The wind industry as a whole directly and indirectly supports more than 300,000 U.S. jobs, including 20,000 wind manufacturing jobs at over 450 domestic facilities, and, in 2023 alone, the industry invested $10 billion in new projects.[1]

19.    As the United States Department of Energy has acknowledged, wind energy is a proven, widely supported, abundant, and inexhaustible clean energy resource. "Electricity generated by wind turbines does not pollute the water we drink or the air we breathe, so wind energy means less smog, less acid rain, and fewer greenhouse gas emissions."[2]

20.    Use of wind energy offsets emissions of pollutants including carbon dioxide, nitrogen oxides, and sulfur dioxide from other sources. The associated reduction in damage to human health and the climate provides a societal benefit with a traceable economic value.[3]

---

[1] American Clean Power, *Wind Power Facts*, https://cleanpower.org/facts/wind-power/.

[2] *See* U.S. Dep't of Energy, *Advantages and Challenges of Wind Energy*, http://energy.gov/eere/wind/advantages-and-challenges-wind-energy; WINDExchange, *Wind Energy Benefits*, U.S. Dep't of Energy, https://windexchange.energy.gov/files/docs/wind-energy-benefits.pptx.

[3] U.S. Dep't of Energy, Office of Energy Efficiency, *Offshore Wind Energy Strategies* 13 (Jan. 2022).

21.     Wind energy delivers an estimated $2 billion in state and local tax payments and land lease payments each year, creates a diverse and secure power grid, and provides one of the lowest-priced energy sources available today.[4]

22.     Offshore wind, in particular, provides the United States with a generational opportunity to supply large amounts of affordable, reliable power while spurring investment and creating U.S. jobs.[5]

23.     Roughly eighty percent of Americans live within 200 miles of the coast.  Coastal electricity load centers have the highest energy demand and the highest wholesale electricity prices due to this demand.  Offshore wind can meet this demand by generating significant amounts of electricity close to consumers.[6]

24.     Generation capacity of offshore wind is exceptional.  Across over 40 leases there are now 73,000 MW of capacity of offshore wind generation under development, enough to power the equivalent of 30 million homes.  The Department of Energy has found that the United States can install a total of 86,000 MW of offshore projects by 2050.[7]

25.     Offshore wind, particularly along the Atlantic seaboard, is a highly reliable energy source.  The turbines are out at sea and hundreds of feet up in the air, where the wind is fast and almost constant.  This consistent power generation helps stabilize the grid by providing a

---

[4] U.S. Dep't of Energy, *supra* note 2; Angel McCoy et al., Nat'l Renewable Energy Laboratory, *Offshore Wind Market Report: 2024 Edition* 22 (Aug. 2024).

[5] American Clean Power, *Wind Power Facts, supra* note 1.

[6] American Clean Power, *Offshore Wind Power Facts,* https://cleanpower.org/facts/offshore-wind/.

[7] *Id.*

reliable source of energy, especially during peak demand periods.  Further, because this generation is located close to coastal population centers, there is less loss from transmission.[8]

26.    The economic investment in offshore wind is enormous.  By 2023, $17 billion had been invested in U.S. offshore wind.[9]  The offshore wind industry is projected to invest $65 billion in projects by 2030.[10]

27.    Offshore wind provides opportunities for working Americans.  The industry could create 56,000 new, well-paying jobs by 2030.  The industry taps into the skills of U.S. oil and gas workers with infrastructure experience, and will help revitalize port communities, such as in and around the Port of Virginia.[11]

**B.    Federal and State Law Support Development of Offshore Wind Energy.**

28.    Congress enacted OCSLA over 70 years ago on August 7, 1953.  OCSLA declares "the Outer Continental Shelf" (OCS) to be "a vital national resource reserve held by the Federal Government for the public," and directs the Secretary of Interior (Secretary) to make the OCS "available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs."  43 U.S.C. § 1332(3).

29.    The Energy Policy Act of 2005 amended OCSLA by adding subsection 8(p)(1)(C), which authorizes the Secretary to grant leases, easements, and rights of way on the OCS for activities that are not otherwise authorized by law and that produce or support

---

[8] U.S. Dep't of Energy, *supra* note 3, at 2.

[9] U.S. Dep't of Energy, Office of Energy Efficiency, *Offshore Wind Market Report: 2023 Edition* 8 (2023).

[10] American Clean Power, *supra* note 7.

[11] *Id.*

production, transportation, or transmission of energy from sources other than oil or gas, including renewable energy sources.  This provision permits BOEM to lease the OCS for offshore wind development.

30.    For over two decades, federal law has declared the policy of the United States as supporting renewable energy (including wind) research, development, demonstration, and deployment.  *See* Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594 (2005); Energy Independence and Security Act of 2007, Pub. L. No. 110-140, 121 Stat. 1492 (2007); Energy Improvement and Extension Act of 2008, enacted as part of the Emergency Economic Stabilization Act of 2008, Pub. L. No. 110-343, Div. B, 122 Stat. 3765, 3807 (2008); American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, 123 Stat. 115 (2009); Energy Act of 2020, enacted as part of the Consolidated Appropriations Act of 2021, Pub. L. No. 116-260, Div. Z, 134 Stat. 1182 (2020); Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat. 449 (2021), also known as the Bipartisan Infrastructure Law (BIL); and Inflation Reduction Act of 2022, Pub. L. No. 117-169, 136 Stat. 1818 (2022).

31.    Thirty-eight states, including Virginia, and the District of Columbia have renewable portfolio standards and goals requiring increased production of energy from renewable energy sources.  In turn, these measures impose corresponding renewable energy generation requirements on public utilities like DEV.  Virginia and many other states are relying on wind energy projects, and specifically offshore wind, to meet these renewable energy mandates and their residents' growing energy demands.

32.    In numerous court cases, including involving CVOW, the government has defended the sufficiency of BOEM's and NMFS's review and accuracy of their conclusions, successfully arguing that the relevant agencies fulfilled all statutory environmental review and

protection obligations.  *See, e.g.*, *Comm. for a Constructive Tomorrow v. U.S. Dep't of the Interior*, 2024 WL 2699895 (denying preliminary injunction or administrative stay against CVOW); *id.* at Dkt. No. 37 (government's summary judgment brief defending CVOW); *Seafreeze Shoreside, Inc. v. U.S. Dep't of Interior*, 123 F.4th 1 (1st Cir. 2024), *cert denied*, No. 24-971, 2025 WL 1287076 (U.S. May 5, 2025); *Nantucket Residents Against Turbines v. U.S. Bureau of Ocean Energy Mgmt.*, 100 F.4th 1, 8 (1st Cir. 2024), *cert. denied,* 145 S. Ct. 1050 (2025).

      **C.**    **The Coastal Virginia Offshore Wind Project.**

33.    In 2013, following a competitive bidding process, BOEM awarded DEV a wind energy lease for a 112,799-acre area located 27 miles off the coast of Virginia Beach.  The project is known as Coastal Virginia Offshore Wind, or CVOW.

34.    Prior to CVOW, DEV successfully permitted and constructed a two-turbine offshore wind pilot project on a nearby research lease.  The pilot project has continued to operate since 2020 and has not engendered national security concerns.

35.    CVOW will feature 176 14.7 MW wind turbines capable of generating approximately 2.6 gigawatts (GW) of renewable energy at full buildout.  Current peak demand for electricity in DEV's system is 24.68 gigawatts, so CVOW will supply over 10 percent of peak electricity demand.[12]  This energy production will result in 5 million tons of avoided carbon dioxide emissions annually, which is equivalent to taking 1 million cars off the road each year. The first delivery of electricity to customers is projected in early 2026.

36.    The President has issued an executive order that makes it a "priority to facilitate the rapid and efficient buildout" of "data centers and infrastructure that powers them."  Exec.

---

[12] https://www.dominionenergy.com/virginia/updates/powering-virginia.

Order No. 14318, *Accelerating Federal Permitting of Data Center Infrastructure*, 90 Fed. Reg. 35385 (July 28, 2025). CVOW will provide electricity to serve the world's largest concentration of data centers. The CVOW project is also necessary to ensure grid reliability, economic growth, and growing energy demand across Virginia and North Carolina. CVOW will also supply electricity for numerous federal government and military facilities within DEV's service area, such as the Pentagon, Naval Station Norfolk (the largest naval base in the world and headquarters and home port of the U.S. Navy's Fleet Forces Command), Naval Air Station Oceana, Joint Base Langley-Eustis, Naval Weapons Station Yorktown, Fort Belvoir, Naval Support Facility Dahlgren, Camp Peary, Harvey Point Defense Testing Activity, the George Bush Center for Intelligence (CIA headquarters), the National Reconnaissance Office, and Newport News Shipbuilding (a private facility that provides vessels to the Department of Defense and other agencies).[13]

37.     CVOW is critical to national energy security objectives, and specifically to Virginia's and DEV's ability to add the approximately 27 GW of new generation needed to meet an unprecedented 5.5% annual growth in electricity demand within the DEV service territory over the next 15 years, with electricity demand doubling by 2039.[14] This energy demand growth translates to approximately 1.8 GW of new capacity per year on average, driven largely by data center expansion, digitization of the economy, and economic growth. To meet this electricity demand growth, DEV will need to dramatically increase electricity generation, relying on a

---

[13] References here to the Department of Defense ("DoD") herein conform to the administrative record and encompass the "Department of War" ("DoW") referenced in BOEM's Order here.

[14] Virginia Electric and Power Company, 2024 Integrated Resource Plan, https://cdn-dominionenergy-prd-001.azureedge.net/-/media/content/about/our-company/irp/pdfs/2024-irp-w_o-appendices.pdf?rev=5b28b014e4814135bb2fcec470dcc92b.

broad all-of-the-above range of energy resources.  CVOW is the fastest and most economical way to deliver nearly 3 GW of energy to Virginia's grid.

38.    CVOW involves a total estimated investment of $11.2 billion.  The CVOW project has created approximately 2,000 direct and indirect U.S. jobs and generated approximately $2 billion in U.S. economic activity.  Each year during construction, it is estimated that CVOW will support the creation of approximately 900 direct and indirect Virginia jobs, generating $143 million in economic output, nearly $57 million in pay and benefits, almost $2 million in revenues for local government in the project area, and approximately $3 million in Virginia state tax revenues.

39.    Once operational, CVOW is expected to support up to 1,100 jobs continuously over the life of the project, annually generating almost $210 million in economic output, close to $83 million in pay and benefits, almost $6 million in revenues for local governments, and approximately $5 million in Virginia state tax revenues.  CVOW is also expected to generate $3 billion in customer fuel savings over its first ten years.

40.    CVOW has generated extensive demand for services from U.S.-flagged vessels because its construction and operation require a wide range of types of vessel services.  Four U.S.-flagged vessels have been constructed in the United States to service CVOW:  a wind turbine installation vessel (the Charybdis, the only such U.S.-flagged vessel), a service operations vessel, and two crew transfer vessels.  The CVOW project has hired approximately 74 other U.S.-flagged vessels to date.  As of August 28, 2025, approximately 32 vessels and 528 offshore personnel are actively engaged in CVOW construction.  The CVOW project has also generated extensive offshore employment; DEV has trained close to 5,900 personnel to operate offshore in the course of the CVOW project.

41.     CVOW stimulates the local economy around Hampton Roads, Virginia, driving the creation of a local offshore wind supply chain and support facilities.  For example, to support CVOW and the offshore wind industry, the Port of Virginia has redeveloped a 72-acre portion of its facilities at the Portsmouth Marine Terminal to serve a staging area and port for the construction of offshore wind projects.  In Norfolk, a private developer is developing a 111-acre site at Lambert's Point as a multipurpose marine terminal known as Fairwinds Landing, slated to be an intermodal maritime industrial facility.  Fairwinds Landing will include the Fairwinds Landing Monitoring Coordination Center, an offshore wind energy command center that CVOW will use as its operations and maintenance headquarters.  This development has economic benefits to restaurants, grocery stores, the hospitality industry, and many other small businesses. Thus, CVOW will likely result in hundreds of jobs in the Hampton Roads area.

42.     CVOW is a "covered project" under the FAST-41 statute.  This designation means that CVOW meets the sector type, size, cost, and complexity criteria to qualify as an important infrastructure project warranting interagency prioritization and coordination.  42 U.S.C. § 4370m-6.  Covered FAST-41 projects also receive additional protection against challenges seeking to suddenly stop their development, because the statute requires courts to consider additional factors prior to issuing any injunctive relief against the project.  42 U.S.C. § 4370m-6(b) (courts must consider "potential for significant negative effects on jobs resulting from an order or injunction" against the project and may "not presume that [they] are reparable").

43.     Onshore construction began on November 1, 2023.  Work to date includes direct pipe and duct bank installation and horizontal directional drill conduit installation under Lake Christine adjacent to the State Military Reservation located in the City of Virginia Beach, as well

as transition joint bay pre-construction work at the State Military Reservation cable landing location.  At the Harpers Switching Station (a new station where underground electrical cable transitions to overhead transmission lines), work to date includes site preparation and installation of switchgear and power conditioning equipment.  At the Fentress Substation (an expanded substation to support additional electricity), work to date includes expansion of the substation footprint and installation of transformers and switchgear.

44.      Onshore construction has advanced considerably.  All components at both electrical substation sites are under construction, including major electrical equipment and supporting civil infrastructure.  Horizontal directional drills and direct pipes have been completed, and 88 percent of duct bank for the underground route has been completed.  Installations of the overhead transmission structures, foundations, and conductor are complete.

45.      Commencement of installation of the monopile foundations for the wind turbine generators and offshore substation began in May 2024.  As of October 2025, all 176 monopiles have been installed.  After a monopile is installed, scour protection is applied to the base of the monopile and transition pieces are installed on top of the monopiles.  Then, fully assembled wind turbine generation towers are installed on the foundations, followed by other component parts. Installation of transition pieces is now in process, and wind turbines are expected to be installed on top of the transition pieces beginning in December 2025.  Two offshore substations were installed in March and November 2025, and the remaining substation is scheduled for installation in early 2026.

46.      The criticality of proceeding with installation as scheduled cannot be overstated. Delays in completing each stage of work as scheduled prevent successive construction phases from proceeding and ultimately jeopardize timely completion of the entire project.

47.     The fabrication of transition pieces and turbine components continues in support of the production, transportation, and installation timeline for the Project.  All 176 transition pieces have been fabricated and 108 have been installed to date.  Fabrication of wind turbine towers, blades, and nacelles is in process.  To date, the sections for 113 full towers have been completed, and 39 have been delivered to Portsmouth Marine Terminal.  Also to date, 121 nacelles are complete, and 141 blades have been fully cast.

48.     A Dominion Energy, Inc. subsidiary has commissioned the first US-flagged specialized vessel for wind turbine installation, the *Charybdis*, which has been constructed with domestic steel at a shipyard in Brownsville, Texas.  At the time of the Order, the *Charybdis* was on location at the site of the first wind turbine installation, fully loaded with four nacelles, four towers, and 12 blades, and preparing to begin work.  Commissioning work to prepare for delivery of first power is substantially delayed by the Order.

49.     Absent the Order, wind energy delivery to customers is anticipated to begin in early 2026.  CVOW construction should be completed by the end of 2026 under the existing construction schedule.

**D.      CVOW Is the Product of Extensive National Security and Other Reviews and Conditions.**

50.     In conjunction and consultation with myriad regulatory agencies and stakeholders, DEV has worked to ensure that the CVOW project meets all legal requirements and has established extensive safeguards to ensure that construction and operation of the project satisfy all applicable standards, including for the protection of national security.

51.     One of the key federal environmental laws involved is the National Environmental Policy Act ("NEPA").  NEPA is a procedural statute that requires federal agencies to consider the impacts of proposed major federal actions on the human environment

and involve the public in that review.  42 U.S.C. §§ 4321, *et seq*.  NEPA reviews are a common vehicle for considering national security issues among other impacts to the human environment.

52.     Prior to issuing the CVOW lease, BOEM in 2012 published an "Environmental Assessment" under NEPA that assessed the potential impact of and reasonable alternatives to commercial wind lease issuance, site characterization activities (geophysical, geotechnical, archaeological, and biological surveys) and site assessment activities (including the installation and operation of a meteorological tower and/or buoys) on the OCS offshore of Virginia and other mid-Atlantic states.  BOEM issued a finding of no significant impact.

53.     DEV submitted the CVOW site assessment plan ("SAP") to BOEM in 2016; BOEM approved the SAP in 2017.  As part of site assessment, DEV analyzed environmental conditions at the site and included "measures for avoiding, minimizing, reducing, eliminating, and monitoring environmental impacts" in the SAP as required by 30 C.F.R. § 585.610(a)(8).  These approved measures include vessel strike avoidance protocols for protected species, surveys of biological and archeological resources, and geophysical and geotechnical conditions of the site.

54.     DEV committed to the CVOW project in 2019.  DEV submitted its first COP to BOEM in 2020.  DEV submitted seven subsequent updates, with the final submission on September 8, 2023.

55.     The Virginia General Assembly passed supportive legislation through the Virginia Clean Economy Act ("VCEA") in 2020.  H.B. 1526, 2020 Gen. Assemb., Reg. Sess. (Va. 2020).  Among other general provisions, the VCEA requires DEV to meet incremental energy efficiency goals, reach 100 percent renewable electricity by 2045, and provide 2,700

megawatts of energy storage capacity by 2035. If DEV falls short of these targets, the VCEA mandates deficiency payments.

56.    DEV began major contract execution for CVOW in 2021.

57.    BOEM issued a Notice of Intent to prepare an Environmental Impact Statement ("EIS") under NEPA for the CVOW COP on July 2, 2021.

58.    BOEM issued a draft EIS on December 16, 2022.

59.    BOEM issued its final EIS ("FEIS") on September 29, 2023, and its NEPA Record of Decision on October 30, 2023. The FEIS analyzes a wide range of potential impacts. These include effects on national security, navigation, air quality, bats, benthic resources, birds, coastal habitat and fauna, finfish and essential fish habitat, marine mammals, sea turtles, fisheries, scenic and visual resources, water quality, wetlands, and cultural resources.

60.    Prior to issuing the FEIS, BOEM consulted with various federal, state, and local agencies as provided by federal law. As required by the Coastal Zone Management Act, BOEM consulted with both the Virginia Department of Environmental Quality and the North Carolina Division of Coastal Management to ensure that the CVOW project is consistent with those states' federally approved coastal zone management programs. FEIS, App. A.2.2.1.[15] BOEM consulted with both NMFS and FWS under Section 7(a)(2) of the ESA regarding impact to protected species. *Id.* at A.2.2.2. BOEM further consulted with NMFS under the Magnuson-Stevens Fishery Conservation and Management Act to protect essential fish habitat, and the Marine Mammal Protection Act regarding marine mammal health and safety. *Id.* at A.2.2.5 &

---

[15] Coastal Virginia Offshore Wind Commercial Project, Final Environmental Impact Statement, Appendix A. Required Environmental Permits and Consultations, https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/CVOW-C_FEIS_App_A_Required_Permits.pdf.

A.2.2.6.  BOEM also engaged with potentially impacted tribes to address potential effects on tribal interests.  *Id.* at A.2.2.3.  In accordance with the National Historic Preservation Act, BOEM consulted with Virginia and North Carolina State Historic Preservation Offices, the Federal Advisory Council on Historic Preservation, federally recognized tribes, and other entities listed in FEIS, App. A, Table A-3, to avoid or resolve adverse effects on potentially historic properties.  *Id.* at A.2.2.4.  The National Park Service and the U.S. Navy joined BOEM in preparing the FEIS as participating agencies, and NMFS, U.S. Army Corps of Engineers ("Corps"), Bureau of Safety and Environmental Enforcement ("BSEE"), U.S. Environmental Protection Agency ("EPA"), U.S. Coast Guard, USFWS, Department of Defense, and Virginia Department of Mines, Minerals and Energy all supported the FEIS as cooperating agencies.  *Id.* at A.2.3.2.

61.    DEV and BOEM also have consulted extensively with the Department of Defense, Navy, National Oceanic and Atmospheric Administration ("NOAA"), and other agencies to ensure the project will not adversely affect national security, as further addressed *infra*.  These efforts have involved numerous meetings, multiple workstreams, and mitigation agreements to address radar interference, operational impacts, construction protocols, and security concerns, including a mitigation payment for NORAD radar upgrades, curtailment protocols for Navy radar testing, communication plans with military commands, risk assessments for foreign investment, and collaboration on air and maritime operations, all while managing environmental and safety challenges such as subsea ordnance detection and ensuring compliance with federal regulations and stakeholder requirements.

62.    BOEM approved the COP on January 28, 2024.  The approved COP is accompanied by almost 100 pages of terms and conditions of operation and includes extensive safeguards to address various national security and other requirements.

63.    BOEM's conditions of COP approval for CVOW expressly incorporate the terms of other federal agency actions regarding CVOW  They also incorporate conditions to address national security, military, navigational, fisheries, and environmental effects, as discussed in Section E below.

64.    In addition, multiple other agencies have issued authorizations for CVOW under their respective authorities and after extensive environmental reviews.  For example, the Corps has issued a Clean Water Act Section 404 individual permit, Rivers and Harbors Act ("RHA") Section 10 permit, and RHA Section 14 permission.  EPA has also issued an OCS air permit.

65.    The location, construction, and operation of CVOW's electric facilities in Virginia also were reviewed and approved by the Virginia State Corporation Commission in 2022, following a comprehensive, months-long, public process.

**E.    CVOW's Suite of Measures to Avoid, Minimize, or Mitigate Potential Adverse Effects.**

66.    The FEIS analyzes national security and military considerations in detail, discussing risks of collisions, navigational complexity, and potential effects on radar systems, among other issues.  FEIS 3.17-20.[16]  BOEM imposed Conditions of COP Approval addressing these issues.  These conditions include requirements to develop mitigation agreements with DoD/NORAD and with the Department of the Navy, including communications protocols,

---

[16] Coastal Virginia Offshore Wind Commercial Project, Final Environmental Impact Statement, Appendix A. Required Environmental Permits and Consultations, https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/CVOW-C_FEIS_App_A_Required_Permits.pdf.

mitigation of impacts for the Naval Air Station Advanced Dynamic Aircraft Measurement System, and assessment of risk related to foreign investment and foreign material vendors. BOEM's Record of Decision approving the CVOW COP reviews BOEM's consultations with DoD "[a]t each stage of the regulatory process," describes the mitigation measures requested by DoD to address potential impacts, and states that BOEM considered other OCS uses, including national security and defense, and took actions "to ensure that the proposed offshore wind energy uses, if approved, would be carried out in a manner that provides for prevention of interference with these uses "[17]

67.     DEV has worked with DoD through the siting clearinghouse process established by 10 U.S.C. § 183a to ensure that CVOW construction and operation does not interfere with radar, training, or operational readiness.  DEV has worked to develop mitigation agreements and to address turbine placement, spacing, and radar.  No agency has called into question DEV's ongoing compliance with these commitments, and neither does BOEM's Order here.  DEV will also strengthen Oceana Naval Air Station by modernizing its aging electrical infrastructure. Through in-kind arrangements, Dominion is funding redundant circuits, upgraded substations, and replacing outdated 4.16kV systems with more reliable 34.5kV circuits. The replacement of "Circuit J," identified by the Navy as critical for radar reliability, will add redundancy and enhance the base's operational resiliency.

68.     The FEIS also analyzed effects on navigation and aviation, concluding that those effects would be "minor to moderate" and could include changes in navigation routes, delays in ports, and effects on communication and radar signals.  FEIS 3.16-25.  BOEM imposed

---

[17] BOEM Record of Decision, Appendix B, at 19-20, 22, https://www.boem.gov/renewable-energy/state-activities/cvow-c-record-decision.

conditions on its COP approval addressing these potential effects.  Those conditions require

lighting, marking, and signaling to ensure that aircraft and vessels can identify and avoid wind

towers.  They also require that CVOW establish procedures for remote braking and shutdown in

emergencies, and that the wind towers be constructed in a grid to facilitate navigation.  DEV has

incorporated these requirements into CVOW's construction and operational plans, in

coordination with the Coast Guard and adjusted turbine layouts and corridors to preserve

shipping lanes and fishing activity.  BOEM's Record of Decision reviews actions to address

effects on navigational and aviation uses of the OCS "to ensure that the offshore wind energy

activities, if approved, would be carried out in a manner that prevents interference with these

uses."[18]

69.    The CVOW structures will only occupy approximately 0.10% of the CVOW

leased area, and only 0.042 percent of the Atlantic OCS.

70.    DEV has implemented, and will continue deploying, extensive other

precautionary measures to protect the environment, and particularly marine life, during project

construction.  These measures are the result of years of interagency and DEV analysis, and

mirror or surpass federal agency conditions of approval in effect for other offshore wind energy

projects or other types of offshore activities.

71.    For example, DEV implements significant vessel strike avoidance measures.  All

vessels under contract with DEV employ specially trained lookouts while any vessel is in transit

to identify ESA-listed species, including the NARW.  All project vessels, regardless of size, must

maintain designated separation distances from NARW and other species, and must operate

---

[18] BOEM Record of Decision, Appendix B, at 22-25, https://www.boem.gov/renewable-energy/state-activities/cvow-c-record-decision.

within the transit corridor between the lease area and the project port facilities at speeds of 10 knots or less.

72.      These safeguards have been applied during CVOW construction in 2024 and 2025.  DEV has complied with the requirements contained in the COP and reported to federal agencies on operations, detections, and mitigation measures.  The required safeguards are effective, and DEV will continue to comply with them during future operations.

73.      The government has recognized these extensive protections incorporated by CVOW and rejected claims of significant or unanalyzed harms.  The United States District Court for the District of Columbia has likewise rejected such claims in currently pending litigation challenging the approval of the CVOW project.

**F.      Recent Administration Actions Targeting the Wind Industry**.

74.      The BOEM Order to CVOW and other offshore wind projects is the latest escalation of federal agency actions targeting renewable energy, and specifically offshore wind.

75.      On the new Administration's first day in office, a Presidential Memorandum restricted new OCS leasing for wind energy and imposed restrictions on wind energy federal permitting offshore and onshore.  Presidential Memorandum, *Temporary Withdrawal of All Areas on the Outer Continental Shelf From Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects,* 90 Fed. Reg. 5313 (Jan. 29, 2025).

76.      Section 1 of the Presidential Memorandum withdraws unleased areas of the Outer Continental Shelf from disposition for wind energy leasing until the Presidential Memorandum is revoked.  Section 1 states, however, that "nothing in this withdrawal affects rights under existing leases in the withdrawn areas," and directs that "the Secretary of the Interior, in consultation with

the Attorney General, as needed, shall conduct a comprehensive review of the ecological, economic, and environmental necessity of terminating any existing wind energy leases, identifying any legal bases for such removal, and submit a report with recommendations to the President."

77.    Section 2 of the Presidential Memorandum directs federal agencies not to issue "new or renewed approvals, rights of way, permits, leases, or loans for onshore or offshore wind projects pending the completion of a comprehensive assessment and review of Federal wind leasing and permitting practices."  However, like Section 1, it does not purport to halt already authorized projects like CVOW.  On December 18, 2025, a court ordered vacatur of BOEM's and other agencies' implementation of the wind permitting ban pursuant to Section 2 of the Presidential Memorandum.

78.    The Presidential Memorandum provides no explanation of its vaguely stated "alleged legal deficiencies," "grave harm" including to "national security interests" that "may" occur, or "potential inadequacies in various environmental reviews" regarding the Federal Government's leasing and permitting of onshore and offshore wind projects.  Nor, despite the passage of several months, has there been any meaningful public information about the studies identified in the memorandum.

79.    Contrary to its unique restriction of wind energy, the current Administration has adopted policies that seek to expedite energy production.  One executive order issued on the same day as the Presidential Memorandum declares a national energy "emergency" and directs agencies to use emergency authorities to facilitate energy production, but arbitrarily excludes wind energy from its provisions.  Exec. Order No. 14156, *Declaring a National Energy Emergency,* Section 8(a), 90 Fed. Reg. 8433, 8436 (Jan. 29, 2025) ("The term 'energy' or

'energy resources' means crude oil, natural gas, lease condensates, natural gas liquids, refined petroleum products, uranium, coal, biofuels, geothermal heat, the kinetic movement of flowing water, and critical minerals ….").  That executive order specifically directs in Sections 4 and 5 that agencies use emergency procedures to expedite covered Corps actions and ESA decisions. Another same-day executive order directs agencies to revise regulations and permitting processes to facilitate energy production, again arbitrarily excluding wind energy.  Exec. Order No. 14154, *Unleashing American Energy,* Section 3, 90 Fed. Reg. 8353, 8354 (Jan. 29, 2025) ("with particular attention to oil, natural gas, coal, hydropower, biofuels, critical mineral, and nuclear energy resources").

80.    Agencies in turn have implemented this disparate treatment of wind projects.  For example, BOEM's website still contains the following statement: "The Department of the Interior and BOEM are implementing President Trump's memorandum temporarily halting offshore wind leasing on the Outer Continental Shelf.  The memorandum also pauses new or renewed approvals, rights of way, permits, leases or loans for offshore wind projects pending a review of federal wind leasing and permitting practices."[19]  Meanwhile, DOI has broadly endorsed and is aggressively pursuing multiple other sources of energy production, including expansion of oil and gas development offshore.  While indefinitely impairing offshore wind, DOI is expediting other energy projects, with no explanation for the differential treatment and despite overlapping potentially affected resources.

81.    The Administration has since escalated its attacks on offshore wind to include projects that are already fully permitted and under construction.  On April 16, 2025, the

---

[19] BOEM, *Lease and Grant Information,* https://www.boem.gov/renewable-energy/lease-and-grant-information.

Secretary of the Interior issued a one-page "Memorandum" directing BOEM to order the immediate and indefinite cessation of all construction activities for the Empire Wind project offshore New York.  That same day, the BOEM Acting Director issued a one-page stop-work order for that project, calling it an "outgrowth" of the Presidential Memorandum on wind.  Neither document cited any authority nor identified any analytical shortcoming to justify this immediate stoppage.  A month later, after imposing millions of dollars in delay costs, BOEM just as summarily issued an order enabling construction to continue, with no explanation or substantiation of the previously identified concerns.

82.     On August 22, 2025, BOEM issued a stop-work order to the Revolution Wind project, which is offshore of Rhode Island.  That order likewise cites to the Presidential Memorandum, and requires an immediate and indefinite halt to construction of that project, which was scheduled to be completed in the coming year.  The order identified no analytical shortcoming in BOEM's previous approval of that project to justify this immediate stoppage.  On September 22, 2025, a federal district preliminarily enjoined BOEM's stop-work order, and the government did not appeal.

83.     The government also has moved for judicial remand or vacatur of BOEM's COP approvals in existing cases regarding four offshore wind projects.

84.     The Administration has adopted numerous other policies targeting wind energy (and in many instances also solar energy).  For example, DOI has issued a memorandum requiring "all Department-related decisions and actions concerning wind and solar energy facilities" to "undergo elevated review by the Office of the Secretary"; directed a review of existing policies within the Department to identify alleged "preferential treatment" of wind and

solar energy; rescinded its designation of all offshore Wind Energy Areas for leasing; and taken other steps directed at impairing wind energy projects at all phases of development.

85.     On August 20, 2025, the President stated on Truth Social, "We will not approve wind or farmer destroying Solar."[20]  The President has made multiple similar statements, including "[w]e're not going to approve windmills unless something happens that's an emergency" and "We're not going to let windmills get built because we're not going to destroy our country any further than it's already been destroyed."[21]  At a Cabinet meeting on August 26, 2025, the President declared: "We don't allow windmills. We're not allowing any windmills to go up, I mean, unless there's a legal situation where somebody committed to it a long time ago."[22]

### G.    BOEM's CVOW Suspension Order.

86.     BOEM and Interior afforded DEV no advance warning or due process regarding the Order for CVOW.

87.     The Order alleges no CVOW violation or deficiency.

88.     The Order points to unnamed "national security threats" based on a November 2025 "additional assessment regarding the national security implications of offshore wind projects" by DoD, "including the rapid evolution of relevant adversary technologies and the resulting direct impacts to national security from offshore wind projects" generally.

89.     The Order deems this information "new" and "classified" without any justification or detail.  Moreover, as BOEM and DoD should know, certain DEV officials have

---

[20] https://www.cnbc.com/2025/08/20/trump-says-us-will-not-approve-solar-or-wind-power-projects.html.

[21] https://thehill.com/policy/energy-environment/5347794-trump-opposes-wind-energy/.

[22] https://subscriber.politicopro.com/article/eenews/2025/08/27/trump-cabinet-officials-keep-up-criticism-of-offshore-wind-ee-00526999.

security clearances to receive and review classified information, yet never were afforded such an opportunity prior to issuance of the Order.

90.    An accompanying press release by the Department of the Interior highlights purported "radar interference" from offshore wind projects that has been "long found."

91.    An accompanying social media post by the Secretary of the Interior criticizes offshore wind on grounds other than national security.

92.    The Order summarily concludes that CVOW's purported harms "can only be feasibly averted by suspension of on-lease activities."

93.    Interior regulations provide that an administrative appeal is not required because the Order was issued with immediate effect.  43 C.F.R. § 4.21(a).

**H.    The Stop-Work Order Is Causing Immediate, Irreparable Harm.**

94.    BOEM's stop-work order immediately began to cause DEV irreparable harm. This harm will increase dramatically if the stop-work order remains in effect.

95.    CVOW construction, including wind turbine installation, that BOEM has now stopped is a 365-day-a-year operation, day and night, including holidays.

96.    DEV is suffering more than $5 million per day in losses solely for costs relating to vessel services associated with the Order.  DEV is also incurring losses related to additional storage costs for the significant amount of equipment, idle workforce, contractual penalties, and additional costs.

97.    Any further delay to CVOW will result in far greater harm to the project. Specialized transportation and installation vessels are required to perform activities at the Lease. Due to their scarcity, the vessels must be booked years in advance.

98.     If any of these planned activities are delayed, it will almost certainly result in the delay of CVOW's completion by 2026.  If DEV cannot complete this work, construction phases dependent on these projects cannot occur.  This would include installation of the remaining offshore wind turbine generators, substations, inter-array cables, and other infrastructure, and would increase the total timeframe during which project construction vessels may be present within the project area.  The result would be a substantially higher total CVOW construction cost, borne by DEV customers not only through rates but also the non-delivery of renewable energy to the grid.

99.     There would be compounding harms to DEV with additional storage and maintenance costs and administrative burdens associated with the components that cannot be installed as scheduled.  DEV would also incur costs for demobilizing deployed vessels and crews and then later remobilizing them at a different, undetermined date.  DEV may not be able to reengage with certain specialized vessels at all due to their scarcity and high demand.  These costs will be borne either by DEV customers or by DEV itself.

100.     Given possible contingencies affecting the construction schedule, it is not possible to quantify precisely the amount of delay that will compromise that schedule.  However, that period is measured in days, not in months, and  could cause DEV to incur hundreds of millions of dollars in additional construction costs.

101.     A delay of CVOW impacts American jobs.  CVOW supports the creation of approximately 2000 American jobs, generating over $143 million in economic output, nearly $57 million in pay and benefits, almost $2 million in revenues for local government, and approximately $3 million in Virginia state tax revenues.

102.     $8.9 billion has been spent to date on CVOW, and CVOW expenditures are expected to be approximately $2.3 billion.  BOEM's actions threaten DEV and its customers' significant investment.

103.     The impact from total cancellation of CVOW would be profound, eliminating 9.5 million MW hours of energy per year in electricity generation, enough to power approximately 660,000 homes, during a declared energy emergency.

104.     CVOW is critical to Virginia's legislative clean energy directive and DEV's commitment to achieving net-zero emissions.  The VCEA requires the transition of Virginia's electric grid to 100 percent non-carbon producing energy generation by 2045.  Va. Code § 56-585.5.  The VCEA also states that the construction of Virginia offshore wind facilities is in the public interest.  Va. Code § 56-585.1:11 (C)(1).

105.     The interruption in construction of the CVOW project due to BOEM's stop-work order will cause additional non-monetary harms to DEV and its customers, including harms associated with delay in realizing $3 billion in fuel savings for customers during the first ten years of CVOW's operation, and with potential impairment to DEV's ability to meet the requirements of the VCEA.  The nature and extent of these harms will depend on whether the delay continues to the point at which it compromises the overall construction schedule.

106.     Under the VCEA, DEV, and in turn its customers, could be forced to make deficiency payments or purchase a substantial amount of renewable energy credits each year CVOW is delayed, as the project is key in meeting the VCEA's renewable portfolio standards. Va Code.§ 56-585.5(C).

## CLAIMS FOR RELIEF

### COUNT I
### Administrative Procedure Act
### (BOEM Order Is Inconsistent with OCSLA, BOEM's Regulations, Lease Terms, and COP Approval Terms)
### 5 U.S.C. §§ 706(2)(A), (C), (D)

107.    Plaintiffs repeat and re-allege the allegations in paragraphs 1-108 as if set forth fully herein.

108.    Under the APA, a "reviewing court shall … hold unlawful and set aside agency action … found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C), or "without observance of procedure required by law," *id.* § 706(2)(D).

109.    BOEM's Order to DEV constitutes final agency action.

110.    BOEM's Order is inconsistent with BOEM's own regulations, and with the terms of the lease and COP approval that BOEM issued to DEV for the CVOW project.

111.    OCSLA states that it is "the policy of the United States" that the OCS "should be made available for *expeditious and orderly development*, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs." 43 U.S.C. § 1332(3) (emphasis added).

112.    BOEM's regulations, and the leases and COP approvals BOEM issues pursuant to those regulations, are designed to support responsible and orderly development of the OCS. They provide BOEM with authority to supervise such development, while also providing those who hold leases and permits to develop the OCS with critical protections against arbitrary action

by limiting BOEM's discretion to take actions impairing issued leases and permits in the absence of noncompliance.

113.    The sole legal authority cited in BOEM's Order, 30 C.F.R. § 585.417, does not grant BOEM freewheeling authority to direct DEV to cease operations under CVOW's approved COP and lease or to direct a suspension of the CVOW lease itself by simply invoking "national security."

114.    BOEM has issued a lease to DEV for the CVOW project, and approved the assignment of that lease to OSW Project LLC.  That lease authorizes the lessee to "conduct activities in the area identified by Addendum A of this lease ("leased area") that are described in [a] SAP or COP that has been approved by [BOEM]."  The lease specifically defines the triggers and scope of any further BOEM action, stating that "if the Lessee fails to comply with (1) any of the approved provisions of the Act or regulations, (2) the approved SAP or COP, or (3) the terms of this lease, including associated Addenda, the Lessor may exercise any of the remedies that are provided under the Act and applicable regulations."  The CVOW lease also specifically limits national security grounds for a lease suspension.

115.    BOEM has approved a COP authorizing CVOW's construction and operation. The COP conditions of approval issued by BOEM state that, "as indicated in the COP … the Lessee may construct and install on the Outer Continental Shelf (OCS) up to 176 Wind Turbine Generators (WTG), up to 3 offshore substations (OSSs), inter-array cables linking the individual WTGs to the OSS, and up to 9 offshore export cables within an export cable corridor of up to 42.5 nautical miles (nmi) in length on the OCS."  Appendix B to the Record of Decision approving the CVOW COP is a 32-page memorandum that reviews consistency of the COP and its conditions of approval with each of the criteria in U.S.C. § 1337(p)(4) and concludes that

"BOEM has determined that the Project will comply with the Bureau's regulations and that the proposed activities will be carried out in a manner that provides for safety, protection of the environment, prevention of waste, and the other factors listed in subsection 8(p)(4) of OCSLA." Record of Decision, Appendix B at 1-2.

116.    The CVOW COP conditions of approval also define and limit the actions that BOEM can take: "BOEM and/or BSEE, as applicable, may issue a notice of noncompliance, pursuant to 30 Code of Federal Regulations (C.F.R.) § 585.106(b) and 30 C.F.R. § 285.400(b), if it is determined that the Lessee failed to comply with any provision of its approved COP, the Lease, the Outer Continental Shelf Lands Act, or OCSLA's implementing regulations. BOEM and/or BSEE may also take additional actions pursuant to 30 C.F.R. § 585.106 and 30 C.F.R. § 285.400, where appropriate."

117.    BOEM has not invoked its remedies provided in the COP conditions of approval. Neither BOEM nor BSEE has issued a notice of noncompliance pursuant to 30 C.F.R. § 585.106(b) or 30 C.F.R. § 285.400(b) asserting a violation of any provision of the COP, the lease, OCSLA, or OCSLA's implementing regulations.

118.    BOEM's regulations provide that BOEM may issue a notice of noncompliance if BOEM determines that "there has been a violation of the regulations in this part, any order of the Director, or any provision of your lease, grant, or other approval issued under this part." 30 C.F.R. § 585.106(b).  BOEM has not issued any such notice of noncompliance, and DEV has complied with applicable legal requirements.

119.    BOEM's regulations consistently restrict BOEM's actions with respect to approved leases, demonstrating that BOEM's regulations authorize interruptions in implementation of an approved project under only very limited circumstances.  BOEM's own

regulations recognize that only BSEE (not BOEM) has authority to issue a cessation order to a lessee. 30 C.F.R. 585.106(d) (referring to "issuance of a cessation order *by BSEE*" as a remedy for failure to comply with a notice of noncompliance issued by BOEM) (emphasis added).

120.    OCSLA and the CVOW lease also limit BOEM's regulatory authority under 30 C.F.R. § 585.417 to suspend a lease on national security or defense grounds.

121.    OCSLA's "national security clause" requires that all leases contain a provision authorizing the Secretary of the Interior to "suspend operations under any lease," but only "upon recommendation of the Secretary of Defense, during a state of war or national emergency declared by Congress or the President of the United States." 43 U.S.C. § 1341(c).

122.    The CVOW lease contains a corresponding provision in Section 3(c), which adopts 43 U.S.C. § 1341(c). Further, Addendum C to the CVOW lease addresses temporary suspensions of operations "in the interest of national security," but such suspensions must be "pursuant to Section 3(c) of this lease." That lease Addendum further provides that any such suspension "for national security reasons will not generally exceed 72 hours." It further provides: "Every effort will be made by the appropriate military agency to provide as much advance notice as possible of the need to suspend operations and/or evacuate. Advance notice will normally be given before requiring a suspension or evacuation." Those requirements have not been satisfied. The lease expressly provides that its provisions govern over conflicting statutory or regulatory provisions.

123.    OCSLA's only other provision authorizing suspension of operations under a lease, 43 U.S.C. § 1334(a)(1), authorizes suspensions to address risks to life, property, mineral deposits, or the environment, but does not authorize suspension of operations on national security grounds. Section 8 of the CVOW lease further provides: "Any cancellation or

suspension ordered by the Lessor that is predicated on a threat of serious irreparable, or immediate harm or damage, or on an imminent threat of serious or irreparable harm or damage, requires a finding by the Lessor of particularized harm that it determines can only be feasibly averted by suspension of on-lease activities or cancellation of the lease." Defendants have not invoked 43 U.S.C. § 1334, nor have they identified and substantiated such a risk.

124.    The foregoing statutory provisions, regulations, lease terms, and COP approval conditions define the narrow circumstances under which BOEM can issue a stop-work order or suspend a lease. The Director of BOEM does not have generalized authority to order a work stoppage at whim. BOEM has not cited an applicable trigger to interrupt CVOW construction, and so the Order issued to DEV was issued in contravention of applicable law.

125.    The Order is inconsistent with OCSLA, the CVOW lease, BOEM's regulations, and the detailed requirements of the COP, and vitiates the orderly mechanisms set forth in the COP, BOEM's conditions of approval, and BOEM's own regulations for implementation and oversight of approved OCS projects.

126.    The COP and the associated conditions of approval provide extensive safeguards to address potential risks associated with construction of the CVOW project. The COP is available on BOEM's public website; it is many hundreds of pages long, and also includes thirty-two appendices, so that the length of the entire document is in the thousands of pages.[23] BOEM's conditions of COP approval are almost a hundred pages long.[24] Yet BOEM has not identified any specific concern or incident of noncompliance for CVOW.

---

[23] https://www.boem.gov/renewable-energy/state-activities/cvow-construction-and-operations-plan.
[24] https://www.boem.gov/renewable-energy/state-activities/cvow-c-conditions-cop-approval-ocs-0483.

127.    In undertaking the CVOW project, DEV acted in reliance on BOEM's approval of the COP, which is the product of extensive analysis by BOEM.  BOEM's regulations set forth a comprehensive scheme governing both approval of a COP and any COP revisions.  *See* 30 C.F.R. Part 585 subpart G.  Revisions to a COP are triggered only in narrow circumstances, including "based on the significance of any changes in available information" and for material changes in the proposed activities.  30 C.F.R. §§ 585.634(b), (c).  BOEM has not invoked these provisions of its regulations or identified any material changes to CVOW or its effects as approved.

128.    APA Section 558 confirms this reading of BOEM's regulations, providing that the "suspension" of a "license" is "lawful" only if preceded by "notice" and an "opportunity to demonstrate or achieve compliance with all lawful requirements."  5 U.S.C. § 558(c).  The APA defines the term "license" broadly to include a "permit, certificate, approval . . . or other form of permission."  5 U.S.C. § 551(8).  APA section 558 includes an exception for "willfullness" or "public health, interest or safety," but BOEM has not provided any determination that would support invocation of those exceptions, nor does BOEM possess such authority in any event.

129.    Like all agencies, BOEM is bound by its own regulations.  By issuing an Order to DEV that ignores the criteria and procedures present in its regulations, BOEM not only acted contrary to law, but also attempted to implement an unlawful amendment of its regulations without observing the notice and comment process required by law.

130.    BOEM's Order to DEV therefore is "not in accordance with law," 5 U.S.C. § 706(2)(A), "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C), and "without observance of procedure required by law," *id.* § 706(2)(D).

Accordingly, it violates the APA as well as the statutory and regulatory provisions cited above and cannot stand.

## COUNT II
### Administrative Procedure Act
### (Stop-Work Order Is Arbitrary and Capricious and Contrary to Law)
### 5 U.S.C. § 706(2)(A)

131.    Plaintiffs repeat and re-allege the allegations in paragraphs 1-132 as if set forth fully herein.

132.    Under the APA, a "reviewing court shall … hold unlawful and set aside agency action … found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  Judicial review is based on applicable law and the underlying administrative record. *Id*. § 706.

133.    When a federal agency shifts its policy or reverses prior decisions, it must provide a reasoned and supported explanation for the change, or the action will be deemed arbitrary and capricious.  This is particularly true when its prior policy has engendered serious reliance interests or where its new policy rests upon factual findings that contradict those which underlay its prior policy.

134.    Moreover, when an agency has not stated any reasons to support a decision, its decision is inherently arbitrary and capricious.  The agency must be able to provide the essential facts upon which the administrative decision was based and explain what justifies the determination with actual evidence beyond conclusory statements.

135.    BOEM's Order comprises a single page, identifies no specific concerns, and provides no supporting documentation.

136.    The Order radically departing from prior agency decisions and policy without offering a reasoned explanation is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

137.    There is no rational connection between the Order and the relevant facts regarding CVOW.  CVOW's potential effects, including on national security, have been thoroughly studied and been largely avoided or resolved.  Defendants have proffered no changed evidence to justify interruption of CVOW construction, and none exists.

138.    BOEM's generalized assertions in the Order arbitrarily ignore relative risks of other forms of energy, including offshore, that the current Administration continues to authorize and seeks to substantially expedite without further study, despite that offshore wind in fact poses no greater national security or other risks than other energy sources, and that it offers unique benefits.

139.     BOEM's Order relies on unsubstantiated allegations against CVOW and other wind projects, despite courts' consistent rejection of such claims.

140.    BOEM and other federal agencies have not only excluded CVOW and wind energy from BOEM's simultaneously adopted policies to expedite multiple forms of energy production, but also have singled out wind energy for adverse treatment.  BOEM has no rational basis to single out the American businesses and workers involved in the wind industry for differential treatment, which is causing and will cause severe economic burdens.

141.    In disturbing its approval of CVOW, BOEM fails to explain its departure from prior Congressionally-authorized policies prioritizing and expediting wind energy development, and from past agency analyses and studies concluding that development of offshore wind energy

does not cause significant environmental harms.  Such an abrupt about-face in agency policy requires substantial justification, and no such justification has been offered or exists.

142.    Moreover, BOEM fails to address the inconsistency between the CVOW Order and the current Administration's call to action on its declared national "energy emergency" due to a lack of energy generating capacity.  Indeed, the CVOW Order is precisely an "undue burden on the identification, development, or use of domestic energy resources" that Executive Order 14154 directs agencies to "suspend, revise, or rescind."  Such an inconsistency requires substantial justification, and no such justification exists.

143.    The Order refers generally to "national security."  But this rationale is not plausible.  BOEM studied national security considerations extensively in the course of the permitting process for CVOW.  BOEM sought public comment on those issues, and consulted with DoD and the Coast Guard, among other agencies, in the course of permitting the CVOW project and developing and approving the COP.  The COP conditions of approval imposed by BOEM contain extensive requirements to address national security, navigational and aviation safety, and other considerations.  The final environmental impact statement for the CVOW project also addresses these issues in detail.  DEV also has worked directly with DoD in planning construction and operation of CVOW, addressing questions and concerns, and has developed mitigation agreements with DoD.  BOEM's order provides no basis to believe that BOEM has received any new information undercutting these comprehensive analyses.  Nor does summarily deeming any "new" information as "classified" excuse BOEM from rationally supporting its Order.

144.    Agencies must take reliance interests into account in their decision-making.  DEV and its CVOW partners have acted in reliance on CVOW approvals and the longstanding federal

policies authorizing and encouraging development of wind energy. Based on Congress' and BOEM's prior actions, they have invested billions of dollars and entered into contractual agreements to construct CVOW and to supply wind energy. BOEM's Order will compromise and potentially destroy these investments and contractual agreements. BOEM's failure to consider reliance interests here is arbitrary and capricious.

145.    Agencies are required to consider costs and benefits in their decision-making. The current Administration has acknowledged the importance of addressing the "massive costs" and "restraint[s] on … economic growth and ability to build and innovate" associated with federal regulation. Exec. Order No. 14102, *Unleashing Prosperity through Deregulation,* 90 Fed. Reg. 9065 (Feb. 6, 2025). BOEM's Order imposes extensive costs on the public and on DEV, including compromising jobs and economic development in the area of the CVOW project, and interference with development of a critical, highly reliable energy source for DEV's customers, in exchange for likely nonexistent benefits of interruption. BOEM's failure to consider the costs and benefits of the Order in this context is arbitrary and capricious.

146.    The Order arbitrarily impairs existing investment-backed expectations. The current Administration has issued an executive order directing agencies to "de-prioritize" "enforcement actions" that "go beyond the powers vested in the Federal Government by the Constitution" and "direct the termination of all such enforcement proceedings that do not comply with the Constitution, laws, or administration policy." That executive order defines an "enforcement action" as "all attempts, civil or criminal, by any agency to deprive a private party of life, liberty or property, or in any way affect a private party's rights or obligations, regardless of the label the agency has historically placed on the action." Exec. Order No. 14219, *Ensuring Lawful Governance and Implementing the President's 'Department of Government Efficiency'*

*Deregulatory Initiative,* Sections 3, 6(d), 90 Fed. Reg. 10583, 10584, (Feb. 25, 2025).  BOEM must provide especially substantial justification for its action to justify impairing DEV's investment in CVOW.  BOEM cannot provide such justification.

147.    Agencies are required to consider alternatives in their decision-making.  BOEM did so in its FEIS and approval for CVOW, and no party has challenged otherwise.  By contrast, BOEM's Order is arbitrary and capricious because BOEM did not consider alternatives that might lessen the impact of the agency action on DEV and others affected by the Order.  Similarly, the Order is arbitrary and capricious because it fails to articulate why immediate implementation was necessary, despite the extensive and indisputable disruption caused by that decision.  Nor did BOEM await completion of the comprehensive reviews identified in the Presidential Memorandum on wind energy, but instead prejudged their outcome as inconsistent with CVOW, and despite previously reaching the opposite conclusion.

148.    Numerous statements and actions by the current Administration indicate that the Order instead is motivated by systematic and unfounded animus against wind energy.  The Administration's stated reasons and timing for the Order appear to be pretextual.  That animus, and the lack of any reasoned basis for the Order, renders the Order arbitrary and capricious.

149.    Because BOEM failed to acknowledge its departure from prior policy and decision-making, failed to provide a reasoned explanation for its new decision and policy, failed to consider important aspects of the problem, failed to consider reliance interests and costs and benefits in this context, and has put forward pretext rather than any reasoned basis, the CVOW Order is arbitrary and capricious and contrary to law in violation of the APA.

**COUNT III**
**OCSLA Citizen Suit**
**(Stop-Work Order Violates OCSLA)**
**43 U.S.C. § 1349**

150.    Plaintiffs repeat and re-allege the allegations in paragraphs 1-151 as if set forth fully herein.

151.    OCSLA's citizen suit provision provides that "any person having a valid legal interest which is or may be adversely affected may commence a civil action on his own behalf to compel compliance with this subchapter against any person, including the United States, and any other government instrumentality or agency (to the extent permitted by the Eleventh Amendment to the Constitution) for any alleged violation of any provision of this subchapter or any regulation promulgated under this subchapter, or of the terms of any permit or lease issued by the Secretary under this subchapter." 43 U.S.C. § 1349(a)(1). And "[a]n action may be brought under this subsection immediately after notification of the alleged violation in any case in which the alleged violation constitutes an imminent threat to the public health or safety or would immediately affect a legal interest of the plaintiff." *Id*. § 1349(a)(3).

152.    The CVOW Order violates OCSLA and its regulations by disregarding the comprehensive procedures governing the administration of the OCS permitting and leasing program. *Id.* § 1337; 30 C.F.R. Part 585. OCSLA confers no authority to BOEM to issue its Order without following the requirements of OCSLA and its implementing regulations.

153.    The CVOW Order immediately affects a legal interest of DEV. 43 U.S.C. § 1349(a)(3).

154.    Under OCSLA's citizen suit provision, Plaintiffs are entitled to the costs of this litigation, "including reasonable attorney and expert witness fees." *Id.* § 1349(a)(5).

## COUNT IV
### U.S. Constitution
### (Stop-Work Order Violates
### Article IV, Section 3, Clause 2; Amendment V)

155.    Plaintiffs repeat and re-allege the allegations in paragraphs 1-156 as if set forth fully herein.

156.    The CVOW stop-work order is inconsistent with constitutional requirements and should be invalidated for that reason.

157.    Under the APA, a "reviewing court shall … hold unlawful and set aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2)(A).  DEV also has a right of action and courts should enjoin and declare unlawful official actions that are *ultra vires* and exceed the executive branch's constitutional authority.

158.    The CVOW Order unlawfully deprives DEV of a property interest without due process.  U.S. Const. amend. V.  Those investing in development of wind facilities have a right to due process before being deprived of their property interests.  *Id*.  DEV holds a lease for the CVOW project, which conveys a property interest as to which DEV has procedural due process rights enforceable against the government.

159.    The Due Process Clause requires that DEV be given notice and an opportunity for a hearing before being deprived of this property interest.  This right is not limited to permanent deprivations, and also applies to temporary or partial impairments of property rights.  DEV was not provided either notice or an opportunity for a hearing before issuance of BOEM's stop-work order.

160.    The U.S. Constitution vests in Congress exclusive lawmaking authority.  U.S. Const., art. I, § 8.  BOEM may not, simply because of belated and manufactured policy objections, usurp the lawmaking powers of Congress, and take or refuse to take action in

violation of the laws enacted by Congress.  Pursuant to its authority under the Property Clause of the Constitution, Congress has established federal statutes governing permitting of all types of energy, including wind energy.  These statutes govern management of the OCS and do not grant the agencies the authority to interfere with applicable permits and authorizations without following procedures required by law.

161.    Under the Property Clause of the U.S. Constitution, Congress—and not the executive branch—has the "Power to dispose and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States."  U.S. Const., art. IV, § 3, cl. 2.

162.    The executive branch has authority to regulate federal property only to the limited extent that Congress has delegated such authority.

163.    Congress's limited delegation of authority is set forth in OCSLA and other statutes.  These statutes impose procedural and substantive requirements on orders issued to OCS lessees, and limit the circumstances in which BOEM can impede fully permitted projects.  The executive branch lacks constitutional authority to override legislation enacted by Congress and ignore processes imposed by this legislation.

164.    Accordingly, the Order cannot be reconciled with the Constitution.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

1.    Declare that Defendant BOEM failed to observe procedure required by law when issuing its Order to DEV, in violation of the APA;

2.      Declare that the Order is in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, and otherwise not in accordance with law, in violation of the APA and OCSLA;

3.      Declare that  Order is arbitrary and capricious, in violation of the APA;

4.      Declare that the Order violates the requirements of OCSLA;

5.      Declare that Defendant BOEM's stop-work order is *ultra vires* under applicable statutes and the U.S. Constitution, deprives DEV of property without due process, and violates the separation of powers;

6.      Issue "all necessary and appropriate process" to preserve DEV's status and rights pending conclusion of [this] review proceeding," 5 U.S.C. § 705;

7.      Vacate Defendant BOEM's stop-work order;

8.      Temporarily, preliminarily, and permanently enjoin, without bond, Defendants from maintaining or implementing the stop-work order to DEV or any similar action;

9.      Grant all other relief as the Court may deem just and proper, including, but not limited to, attorney's fees and costs.


Dated: December 23, 2025                    Respectfully submitted,

                                            */s/ Nessa Horewitch Coppinger*
                                            NESSA HOREWITCH COPPINGER,
                                            VA Bar No. 65566
                                            JAMES M. AUSLANDER, *pro hac vice pending*
                                            R. JUSTIN SMITH, *pro hac vice pending*
                                            HILARY T. JACOBS, *pro hac vice pending*
                                            JULIUS M. REDD*, pro hac vice pending*
                                            Beveridge & Diamond, P.C.
                                            1900 N Street, NW, Suite 100
                                            Washington, D.C. 20036
                                            Telephone: 202-789-6000
                                            Fax: 202-789-6190
                                            ncoppinger@bdlaw.com
                                            jauslander@bdlaw.com

jsmith@bdlaw.com
hjacobs@bdlaw.com
jredd@bdlaw.com

*Counsel for Virginia Electric and Power Company, d/b/a Dominion Energy Virginia, and OSW Project LLC*