# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### NORFOLK DIVISION

|  |  |
|---|---|
| VIRGINIA ELECTRIC AND POWER COMPANY, D/B/A DOMINION ENERGY VIRGINIA; OSW PROJECT LLC,<br>　　　　　Plaintiffs,<br>v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR; BUREAU OF OCEAN ENERGY MANAGEMENT; DOUGLAS BURGUM, Secretary of the Interior, in his official capacity; MATTHEW GIACONA, Acting Director, Bureau of Ocean Energy Management, in his official capacity,<br><br>　　　　　Defendants. | Case No. 2:25-cv-00830 |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF
## MOTION FOR TEMPORARY RESTRAINING ORDER

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

FACTUAL BACKGROUND ............................................................................................. 5

    A.   Wind Is a Critical Energy Source and Is Subject to Extensive Safeguards. .................. 5

    B.   The Coastal Virginia Offshore Wind Commercial Project. ............................................ 7

    C.   CVOW Is the Product of Extensive Legal Reviews. ...................................................... 8

    D.   BOEM Analyzed and Addressed CVOW's Compatibility with National
        Security and Other OCS Uses. ........................................................................................ 9

    E.   BOEM's Unlawful CVOW Suspension Order. ............................................................ 11

STANDARD OF REVIEW ............................................................................................. 13

ARGUMENT ................................................................................................................... 14

I.      BOEM'S ORDER IS CAUSING SUBSTANTIAL, IMMINENT,
        IRREPARABLE, AND ONGOING INJURY TO DEV. ........................................... 14

II.     DEV IS LIKELY TO PREVAIL ON THE MERITS. ............................................... 17

    A.   DEV Has Standing to Sue. ........................................................................................... 17

    B.   BOEM's Order Constitutes Final Agency Action. ....................................................... 17

    C.   BOEM's Order Is Inconsistent with OCSLA, BOEM's Own Regulations,
        the CVOW Lease, and the CVOW COP Approval. ..................................................... 18

    D.   BOEM's Order Is Arbitrary and Capricious. ............................................................... 24

    E.   BOEM's Order Is Barred by OCSLA. ......................................................................... 28

III.    THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST FAVOR
        PRELIMINARY INJUNCTIVE RELIEF. ............................................................... 29

CONCLUSION ................................................................................................................ 30

# TABLE OF AUTHORITIES

*Cases*

*Ala. Ass'n of Realtors v. Dep't of Health and Human Services,*
    594 U.S. 758 (2021)............................................................................................ 16

*Bennett v. Spear,*
    520 U.S. 154 (1997)............................................................................................ 17

*Casa de Maryland, Inc v. Wolf,*
    486 F. Supp. 3d 928 (D. Md. 2020) ................................................................... 14

*Chevron, U.S.A., Inc. v. FERC,*
    193 F. Supp. 2d 54 (D.D.C. 2002)...................................................................... 28

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
    401 U.S. 402 (1971)............................................................................................ 24

*Colo. Interstate Gas Co. v. FERC,*
    850 F.2d 769 (D.C. Cir. 1988)............................................................................ 24

*Comm. For Constructive Tomorrow (CFACT) v. U.S. Dep't of Interior,*
    2024 No. 24-cv-774; 2024 WL 2699895 (May 24, 2024)............................... 6, 7

*DHS  v. Regents of the Univ. of Cal.,*
    591 U.S. 1 (2020)................................................................................................ 26

*Di Biase v. SPX Corp.,*
    872 F.3d 224 (4th Cir. 2017) ............................................................................. 17

*E. Tenn. Natural Gas Co. v. Sage,*
    361 F.3d 808 (4th Cir. 2004) ............................................................................. 16

*Elec. Data Sys. Fed. Corp. v. General Services Admin.,*
    629 F. Supp. 350 (D.D.C. 1986)......................................................................... 13

*Encino Motorcars, LLC v. Navarro,*
    579 U.S. 211 (2016)................................................................................. 24, 25, 26

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009)...................................................................................... 24, 25

*Fort Stewart Schs. v. FLRA,*
    495 U.S. 641 (1990)............................................................................................ 23

*FTC v. Standard Oil Co. of Cal.*,
    449 U.S. 232 (1980)................................................................ 17

*Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers Local No. 70*,
    415 U.S. 423 (1974)................................................................ 13

*Grayscale Inv. LLC v. SEC*,
    82 F.4th 1239 (D.C. Cir. 2023)................................................ 24

*Hornbeck Offshore Servs., L.L.C. v. Salazar*,
    696 F. Supp. 2d 627 (E.D. La. 2010)................................. 27, 28

*Invenergy Renewables, Inc. v. United States*,
    422 F. Supp. 3d 1255 (Ct. Int'l. Trade 2019) ......................... 29

*Louisiana v. Biden*,
    622 F. Supp. 3d 267 (W.D. La. 2022).............................. 17, 18

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)................................................................ 17

*McDonnell Douglas Corp. v. U.S. Dep't of Air Force*,
    375 F.3d 1182 (D.C. Cir. 2004)................................................ 25

*Mexican Gulf Fishing Co. v. U.S. Dep't of Commerce*,
    60 F.4d 956 (5th Cir. 2023) ..................................................... 27

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983).......................................................... 24, 27

*Mountain Valley Pipeline LLC v. 6.56 Acres of Land*,
    915 F.3d 197 (4th Cir. 2019) ................................................... 16

*N.C. Growers' Ass'n, Inc. v. United Farm Workers*,
    702 F.3d 755 (4th Cir. 2012) ................................................... 24

*N.H. Indonesian Cmty. Support v. Trump*,
    No. 25-CV-38-JL-TSM, 2025 WL 457609 (D.N.H. Feb. 11, 2025) ............................... 30

*Nantucket Residents Against Turbines v. BOEM*,
    100 F.4th 1 (1st Cir. 2024).......................................................... 7

*Nat'l Council of Nonprofits v. OMB*,
    No. 25-239, 2025 WL 597959 (D.D.C. Feb 25, 2025)................................... 23

iv

*Nat'l Fed'n of Indep. Bus. v. U.S. Dep't of Labor*,
    595 U.S. 109 (2022)................................................................................................. 23

*Nat'l Institutes of Health v. Am. Pub. Health Ass'n, 606 U.S. ---*,
    No. 25A103, 2025 WL 2415669 (U.S. Aug. 21, 2025)................................. 17

*New York v. Trump*,
    769 F. Supp. 3d 119 (D.R.I. 2025)...................................................................... 25

*New York v. Trump*,
    2025 No. 25-cv-11221-PBS; 2025 WL 3514301 (D. Mass. Dec. 8, 2025) ........... 2, 23, 27

*Nken v Holder*,
    556 U.S. 418 (2009)................................................................................................. 29

*Ohio v. EPA*,
    603 U.S. 279 (2024)........................................................................................... 24, 25

*Pacito v. Trump*,
    768 F. Supp. 3d 1199 (W.D. Wash. 2025)...................................................... 25

*Sarsour v. Trump*,
    245 F. Supp. 3d 719 (E.D. Va. 2017) .............................................................. 13

*Seafreeze Shoreside, Inc. v. U.S. Dep't of Interior*,
    123 F.4th 1 (1st Cir. 2024)..................................................................................... 7

*Smiley v. Citibank*,
    517 U.S. 735 (1996)................................................................................................. 26

*Telvest, Inc. v. Bradshaw*,
    618 F.2d 1029 (4th Cir. 1980) .............................................................................. 30

*Thunder Basin Coal Co. v. Reich*,
    510 U.S. 200 (1994)................................................................................................. 17

*U.S. Dep't of Commerce v. New York*,
    588 U.S. 752 (2019)................................................................................................. 28

*United States v. Patton*,
    771 F.2d 1240 (9th Cir. 1985) .............................................................................. 23

*Winter v. Nat. Res. Def. Council*,
    555 U.S. 7 (2008).................................................................................................... 13

*Federal Statutes*

5 U.S.C. § 551(8) ................................................................................................ 23

5 U.S.C. § 558(c) ............................................................................................... 23

5 U.S.C. § 705 .................................................................................................... 14

5 U.S.C. § 706(2)(A) ............................................................................. 18, 23, 24

5 U.S.C. § 706(2)(C) .................................................................................. 18, 23

5 U.S.C. § 706(2)(D) ................................................................................. 18, 23

10 U.S.C. § 183a ............................................................................................ 3, 9

43 U.S.C. § 1332(1)(C) ...................................................................................... 6

43 U.S.C. § 1332(3) ..................................................................................... 6, 18

43 U.S.C. § 1334(a)(1) ...................................................................................... 22

43 U.S.C. § 1341(c) .......................................................................................... 22

43 U.S.C. § 1349(a)(1) ...................................................................................... 28

43 U.S.C. § 1349(a)(2) ...................................................................................... 28

43 U.S.C. § 1349(a)(3) ...................................................................................... 28

Energy Tax Act, Pub. L. No. 95-618, 92 Stat. 3174 (1978) ............................... 6

Energy Policy Act, Pub. L. No. 109-58, 119 Stat. 594 (2005) ........................... 6

Energy Independence and Security Act, Pub. L. No. 110-140, 121 Stat. 1492 (2007) ................. 6

Emergency Economic Stabilization Act, Pub. L. No. 110-343, 122 Stat. 3765 (2008) ................. 6

Energy Act, Pub. L. No. 116-260, div. Z, 134 Stat. 1182 (2020) ...................... 6

Inflation Reduction Act, Pub. L. No. 117-169, 136 Stat. 1818 (2022) ............... 6

Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat. 429 (2021) ...................... 6

*State Statutes*

Va. Code § 56-585.1:11(C)(1). ............................................................ 16, 30

Va. Code § 56-585.5 ............................................................................ 16, 30

Va. Code § 56-585.5C. ........................................................................ 16

*Federal Rules*

Fed. R. Civ. P. 65(b) ............................................................................ 13

Fed. R. Civ. P. 65(d) ............................................................................ 13

*Federal Regulations*

30 C.F.R. § 285.400 ............................................................................ 20

30 C.F.R. § 285.400(b) ........................................................................ 20

30 C.F.R. § 585.106 ............................................................................ 20

30 C.F.R. § 585.106(b) ........................................................................ 21

30 C.F.R. § 585.417(b) ........................................................................ 21

30 C.F.R. § 585.634(b) ........................................................................ 21

43 C.F.R. § 4.21(a) .............................................................................. 18

*Executive Orders and Presidential Memoranda*

Exec. Order No. 14102, *Unleashing Prosperity through Deregulation,* 90 Fed. Reg. 9065 (Feb. 6, 2025). ........................................................... 27

Exec. Order No. 14156, *Declaring a National Energy Emergency*, 90 Fed. Reg. 8433 (Jan. 20, 2025). ................................................................... 13, 30

Exec. Order No. 14154, *Unleashing American Energy*, Section, 90 Fed. Reg. 8353 (Jan. 20, 2025). ..................................................................... 13, 26

Exec. Order No. 14219, *Ensuring Lawful Governance and Implementing the President's 'Department of Government Efficiency' Deregulatory Initiative* 90 Fed. Reg. 10583 (Feb. 19, 2025) ........................................................ 26

Presidential Memorandum, 90 Fed. Reg. 5313 (Jan. 29, 2025). ................... 12

## INTRODUCTION

On December 22, 2025, the Acting Director of the Bureau of Ocean Energy Management (BOEM) suddenly and without warning issued a one-page Order directing Dominion Energy Virginia (DEV)[1] to immediately "suspend all ongoing activities related to the Coastal Virginia Offshore Wind - Commercial Project [CVOW] on the Outer Continental Shelf [OCS] for the next 90 days for reasons of national security," and stating that "BOEM may further extend the 90-day suspension period."  CVOW has been fully permitted and under construction on the OCS and onshore since early 2024, and is projected to begin delivering electricity to DEV customers in early 2026.  CVOW will be capable of supplying 9.5 million megawatt (MW) hours of energy per year, enough to power approximately 660,000 homes.  DEV in good faith has taken immediate action to comply with the Order, even though the Order lacks any legal or factual basis.  DEV intends to promptly move for a preliminary injunction.  DEV respectfully requests that this Court issue a temporary restraining order against enforcement of the Order to preserve the interim status quo until a preliminary injunction motion can be decided.  DEV has provided required notice of this motion to Defendants and their counsel.

Immediate relief is needed and warranted.  The Order sets forth no rational basis for BOEM's action, ignores BOEM's own lease terms and regulations, is procedurally deficient, is arbitrary and capricious, and violates the Outer Continental Shelf Lands Act (OCSLA).  The Order contains merely a couple of sentences that profess vague and unspecified "national security threats" and "potential" harm.  It identifies no CVOW violation or deficiency and is devoid of support.  Prior to the Order, no agency had conveyed to DEV—including any DEV

---

[1] DEV encompasses both Plaintiff Virginia Electric and Power Company (the recipient of the Order) and Plaintiff OSW Project LLC, which is jointly owned by DEV and by Stonepeak Partners and the assigned lessee of the CVOW lease area OSC-A 0483.

1

officials with security clearances to receive purportedly "classified" information—any radar or national security concern with ongoing CVOW construction.  The Order also points to no demonstrated radar or other security impacts in decades of experience with wind projects.

Rather, the Order appears pretextual, driven by the current Administration's repeatedly stated animus toward renewable energy, and specifically offshore wind.  And it doubles down on agencies' prior unlawful actions against wind projects.  The Order comes just two business days after a court vacated BOEM's (and other agencies') blanket ban on federal permitting for wind projects as arbitrary and capricious and contrary to law.  *New York v. Trump*,  No. 25-cv-11221-PBS, 2025 WL 3514301 (D. Mass. Dec. 8, 2025); *id.*, ECF No. 240 (Dec. 18, 2025) (judgment). The Order also repeats vague "national security" concerns BOEM invoked to suddenly order another offshore wind project to stop work, which a different federal district court recently enjoined as "the height of arbitrary and capricious action."  *Revolution Wind v. Burgum*, No. 25-cv-02999-RCL, at 41 (preliminary injunction hearing transcript) (Sept. 22, 2025).[2]  And the illegal Order is creating immediate, severe, and irreparable harm for DEV and its customers, including more than $5 million per day, and risking deprivation of benefits to Virginians from their billions of dollars of unrecoverable investment in CVOW's development over the last decade.  Indeed, the Order arrived the same day that the vessel carrying the first wind turbine generators for installation arrived at the CVOW lease area.  Hollett Affidavit (H.A.) ¶¶ 27, 35.

CVOW has received all necessary approvals for construction and operation and has successfully undergone multiple, multi-year legal reviews and permitting processes across multiple Administrations.  BOEM and multiple other agencies conducted extraordinarily

---

[2] BOEM issued concurrent suspension orders for four other wind projects, including Revolution Wind, which are not the subject of this action.  *See* https://www.doi.gov/pressreleases/trump-administration-protects-us-national-security-pausing-offshore-wind-leases (Press Release).

thorough national security and other reviews of CVOW and carefully considered potential adverse effects. As to national security, BOEM's CVOW Record of Decision (ROD) explains how "[w]hile reviewing the COP [Construction and Operations Plan], BOEM coordinated with DoD [Department of Defense] to develop measures necessary to safeguard against potential liabilities and impacts on DoD activities" via the Military Aviation and Installation Assurance Siting Clearinghouse (DoD Clearinghouse) established by 10 U.S.C. § 183a.[3] CVOW adheres to a mandatory and robust suite of measures protective of national security, the environment, and other reasonable OCS uses, which have been consistently endorsed by agencies and courts for offshore wind projects and exceed requirements for other uses of the OCS. These conditions exist in BOEM's regulations, the CVOW lease that BOEM issued to DEV, and the BOEM-approved CVOW COP and its associated terms and conditions specifically to address any potential national security concerns. *E.g.*, ROD at 20 ("To protect the national security interests of the United States, BOEM has included these measures as conditions of COP approval in Appendix A of the ROD."), Appendix A. But the Order summarily disregards all such measures.

DEV has invested approximately $8.9 billion to develop CVOW to date. H.A. ¶ 36. Certainty and predictability are of critical importance in conducting capital-intensive energy and infrastructure projects, as the current Administration has repeatedly recognized elsewhere. Congress' intent in enacting OCSLA was to encourage development of the OCS including for wind energy, and BOEM has adopted regulations that establish a predictable legal framework to facilitate the billions of dollars in capital investments needed for such development. These same authorities specify the narrow circumstances and requisite procedures for BOEM to controvert its

---

[3] BOEM CVOW Record of Decision, Appendix B, at 20, https://www.boem.gov/renewable-energy/state-activities/cvow-c-record-decision. References to DoD herein conform to the administrative record and encompass the "Department of War" (DoW) referenced in the Order.

prior approvals or suspend a lease, which BOEM disregarded here.

BOEM's arbitrary and illegal actions are fundamentally inconsistent with this legal framework and BOEM's carefully considered prior approvals. Our Nation is governed by laws, and a stable legal and regulatory environment is essential to allow regulated public utilities like DEV, as well as other businesses, contractors, suppliers, and workers, to invest and support our Nation's energy needs and associated jobs. Sudden and baseless suspension or withdrawal of regulatory approvals by government officials based on summarily averred national security concerns that already have been exhaustively studied cannot be reconciled with the predictability needed to support the exceptionally large capital investments required for large-scale energy development projects like CVOW, which are critical to domestic energy security.

The balance of equities and public interest also favor a temporary restraining order. BOEM has not identified any concrete risks that the Order is intended to address. That is because CVOW construction has proceeded according to approved conditions and detailed plans undertaken with full transparency to BOEM and other relevant agencies. Moreover, all of CVOW's offshore wind turbine and substation foundations are already in place, and construction of other offshore and onshore components is ongoing or complete. There is a strict timeline for remaining CVOW construction activities, and any delay will increase the cost of and jeopardize the availability of specialized vessels, equipment, and labor. Today, CVOW components and personnel are fully loaded on vessels and in port with nowhere to go. CVOW construction schedule delays in turn will impose extensive costs on DEV and its customers who will benefit from CVOW, and delay the availability of electricity from the CVOW project during President Trump's simultaneously declared national energy emergency warranting increased domestic energy projection. Indeed, Virginians are already paying for CVOW, and the Order arbitrarily

4

stopping the project means they may get nothing for their money.  H.A. ¶ 44.  A temporary restraining order therefore is necessary to preserve the status quo while this litigation proceeds.

## FACTUAL BACKGROUND

**A.    Wind Is a Critical Energy Source and Is Subject to Extensive Safeguards.**

Wind currently provides more than 10 percent of the nation's electricity, and the wind industry will make up a significant portion of the 1,000 terawatt hours of new electricity needed by 2035 to meet growing demand.  Existing demand served by DEV includes more than 30 DoD installations such as the Pentagon and Naval Station Norfolk (the world's largest naval base) and roughly 820MW of all federal load.  H.A. ¶ 6.  The wind industry directly and indirectly supports more than 300,000 U.S. jobs, including 20,000 wind manufacturing jobs at over 450 facilities. In 2023 alone, the U.S. wind industry invested $10 billion in new projects, and it delivers an estimated annual $2 billion in state and local tax and land lease payments.[4]

Offshore wind, particularly along the Atlantic seaboard, is a highly reliable energy source.  Turbines are many miles out at sea and hundreds of feet up in the air, where the wind is fast and almost constant.  This consistent power generation helps stabilize the grid by providing a reliable source of energy, especially during peak demand periods.  Further, because this generation is located close to coastal population centers, there is limited loss from transmission.[5] By 2023, $17 billion had been invested in U.S. offshore wind, including CVOW, with billions more dollars and thousands more jobs expected.[6]

For over two decades, support for wind energy research, development, and deployment

---

[4] American Clean Power, *Wind Power Facts*, https://cleanpower.org/facts/wind-power/.
[5] U.S. Dep't of Energy, Office of Energy Efficiency, *Offshore Wind Energy Strategies* 2 (Jan. 2022).
[6] U.S. Dep't of Energy, Office of Energy Efficiency, *Offshore Wind Market Report: 2023 Edition* 8 (2023); American Clean Power, *Offshore Wind Power Facts*, https://cleanpower.org/facts/offshore-wind/.

has been the bipartisan policy of the United States. Congress repeatedly has declared as much.[7]

Thirty-eight states, including Virginia, and the District of Columbia have renewable portfolio

standards and goals requiring increased production of energy from renewable energy sources.[8]

In turn, these measures impose corresponding renewable energy generation requirements on

public utilities like DEV. Virginia and many other states rely on offshore wind energy projects,

to meet these renewable energy mandates and their residents' growing energy demands.

OCSLA declares "the Outer Continental Shelf" (OCS) to be "a vital national resource

reserve held by the Federal Government for the public," and directs the Secretary of Interior

(Secretary) to make the OCS "available for expeditious and orderly development, subject to

environmental safeguards, in a manner which is consistent with the maintenance of competition

and other national needs." 43 U.S.C. § 1332(3). The Energy Policy Act of 2005 amended

OCSLA to enable BOEM to lease the OCS for offshore wind development. *Id.* § 1337(p)(1)(C).

BOEM and other federal agencies have exhaustively evaluated the impacts associated

with offshore wind development and have repeatedly determined that projects are safe and

compatible with other OCS activities. In court cases, including about CVOW, the government

has vigorously defended federal agency approvals for offshore wind development. *See, e.g.,*

*Comm. For Constructive Tomorrow (CFACT) v. U.S. Dep't of Interior*, No. 24-cv-774, 2024 WL

---

[7] *See* Energy Tax Act of 1978 (P.L. 95-618); Energy Policy Act of 2005 (EPACT 2005; P.L. 109-58); Energy Independence and Security Act of 2007 (EISA; P.L. 110-140); Energy Improvement and Extension Act (EIEA), enacted as part of the Emergency Economic Stabilization Act of 2008 (EESA; P.L. 110-343); American Recovery and Reinvestment Act of 2009 (ARRA; P.L. 111-5); Energy Act of 2020, enacted as part of the Consolidated Appropriations Act of 2021 (P.L. 116-260); Infrastructure Investment and Jobs Act (IIJA; P.L. 117-58); and Inflation Reduction Act of 2022 (IRA; P.L. 117-169).
[8] NCSL, *State Renewable Portfolio Standards and Goals* (2021), https://www.ncsl.org/energy/state-renewable-portfolio-standards-and-goals; *see also* Richard K. Greene, *States Use Incentives to Attract Renewable Energy Business* (2009), https://www.areadevelopment.com/taxesincentives/nov09/ renewable-business11.shtml.

2699895 (D.D.C. May 24, 2024) (denying preliminary injunction or administrative stay against CVOW); *Id.,* Dkt. 37 (government's summary judgment brief defending CVOW); *Seafreeze Shoreside, Inc. v. U.S. Dep't of Interior*, 123 F.4th 1 (1st Cir. 2024); *Nantucket Residents Against Turbines v. BOEM*, 100 F.4th 1, 8 (1st Cir. 2024).[9]

### B.    The Coastal Virginia Offshore Wind Commercial Project.

In 2013, following a competitive bidding process, BOEM awarded DEV a wind energy lease for a 112,799-acre area located 27 miles off the coast of Virginia Beach.  H.A. ¶ 7.  CVOW features 176 14.7 MW wind turbines capable of generating nearly 2.6 gigawatts (GW) of energy at full buildout.  This renewable energy production will avoid 5 million tons of carbon dioxide emissions annually.  CVOW will provide energy for military facilities and the world's largest concentration of data centers.  CVOW is also needed to ensure grid reliability, foster economic growth, and meet growing energy demand across Virginia and North Carolina.  H.A. ¶ 7.

CVOW involves a total estimated investment of $11.2 billion.  H.A. ¶ 10.  It has created an estimated 2,000 American jobs and generated approximately $2 billion in American economic activity.  *Id.*  Once operational, CVOW is expected to support up to 1,100 jobs continuously over the life of the project, annually generating almost $210 million in economic output.  *Id.*  CVOW is also expected to generate $3 billion in customer fuel savings over its first ten years.  *Id.*  CVOW has generated extensive demand for services from U.S.-flagged vessels, H.A. ¶ 11, and stimulated the local economy around Hampton Roads, Virginia.  H.A. ¶ 12.

Many CVOW elements are nearing completion, and the first delivery of electricity to customers is projected in early 2026.  H.A. ¶ 20.  Onshore construction began on November 1,

---

[9] The government never raised the Order or national security concerns in or leading up to the parties' latest status report filed just last week in existing litigation by plaintiff groups against CVOW.  *CFACT, supra*, ECF No. 48 (Dec. 17, 2025).

2023, and has made extensive progress. H.A. ¶¶ 21-22. Offshore construction began in May 2024 and is currently underway; all 176 turbine monopiles have been installed as of October 2025, and wind turbines are anticipated to be installed on top of the monopiles beginning in December 2025. H.A. ¶¶ 23-27. CVOW should be completed and in-service by the end of 2026 under the existing construction schedule. H.A. ¶ 21. The criticality of proceeding as scheduled cannot be overstated. CVOW construction activities, including wind turbine installation, that BOEM has now stopped are a 365-day-a-year operation, day and night, including holidays. H.A. ¶ 33. Delays in installing wind turbines and conducting other work in the lease area, which also rely upon specialized vessels and equipment in limited supply, jeopardize timely completion of the entire project and will result in millions of dollars in otherwise avoidable costs for DEV and its customers. H.A. ¶¶ 33-38.

### C.    CVOW Is the Product of Extensive Legal Reviews.

In conjunction and consultation with myriad regulatory agencies and stakeholders over a decade and across multiple Administrations, DEV has worked to ensure that the CVOW project meets all legal requirements, and has put in place extensive safeguards to ensure that construction and operation of the project satisfy all applicable standards.

Prior to issuing the CVOW lease, BOEM in 2012 published an Environmental Assessment under the National Environmental Policy Act (NEPA) that assessed the potential impact of and reasonable alternatives to commercial wind lease issuance, which was accompanied by a finding of no significant impact.[10] DEV then prepared and submitted a site assessment plan, which BOEM approved in 2017. *See id.* DEV submitted its first COP to BOEM in 2020. DEV submitted seven updates, with the final submission on September 8, 2023.

---

[10] *See* BOEM CVOW website, https://www.boem.gov/renewable-energy/state-activities/CVOW-C.

8

*See id.*  Previously, DEV constructed and installed two pilot turbines on an adjacent lease, which have continued to operated since 2020 without incident or national security concerns.[11]

BOEM conducted an extensive analysis for DEV's COP, which involved consultation with numerous federal, state, and local agencies, tribes, and other stakeholders on a wide range of national security and other issues.  Relevant here, BOEM consulted extensively with the DoD and other agencies to ensure CVOW will not adversely affect national security, including via the DoD Clearinghouse process.  *See* 10 U.S.C. § 183a.  Consultations with additional agencies appear in Appendix A to the Final Environmental Impact Statement (FEIS).[12]

BOEM approved the COP on January 28, 2024.[13]  The approved COP is accompanied by almost 100 pages of terms and conditions of operation and includes extensive safeguards to address potential effects on national security, navigation, and the environment.[14]

Other agencies also issued CVOW authorizations under their respective authorities after extensive reviews.  For example, the U.S. Army Corps of Engineers ("Corps") issued a Clean Water Act Section 404 individual permit, Rivers and Harbors Act (RHA) Section 10 permit, and RHA Section 14 permission.  EPA issued an OCS air permit.  The location, construction, and operation of all CVOW electric facilities in Virginia were reviewed and approved by the Virginia State Corporation Commission in 2022, after a comprehensive, months-long, public process.

> **D.    BOEM Analyzed and Addressed CVOW's Compatibility with National Security and Other OCS Uses.**

---

[11] *See* https://coastalvawind.com/about/the-project.
[12] Coastal Virginia Offshore Wind Commercial Project, Final Environmental Impact Statement, Appendix A, Required Environmental Permits and Consultations, https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/CVOW-C_FEIS_App_A_Required_Permits.pdf.
[13] https://www.boem.gov/renewable-energy/state-activities/cvow-c-cop-approval-letter-ocs-0483.
[14] https://www.boem.gov/renewable-energy/state-activities/cvow-c-conditions-cop-approval-ocs-0483 (COP Conditions).

9

The Order generically invokes "national security" as the basis for suspending CVOW. But BOEM considered national security issues in detail when reviewing and approving CVOW. BOEM's process for developing the FEIS included consultation with DoD, the U.S. Coast Guard, and other agencies on national security and navigation issues, as well as consultation with Virginia agencies, local governments, tribes, and the public.

Before issuing the CVOW lease, BOEM already had conducted analysis to site the lease area so as to deconflict other activities in the vicinity.[15]  The FEIS in conjunction with the COP, in which DoD was a cooperating agency, then analyzed national security and military considerations in detail.  FEIS 3.17-20.[16]  The FEIS discussed risks of collisions, navigational complexity, and potential effects on radar systems such as "clutter," among other issues.  FEIS 3.17-6, 3.17-12 (finding CVOW's effects to radar systems to be "negligible to moderate"). BOEM's COP approval imposed conditions addressing these issues, mirroring each of the specific mitigation measures identified by the DoD Clearinghouse.  ROD, App. B, at 20; COP Conditions at 30-35 ("Navigational and Aviation Safety Conditions" and "National Security Conditions").  DEV has complied with those conditions by coordinating and entering into mitigation agreements with DoD and other agencies to address turbine placement, spacing, and radar.  H.A. ¶¶ 28-31.  CVOW agreements also enhance national security, e.g., by modernizing the Oceana Naval Air Station's aging electrical infrastructure.  *Id.*  There is no indication from BOEM or any other agency that these conditions are unmet or that any national security concerns are unaddressed, let alone an issue that could result in the imminent halt of CVOW construction.

---

[15] Final Environmental Assessment, Commercial Wind Lease Issuance and Site Assessment Activities on the Atlantic Outer Continental Shelf (2012) (analyzing leasing options and discussing previous "Smart from the Start" Atlantic Wind Energy Initiative).
[16] Coastal Virginia Offshore Wind Commercial Project, Final Environmental Impact Statement (Sept. 2023), https://www.boem.gov/renewable-energy/state-activities/cvow-cfeisvolumeifeis.

The FEIS also analyzed effects on navigation, including possible changes in vessel routes, delays in ports, and effects on communication and radar signals. FEIS 3.16-25. BOEM likewise imposed COP approval conditions addressing these potential effects, requiring lighting, marking, and signaling so that aircraft and vessels can identify and avoid wind turbines. CVOW also must establish procedures for remote braking and shutdown in emergencies, and construct wind turbines in a grid to facilitate navigation. COP Conditions at 30-32; H.A. ¶ 28. Notably, the CVOW lease encompasses only 0.042 percent of the Atlantic OCS.[17]

**E.      BOEM's Unlawful CVOW Suspension Order.**

The Order alleges no CVOW violation or deficiency to remedy; rather, it inexplicably orders a shutdown while BOEM "determine[s]" if any deficiency exists in the first place based on vacuous "national security threats." Per the Order, these threats were raised in a "November 2025" "additional assessment regarding the national security implications of offshore wind projects" by DoD, "including the rapid evolution of relevant adversary technologies and the resulting direct impacts to national security from offshore wind projects" generally. No specific allegation is made as to CVOW. The Order summarily deems this "new" information "classified" without justification, and further ignores that multiple DEV officials have security clearances yet never had an opportunity to review and comment before BOEM took the extreme step of issuing its Order. The Order offers no details nor does it explain how any purported risk differs from concerns that have been studied for years and found not to warrant disapproval of projects—much less the draconian sudden stoppage of projects under construction. Indeed, the Order says BOEM has conducted only an "initial review." And Interior's accompanying Press Release (*see supra* note 2) suggests there is nothing new, pointing to unsubstantiated "long

---

[17] The total acreage of BOEM's Atlantic OCS planning areas is available at https://www.boem.gov/oil-gas-energy/atlantic-ocs-lease-status-information.

found" "radar interference called 'clutter'" from wind towers and blades.

The Order further posits that "the particularized harm posed by this project can only be feasibly averted by suspension of on-lease activities" notwithstanding exhaustive mitigation measures already in place. Indisputably, no agency afforded DEV advance warning or due process regarding the Order stopping CVOW in its tracks. Nor does BOEM explain why, despite receiving the purported DoD information sometime in November 2025, it never raised such concerns with DEV and instead waited until December 22, 2025 to issue its Order to CVOW (and similar orders to four other offshore wind projects). Rather, the Order's unreasonable position is that, despite years of close DEV and interagency coordination, now any "discussions" about national security should occur only while CVOW work has stopped.

The CVOW Order follows, and even goes beyond, a series of Administration and Interior cursory actions aimed at shutting down the U.S. wind industry that similarly cited bald "national security" concerns. Just last week, a court vacated agencies' implementation of a presidential directive issued on the current Administration's first day in office, immediately and indefinitely prohibiting all new and renewed wind energy federal permitting. Presidential Memorandum, "Temporary Withdrawal of All Areas on the Outer Continental Shelf From Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects," § 2, 90 Fed. Reg. 5313 (Jan. 29, 2025). Like the CVOW Order, the Presidential Memorandum's one-paragraph directive and agencies' adoption thereof contained no reasoned explanation. But even that directive did not purport to affect existing leases or approvals like the CVOW Order does. In August 2025, Interior shut down another offshore wind project that, like CVOW, was already largely constructed, baldly claiming "BOEM is seeking to address concerns related to the protection of national security interests of the United States"—but a court rejected

that premise and allowed construction to resume, and the government did not appeal.[18]  Nor does

the CVOW Order explain how it is consistent with the ongoing declared national energy

emergency or current policies to expedite rather than restrict domestic energy production.  *E.g.*,

Exec. Order No. 14156, *Declaring a National Energy Emergency*, Section 8(a), 90 Fed. Reg.

8433, 8436 (Jan. 20, 2025) (excluding wind from "energy" definition); Exec. Order No. 14154,

*Unleashing American Energy*, Section 3, 90 Fed. Reg. 8353, 8354 (Jan. 20, 2025) (same).

Further highlighting pretext, the Secretary of the Interior celebrated the Order by accusing wind

energy as being "expensive, unreliable, heavily subsidized" and inferior to natural gas.[19]

### STANDARD OF REVIEW

The same legal standards govern a motion for a temporary restraining order and a motion

for a preliminary injunction.  *Sarsour v. Trump*, 245 F. Supp. 3d 719, 728 (E.D. Va. 2017).  To

obtain preliminary injunctive relief, a plaintiff must show: (1) a likelihood of success on the

merits, (2) that plaintiff will be irreparably harmed absent preliminary relief, (3) a lack of harm

to other parties from an injunction; and (4) that the public interest favors an injunction.  *Winter v.*

*Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008) (citations omitted).

A temporary restraining order serves to "preserve the status quo and prevent[] irreparable

harm," for an initial defined duration pending further proceedings.  *Granny Goose Foods, Inc. v.*

*Brotherhood of Teamsters & Auto Truck Drivers Local No. 70*, 415 U.S. 423, 439 (1974); *Elec.*

*Data Sys. Fed. Corp. v. General Services Admin.*, 629 F. Supp. 350, 352 (D.D.C. 1986) ("In the

context of the limited purpose of a temporary restraining order, the Court's analysis of these

factors seeks principally to ensure preservation of the status quo."); Fed. R. Civ. P. 65(b), (d).

Similarly, under Section 705 of the Administrative Procedure Act, as "necessary to

---

[18] https://www.boem.gov/renewable-energy/directorsorder-20250822pdf.
[19] https://x.com/SecretaryBurgum/status/2003094666040787213.

prevent irreparable injury," a court may "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of review proceedings."  5 U.S.C. § 705.  "The factors governing … issuance of a Section 705 stay" are the same as those "governing issuance of a preliminary injunction."  *Casa de Maryland, Inc v. Wolf*, 486 F. Supp. 3d 928, 950 (D. Md. 2020) (citation omitted).

## ARGUMENT

DEV readily meets all criteria for immediate injunctive relief, and the urgency to preserve the status quo to allow the Court to more thoroughly rule on a preliminary injunction is overwhelming.  The Court should accordingly issue a temporary restraining order suspending BOEM's Order and barring its enforcement pending a further Court order.

## I.     BOEM'S ORDER IS CAUSING SUBSTANTIAL, IMMINENT, IRREPARABLE, AND ONGOING INJURY TO DEV.

CVOW is a multi-billion investment for DEV and its customers.  Every day of delay in construction causes DEV to incur more than $5 million in costs for vessel services alone.  H.A. ¶ 35.  Given project realities and deadlines, this harm will increase exponentially—to potentially hundreds of millions of dollars or more—if the Order remains in effect, even during the weeks or months typically required to adjudicate a preliminary injunction.  H.A. ¶ 37.

Substantial Immediate Costs of Delay.  BOEM's stop-work order immediately began to cause DEV irreparable harm.  H.A. ¶¶ 33-38.  Beyond daily vessel costs, DEV is also incurring losses related to additional storage costs for the significant amount of equipment, idle workforce, contractual penalties, and similar costs, H.A. ¶¶ 34-35, which could imperil the project's completion and the delivery of 2.6 crucial gigawatts (GW) of clean energy to DEV's customers annually, H.A. ¶ 33.  These costs and losses alone suffice to establish DEV's irreparable harm.

Risks of Construction Delays.  Apart from these immediate costs, delaying CVOW

construction for even a short time could cause construction delays of a year or more. H.A. ¶ 33. That is because the schedule relies on interdependent steps and is structured around the availability of key vessels, equipment, and labor during specific construction windows. *Id.* Following completion of all monopile installation, CVOW is focused on installing the remaining offshore wind turbine generators, substations, inter-array cables, and other infrastructure. *Id.* Specialized transportation and installation vessels owned by third parties are required to perform these activities and, due to their scarcity, the vessels must be booked years in advance. H.A. ¶¶ 34, 37. The need to install this infrastructure will increase the total timeframe during which project construction vessels are needed within the project area. The result will be a substantially higher total CVOW construction cost, borne by DEV customers not only through rates but also the non-delivery of renewable energy to the grid. H.A. ¶ 36.

Delay also causes other compounding and cascading harms to DEV, including additional storage and maintenance costs and administrative burdens associated with the components that cannot be installed as scheduled. H.A. ¶ 34. DEV will also incur costs to demobilize deployed vessels and crews and then later remobilize them at a different, undetermined date. H.A. ¶¶ 34-35, 37. DEV may not be able to reengage with certain specialized vessels at all due to their scarcity and high demand. *Id.* These costs will be borne by DEV or its customers. H.A. ¶ 44.

Though specifying an initial suspension of 90 days, the Order indicates its total duration is indefinite, so DEV is not able to plan or schedule future construction on the OCS while the Order is in place. BOEM's Order thus will not only have severe monetary costs but also affect employment and the national and regional economy, jeopardizing CVOW's generated thousands of jobs and billions of dollars in economic activity. H.A. ¶ 10.

Risks of Postponed Operations. DEV's inability to complete CVOW construction

inherently also delays CVOW's delivery of electricity to the grid and DEV's customers.  As discussed above, thousands of local jobs and millions of dollars of economic, tax, and fuel savings benefits depend on the timely completion of the CVOW project.

CVOW's timely generation of wind energy is also critical to Virginia's legislative clean energy directive and DEV's commitment to achieving net-zero emissions.  The Virginia Clean Economy Act (VCEA) states that the construction of Virginia offshore wind facilities is in the public interest.  Va. Code § 56-585.1:11 (C)(1).  The VCEA requires the transition of Virginia's electric grid to 100% non-carbon producing energy generation by 2045.  Va. Code § 56-585.5.  CVOW's delay could impair DEV's ability to meet these requirements.  Under the VCEA, DEV could be forced to make deficiency payments or purchase a substantial amount of renewable energy credits each year CVOW is delayed.  Va. Code § 56-585.5(C); H.A. ¶ 40.

DEV's Harms Cannot Be Recouped.  Because DEV has no effective remedy to recover the costs it will suffer as a result of the Order, its harms are irreparable.  In *Mountain Valley Pipeline LLC v. 6.56 Acres of Land*, 915 F.3d 197, 217-19 (4th Cir. 2019), the Fourth Circuit found that delaying construction of a natural gas pipeline would cause irreparable harm in similar circumstances.  The harms identified by the pipeline included "lost revenues from the delay in pipeline service estimated at $40 to $50 million per month; charges and penalties for the breach of construction contracts, totaling $200 million; and carrying costs to prolong the project, such as storage and personnel expenses, for an additional $40 to $45 million."  *Id.* at 217.  The court found that these "economic losses would *not* be recoverable" (as here) and therefore constituted "irreparable injury justifying preliminary relief."  *Id.* at 218; *see also E. Tenn. Natural Gas Co. v. Sage*, 361 F.3d 808, 828-29 (4th Cir. 2004); *Ala. Ass'n of Realtors v. Dep't of Health and Human Services*, 594 U.S. 758, 765 (2021).  Here too, DEV's costs to comply with the Order are

16

irreparable since costs to adhere to a government policy "later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs," including because the United States is typically immune to monetary damages.  *See Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220-21 (1994) (Scalia, J., concurring in part and concurring in the judgment); *Nat'l Institutes of Health v. Am. Pub. Health Ass'n*, 606 U.S. ---, No. 25A103, 2025 WL 2415669, at *1 (U.S. Aug. 21, 2025) (loss of money is irreparable harm "if the funds 'cannot be recouped' and are thus 'irrevocably expended'") (citation omitted); *Louisiana v. Biden*, 622 F. Supp. 3d 267, 297 (W.D. La. 2022) (federal oil and gas leasing pause created economic losses that "would be difficult, if not impossible to recover due to sovereign immunity")*.*

## II.    DEV IS LIKELY TO PREVAIL ON THE MERITS.

A plaintiff "need not establish a certainty of success" to obtain preliminary relief, and must only "make a clear showing that [they are] likely to succeed at trial."  *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (cleaned up).  DEV meets this standard.

### A.    DEV Has Standing to Sue.

DEV satisfies all three elements of Article III standing: (1) injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that it is likely to be redressed by a favorable decision. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).  The Order directly affects DEV's ability to proceed with CVOW and is causing immediate harm, as set forth *supra*, that can be redressed by an order of this Court allowing CVOW activities to resume.

### B.    BOEM's Order Constitutes Final Agency Action.

BOEM's Order is final agency action because it consummates BOEM's decision to shut down CVOW for at least 90 days and has legal consequences for DEV.  *Bennett v. Spear*, 520 U.S. 154, 178 (1997); *FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 239 (1980) (final agency action has a "direct and immediate … effect on [DEV's] day-to-day business").  Indeed, the

Order characterizes itself as an appealable "determination." The Order is immediately effective and thus obviates any administrative appeal within Interior. 43 C.F.R. § 4.21(a).

> **C.    BOEM's Order Is Inconsistent with OCSLA, BOEM's Own Regulations, the CVOW Lease, and the CVOW COP Approval.**

Under the APA, a "reviewing court shall … hold unlawful and set aside agency action … found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id*. § 706(2)(C), or "without observance of procedure required by law," *id*. § 706(2)(D). DEV is likely to prevail on, among other claims, its claim that the Order is inconsistent with OCSLA, BOEM regulations, and the CVOW lease and COP approval terms.

OCSLA states that it is "the policy of the United States" that the OCS "should be made available for *expeditious and orderly development,* subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs." 43 U.S.C. § 1332(3) (emphasis added). OCSLA, BOEM's regulations, and the leases and COP approvals BOEM issues pursuant to those regulations accordingly support responsible and orderly development of the OCS. OCSLA and other applicable authorities provide BOEM with authority to supervise such development, while also providing those who hold leases and permits to develop the OCS with critical protections against arbitrary action by limiting BOEM's discretion to take actions impairing issued leases and permits in the absence of material noncompliance and extraordinary circumstances. BOEM possesses a defined set of supervisory authorities over OCS development, which are discussed below. But OCSLA and its implementing regulations do not authorize BOEM's Order here. *Cf. Louisiana*, 622 F. Supp. 3d at 277-78, 289 (reviewing OCSLA's structure and "strict regulations" in the context of a pause on oil and gas leasing and finding no statutory authority for the pause).

18

The BOEM Director does not have generalized authority to issue a stop-work or suspension order at whim.  Rather, the applicable CVOW lease terms, CVOW COP approval conditions, regulations, and statutory provisions define the narrow circumstances under which BOEM can issue such an order to DEV.  BOEM has not cited an applicable trigger to interrupt CVOW construction, and so the Order was issued in contravention of BOEM's authority.

The CVOW Lease Defines BOEM's Remedies.  The CVOW lease issued by BOEM authorizes DEV to "conduct activities in the area identified by Addendum A of this lease ('leased area') that are described in a [Site Assessment Plan (SAP)] or COP that has been approved by [BOEM]."[20]  Section 8 specifically defines the triggers and scope of any further BOEM action, stating that "if the Lessee fails to comply with (1) any of the approved provisions of the Act or regulations, (2) the approved SAP or COP, or (3) the terms of this lease, including associated Addenda, the Lessor may exercise any of the remedies that are provided under the Act and applicable regulations."  The Order does not allege that any of these conditions apply.

To the extent BOEM characterizes its Order as suspending the lease, it fares no better.[21] The remedies subject to lease Section 8 expressly include "suspension" of a lease.  That lease section further provides that any ordered suspension "that is predicated on a threat of serious irreparable, or immediate harm or damage, or on an imminent threat of serious or irreparable harm or damage," first "requires a finding by the Lessor of particularized harm that it determines can only be feasibly averted by suspension of on-lease activities or cancellation of the lease." While the Order parrots the condition that harm can "only be feasibly averted" by a suspension,

---

[20] *See* Attachment A for a copy of the current CVOW Lease.
[21] The Order is ambiguous as to whether its "suspension" purports to include the CVOW lease itself.  *See* Order ("suspend all ongoing activities"); Press Release ("pausing offshore wind leases").  In either event, the Order exceeds applicable constraints on BOEM.

it provides no "finding" other than that bald conclusion based on BOEM's mere "initial review," much less any supporting basis or reasoning. Nor does the Order even allege that any harm from continued construction pending Interior's review of any further information is imminent, serious, or irreparable so as to somehow warrant a total stoppage of CVOW construction offshore; BOEM cannot exercise greater authority absent such exigent circumstances. And the lease's other provisions addressing a suspension, as discussed *infra*, adopt statutory constraints on national security-based suspensions that foreclose the Order here.

The CVOW COP Approval Defines BOEM's Remedies. BOEM's COP Conditions are almost a hundred pages long.[22] They state that, "as indicated in the COP … the Lessee may construct and install on the [OCS] up to 176 Wind Turbine Generators (WTG), up to 3 offshore substations (OSSs), inter-array cables linking the individual WTGs to the OSS, and up to 9 offshore export cables within an export cable corridor of up to 42.5 nautical miles (nmi) in length on the OCS." BOEM's COP Conditions define and limit the actions that BOEM can take with respect to the approved COP: "BOEM and/or BSEE, as applicable, may issue a notice of noncompliance, pursuant to 30 Code of Federal Regulations (C.F.R.) § 585.106(b) and 30 C.F.R. § 285.400(b), if it is determined that the Lessee failed to comply with any provision of its approved COP, the lease, the Outer Continental Shelf Lands Act, or OCSLA's implementing regulations. BOEM and/or BSEE may also take additional actions pursuant to 30 C.F.R. § 585.106 and 30 C.F.R. § 285.400, where appropriate." BOEM has not identified any specific concern or incident of noncompliance for CVOW. Nor does the Order invoke those authorities.

BOEM Regulations Define BOEM's Remedies. BOEM's regulations set forth a

---

[22] *See supra* note 12. The COP itself is thousands of pages. https://www.boem.gov/renewable-energy/state-activities/coastal-virginia-offshore-wind-project-construction-and-0.

comprehensive scheme governing both approval of a COP and any revisions. *See* 30 C.F.R. Part 585, subpart G. Any COP revisions are triggered only in narrow circumstances, "based on the significance of any changes in available information" and for material changes in the proposed activities. 30 C.F.R. §§ 585.634(b), (c). BOEM also may issue a notice of noncompliance if BOEM determines that "there has been a violation of the regulations in this part, any order of the Director, or any provision of your lease, grant, or other approval issued under this part." 30 C.F.R. § 585.106(b). But even in those circumstances, only the Bureau of Safety and Environmental Enforcement (BSEE), not BOEM, can issue a cessation order to a lessee. *Id.* BOEM has not invoked these regulations or identified material changes to CVOW as approved.

The Order cites 30 C.F.R. § 585.417(b) providing that BOEM "may" order a suspension of a lease (the Order again is unclear if it does so) when "necessary for reasons of national security or defense." But that does not save the Order either. Section 1 of the lease, a contractual document between DEV and the United States, provides that the lease terms govern over statutes and regulations "to the extent that they explicitly conflict with an express provision of this lease." Because as discussed above, the CVOW lease expressly limits the circumstances and conditions for BOEM to suspend it, the Order's attempt to sidestep them conflicts with the lease. Even absent that conflict, BOEM has not demonstrated that a suspension is "necessary" here. Moreover, as discussed next, BOEM's cited regulation cannot be read to negate OCSLA and the lease's express constraints on suspensions on claimed national security grounds.

OCSLA Defines BOEM's Remedies. OCSLA also does not authorize the Order stopping CVOW in its tracks by vaguely and belatedly averring concerns about "national security." The "National Security Clause" in OCSLA Section 12 requires that all leases "contain a provision" authorizing the Secretary of the Interior to "suspend operations under any lease," but only "upon

21

a recommendation of the Secretary of Defense, during a state of war or national emergency declared by Congress or the President of the United States." 43 U.S.C. § 1341(c). Correspondingly, Section 3(c) of the CVOW lease "reserves the right to suspend the Lessee's operations in accordance with the national security and defense provisions of Section 12 of the Act and applicable regulations, provided that compensation must be paid to the Lessee as provided by 43 U.S.C. § 1341(c) and (d)."  Additionally, Addendum C to the CVOW lease addresses temporary suspensions of operations "in the interest of national security," but such suspensions must be "pursuant to Section 3(c) of this lease."  It further provides that any such suspension "for national security reasons will not generally exceed 72 hours."  It also provides: "Every effort will be made by the appropriate military agency to provide as much advance notice as possible of the need to suspend operations and/or evacuate. Advance notice will normally be given before requiring a suspension or evacuation."

The Order failed to adhere to any, let alone all, these statutory and lease conditions to invoke national security for a CVOW suspension.  BOEM acted unilaterally here, and does not even indicate whether DoD recommended a suspension.[23]  BOEM points to no declared "state of war" or "national emergency."  BOEM neither indicates that the running of the CVOW lease term is suspended nor affords compensation to DEV.  BOEM's 90-day initial suspension exceeds the presumptive 72-hour limit under the lease.  And BOEM afforded DEV zero prior notice.

In sum, BOEM has not validly invoked its narrow authority to stop work on CVOW. Agencies "are creatures of statute" and are therefore subject to the limits prescribed by

---

[23] OCSLA's only other provision authorizing suspensions of operations on a lease, 43 U.S.C. § 1334(a)(1), applies only "if there is a threat of serious, irreparable, or immediate harm or damage" to life, property, mineral deposits, or the environment, and not for national security grounds.  And as noted above, Section 8 of the CVOW lease requires advance notice in that situation.  The Order invokes none of these grounds to stop work on CVOW.

Congress.  *Nat'l Fed'n of Indep. Bus. v. U.S. Dep't of Labor*, 595 U.S. 109, 117 (2022).  In other

words, they "literally have no power to act except to the extent Congress has authorized."  *Nat'l*

*Council of Nonprofits v. OMB*, No. 25-239, 2025 WL 597959 at *15 (D.D.C. Feb 25, 2025).

Moreover, "[i]t is a familiar rule of administrative law that an agency must abide by its own

regulations."  *Fort Stewart Schs. v. FLRA*., 495 U.S. 641, 654 (1990).  Plenary power over

federal lands and the OCS rests with Congress, and the Executive Branch has only the authorities

over the OCS that Congress has delegated.  *See, e.g., United States v. Patton*, 771 F.2d 1240,

1243 (9th Cir. 1985) ("Strict adherence to the wording of the statute is of particular importance

in construing a statute regulating public lands, over which Congress has unlimited authority.").

The Order also contravenes APA Section 558, which provides that the "suspension" of a

"license" is "lawful" only if preceded by "notice" and an "opportunity to demonstrate or achieve

compliance with all lawful requirements."  5 U.S.C. § 558(c).  The APA defines the term

"license" broadly to include a "permit, certificate, approval … or other form of permission."  5

U.S.C. § 551(8).  APA Section 558 includes exceptions for "willfulness" or "public health,

interest or safety," but BOEM made no determination to support invocation of those exceptions.

5 U.S.C. § 558(c).  BOEM's sudden and unilateral interference with a prior decision does not

comport with the APA's directives for prompt and durable agency decisionmaking.  *See also*

*New York*, 2025 WL 3514301, at *15-17 (discussing 5 U.S.C. § 558(c) mandates).

It follows that the Order is "not in accordance with law," 5 U.S.C. § 706(2)(A), is "in

excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.*

§ 706(2)(C), and is "without observance of procedure required by law," *id.* § 706(2)(D).  It defies

OCSLA's mandate that OCS development be "expeditious" and "orderly."  It upends

longstanding BOEM approvals while disregarding prerequisite grounds and procedures.  And it

attempts to amend the criteria and procedures in its regulations without observing the notice and comment process required by law. *N.C. Growers' Ass'n, Inc. v. United Farm Workers*, 702 F.3d 755, 764-66 (4th Cir. 2012) (revocation and replacement of agency rules is void if conducted without notice and comment). A temporary restraining order of the unlawful Order is warranted.

### D.    BOEM's Order Is Arbitrary and Capricious.

DEV is likely to prevail on its separate claim that BOEM's order is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Judicial review under the APA is based on the administrative record supplied by the government. *Id.* § 706 ("the court shall review the whole record or those parts of it cited by a party"). An agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The agency must offer a "satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made," *Ohio v. EPA*, 603 U.S. 279, 292 (2024), and provide a "reasoned explanation" for a change in policy, *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). The Court's "inquiry … is to be searching and careful." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

When a federal agency shifts its policy or reverses prior decisions, it must provide a reasoned and supported explanation for the change, or the action will be deemed arbitrary and capricious. "Dissimilar treatment of evidently identical cases is the quintessence of arbitrariness and caprice." *Grayscale Inv. LLC v. SEC*, 82 F.4th 1239, 1245 (D.C. Cir. 2023) (quoting *Colo. Interstate Gas Co. v. FERC*, 850 F.2d 769, 774 (D.C. Cir. 1988)); *Encino Motorcars, LLC v.*

*Navarro*, 579 U.S. 211, 222 (2016) ("[u]nexplained inconsistency" is grounds to invalidate agency action). This is particularly true when its prior decision has engendered serious reliance interests or where its new decision rests upon factual findings that contradict those which underlay its prior decision. *Fox*, 556 U.S. at 515-16. When an agency has not stated any reasons to support a decision, its decision is inherently arbitrary and capricious. *See McDonnell Douglas Corp. v. U.S. Dep't of Air Force*, 375 F.3d 1182, 1187 (D.C. Cir. 2004) ("[W]e do not defer to the agency's conclusory or unsupported suppositions."); *Pacito v. Trump*, 768 F. Supp. 3d 1199, 1232 (W.D. Wash. 2025) ("[W]e may not infer an agency's reasoning from mere silence.").

BOEM suddenly stopped the multi-billion dollar CVOW project via a one-page Order with no documented support. BOEM's lack of explanation for this radical departure from its prior decision for this same project is inherently arbitrary and capricious. *Ohio*, 603 U.S. at 292; *New York v. Trump,* 769 F. Supp.3d. 119, 141 (D.R.I. 2025) ("abrupt" implementation of "blanket pause" on federal funding without explanation is arbitrary and capricious).

The Court cannot infer BOEM's reasoning from wholecloth. That said, the relevant facts regarding CVOW do not support the Order. CVOW's potential effects on national security interests have been thoroughly studied, and BOEM concluded that they had been adequately addressed through a suite of mitigation strategies. BOEM then zealously defended its COP approval in court. Such an abrupt about-face in agency policy requires substantial justification to justify interruption of CVOW construction, yet none exists. This type of "[u]nexplained inconsistency" with BOEM's prior decisions and policies renders the Order arbitrary and capricious. *Navarro*, 579 U.S. at 222; *see also Revolution Wind*, *supra*, at 40 (enjoining stop-work order where BOEM cited only "the mere potential for national security concerns" and did "not actually point to any factual findings that lead them to believe that concern was implicated

by the project or that "rise[s] to such a level that work must cease immediately").

BOEM's adverse treatment of DEV with the stop-work order and of other wind projects also stands in sharp contrast with the Administration's active promotion of other energy production and reducing agency review and approval timeframes. Indeed, the stop-work order is precisely an "undue burden on the identification, development, or use of domestic energy resources" of the kind that Executive Order 14154 directs agencies to "suspend, revise, or rescind." Such an inconsistency requires substantial justification, but the Order offers none.[24]

Moreover, "when an agency changes course … it must be 'cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (quoting *Navarro*, 579 U.S. at 222). DEV has acted in reliance on CVOW approvals and the longstanding federal policies authorizing and encouraging development of wind energy. Based on Congress' and BOEM's prior actions, DEV has invested billions of dollars and entered into contractual agreements to construct CVOW and supply wind energy. BOEM's Order compromises and potentially destroys these investments and contractual agreements. BOEM's failure to consider these reliance interests, without a valid explanation and by administrative fiat, is arbitrary and capricious. *See Smiley v. Citibank*, 517 U.S. 735, 742 (1996) ("sudden and unexplained change … or change that does not take account

---

[24] Similarly, the current Administration has issued an executive order directing agencies to "de-prioritize" "enforcement actions" that "go beyond the powers vested in the Federal Government by the Constitution" and "direct the termination of all such enforcement proceedings that do not comply with the Constitution, laws, or administration policy." That executive order defines an "enforcement action" as "all attempts, civil or criminal, by any agency to deprive a private party of life, liberty or property, *or in any way affect a private party's rights or obligations, regardless of the label the agency has historically placed on the action*." Exec. Order No. 14219, *Ensuring Lawful Governance and Implementing the President's 'Department of Government Efficiency' Deregulatory Initiative* (Feb. 19, 2025) sections 3, 6(d) (emphasis added). BOEM cannot provide the requisite substantial justification for impairing DEV's investment in CVOW.

of legitimate reliance on prior interpretation may be arbitrary, capricious, or an abuse of discretion") (citation omitted); *New York*, 2025 WL 3514301, at 14 (agencies' wind permitting ban failed to "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns, let alone provide the 'more detailed justification' required upon determining that serious reliance interests exist"). This is particularly true here, as DEV has property interests in its now-impaired lease.

Agency action is similarly arbitrary and capricious if it fails "to consider an important aspect of the problem," *State Farm*, 463 U.S. at 43; which includes the failure to consider the costs and benefits of a decision. *Mexican Gulf Fishing Co. v. U.S. Dep't of Commerce*, 60 F.4d 956, 973 (5th Cir. 2023). The current Administration has recently acknowledged the importance of addressing the "massive costs" and "restraint[s] on … economic growth and ability to build and innovate" associated with federal regulation. Exec. Order No. 14102, *Unleashing Prosperity through Deregulation,* 90 Fed. Reg. 9065 (Feb. 6, 2025). The Order imposes extensive costs on DEV and the public, including compromising jobs and economic development in the area of the CVOW project, and interfering with development of a critical, highly reliable energy source for DEV's customers during a declared energy emergency, in exchange for likely nonexistent benefits of project interruption. Failure to consider the costs and benefits of a stop-work order in this context is arbitrary and capricious. *See Hornbeck Offshore Wind Serv. v. Salazar,* 696 F. Supp. 2d 627, 638 (E.D. La. 2010) (Interior's failure to consider operators' safety records and to provide "evidence … indicating that the Secretary balanced the concern for environmental safety" with development interests was arbitrary and capricious).

Finally, there is every reason to believe that the stated reasons for BOEM's Order are pretextual, and the Order is instead motivated solely by the Administration's widely publicized

animus toward wind energy. Where there is a "significant mismatch" between an agency's decision and the rationale the agency provides, courts conclude that the agency's justification is "contrived" and cannot support the agency's decision. *U.S. Dep't of Commerce v. New York*, 588 U.S. 752, 783-85 (2019). BOEM has provided no concrete explanation for suddenly walking away from the result of the extensive process by which it approved the CVOW project. The Order instead is part of a pattern of systematic obstruction of wind energy development by the Administration. DEV anticipates that the administrative record and any discovery in this matter will yield no substantive basis for the Order. But in the near-term, the Order cannot remain effective, or it will realize its arbitrary and punitive ends despite its illegality.

Because BOEM failed to acknowledge its sudden departure from prior decision-making, provide a reasoned explanation for its new decision, consider important aspects of the problem, and weigh reliance interests and costs and benefits, the Order is arbitrary and capricious.

### E.      BOEM's Order Is Barred by OCSLA.

OCSLA provides a remedy to "compel compliance" in the event of a violation of OCSLA, its implementing regulations, "or the terms of any permit or lease." 43 U.S.C. § 1349(a)(1). The COP is a permit authorizing construction and operation of CVOW. As set forth *supra*, the Order violates the limitations on BOEM's authorities established by OCSLA, its implementing regulations, and CVOW's lease and COP approval. These violations immediately affect DEV's legal interests and are thus actionable immediately after notification as required by the statute. 43 U.S.C. §§ 1349(a)(2), (3).[25] DEV likely will succeed on this claim as well.

---

[25] In *Hornbeck Offshore Servs., L.L.C. v. Salazar*, 696 F. Supp. 2d 627 (E.D. La. 2010), the alleged OCSLA violation immediately affected the plaintiffs' legal interest because "the moratorium [was] already in effect and has already caused the cancellation and threatened cancellation of some of the plaintiffs' contracts." *Hornbeck Offshore Servs., L.L.C*, 696 F. Supp. 2d at 636 n.7; *see also Chevron, U.S.A., Inc. v. FERC*, 193 F. Supp. 2d 54, 64-65 (D.D.C. 2002).

### III.    THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST FAVOR PRELIMINARY INJUNCTIVE RELIEF.

The final factors, balance of equities and the public interest, also weigh in favor of a temporary restraining order.  Given that the government is the opposing party, these factors merge.  *Nken v Holder*, 556 U.S. 418, 435 (2009).  There is a strong public interest in applying predictable legal rules to OCS development.  OCS development is capital-intensive, and businesses cannot make investment decisions if there is complete uncertainty as to whether the government will honor the permits it issues.  *Invenergy Renewables, Inc. v. United States*, 422 F. Supp. 3d 1255 (Ct. Int'l. Trade 2019) (describing the harms caused by "eliminating the business certainty required by the solar industry to plan and develop future projects.").  BOEM's lawless Order here deters future investment in wind and in other capital-intensive technologies.

More generally, the public has a strong interest in a reliable, affordable energy supply. The CVOW project will supply affordable electricity as part of an "all of the above" national energy strategy amidst a declared energy emergency caused by surging load growth.[26]  The North American Electric Reliability Corporation (NERC) has estimated that over 79 GW of generation capacity will retire within the next decade, whereas load growth from data centers and semiconductor chip manufacturing facilities could increase demand by as much as 128 GW by 2029.[27]  Future electricity supply constraints not only threaten to dramatically increase electricity prices for ratepayers but "leave[] us vulnerable to hostile foreign actors and poses an imminent

---

[26] *See, e.g.*, DEV, 2024 Integrated Resource Plan, at 1, 2, 53, https://cdn-dominionenergy-prd-001.azureedge.net/-/media/content/about/our-company/irp/pdfs/2024-irp-w_o-appendices.pdf?rev=5b28b014e4814135bb2fcec470dcc92b.

[27] NERC, *2024 Long-Term Reliability Assessment*, (July 15, 2025); John D. Wilson, Zach Zimmerman, and Rob Gramlich, *Strategic Industries Surging: Driving US Power Demand*, Grid Strategies (Dec. 1, 2024).

and growing threat to the United States' national security."  Exec. Order No. 14156.

Moreover, Virginia law renders Virginia offshore clean energy, and specifically wind, in the public interest, Va. Code § 56-585.1:11(C)(1), and mandates that the State's electric grid transition to 100% non-carbon-producing energy generation by 2045.  Va. Code § 56-585.5.  The Court should give that legislative determination significant weight.  *Telvest, Inc. v. Bradshaw*, 618 F.2d 1029, 1036 (4th Cir. 1980) (giving weight to a state statute in analyzing the public interest factor).  The public and government also are not harmed by "a continuation of the status quo during the pendency of … litigation [which] only shortly prolong[s] the longstanding practice and policy of the United States government."  *See N.H. Indonesian Cmty. Support v. Trump*, No. 25-CV-38-JL-TSM, 2025 WL 457609, at *5 (D.N.H. Feb. 11, 2025).

Further, halting CVOW's development not only threatens hundreds of jobs that generate $143 million in economic output, but also imperils substantial economic development that is transforming the Hampton Roads area into an offshore wind support hub—and the hundreds of millions in tax revenue, salary and benefits, and economic activity this would spur.  H.A. ¶¶ 10, 12.  Given that BOEM's Order is not in the public's or government's interest, while immediately harming DEV and its public customers, the balance of equities tips sharply in favor of a temporary restraining order to maintain the status quo.

## CONCLUSION

For the foregoing reasons, DEV respectfully requests that this Court issue a temporary restraining order suspending BOEM's Order and barring further actions by BOEM to enforce the Order, pending further order of this Court.

30

Dated: December 23, 2025                        Respectfully submitted,

*/s/ Nessa Horewitch Coppinger*
NESSA HOREWITCH COPPINGER,
VA Bar No. 65566
JAMES M. AUSLANDER, *pro hac vice pending*
R. JUSTIN SMITH, *pro hac vice pending*
HILARY T. JACOBS, *pro hac vice pending*
JULIUS M. REDD*, pro hac vice pending*
Beveridge & Diamond, P.C.
1900 N Street, NW, Suite 100
Washington, D.C. 20036
Telephone: 202-789-6000
Fax: 202-789-6190
ncoppinger@bdlaw.com
jauslander@bdlaw.com
jsmith@bdlaw.com
hjacobs@bdlaw.com
jredd@bdlaw.com

*Counsel for Virginia Electric and Power Company, d/b/a Dominion Energy Virginia, and OSW Project LLC*

31

## CERTIFICATE OF SERVICE

I hereby certify that, promptly following filing, I will cause a true and correct copy of the foregoing Plaintiffs' Memorandum in Support of Motion for Temporary Restraining Order to be served on the following counsel via electronic mail, which is reasonably calculated to provide actual notice, given the emergency nature of the requested relief and the fact that counsel has not yet appeared in this action.

| | |
|---|---|
| Marissa Piropato<br>*Marissa.Piropato@usdoj.gov*<br>Kristofor Swanson<br>*Kristofor.Swanson@usdoj.gov*<br>Mark Brown<br>*Mark.Brown@usdoj.gov*<br>Amanda Rudat<br>*Amanda.Rudat@usdoj.gov*<br>**Attorney General of the United States**<br>**U.S. Department of Justice**<br>950 Pennsylvania Avenue, NW<br>Washington, DC 20530-0001<br>Tel: (202) 514-2000 | United States Attorney's Office<br>Eastern District of Virginia –<br>Norfolk Division<br>101 West Main Street, Suite 8000<br>Norfolk, VA 23510-1671<br>Tel: (757) 441-6331<br>Email: usavae.usattys@usdoj.gov |

*/s/ Nessa Horewitch Coppinger*
NESSA HOREWITCH COPPINGER,
VA Bar No. 65566
Beveridge & Diamond, P.C.
1900 N Street, NW, Suite 100
Washington, D.C. 20036
Telephone: 202-789-6000
Fax: 202-789-6190
ncoppinger@bdlaw.com

*Counsel for Virginia Electric and Power Company,
d/b/a Dominion Energy Virginia, and OSW Project
LLC*

# ATTACHMENT A

RECEIVED

JAN 15 2025

Office of Renewable
Energy Programs

**AMENDMENT AND RESTATEMENT**

**Renewable Energy Lease OCS-A 0483**

This Amendment and Restatement of Renewable Energy Lease OCS-A 0483 (the "Lease) is made and entered into by and between the United States of America, ("Lessor"), acting through the Bureau of Ocean Energy Management ("BOEM"), its authorized officer, and OSW Project LLC Company (the "Lessee").

<u>WITNESSETH:</u>

THAT WHEREAS the Lease, containing approximately 112,779 acres, was entered into by and between the Lessor and Virginia Electric and Power Company, effective as of November 1, 2013; and

WHEREAS the Lease was amended on March 28, 2016, to strike Stipulation 2.1.3, Addendum "C" from the lease; and

WHEREAS the Lease was amended on December 6, 2023, to adjust language in Addendum "D"; and

WHEREAS BOEM approved the Lessee's Construction and Operations Plan (COP), granted a Project Easement, and amended Addenda A and D, effective January 28, 2024; and

WHEREAS Virginia Electric and Power Company assigned 100% record title interest in the lease to OSW Project LLC, effective October 4, 2024;

NOW, THEREFORE, in consideration of the premises, the Lessor and Lessee hereby agree that Lease OCS-A 0483 is amended and restated in its entirety to read as follows:

| UNITED STATES DEPARTMENT OF THE INTERIOR BUREAU OF OCEAN ENERGY MANAGEMENT<br><br>**COMMERCIAL LEASE OF SUBMERGED LANDS FOR RENEWABLE ENERGY DEVELOPMENT ON THE OUTER CONTINENTAL SHELF**<br><br>*Paperwork Reduction Act of 1995 statement: This form does not constitute an information collection as defined by 44 U.S.C. § 3501 et seq. and therefore does not require approval by the Office of Management and Budget.* | Office<br><br>Sterling, VA | Renewable Energy Lease Number<br><br>OCS-A 0483 |
|---|---|---|
| | Cash Bonus and/or Acquisition Fee $1,600,000.00 | Resource Type<br><br>Wind |
| | Effective Date<br><br>November 1, 2013 | Block Number(s)<br><br>See Addendum A |

This lease, which includes any addenda hereto, is hereby entered into by and between the United States of America, ("Lessor"), acting through the Bureau of Ocean Energy Management ("BOEM"), its authorized officer, and

| Lessee | Interest Held |
|---|---|
| OSW Project LLC | 100% |

("Lessee"). This lease is effective on the date written above ("Effective Date") and will continue in effect until the lease terminates as set forth in Addendum "B." In consideration of any cash payment heretofore made by the Lessee to the Lessor and in consideration of the promises, terms, conditions, covenants, and stipulations contained herein and attached hereto, the Lessee and the Lessor agree as follows:

**Section 1: Statutes and Regulations.**

This lease is issued pursuant to subsection 8(p) of the Outer Continental Shelf Lands Act ("the Act"), 43 U.S.C. §§ 1331 *et seq.* This lease is subject to the Act and regulations promulgated pursuant to the Act, including but not limited to, offshore renewable energy and alternate use regulations at 30 CFR Part 285, 30 CFR Part 585 as well as other applicable statutes and regulations in existence on the Effective Date of this lease. This lease is also subject to those statutes enacted (including amendments to the Act or other statutes) and regulations promulgated thereafter, except to the extent that they explicitly conflict with an express provision of this lease. It is expressly understood that amendments to existing statutes, including but not limited to the Act, and regulations may be made, and/or new statutes may be enacted or new regulations promulgated, which do not explicitly conflict with an express provision of this lease, and that the Lessee bears the risk that such amendments, regulations, and statutes may increase or decrease the Lessee's obligations under the lease.

**Section 2:  Rights of the Lessee.**

(a)  The Lessor hereby grants and leases to the Lessee the exclusive right and privilege, subject to the terms and conditions of this lease and applicable regulations, to: (1) submit to the Lessor for approval a Site Assessment Plan (SAP) and Construction and Operations Plan (COP) for the lease activities identified in Addendum "A" of this lease; and (2) conduct activities in the area identified in Addendum "A" of this lease ("leased area") that are described in a SAP or COP that has been approved by the Lessor.  This lease does not, by itself, authorize any activity within the leased area.

(b)  The rights granted to the Lessee herein are limited to those activities described in any SAP or COP approved by the Lessor.  The rights granted to the Lessee are limited by the lease-specific terms, conditions, and stipulations required by the Lessor in Addendum "C."

(c)  This lease does not authorize the Lessee to conduct activities on the Outer Continental Shelf (OCS) relating to or associated with the exploration for, or development or production of, oil, gas, other seabed minerals, or renewable energy resources other than the renewable energy resources identified in Addendum "A."

(d)  The Lessee may request a suspension of this lease from Lessor under 30 CFR § 585.416 for up to two years per request. The suspension will be in effect for the period specified by Lessor in the suspension order, unless the Lessee requests an earlier termination of the suspension. If the Lessee so requests, the Lessor may end the suspension on the date requested by the Lessee, or at any time before the specified end date. Nothing in this provision should be read to limit BSEE's authority.

**Section 3:  Reservations to the Lessor.**

(a)  All rights in the leased area not expressly granted to the Lessee by the Act, applicable regulations, this lease, or any approved SAP or COP, are hereby reserved to the Lessor.

(b)  The Lessor will decide whether to approve or disapprove a SAP or COP in accordance with the applicable regulations in 30 CFR Part 585, including 30 CFR § 585.102(a).  Disapproval of plans will not subject the Lessor to liability under the lease.  The Lessor also retains the right to approve a SAP or COP with conditions, as provided in applicable regulations.  (c)  The Lessor reserves the right to suspend the Lessee's operations in accordance with the national security and defense provisions of Section 12 of the Act and applicable regulations, provided that compensation must be paid to the Lessee as provided by 43 U.S.C. § 1341(c) and (d).

(d)  The Lessor reserves the right to authorize other uses within the leased area and project easement(s) that will not unreasonably interfere with activities described in a SAP and/or COP, approved pursuant to this lease.

**Section 4:  Payments.**

(a)  The Lessee must make all rent payments to the Lessor in accordance with applicable regulations in 30 CFR Part 585, unless otherwise specified in Addendum "B."

(b)  The Lessee must make all operating fee payments to the Lessor in accordance with applicable regulations in 30 CFR Part 585, as specified in Addendum "B."

**Section 5:  Plans.**

The Lessee may conduct those activities described in Addendum "A" only in accordance with a SAP or COP approved by the Lessor.  The Lessee may not deviate from an approved SAP or COP except as approved by the Lessor pursuant to applicable regulations in 30 CFR Part 585.

**Section 6:  Associated Project Easements.**

Pursuant to 30 CFR §  585.200(b), the Lessee has the right to one or more project easement(s), without further competition, for the purpose of installing, maintaining, repairing and replacing: gathering, transmission, distribution, and inter-array cables; power and pumping stations; facility anchors; pipelines; and associated facilities and other appurtenances on the OCS as necessary for the full enjoyment of the lease, and under applicable regulations in 30 CFR Part 285 and 30 CFR Part 585.  As part of submitting a COP for approval, the Lessee may request that one or more easement(s) be granted by the Lessor. If the Lessee requests that one or more easement(s) be granted when submitting a COP for approval, such project easements will be granted by the Lessor in accordance with the Act and applicable regulations in 30 CFR Part 585 upon approval of the COP in which the Lessee has demonstrated a need for such easements.  Such easements must be in a location acceptable to the Lessor, and will be subject to such conditions as the Lessor may require. The project easement(s) issued in conjunction with an approved COP under this lease will be incorporated into this lease as Addendum "D".

**Section 7:  Conduct of Activities.**

The Lessee must conduct, and agrees to conduct, all activities in the leased area in accordance with an approved SAP or COP, all applicable laws and regulations, and the lease-specific terms, conditions and stipulations in Addendum "C".

The Lessee further agrees that no activities authorized by this lease will be carried out in a manner that:

(a)  could unreasonably interfere with or endanger activities or operations carried out under any lease or grant issued or maintained pursuant to the Act, or under any other license or approval from any Federal agency;

(b)  could cause any undue harm or damage to the environment;

(c)  could create hazardous or unsafe conditions; or

(d)    could adversely affect sites, structures, or objects of historical, cultural, or archaeological significance, without notice to and direction from the Lessor on how to proceed.

## Section 8:  Violations, Suspensions, Cancellations, and Remedies.

If the Lessee fails to comply with (1) any of the applicable provisions of the Act or regulations, (2) the approved SAP or COP, or (3) the terms of this lease, including associated Addenda, the Lessor may exercise any of the remedies that are provided under the Act and applicable regulations, including, without limitation, issuance of cessation of operations orders, suspension or cancellation of the lease, and/or the imposition of penalties, in accordance with the Act and applicable regulations.

The Lessor may also cancel this lease for reasons set forth in subsection 5(a)(2) of the Act (43 U.S.C. § 1334(a)(2)), and for reasons provided by the Lessor pursuant to 30 CFR § 585.422. Any cancellations are subject to the limitations and protections contained in subsections 5(a)(2)(B) and (C) of the Act (43 U.S.C. § 1334 (a)(2)(B) and (C)).

Any cancellation or suspension ordered by the Lessor that is predicated on a threat of serious irreparable, or immediate harm or damage, or on an imminent threat of serious or irreparable harm or damage, requires a finding by the Lessor of particularized harm that it determines can only be feasibly averted by suspension of on-lease activities.

Non-enforcement by the Lessor of a remedy for any particular violation of the applicable provisions of the Act or regulations, or the terms of this lease, will not prevent the Lessor from exercising any remedy, including cancellation of this lease, for any other violation or for the same violation occurring at any other time.

## Section 9:  Indemnification.

The Lessee hereby agrees to indemnify the Lessor for, and hold the Lessor harmless from, any claim caused by or resulting from any of the Lessee's operations or activities on the leased area or project easements or arising out of any activities conducted by or on behalf of the Lessee or its employees, contractors (including Operator, if applicable), subcontractors, or their employees, under this lease, including claims for:

a.  loss or damage to natural resources,
b.  the release of any petroleum or any Hazardous Materials,
c.  other environmental injury of any kind,
d.  damage to property,
e.  injury to persons, and/or
f.  costs or expenses incurred by the Lessor.

Except as provided in any Addenda to this lease, the Lessee will not be liable for any losses or damages proximately caused by the activities of the Lessor or the Lessor's employees,

contractors, subcontractors, or their employees.  The Lessee must pay the Lessor for damage, cost, or expense due and pursuant to this section within 90 days after written demand by the Lessor.  Nothing in this lease will be construed to waive any liability or relieve the Lessee from any penalties, sanctions, or claims that would otherwise apply by statute, regulation, operation of law, or could be imposed by the Lessor or other government agency acting under such laws.

"Hazardous Material" means

1. Any substance or material defined as hazardous, a pollutant, or a contaminant under the *Comprehensive Environmental Response, Compensation, and Liability Act* at 42 U.S.C. §§ 9601(14) and (33);

2. Any regulated substance as defined by the Resource Conservation and Recovery Act ("RCRA") at 42 U.S.C. § 6991 (7), whether or not contained in or released from underground storage tanks, and any hazardous waste regulated under RCRA pursuant to 42 U.S.C. §§ 6921 *et seq.*;

3. Oil, as defined by the Clean Water Act at 33 U.S.C. § 1321(a)(1) and the Oil Pollution Act at 33 U.S.C. § 2701(23); or

4. Other substances that applicable Federal, state, tribal, or local laws define and regulate as "hazardous."

**Section 10:  Financial Assurance.**

The Lessee must at all times maintain the financial assurance required prior to issuance of this lease, as provided in 30 CFR Part 585.  The Lessee must also provide and maintain a supplemental surety bond(s) or other authorized financial assurance if the Lessor determines that additional financial assurance is necessary to ensure compliance with 30 CFR Part 585, applicable plan approvals, and the terms and conditions of this lease.

**Section 11:  Assignment or Transfer of Lease.**

This lease may not be assigned or transferred in whole or in part without written approval of the Lessor.  The Lessor reserves the right, in its sole discretion, to deny approval of the Lessee's application to transfer or assign all or part of this lease, in accordance with applicable regulations in 30 CFR Part 585.  Any assignment or transfer made in contravention of this section is void.

**Section 12:  Relinquishment of Lease.**

The Lessee may relinquish this entire lease or any officially designated subdivision thereof by filing with the appropriate office of the Lessor a written relinquishment application, in accordance with applicable regulations in 30 CFR Part 585.  No relinquishment of this lease

or any portion thereof will relieve the Lessee or its surety of the obligations accrued hereunder, including but not limited to, the responsibility to remove property and restore the leased area pursuant to section 13 of this lease and applicable regulations.

**Section 13: Removal of Property and Restoration of the Leased Area on Termination of Lease.**

Unless otherwise authorized by the Lessor, pursuant to the applicable regulations in 30 CFR Part 285 and 30 CFR Part 585, the Lessee must remove or decommission all facilities, projects, cables, pipelines, and obstructions and clear the seafloor of all obstructions created by activities on the leased area, including any project easements within two years following lease termination, whether by expiration, cancellation, contraction, or relinquishment, in accordance with any approved SAP, COP, or approved Decommissioning Application, and applicable regulations in 30 CFR Parts 285, 585, and 586.

**Section 14: Safety Requirements.**

The Lessee must:

    a. maintain all places of employment for activities authorized under this lease in compliance with occupational safety and health standards and, in addition, free from recognized hazards to employees of the Lessee or of any contractor or subcontractor operating under this lease;

    b. maintain all operations within the leased area in compliance with regulations in 30 CFR Part 285 and 30 CFR Part 585 and orders from the Lessor and other Federal agencies with jurisdiction, intended to protect persons, property and the environment on the OCS; and

    c. provide any requested documents and records, which are pertinent to occupational or public health, safety, or environmental protection, and allow prompt access, at the site of any operation or activity conducted under this lease, to any inspector authorized by the Lessor or other Federal agency with jurisdiction.

**Section 15: Debarment Compliance.**

The Lessee must comply with the Department of the Interior's non-procurement debarment and suspension regulations set forth in 2 CFR Parts 180 and 1400 and must communicate the requirement to comply with these regulations to persons with whom it does business related to this lease by including this requirement in all relevant contracts and transactions.

**Section 16: Equal Opportunity Clause.**

During the performance of this lease, the Lessee must fully comply with paragraphs (1) through (7) of Section 202 of Executive Order 11246, as amended (reprinted in 41 CFR 60-1.4(a)), and the implementing regulations, which are for the purpose of preventing employment discrimination against persons on the basis of race, color, religion, sex, or national origin.  Paragraphs (1) through (7) of Section 202 of Executive Order 11246, as amended, are incorporated in this lease by reference.

**Section 17:  Certification of Nonsegregated Facilities.**

By entering into this lease, the Lessee certifies, as specified in 41 CFR 60-1.8, that it does not and will not maintain or provide for its employees any segregated facilities at any of its establishments and that it does not and will not permit its employees to perform their services at any location under its control where segregated facilities are maintained.  As used in this certification, the term "facilities" means, but is not limited to, any waiting rooms, work areas, restrooms and washrooms, restaurants and other eating areas, timeclocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees.  Segregated facilities include those that are segregated by explicit directive or those that are in fact segregated on the basis of race, color, religion, sex, or national origin, because of habit, local custom, or otherwise; provided, that separate or single-user restrooms and necessary dressing or sleeping areas must be provided to assure privacy as appropriate.  The Lessee further agrees that it will obtain identical certifications from proposed contractors and subcontractors prior to awarding contracts or subcontracts unless they are exempt under 41 CFR 60-1.5.

**Section 18:  Notices.**

All notices or reports provided from one party to the other under the terms of this lease must be in writing, except as provided herein and in the applicable regulations in 30 CFR Parts 285, 585, and 586.  Written notices and reports must be delivered to the Lessee's or Lessor's Lease Representative, as specifically listed in Addendum "A," either electronically, by hand, by facsimile, or by United States first class mail, adequate postage prepaid.  Each party must, as soon as practicable, notify the other of a change to their Lessee's or Lessor's Contact Information listed in Addendum "A" by a written notice signed by a duly authorized signatory and delivered by hand or United States first class mail, adequate postage prepaid.  Until such notice is delivered as provided in this section, the last recorded contact information for either party will be deemed current for service of all notices and reports required under this lease.  For all operational matters, notices and reports must be provided to the party's Operations Representative, as specifically listed in Addendum "A," as well as the Lease Representative.

**Section 19:  Severability Clause.**

If any provision of this lease is held unenforceable, all remaining provisions of this lease will remain in full force and effect.

**Section 20:  Modification.**

Unless otherwise authorized by the applicable regulations in 30 CFR Part 585, this lease may be modified or amended only by mutual agreement of the Lessor and the Lessee. No such modification or amendment will be binding unless it is in writing and signed by duly authorized signatories of the Lessor and the Lessee.


**Section 21:  Variance.**

The Lessee may submit a written request via email to the BOEM Office of Renewable Energy Programs Chief and/or the Bureau of Safety and Environmental Enforcement (BSEE) via TIMSWeb (https://timsweb.bsee.gov/), requesting a variance from the requirements of this lease. The request must explain why compliance with a particular requirement is not technically and/or economically practicable or feasible and any alternative actions the Lessee proposes to take. To the extent not otherwise prohibited by law and after consideration of all relevant facts and applicable legal requirements, BOEM and/or BSEE may grant the request for a variance if the appropriate Bureau(s) determine that the variance: (1) would not result in a change in the project impact levels described in the Environmental Assessment EA and the Finding of No Significant Impact issued for this lease; (2) would not alter obligations or commitments resulting from consultations performed by BOEM and BSEE under federal law in connection with this lease in a manner that would require BOEM to re-initiate or perform additional consultations (e.g., Endangered Species Act (ESA), Coastal Zone Management Act, National Historic Preservation Act (NHPA)); and (3) would not alter BOEM's determination that the activities associated with the project would be conducted in accordance with Section 8(p)(4) of the Outer Continental Shelf Lands Act (OCSLA). After making a determination regarding a request for a variance, BOEM and/or BSEE will notify the Lessee in writing whether the appropriate Bureau(s) will approve the proposed variance from the lease requirement(s) identified above. Approvals of variance requests will be made publicly available.

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF OCEAN ENERGY MANAGEMENT

**ADDENDUM "A"**

DESCRIPTION OF LEASED AREA AND LEASE ACTIVITIES

Lease Number OCS-A 0483

I.    Lessor and Lessee Contact Information

Lessee Company Number:    15201

(a) Lessor's Contact Information

|  | Lease Representative | Operations Representative |
|---|---|---|
| Title | Deputy Associate Director for Operations, Atlantic Outer Continental Shelf, Office of Renewable Energy Programs | Same as Lease Representative |
| Address | U.S. Department of the Interior Bureau of Ocean Energy Management 45600 Woodland Road, Mail Stop VAM-OREP Sterling, Virginia 20166 | |
| Phone | (703) 787-1300 | |
| Fax | (703) 787-1708 | |
| Email | renewableenergy@boem.gov | |

(b) Lessee's Contact Information

|  | **Lease Representative** | **Operations Representative** |
|---|---|---|
| Name | Joshua J. Bennett | Same as Lease Representative |
| Title | Vice President – Offshore Wind Operations | |
| Address | Virginia Electric and Power Company 120 Tredegar Street Richmond, Virginia 23219 | |
| Phone | (804) 638-0248 | |
| Fax | | |
| Email | joshua.j.bennett@dominionenergy.com | |

II.    <u>Description of Leased Area</u>

The total acreage of the lease area is approximately 112,799.

This area is subject to later adjustment, in accordance with applicable regulations (e.g., contraction, relinquishment, etc.) in 30 CFR Part 585.

The following Blocks or portions of Blocks lying within Official Protraction Diagram Currituck Sound NJ18-11, are depicted on the map below and comprise 112,799 acres, more or less.

1)    Block 6012, E1/2; SE1/4 of NW1/4; SW1/4
2)    Block 6013, All of Block
3)    Block 6014, All of Block
4)    Block 6015, All of Block
5)    Block 6016, All of Block
6)    Block 6062, All of Block
7)    Block 6063, All of Block
8)    Block 6064, All of Block
9)    Block 6065, All of Block
10)    Block 6066, All of Block
11)    Block 6112, All of Block
12)    Block 6113, All of Block
13)    Block 6114, All of Block
14)    Block 6115, All of Block
15)    Block 6116, All of Block
16)    Block 6162, All of Block
17)    Block 6163, All of Block
18)    Block 6164, All of Block
19)    Block 6165, All of Block
20)    Block 6166, All of Block

For the purposes of these calculations, a full Block is 2,304 hectares.  The acreage of a hectare is 2.471043930.



III.    Renewable Energy Resource

       Wind

IV.    Description of Lease Activities

Generation of energy using wind turbine generators and associated offshore substation platforms, inner-array cables, and subsea export cables. Site assessment activities consistent with 30 CFR § 585.600(a)(1).

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF OCEAN ENERGY MANAGEMENT

**ADDENDUM "B"**

LEASE PERIODS AND PAYMENTS

Lease Number OCS-A 0483

I.    Lease Periods

The duration of each period of the lease is described below.  The Lessor may extend or otherwise modify the periods in accordance with applicable regulations in 30 CFR Part 585.

| Period | Duration |
|---|---|
| The Preliminary Period | begins on the effective date of the lease and ends either when a COP is received by the Lessor for review or at the expiration of six years, whichever occurs first. |
| The COP Review Period | begins when the Lessor receives a COP from the Lessee and ends upon COP approval, disapproval, or approval with conditions. |
| The Design and Construction Period | begins at COP approval and ends when the operations period begins. |
| The Operations Period | begins when the requirements of 30 CFR 285.637 are met and ends in 35 years or the duration included and approved as part of the Lessee's COP, whichever is lesser. |

Renewal:  The Lessee may request renewal for all lease periods for good cause, in accordance with applicable regulations in 30 CFR Part 585.  The Lessor, at its discretion, may approve a renewal request to conduct substantially similar activities as were originally authorized under this lease or in an approved plan.  Good cause for extension of a Preliminary Period may include Lessee's inability to procure an offtake agreement after reasonable efforts, and good cause for extension of an Operations Period may include if a project's design and verification indicate a useful life longer than the leased Operations Period.

The Lessor, at its discretion, may approve a renewal request to conduct substantially similar activities as were originally authorized under this lease or in an approved plan.  The Lessor will not approve a renewal request that involves development of a type of renewable energy not originally authorized in the lease.  The Lessor may revise or adjust payment terms of the original lease as a condition of lease renewal.

II.    Definitions

*Day(s)* means calendar day(s) unless otherwise specified.

*Lease Anniversary* means the anniversary of the Effective Date of the lease.
*End Date* means the earlier of a) the last calendar day of the last month of the Operations Period; or b) the date on which the lease terminates for another reason under 30 CFR § 585.432.

*Commercial Operations* means the generation of electricity or other energy product for commercial use, sale, transmission, or distribution.

*Commercial Operations Date*, or *COD*, means the date on which the Lessee first begins commercial operations on the lease.

*Delivery Point* means the meter identified in the Construction and Operations Plan (COP) where the Lessee's facility interconnects with the electric grid to deliver electricity for sale.

*Available for Commercial Operations* means the date on which an individual wind turbine generator (WTG) is engaged in Commercial Operations on the lease. An individual WTG is no longer available for Commercial Operations on the first day that it is permanently decommissioned.  These dates are determined by the COP, the Facility Design Report (FDR) or the Fabrication Installation Report (FIR).

III.    <u>Lease Payments</u>

Unless otherwise authorized by the Lessor in accordance with the applicable regulations in 30 CFR Part 585, the Lessee must make payments as described below.

(a)    ***Rent.***  The Lessee must pay rent as described below:

Rent payments prior to the COD, or prior to the lease End Date in the event that the lease terminates prior to the COD, are calculated by multiplying the acres in the leased area times the rental rate per acre.  The acreage for the lease is documented in Addendum "A".  For example:

- Acres: 100,000

- Annual Rental Rate: $3.00 per acre or fraction thereof

- Rental Fee for Entire Leased Area: $3.00 x 100,000 = $300,000

The first year's rent payment will be separated into two 6-month payments.  The first 6-month payment of $169,198 is due within 45 days of the date that the lease is received by the Lessee for execution.  The second 6-month payment of $169,199 is due by the first day of the seventh month after the Effective Date of the lease.  Rent for the entire leased area for the next year and for each subsequent year is due on or before each Lease Anniversary through the year in which the COD

occurs. The rent for each year subsequent to the COD on the portion of the lease not authorized for Commercial Operations is due on or before each Lease Anniversary.

Rental payments account for lease acreage that will begin commercial operations during the upcoming lease year. Rent will only be due for the undeveloped or non-operating acreage. The rent calculation becomes a three-step process:

> (1) rent is calculated on the portion of the lease not authorized for commercial operations.

> (2) rent is calculated on the portion of the lease authorized for commercial operations but without operating turbines.

> (3) the sum of (1) and (2) yield the rent due.

**Step (1)**: The Lessee will continue to pay rent at the lease rate for acreage outside the approved commercial project area. The demarcation between acreage for a commercial project and undeveloped acreage will be defined in the COP or supplemental documents approved by BOEM. For example, if the total lease acreage is 100,000 acres and exactly one-quarter of the lease acreage is approved for commercial operations, 75,000 acres is not authorized for commercial operations.

- Acres: 75,000

- Annual Rental Rate: $3.00 per acre or fraction thereof

- Rental Fee for Undeveloped Leased Area: $3.00 x 75,000 = $225,000


**Step (2)**: The portion of the acreage covered by approved Commercial Operations subject to rent will be equal to one minus the operating nameplate capacity divided by the total nameplate capacity, $\frac{M_t}{\sum N_w}$, as defined in Section III (b) (4) below, prior to any adjustments as specified in the most recent approved COP for turbine maintenance, replacements, repowering, or decommissioning. If contiguous acreage for an approved project cannot be developed due to buffers or other surface occupancy restrictions, it will be considered part of the operating area of the lease and covered by the lease's operating fee payment.

- Acres: 25,000

- Annual Rental Rate: $3.00 per acre or fraction thereof

- Rental Fee for Undeveloped Acreage Authorized for Commercial Operations: $3.00 x 25,000 x $(1 - \frac{M_t}{\sum N_w})$ = $Rent

Using the summed capacity of 14.21 megawatts (MW) from the 30 MW project in Table 1 from Section III (b) (4) below, the rental calculation for the project area is: $3.00 x 25,000 x (1 - 0.473667) = $39,475

**Step (3)**: Summing the rent due in steps (1) & (2): $225,000 + $39,475 = $264,475.

- The Adjusted Annual Rent Payment will be rounded up to the nearest dollar.

All rent payments must be made as required in 30 CFR 1218.51. Late rent payments will be charged underpayment interest in accordance with 30 CFR 1218.54.

All rent payments, including the last rent payment, are payable for the full year.

During the construction and decommissioning periods, the rental paid can be adjusted following a reconciliation process. The adjustment of rent for the commercial project area will be calculated based on actual construction and decommissioning dates and will equal the fractional remainder of the operating nameplate capacity as calculated for $M_t$ in (b)(4) below. The Lessee should work with BOEM's Office of Renewable Energy Programs and the Office of Natural Resources Revenue (ONRR) on any payment reconciliation as instructed in Section III (c).

(1) *Project Easement.*

Rent for any project easement(s) is described in Addendum "D."

(2) *Relinquishment.*

If the Lessee submits an application for relinquishment of a portion of the leased area within the first 45 days following the date that the lease is received by the Lessee for execution, and the Lessor approves that application, no rent payment will be due on that relinquished portion of the leased area. Later relinquishments of any leased area will reduce the Lessee's rent payments due the year following the Lessor's approval of the relinquishment, through a reduction in the acres in the leased area, the corresponding rent payment for the entire leased area, and any related adjusted annual rent payments.

(b)     *Operating Fee.* The Lessee must pay an operating fee as described below:

(1) **Initial Operating Fee Payment.**

The Lessee must pay an initial prorated operating fee within 90 days after the COD. The initial operating fee payment covers the first year of Commercial Operations on the lease and will be calculated in accordance with subsection (4), below, using an operating fee rate of 0.02 and a capacity factor of 0.4.

(2) **Annual Operating Fee Payments.**

The Lessee must pay the operating fee for each subsequent year of Commercial Operations on or before each Lease Anniversary following the formula in subsection (4). The Lessee must calculate each operating fee annually subsequent to the initial operating fee payment using an operating fee rate of 0.02 through the operations period of the lease. The capacity factor of 0.4 will remain in effect until the Lease Anniversary of the year in which the Lessor adjusts the capacity factor.

(3) **Final Operating Fee Payment.**

The final operating fee payment is due on the Lease Anniversary prior to the End Date. The final operating fee payment covers the last year of Commercial Operations on the lease and will be calculated in accordance with the formula in subsection (4) below.

(4) **Formula for Calculating the Operating Fee in Year *t*.**

| $F_t$ | = | $M_t$ | * | $H$ | * | $c_p$ | * | $P_t$ | * | $r_t$ |
|-------|---|-------|---|-----|---|-------|---|-------|---|-------|

| (annual operating fee) | | (nameplate capacity) | | (hours per year) | | (capacity factor) | | (power price) | | (operating fee rate) |
|---|---|---|---|---|---|---|---|---|---|---|

Where:

| t = | the year of Commercial Operations on the lease starting from each Lease Anniversary, where $t$ equals 1 represents the year beginning on the Lease Anniversary prior to, or on, the COD. |
|---|---|
| $F_t$ = | the dollar amount of the annual operating fee in year $t$. |
| $M_t$ = | the nameplate capacity expressed in megawatts (MW) rounded to the nearest second decimal place in year $t$ of Commercial Operations on the lease.  The capacity calculation is a two-step process: (1) scaling each turbine's nameplate capacity in proportion to the number of days in the year that it is operational and (2) summing these scaled values across all turbines.

The value of $M_t$, reflecting the availability of turbines, will be determined based on the FDR or FIR.  This value will be adjusted to reflect any changes to installed capacity approved by BOEM as of the date each operating fee payment is due, in accordance with the calculation in Equation 1, for each year of Commercial Operations on the lease.

$$(1) \quad M_t = \sum_{w=1}^{W_t} \left( N_w \; x \left[ \frac{Y_{w,t}}{D} \right] \right)$$

Where:

$W_t$ = Number of individual wind generation turbines, $w$, that will be available for Commercial Operations during any day of the year, $t$, per the FDR or FIR.

$N_w$ = Nameplate capacity of individual wind generation turbine, $w$, per the FDR or FIR expressed in MW.

$Y_{w,t}$ = Number of days that turbine $w$ is commercially available during year.

$D$ = Days in the year set equal to 365 in all years for purposes of this calculation.

$M_t$ may be reduced only in the event that installed capacity is permanently decommissioned. $M_t$ will not be changed in response to routine or unplanned maintenance of units, including the temporary removal of a nacelle for off-site repair or replacement with a similar unit. |

EXAMPLE:  Table 1 illustrates the calculations represented by Equation (1) for a single lease year for a lease on which the Lessee plans to erect six turbines, each with a nameplate capacity of 5 MW.  Based on the days in each turbine's Commercial Operations period (column B), the exhibit shows the number of days during the year that the turbine is available for Commercial Operations.  Dividing this value by 365 (column D) yields the percent of days during the year that the turbine is available for Commercial Operations (column E).  For each turbine, the resulting percentage (column E) is multiplied by its nameplate capacity (column A) to calculate its scaled capacity for the year (column F).  The individual values in column F are then summed across all six turbines to calculate total capacity (Mt).

### Table 1:  Example of $M_t$ Calculations for Installation

| Turbine | Nameplate Capacity ($N_w$) [A] | Days in Turbine's Commercial Operations Period [B] | Number of days available for Commercial Operations in year t ($Y_{w,t}$) [C] | Number of days in the Year [D] | Percent of days available for Commercial Operations $\left(\frac{Y_{w,t}}{D}\right)$ [E = C ÷ D] | Turbine capacity scaled based on percent of days in Commercial Operations $N_w \times \frac{Y_{w,t}}{D}$ [F = A × E] |
|---|---|---|---|---|---|---|
| #1 | 5 | January 1 to December 31 | 365 | 365 | 100% | 5.00 |
| #2 | 5 | January 1 to December 31 | 365 | 365 | 100% | 5.00 |
| #3 | 5 | October 1 to December 31 | 92 | 365 | 25.2% | 1.26 |
| #4 | 5 | October 1 to December 31 | 92 | 365 | 25.2% | 1.26 |
| #5 | 5 | October 1 to December 31 | 92 | 365 | 25.2% | 1.26 |
| #6 | 5 | December 1 to December 31 | 31 | 365 | 8.5% | 0.42 |

| | |
|---|---|
| | Available capacity summed across all turbines: $M_t = \sum_{w=1}^{W_t}\left(N_w \times \left[\frac{Y_{w,t}}{D}\right]\right) = 14.21$ <br><br> The same calculation would be performed for the lease during the decommissioning phase. |
| H = | the number of hours in the year for billing purposes which is equal to 8,760 for all years of Commercial Operations on the lease. |
| $c_p$ = | the "Capacity Factor" in Performance Period p, which represents the share of anticipated generation of the facility that is delivered to where the Lessee's facility interconnects with the electric grid (i.e. the Delivery Point) relative to its generation at continuous full power operation at the nameplate capacity, expressed as a decimal between zero and one. Performance Period $(p)$ is the period of Commercial Operation Years $(t)$ during which each year has the same capacity factor. <br><br> The initial Capacity Factor ($c_0$) will be set to 0.4. <br><br> The Capacity Factor will be subject to adjustment at the end of each Performance Period. After the sixth year of Commercial Operations on the lease has concluded, the Lessee will utilize data gathered from years two through six of Commercial Operations on the lease and propose a revised Capacity Factor to be used to calculate subsequent annual payments, as provided for in Table 2 below.  A similar process will be conducted at the conclusion of each five-year Performance Period, thereafter. <br><br> **Table 2:  Definition of Performance Periods[1]** <br><br> (table below) |

| Performance Period ($p$) | Commercial Operation Years ($t$) | Payments Affected by Adjustment | Capacity Factor ($c$) | |
|---|---|---|---|---|
| 0 (COD) | Not Applicable | Payments 1 to 7 | $c_0$=0.4 | -- |
| 1 | $t$ = 2 to 6 | Payments 8 to 12 | $c_1$ | $n_1$=6 |
| 2 | $t$ = 7 to 11 | Payments 13 to 17 | $c_2$ | $n_2$=11 |
| 3 | $t$ = 12 to 16 | Payments 18 to 22 | $c_3$ | $n_3$=16 |
| 4 | $t$ = 17 to 21 | Payments 23 to 27 | $c_4$ | $n_4$=21 |

[1] The Lessor acknowledges that there is a potential scenario where the design and construction period under 585.235(a)(3) may significantly overlap commercial operations as defined in Section II of this Addendum "B". In the event that the payment schedule appears likely to extend beyond 37 payments, the Lessor will provide an updated payment schedule to the Lessee.

| 5 | $t$ = 22 to 26 | Payments 28 to 32 | $c_5$ | $n_5$=26 |
| 6 | $t$ = 27 to 31 | Payments 33 through 37 (as applicable) | $c_6$ | $n_6$=31 |

**Adjustments to the Capacity Factor**

The Actual 5-year Average Capacity Factor ($Xp$) is calculated for each Performance Period after COD ($p > 0$) per Equation 2 below.  $Xp$ represents the sum of actual, metered electricity generation in megawatt-hours (MWh) at the Delivery Point to the electric grid ($A_t$) divided by the amount of electricity generation in MWh that would have been produced if the facility operated continuously at its full, stated capacity ($M_t$) in all of the hours ($h_t$) in each year, $t$, of the corresponding five-year period.

$$(2)\ X_p = \frac{\sum_{t=n-4}^{n} A_t}{\left(\sum_{t=n-4}^{n} M_t \ x \ h_t\right)}$$

Where:

$M_t$ = Nameplate Capacity as defined above.

$n$ = "Date End Year" value for the Performance Period, $p$, as defined in Table 2.

$p$ = Performance Period as defined in Table 2.

$A_t$ = Actual generation in MWh associated with each year of Commercial Operations, $t$, on the lease that is transferred at the Delivery Point; Delivery Point meter data supporting the values submitted for annual actual generation must be recorded, preserved, and timely provided to the Lessor upon request.  The generation data for the facility must be the same data reported on the Energy Information Administration's EIA-923.

$h_t$ = Hours in the year on which the Actual Generation associated with each year of Commercial Operations, $t$, on the lease is based; this definition of "hours in the year" differs from the definition of H in the operating fee equation above.  The hours in the year for purposes of calculating the capacity factor must take into account the actual number of hours, including those in leap years.

The value of the Capacity Factor at the outset of Commercial Operations ($p = 0$) is set to 0.4 as stated in equation 3:

$$(3)\ c_0 = 0.4$$

| $P_t$ = | a measure of the annual average wholesale electric power price expressed in dollars per MW hour. |

| | The Lessee must calculate Pt at the time each operating fee payment is due, subject to approval by the Lessor.  The Price ($P_t$) must equal the simple average of the "on-the-hour" spot price indices for the PJM Dominion power market (PJM DOM Zone) for the most recent calendar year of data available. Aggregated data from commercial subscription services such as S&P Global Market Intelligence Platform or Hitachi ABB Velocity Suite can also be used and may be posted by BOEM for reference.  BOEM may post the power price data it intends to use for the Lessee's reference at boem.gov.<br><br>The source of data used in the calculations must be noted in the Lessee's documentation supporting its estimate of the value of Pt each year for review and approval by the Lessor. BOEM will use the posted prices to verify the Lessee's calculations. |
|---|---|
| $r_t$ = | the operating fee rate of 0.02 (2%). |

(c)      **Reporting, Validation, Audits, and Late Payments.**

The Lessee must submit the values used in the operating fee formula to the Lessor at the time the annual payment based on these values is made.  Submission of this and other reporting, validation, audit and late payment information as requested by the Lessor must be sent to the Lessor using the contact information indicated in Addendum "A", unless the Lessor directs otherwise.  Failure to submit the estimated values and the associated documentation on time to the Lessor may result in penalties as specified in applicable regulations.

Within 60 days of the submission by the Lessee of the annual payment, the Lessor will review the data submitted and validate that the operating fee formula was applied correctly.  If the Lessor validation results in a different operating fee amount, the amount of the annual operating fee payment will be revised to the amount determined by the Lessor.

The Lessor also reserves the right to audit the meter data upon which the Actual 5-year Average Capacity Factor is based at any time during the lease term.  If, as a result of such audit, the Lessor determines that any annual operating fee payment was calculated incorrectly, the Lessor has the right to correct any errors and collect the correct annual operating fee payment amount.

If the annual operating fee is revised downward as a result of the Lessee's calculations, as validated by the Lessor, or an audit of meter data conducted by the Lessee or Lessor, the Lessee will be refunded the difference between the amount of the payment received and the amount of the revised annual operating fee, without interest.  Similarly, if the payment amount is revised upward, the Lessee is required to pay the difference between the amount of the payment received and the amount of the revised annual operating fee, plus underpayment interest on the balance, in accordance with 30 CFR § 1218.54.

Late operating fee payments will be charged underpayment interest in accordance with 30 CFR § 1218.54.

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF OCEAN ENERGY MANAGEMENT

**ADDENDUM "C"**

LEASE-SPECIFIC TERMS, CONDITIONS, AND STIPULATIONS

Lease Number OCS-A 0483

The Lessee's rights to conduct activities on the leased area are subject to the following terms, conditions, and stipulations. The Lessor reserves the right to impose additional terms, and conditions incident to the future approval or approval with modifications of plans, such as a Site Assessment Plan (SAP) or Construction and Operations Plan (COP).

1    DEFINITIONS ................................................................................................................ 2

2    SCHEDULE .................................................................................................................... 3

2.1    Site Characterization ............................................................................................ 3

2.2    Progress Reporting .............................................................................................. 4

3    NATIONAL SECURITY AND MILITARY OPERATIONS ......................................... 4

3.1    Hold and Save Harmless .................................................................................... 4

3.2    Evacuation or Suspension of Activities ........................................................... 5

3.3    Electromagnetic Emissions ............................................................................... 6

4    STANDARD OPERATING CONDITIONS ................................................................ 6

4.1    General ................................................................................................................... 6

4.2    Archaeological Survey Requirements .............................................................. 8

4.3    Geological and Geophysical (G&G) Survey Requirements .......................... 11

4.4    Protected-Species Reporting Requirements ................................................... 14

5    COORDINATION .......................................................................................................... 15

5.1    Notification ........................................................................................................... 15

# 1   DEFINITIONS

1.1   Definition of "Archaeological Resource":  The term "archaeological resource" has the same meaning as "archaeological resource" in BOEM regulations provided in 30 CFR 585.113.

1.2   Definition of "Dynamic Management Area (DMA)":  The term "DMA" refers to a temporary area designated by the National Oceanic and Atmospheric Administration (NOAA) National Marine Fisheries Service (NMFS) and consisting of a circle around a confirmed North Atlantic right whale sighting.  The radius of this circle expands incrementally with the number of whales sighted, and a buffer is included beyond the core area to allow for whale movement.  Mandatory or voluntary speed restrictions may be applied by NOAA NMFS within DMAs.  Information regarding the location and status of applicable DMAs is available from the NMFS Office of Protected Resources.

1.3   Definition of "Effective Date":  The term "Effective Date" has the same meaning as "effective date" in BOEM regulations provided in 30 CFR 585.237.

1.4   Definition of "Geological and Geophysical Survey (G&G Survey)":  The term "G&G Survey" serves as a collective term for surveys that collect data on the geology of the seafloor and landforms below the seafloor.  High resolution geophysical surveys and geotechnical (sub-bottom) sampling are components of G&G surveys.

1.5   Definition of "Geotechnical Exploration":  The term "Geotechnical Exploration" is used to refer to site-specific sediment and underlying geologic data acquired from the seafloor and the sub-bottom and includes geotechnical surveys utilizing borings, vibracores, and cone penetration tests.

1.6   Definition of "High Resolution Geophysical Survey (HRG Survey)":  The term "HRG Survey" means a marine remote-sensing survey using electromechanical survey equipment.  This equipment includes, but is not limited to, such equipment as side-scan sonar, magnetometer, shallow and medium (Seismic) penetration sub-bottom profiler systems, narrow beam or multibeam echo sounder, or other such equipment employed for the purposes of providing data on geological conditions, identifying shallow hazards, identifying archaeological resources, charting bathymetry, and gathering other site characterization information.

1.7   Definition of "Listed Species":  The term "listed species," also referred to in adjective form as "listed," means any species of fish, wildlife, or plant that has been determined to be endangered or threatened under Section 4 of the Endangered Species Act.  Listed species are provided in 50 CFR 17.11-17.12.

1.8   Definition of "Protected-Species Observer":  The term "protected-species observer," or "observer," means an individual who is trained in the shipboard identification and behavior of protected species.  Protected species include marine mammals (those protected under the Endangered Species Act and those protected under the Marine Mammal Protection Act) and sea turtles.

1.9    Definition of "Ramp-up":  The term "ramp-up" means the process of incrementally increasing the acoustic source level of the survey equipment when conducting HRG surveys until it reaches the operational setting.

1.10    Definition of "Site Assessment Activities":  The term "site assessment activities" or "site assessment," has the same meaning as "site assessment activities" in 30 CFR 585.113.

1.11    Definition of "Qualified Marine Archaeologist":  The term "qualified marine archaeologist" means a person retained by the Lessee who meets the Secretary of the Interior's Professional Qualifications Standards for Archaeology (48 FR 44738-44739), and has experience analyzing marine geophysical data.

1.12    Definition of "Take":  The terms "Takes" and "Taken" and "Taking" have the same meaning as the term "take" as defined in 16 U.S.C. § 1532(19).


# 2    SCHEDULE

## 2.1    Site Characterization

2.1.1    <u>Survey Plans</u>.

2.1.1.1    <u>SAP Survey Plan</u>.  If the Lessee proposes to conduct site assessment activities during the site assessment term, then the Lessee must submit to the Lessor a complete SAP survey plan.  This SAP survey plan must include details of any surveys to be conducted on this lease necessary to support the submission of a SAP (i.e., necessary to satisfy the information requirements in the applicable regulations, including but not limited to 30 CFR 585.606, 610, 611).

At once below:

The Lessee must submit the SAP survey plan to the Lessor 30 calendar days prior to the date of the required pre-survey meeting with the Lessor (See 2.1.2).  The Lessor may require that the Lessee modify the SAP survey plan to address any comments the Lessor submits to the Lessee on the contents of the SAP survey plan in a manner deemed satisfactory to the Lessor prior to the commencement of any survey activities described in the SAP survey plan.

2.1.1.2    <u>COP Survey Plan</u>.  The Lessee must submit to the Lessor for review a complete COP survey plan providing details and timelines of the surveys to be conducted on this lease that are necessary to support the submission of a COP (i.e., necessary to satisfy the information requirements in the applicable regulations, including but not limited to 30 CFR 585.621, 626, 627).  The COP survey plan must be submitted to the Lessor no later than on the first anniversary of this lease's Effective Date and at least 30 calendar days prior to the date of the pre-survey meeting with the Lessor (see 2.1.2).  The Lessee must modify the COP survey plan to address any comments the Lessor submits to the Lessee on the contents of the COP survey plan in a manner deemed satisfactory to the Lessor prior to the commencement of these survey activities.

2.1.2  <u>Pre-Survey Meeting with the Lessor</u>.  At least 60 calendar days prior to the initiation of survey activities in support of the submission of a plan (i.e., SAP and COP), the Lessee must hold a pre-survey meeting with the Lessor to discuss the applicable proposed survey plan and timelines.  The Lessee must ensure the presence of a Qualified Marine Archaeologist at this meeting (See 4.2.2).

## 2.2  Progress Reporting

2.2.1  <u>Semi-Annual Progress Report</u>.  The Lessee must submit to the Lessor a semi-annual (i.e., every six months) progress report through the duration of the site assessment term that includes a brief narrative of the overall progress since the last progress report, or – in the case of the first report – since the Effective Date.  The progress report must include an update regarding progress in executing the activities included in the survey plans, and include as an enclosure updated survey plans accounting for any modifications in schedule.

# 3    NATIONAL SECURITY AND MILITARY OPERATIONS

The Lessee must comply with the requirements specified in stipulations 3.1, 3.2, and 3.3 when conducting site characterization activities in support of plan (i.e., SAP and COP) submittal.

## 3.1  Hold and Save Harmless

Whether compensation for such damage or injury might be due under a theory of strict or absolute liability or otherwise, the Lessee assumes all risks of damage or injury to persons or property, which occur in, on, or above the OCS, to any persons or to any property of any person or persons in connection with any activities being performed by the Lessee in, on, or above the OCS, if such injury or damage to such person or property occurs by reason of the activities of any agency of the United States Government, its contractors, or subcontractors, or any of its officers, agents or employees, being conducted as a part of, or in connection with, the programs or activities of the individual military command headquarters (hereinafter "the appropriate command headquarters") listed in the contact information provided as an enclosure to this lease.

Notwithstanding any limitation of the Lessee's liability in Section 9 of the lease, the Lessee assumes this risk whether such injury or damage is caused in whole or in part by any act or omission, regardless of negligence or fault, of the United States, its contractors or subcontractors, or any of its officers, agents, or employees.  The Lessee further agrees to indemnify and save harmless the United States against all claims for loss, damage, or injury in connection with the programs or activities of the command headquarters, whether the same be caused in whole or in part by the negligence or fault of the United States, its contractors, or subcontractors, or any of its officers, agents, or employees and whether such claims might be sustained under a theory of strict or absolute liability or otherwise.

## 3.2   Evacuation or Suspension of Activities

3.2.1   <u>General</u>.  The Lessee hereby recognizes and agrees that the United States reserves and has the right to temporarily suspend operations and/or require evacuation on this lease in the interest of national security pursuant to Section 3(c) of this lease.

3.2.2   <u>Notification</u>.  Every effort will be made by the appropriate military agency to provide as much advance notice as possible of the need to suspend operations and/or evacuate.  Advance notice will normally be given before requiring a suspension or evacuation.  Temporary suspension of operations may include but is not limited to the evacuation of personnel and appropriate sheltering of personnel not evacuated.

"Appropriate sheltering" means the protection of all Lessee personnel for the entire duration of any Department of Defense activity from flying or falling objects or substances and will be implemented by an order (oral and/or written) from the BOEM Office of Renewable Energy Programs (OREP) Program Manager, after consultation with the appropriate command headquarters or other appropriate military agency or higher Federal authority.  The appropriate command headquarters, military agency or higher authority will provide information to allow the Lessee to assess the degree of risk to, and provide sufficient protection for, the Lessee's personnel and property.

3.2.3 <u>Duration</u>.  Suspensions or evacuations for national security reasons will not generally exceed 72 hours; however, any such suspension may be extended by order of the OREP Program Manager.  During such periods, equipment may remain in place, but all operations, if any, must cease for the duration of the temporary suspension if so directed by the OREP Program Manager.  Upon cessation of any temporary suspension, the OREP Program Manager will immediately notify the Lessee such suspension has terminated and operations on the leased area can resume.

3.2.4 <u>Lessee Point-of-Contact for Evacuation/Suspension Notifications</u>.  The Lessee must inform the Lessor of the persons/offices to be notified to implement the terms of 3.2.2 and 3.2.3.

3.2.5 <u>Coordination with Command Headquarters</u>.  The Lessee must establish and maintain early contact and coordination with the appropriate command headquarters, in order to avoid or minimize the potential to conflict with and minimize the potential effects of conflicts with military operations.

3.2.6 <u>Reimbursement</u>.  The Lessee is not entitled to reimbursement for any costs or expenses associated with the suspension of operations or activities or the evacuation of property or personnel in fulfillment of the military mission in accordance with 3.2.1 through 3.2.5 above.

## 3.3  Electromagnetic Emissions

The Lessee, prior to entry into any designated defense operating area, warning area, or water test area for the purpose of commencing survey activities undertaken to support SAP or COP submittal, must enter into an agreement with the commander of the appropriate command headquarters to coordinate the electromagnetic emissions associated with such survey activities.  The Lessee must ensure that all electromagnetic emissions associated with such survey activities are controlled as directed by the commander of the appropriate command headquarters.

# 4  STANDARD OPERATING CONDITIONS

## 4.1  General

4.1.1 <u>Vessel Strike Avoidance Measures</u>.  The Lessee must ensure that all vessels conducting activities in support of plan (i.e., SAP and COP) submittal comply with the vessel-strike avoidance measures specified in stipulations 4.1.1.1 through 4.1.1.7, except under extraordinary circumstances when the safety of the vessel or crew is in doubt or the safety of life at sea is in question.

4.1.1.1  The Lessee must ensure that vessel operators and crews maintain a vigilant watch for cetaceans, pinnipeds, and sea turtles and slow down or stop their vessel to avoid striking these protected species.

4.1.1.2  The Lessee must ensure that all vessel operators comply with 10 knot (18.5 km/hr) speed restrictions in any Dynamic Management Area (DMA).  In addition, the Lessee must ensure that all vessels operating from November 1 through April 30 operate at speeds of 10 knots (18.5 km/hr) or less.

4.1.1.3  <u>North Atlantic right whales.</u>

4.1.1.3.1  The Lessee must ensure all vessels maintain a separation distance of 500 meters (1,640 ft) or greater from any sighted North Atlantic right whale.

4.1.1.3.2  The Lessee must ensure that the following avoidance measures are taken if a vessel comes within 500 meters (1,640 ft) of any North Atlantic right whale:

4.1.1.3.2.1  If underway, any vessel must steer a course away from the North Atlantic right whale at 10 knots (18.5 km/h) or less until the 500 meters (1,640 ft) minimum separation distance has been established (except as provided in 4.1.1.3.2.2).

4.1.1.3.2.2  If a North Atlantic right whale is sighted within 100 meters (328 ft) to an underway vessel, the vessel operator must immediately reduce speed and promptly shift the engine to neutral.  The vessel operator must not engage the engines until the North Atlantic right whale has moved beyond 100 meters (328 ft).

4.1.1.3.2.3  If a vessel is stationary, the vessel must not engage engines until the North Atlantic right whale has moved beyond 100 meters (328 ft), at which point the Lessee must comply with 4.1.1.3.2.1.

4.1.1.4  <u>Non-delphinoid cetaceans other than the North Atlantic right whale.</u>

4.1.1.4.1  The Lessee must ensure all vessels maintain a separation distance of 100 meters (328 ft) or greater from any sighted non-delphinoid cetacean.

4.1.1.4.2  The Lessee must ensure that the following avoidance measures are taken if a vessel comes within 100 meters (328 ft) of any non-delphinoid cetacean:

4.1.1.4.2.1  If any non-delphinoid cetacean is sighted, the vessel underway must reduce speed and shift the engine to neutral, and must not engage the engines until the non-delphinoid cetacean has moved beyond 100 meters (328 ft).

4.1.1.4.2.2  If a vessel is stationary, the vessel must not engage engines until the non-delphinoid cetacean has moved beyond 100 meters (328 ft).

4.1.1.5    Delphinoid cetaceans.

4.1.1.5.1    The Lessee must ensure that all vessels maintain a separation distance of 50 meters (164 ft) or greater from any sighted delphinoid cetacean.

4.1.1.5.2    The Lessee must ensure that the following avoidance measures are taken if the vessel comes within 50 meters (164 ft) of any delphinoid cetacean:

4.1.1.5.2.1    The Lessee must ensure that any vessel underway remain parallel to a sighted delphinoid cetacean's course whenever possible, and avoid excessive speed or abrupt changes in direction.  The Lessee may not adjust course and speed until the delphinoid cetacean has moved beyond 50 meters (164 ft) or the delphinoid cetacean has moved abeam of the underway vessel.

4.1.1.5.2.2    The Lessee must ensure that any vessel underway reduce vessel speed to 10 knots (18.5 km/h) or less when pods (including mother/calf pairs) or large assemblages of delphinoid cetaceans are observed.  The Lessee may not adjust course and speed until the delphinoid cetaceans have moved beyond 50 meters (164 ft) or abeam of the underway vessel.

4.1.1.6    Sea Turtles and Pinnipeds.

4.1.1.6.1    The Lessee must ensure all vessels maintain a separation distance of 50 meters (164 ft) or greater from any sighted sea turtle or pinniped.

4.1.1.7    Vessel Operator Briefing.  The Lessee must ensure that all vessel operators are briefed to ensure they are familiar with the requirements specified in 4.1.1.

4.1.2    Marine Trash and Debris Prevention.  The Lessee must ensure that vessel operators, employees, and contractors actively engaged in activity in support of plan (i.e., SAP and COP) submittal are briefed on marine trash and debris awareness and elimination, as described in the BSEE NTL No. 2012-G01 ("Marine Trash and Debris Awareness and Elimination") or any NTL that supercedes this NTL, except that the Lessor will not require the Lessee, vessel operators, employees, and contractors to undergo formal training or post placards.  The Lessee must ensure that these vessel operator employees and contractors are made aware of the environmental and socioeconomic impacts associated with marine trash and debris and their responsibilities for ensuring that trash and debris are not intentionally or accidentally discharged into the marine environment.  The above-referenced NTL provides information the Lessee may use for this awareness training.

## 4.2    Archaeological Survey Requirements

4.2.1    Archaeological Survey Required.  The Lessee must provide the results of an archaeological survey with its SAP and COP.

4.2.2 <u>Qualified Marine Archaeologist</u>.  The Lessee must ensure that the analysis of archaeological survey data collected in support of plan (i.e., SAP and COP) submittal and the preparation of archaeological reports in support of plan submittal are conducted by a Qualified Marine Archaeologist.

4.2.3 <u>Tribal Pre-Survey Meeting</u>.  Subsequent to any pre-survey meeting with the Lessor (see 2.1.2) and at least 45 calendar days prior to commencing survey activities performed in support of plan (i.e., SAP and COP) submittal, the Lessee must invite by certified mail the Narragansett Indian Tribe, the Shinnecock Indian Nation, and the Lenape Tribe of Delaware to a tribal pre-survey meeting.  The purpose of this meeting will be for the Lessee and the Qualified Marine Archaeologist to discuss the Lessee's Survey Plan and consider requests to monitor portions of the archaeological survey and the geotechnical sampling activities, including the visual logging and analysis of geotechnical samples (e.g., cores).  The meeting must be scheduled for a date at least 30 calendar days prior to commencing survey and at a location and time that affords the participants a reasonable opportunity to participate.  The anticipated date for the meeting must be identified in the timeline of activities described in the applicable survey plan (see 2.1.1).

4.2.4 <u>Geotechnical Exploration</u>.  The Lessee may only conduct geotechnical exploration activities, including geotechnical sampling or other direct sampling or investigation techniques, which are performed in support of plan (i.e., SAP and COP) submittal, in locations where an analysis of the results of geophysical surveys has been completed.  This analysis must include a determination by a Qualified Marine Archaeologist as to whether any potential archaeological resources are present in the area.  Except as allowed by the Lessor under 4.2.6, the geotechnical exploration activities must avoid potential archaeological resources by a minimum of 50 meters, and the avoidance distance must be calculated from the maximum discernible extent of the archaeological resource.  A Qualified Marine Archaeologist must certify, in the Lessee's archaeological reports, that geotechnical exploration activities did not impact potential historic properties identified as a result of the HRG surveys performed in support of plan submittal, except as follows:  in the event that the geotechnical exploration activities did impact potential historic properties identified in the archaeological surveys without the Lessor's prior approval, the Lessee and the Qualified Marine Archaeologist who prepared the report must instead provide a statement documenting the extent of these impacts.

4.2.5    <u>Monitoring and Avoidance</u>.  The Lessee must inform the Qualified Marine Archaeologist that he or she may be present during HRG surveys and bottom-disturbing activities performed in support of plan (i.e., SAP and COP) submittal to ensure avoidance of potential archaeological resources, as determined by the Qualified Marine Archaeologist (including bathymetric, seismic, and magnetic anomalies; side scan sonar contacts; and other seafloor or sub-surface features that exhibit potential to represent or contain potential archaeological sites or other historic properties).  In the event that this Qualified Marine Archaeologist indicates that he or she wishes to be present, the Lessee must facilitate the Qualified Marine Archaeologist's presence, as requested by the Qualified Marine Archaeologist, and provide the Qualified Marine Archaeologist the opportunity to inspect data quality.

4.2.6    <u>No Impact without Approval</u>.  In no case may the Lessee knowingly impact a potential archaeological resource without the Lessor's prior approval.

4.2.7    <u>Post-Review Discovery Clauses</u>.  If the Lessee, while conducting site characterization activities in support of plan (i.e., SAP and COP) submittal, discovers a potential archaeological resource, such as the presence of a shipwreck (e.g., a sonar image or visual confirmation of an iron, steel, or wooden hull, wooden timbers, anchors, concentrations of historic objects, piles of ballast rock), prehistoric artifacts, or relict landforms, etc. within the project area, the Lessee must:

4.2.7.1    Immediately halt seafloor/bottom-disturbing activities within the area of discovery;

4.2.7.2    Notify the Lessor within 24 hours of discovery;

4.2.7.3    Notify the Lessor in writing via report to the Lessor within 72 hours of its discovery;

4.2.7.4    Keep the location of the discovery confidential and take no action that may adversely affect the archaeological resource until the Lessor has made an evaluation and instructs the applicant on how to proceed; and

4.2.7.5    Conduct any additional investigations as directed by the Lessor to determine if the resource is eligible for listing in the National Register of Historic Places (30 CFR 585.802(b)).  The Lessor will do this if:  (1) the site has been impacted by the Lessee's project activities; or (2) impacts to the site or to the area of potential effect cannot be avoided.  If investigations indicate that the resource is potentially eligible for listing in the National Register of Historic Places, the Lessor will tell the Lessee how to protect the resource or how to mitigate adverse effects to the site.  If the Lessor incurs costs in protecting the resource, under Section 110(g) of the National Historic Preservation Act, the Lessor may charge the Lessee reasonable costs for carrying out preservation responsibilities under the OCS Lands Act (30 CFR 585.802(c-d)).

## 4.3   Geological and Geophysical (G&G) Survey Requirements

4.3.1   <u>General</u>.  The Lessee must ensure that all vessels conducting activity in support of a plan (i.e., SAP and COP) submittal comply with the geological and geophysical survey requirements specified in 4.3 except under extraordinary circumstances when the safety of the vessel or crew are in doubt or the safety of life at sea is in question.

4.3.2   <u>Visibility</u>.  The Lessee must not conduct G&G surveys in support of plan (i.e., SAP and COP) submittal at any time when lighting or weather conditions (e.g., darkness, rain, fog, sea state) prevents visual monitoring of the HRG survey exclusion zone (see 4.3.6) or the geotechnical sampling exclusion zone (see 4.3.7), except as allowed under 4.3.3.

4.3.3   <u>Modification of Visibility Requirement.</u>  If the Lessee intends to conduct G&G survey operations in support of plan submittal at night or when visual observation is otherwise impaired, the Lessee must submit to the Lessor an alternative monitoring plan detailing the alternative monitoring methodology (e.g., active or passive acoustic monitoring technologies).  The Lessor may decide to allow the Lessee to conduct G&G surveys in support of plan submittal at night or when visual observation is otherwise impaired using the proposed alternative monitoring methodology.

4.3.4   <u>Protected-Species Observer</u>.  The Lessee must ensure that the exclusion zone for all G&G surveys performed in support of plan (i.e., SAP and COP) submittal is monitored by one or more NMFS-approved protected-species observers around the sound source.  The Lessee must provide to the Lessor a list of observers and their résumés no later than 45 calendar days prior to the scheduled start of surveys performed in support of plan submittal.  The résumés of any additional observers must be provided at least 15 calendar days prior to each observer's start date.  The Lessor will send the observer information to NMFS for approval.

4.3.5   <u>Optical Device Availability</u>.  The Lessee must ensure that reticle binoculars and other suitable equipment are available to each observer to adequately perceive and monitor protected marine species within the exclusion zone during surveys conducted in support of plan (i.e., SAP and COP) submittal.

4.3.6   <u>High-Resolution Geophysical (HRG) Surveys.</u>  Stipulations specific to HRG surveys conducted in support of plan (i.e., SAP and COP) submittal where one or more acoustic sound sources is operating at frequencies below 200 kHz are provided in 4.3.6.1 through 4.3.6.9:

4.3.6.1 <u>Establishment of Default Exclusion Zone</u>.  The Lessee must ensure a 200-meter radius exclusion zone for cetaceans, pinnipeds, and sea turtles.  The Lessee may not use HRG survey devices that emit sound levels that exceed the 180 dB Level A harassment radius (200 meter) boundary without approval by the Lessor.  If the Lessor determines that the exclusion zone does not encompass the 180 dB Level A harassment radius, the Lessor may impose additional, relevant requirements on the Lessee, including but not limited to, required expansion of this exclusion zone.

4.3.6.2 <u>HRG Survey Chesapeake Bay Seasonal Management Area (SMA) Right Whale Monitoring</u>.  The Lessee must ensure that between November 1 and April 30 vessel operators monitor National Marine Fisheries Service (NMFS) North Atlantic Right Whale reporting systems (e.g., the Early Warning System, Sighting Advisory System, and Mandatory Ship Reporting System) for the presence of North Atlantic right whales during HRG survey operations within or adjacent to this SMA.

4.3.6.3 <u>Dynamic Management Area Shutdown Requirement</u>.  The Lessee must ensure that vessels cease HRG survey activities within 24 hours of NMFS establishing a DMA in the Lessee's HRG survey area.  HRG surveys may resume in the affected area after the DMA has expired.

4.3.6.4 <u>Clearance of Exclusion Zone</u>.  The Lessee must ensure that active acoustic sound sources will not be activated until the protected species observer has reported the exclusion zone clear of all cetaceans, pinnipeds, and sea turtles for 60 minutes.

4.3.6.5 <u>Electromechanical Survey Equipment Ramp-Up</u>.  The Lessee must ensure that, when technically feasible, a "ramp-up" of the electromechanical survey equipment occurs at the start or re-start of HRG survey activities.  A ramp-up would begin with the power of the smallest acoustic equipment for the HRG survey at its lowest power output.  The power output would be gradually turned up and other acoustic sources added in a way such that the source level would increase in steps not exceeding 6 dB per 5-minute period.

4.3.6.6 <u>Shutdown for Non-Delphinoid Cetaceans and Sea Turtles</u>.  If a non-delphinoid cetacean or sea turtle is sighted at or within the exclusion zone, an immediate shutdown of the electromechanical survey equipment is required.  The vessel operator must comply immediately with such a call by the observer.  Any disagreement or discussion must occur only after shutdown.  Subsequent restart of the electromechanical survey equipment may only occur following clearance of the exclusion zone (see 4.3.6.4) and implementation of ramp-up procedures (see 4.3.6.5).

4.3.6.7  <u>Power Down for Delphinoid Cetaceans and Pinnipeds.</u>  If a delphinoid cetacean or pinniped is sighted at or within the exclusion zone, the electromechanical survey equipment must be powered down to the lowest power output that is technically feasible.  The vessel operator must comply immediately with such a call by the observer.  Any disagreement or discussion must occur only after power-down.  Subsequent power up of the electromechanical survey equipment must use the ramp-up provisions described in 4.3.6.5 and may occur after (1) the exclusion zone is clear of delphinoid cetaceans and pinnipeds or (2) a determination by the observer after a minimum of 10 minutes of observation that the delphinoid cetacean or pinniped is approaching the vessel or towed equipment at a speed and vector that indicates voluntary approach to bow-ride or chase towed equipment.  An incursion into the exclusion zone by a non-delphinoid cetacean or sea turtle during a power-down requires implementation of the shutdown procedures described in 4.3.6.6.

4.3.6.8  <u>Pauses in Electromechanical Survey Sound Source.</u>  The Lessee must ensure that, if the electromechanical sound source shuts down for reasons other than encroachment into the exclusion zone by a non-delphinoid cetacean or sea turtle, including reasons such as, but not limited to, mechanical or electronic failure, resulting in the cessation of the sound source for a period greater than 20 minutes, restart of the electromechanical survey equipment commences only after clearance of the exclusion zone (see 4.3.6.4) and implementation of ramp-up procedures (see 4.3.6.5).  If the pause is less than 20 minutes the equipment may be restarted as soon as practicable at its operational level as long as visual surveys were continued diligently throughout the silent period and the exclusion zone remained clear of cetaceans, pinnipeds, and sea turtles.  If visual surveys were not continued diligently during the pause of 20-minutes or less, the Lessee must restart the electromechanical survey equipment following clearance of the exclusion zone (see 4.3.6.4) and implementation of ramp-up procedures (see 4.3.6.5).

4.3.6.9  <u>Compliance with Equipment Noise Standards.</u>  All HRG survey equipment used by the Lessee must comply with applicable equipment noise standards of the U.S. Environmental Protection Agency (EPA), unless directed otherwise by the Lessor.  All HRG survey equipment, even if modified from the original, must have noise-control devices no less effective than those provided on the original equipment.

4.3.7  <u>Geotechnical Exploration.</u>  Stipulations specific to geotechnical exploration limited to borings and vibracores and conducted in support of plan (i.e., SAP and COP) submittal are provided in 4.3.7.1 through 4.3.7.4.

4.3.7.1 <u>Establishment of Default Exclusion Zone</u>.  The Lessee must ensure a 200-meter default exclusion zone for cetaceans, pinnipeds, and sea turtles.  The Lessee may not use geotechnical survey equipment that emits sound levels that exceed the 120 dB Level B harassment radius (200 meter) boundary without approval by the Lessor.  If the Lessor determines that the exclusion zone does not encompass the 120 dB Level B harassment radius, the Lessor may impose additional, relevant requirements on the Lessee, including but not limited to, required expansion of this exclusion zone.

4.3.7.2 <u>Clearance of Exclusion Zone.</u>  The Lessee must ensure that the geotechnical sound source is not activated until the observer has reported the exclusion zone clear of all cetaceans, pinnipeds, and sea turtles for 60 minutes.

4.3.7.3 <u>Shutdown for Non-Delphinoid Cetaceans and Sea Turtles</u>.  If any non-delphinoid cetaceans or sea turtles are sighted at or within the exclusion zone, an immediate shutdown of the geotechnical survey equipment is required.  The vessel operator must comply immediately with such a call by the observer.  Any disagreement or discussion must occur only after shutdown.  Subsequent restart of the geotechnical survey equipment may only occur following clearance of the exclusion zone (see 4.3.7.2).

4.3.7.4 <u>Pauses in Geotechnical Survey Sound Source.</u>  The Lessee must ensure that, if the geotechnical sound source shuts down for reasons other than encroachment into the exclusion zone by a non-delphinoid cetacean or sea turtle, including reasons such as, but not limited to, mechanical or electronic failure, resulting in the cessation of the sound source for a period greater than 20 minutes, restart of the geotechnical survey equipment commences only following clearance of the exclusion zone (see 4.3.7.2).  If the pause is less than 20 minutes, the equipment may be restarted as soon as practicable as long as visual surveys were continued diligently throughout the silent period and the exclusion zone remained clear of cetaceans, pinnipeds, and sea turtles.  If visual surveys were not continued diligently during the pause of 20 minutes or less, the Lessee may restart the geotechnical survey equipment only after clearance of the exclusion zone (see 4.3.7.2).

## 4.4  Protected-Species Reporting Requirements

The Lessee must ensure compliance with the following reporting requirements for site characterization activities performed in support of plan (i.e., SAP and COP) submittal and must use the contact information provided as an enclosure to this lease, or updated contact information as provided by the Lessor, to fulfill these requirements:

4.4.1   <u>Reporting Injured or Dead Protected Species</u>.  The Lessee must ensure that sightings of any injured or dead protected species (e.g., marine mammals, sea turtles or sturgeon) are reported to the Lessor, NMFS, and the NMFS Northeast Regional Stranding Hotline within 24 hours of sighting, regardless of whether the injury or death is caused by a vessel.  In addition, if the injury or death was caused by a collision with a project-related vessel, the Lessee must ensure that the Lessor is notified of the incident within 24 hours.  The Lessee must use the form provided in Appendix A to ADDENDUM "C" to report the sighting or incident.  If the Lessee's activity is responsible for the injury or death, the Lessee must ensure that the vessel assist in any salvage effort as requested by NMFS.

4.4.2   <u>Protected Species Observer Reports</u>.  The Lessee must ensure that the protected-species observer record all observations of protected species using standard marine mammal observer data collection protocols.  The list of required data elements for these reports is provided in Appendix B to ADDENDUM "C".

4.4.3   <u>Final Report of G&G Survey Activities and Observations</u>.  The Lessee must provide the Lessor with a report within 90 calendar days following the commencement of HRG or geotechnical sampling activities that includes a summary of survey activities, all protected-species observer reports, a summary of the survey activities and an estimate of the number of listed marine mammals and sea turtles observed and/or Taken during these survey activities.

4.4.4   <u>Marine Mammal Protection Act Authorization(s)</u>.  If the Lessee is required to obtain an authorization pursuant to section 101(a)(5) of the Marine Mammal Protection Act prior to conducting survey activities, then the Lessee must provide to the Lessor a copy of the authorization prior to commencing these activities.

# 5   COORDINATION

5.1   <u>Notification</u>.  The Lessor will endeavor to notify the Lessee of any activity that the Lessor authorizes or funds that the Lessor has determined may affect the activities of the Lessee within the lease area.

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF OCEAN ENERGY MANAGEMENT

**APPENDIX "A" TO ADDENDUM C**

Lease Number OCS-A 0483

INCIDENT REPORT:  PROTECTED SPECIES INJURY OR MORTALITY

*Photographs and/or video footage should be taken of all injured or dead animals, if possible.*

Observer's full name and/or Reporter's full name: _____

Date and Time animal observed: _____

Date and Time animal/samples collected: _____

Location of Incident (Latitude/Longitude): _____

Species Identification (closest taxonomic level possible): _____

Photograph/Video footage collected:  YES  /  NO    If Yes, was the data provided to NMFS?  YES  /  NO

Name of vessel, vessel speed at time of incident, and activity ongoing at time of observation (e.g., transit, survey, pile driving): _____

_____

Environmental conditions at time of observation (i.e., Beaufort sea state, cloud cover, wind speed, glare):

_____

_____

Water temperature (°C) and depth at site of observation: _____

Describe location of animal and events leading up to, including, and after, the incident: _____

_____

Status of all sound-source use in the 24 hours preceding the incident: _____

_____

Describe all marine mammal, sea turtle, and sturgeon observations in the 24 hours preceding the incident:

_____

_____

_____

**Marine Mammal information:**

Injuries observed: _____

Condition/description of animal: _____

_____

_____

Other remarks: _____

_____

_____

Date and time incident reported to NMFS Stranding Hotline: _____

_____

--------------------------------------------------------------------------------------------------------------

**Sturgeon Information:**

Fork length (or total length): _____ Weight: _____

Condition of specimen/description of animal:

_____

_____

_____

_____

Fish Decomposed:        NO        SLIGHTLY        MODERATELY        SEVERELY

Fish tagged: YES / NO   *Please record all tag numbers.* Tag #: _____

Photograph taken: YES / NO
(please label *species, date, geographic site* and *vessel name* when transmitting photo)

Genetics sample taken: YES / NO

Genetics sample transmitted to: _____ on (mm/dd/yyyy)_____

--------------------------------------------------------------------------------------------------------------

**Sea Turtle Species Information:** *(please designate cm/m or inches)*

Weight (kg or lbs): _____

Sex (circle):  Male    Female    Unknown      How was sex determined? _____

Straight carapace length: _____Straight carapace width: _____

Curved carapace length: _____ Curved carapace width: _____

Plastron length: _____ Plastron width: _____

Tail length: _____ Head width: _____

Condition of specimen/description of animal: _____

_____

_____

_____

**Existing Flipper Tag Information**

Left: _____ Right: _____

PIT Tag #: _____

**Miscellaneous:**

Genetic biopsy taken: YES  /  NO

Photos taken:        YES  /  NO

**Turtle Release Information:**

Date: _____Time: _____

Latitude: _____Longitude: _____

State: _____ County: _____

**Remarks:** (note if turtle was involved with tar or oil, gear or debris entanglement, wounds or mutilations, propeller damage, papillomas, old tag locations, etc.):

_____

_____

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF OCEAN ENERGY MANAGEMENT

**Appendix B to ADDENDUM "C"**

Lease Number OCS-A 0483

REQUIRED DATA ELEMENTS FOR PROTECTED SPECIES OBSERVER REPORTS

Per ADDENDUM "C", 4.4.2, the Lessee must ensure that the protected-species observer record all observations of protected species using standard marine mammal observer data collection protocols.  The list of required data elements for these reports is provided below:

1. Vessel name;

2. Observers' names and affiliations;

3. Date;

4. Time and latitude/longitude when daily visual survey began;

5. Time and latitude/longitude when daily visual survey ended; and

6. Average environmental conditions during visual surveys including:

    a. Wind speed and direction;

    b. Sea state (glassy, slight, choppy, rough, or Beaufort scale);

    c. Swell (low, medium, high, or swell height in meters); and

    d. Overall visibility (poor, moderate, good).

7. Species (or identification to lowest possible taxonomic level);

8. Certainty of identification (sure, most likely, best guess);

9. Total number of animals;

10. Number of juveniles;

11. Description (as many distinguishing features as possible of each individual seen, including length, shape, color and pattern, scars or marks, shape and size of dorsal fin, shape of head, and blow characteristics);

12. Direction of animal's travel – related to the vessel (drawing preferably);

13. Behavior (as explicit and detailed as possible; note any observed changes in behavior);

14. Activity of vessel when sighting occurred.

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF OCEAN ENERGY MANAGEMENT

**ADDENDUM D**

PROJECT EASEMENT
Lease Number OCS-A 0483
**Granted:** January 28, 2024

This section includes a description of the offshore export cable corridor and Project Easement for this lease, and a calculation of the associated rent for the area within the project easement.

I.        Project Easement Description

This project easement is subject to: all terms and conditions of Lease OCS-A 0483, executed effective November 1, 2013; the Construction and Operations Plan (COP); the terms and conditions of the COP approval issued January 28, 2024 ; and any subsequent revisions, amendments, or supplements to any of these .

The map in Figure 1 below depicts the offshore export cable corridor for the project described in the COP. The corridor is of variable width, ranging from a maximum width of 4,867.6 ft (1,483.6 m) to a minimum width of 1,668.5 feet (ft; 508.6 meters [m]) (exact width dependent upon water depth at any given location, existing telecommunications cables, and crossings, and the DOD exclusion areas to the south as well as other existing factors). The corridor will extend approximately 24.34 statute miles from the OCS-A 0483 western lease boundary through federal waters to the Submerged Lands Act Boundary offshore of the Virginia coastline.

Within Figure 1, the project easement is bounded by solid lines and by BOEM aliquots (OCS sub-blocks). The project easement extends approximately 24.34 statute miles and includes approximately 9,804 acres.

The project easement's centerline can be determined by interconnecting the points indicated by the centerline coordinates in Table 1 below. The centerline coordinates follow an order from east to west and are provided in both geographic NAD(83) (longitude, latitude) and UTM Zone 19N, NAD(83) (eastings, northings).



**Figure 1. Offshore Export Cable Corridor and Project Easement (OCS-A 0483)**

**Table 1: Project Easement Centerline Coordinates**

| Point Number | LONGITUDE | LATITUDE | EASTING | NORTHING |
|---|---|---|---|---|
| 1 | -75.48457307 | 36.85015708 | 456799.9907 | 4078359.577 |
| 2 | -75.48713012 | 36.84966751 | 456571.7497 | 4078306.428 |
| 3 | -75.51590793 | 36.84350163 | 454002.4597 | 4077635.905 |
| 4 | -75.53210903 | 36.84018602 | 452555.9352 | 4077276.021 |
| 5 | -75.53544294 | 36.83947084 | 452258.2297 | 4077198.345 |
| 6 | -75.5630887 | 36.83380626 | 449789.5219 | 4076584.132 |
| 7 | -75.56443631 | 36.83347435 | 449669.1377 | 4076548.022 |
| 8 | -75.56701624 | 36.83249742 | 449438.44 | 4076441.011 |
| 9 | -75.56806732 | 36.83204028 | 449344.4109 | 4076390.856 |
| 10 | -75.57192677 | 36.83050645 | 448999.2361 | 4076222.759 |
| 11 | -75.57314068 | 36.8298256 | 448890.5331 | 4076147.879 |
| 12 | -75.57466182 | 36.82901855 | 448754.3466 | 4076059.167 |
| 13 | -75.57513307 | 36.82872785 | 448712.1289 | 4076027.172 |
| 14 | -75.5754966 | 36.82844219 | 448679.5193 | 4075995.678 |
| 15 | -75.5758079 | 36.82811786 | 448651.5421 | 4075959.867 |
| 16 | -75.57625869 | 36.82753584 | 448610.9524 | 4075895.545 |
| 17 | -75.57666143 | 36.8269785 | 448574.6643 | 4075833.935 |
| 18 | -75.57699815 | 36.8264492 | 448544.2816 | 4075775.399 |
| 19 | -75.5802162 | 36.82067943 | 448253.4136 | 4075137.087 |
| 20 | -75.58089072 | 36.81938349 | 448192.3819 | 4074993.692 |
| 21 | -75.58098086 | 36.81924048 | 448184.2462 | 4074977.876 |
| 22 | -75.58361377 | 36.81629389 | 447947.4284 | 4074652.437 |
| 23 | -75.58394424 | 36.81594697 | 447917.7187 | 4074614.133 |
| 24 | -75.58424921 | 36.81566552 | 447890.327 | 4074583.077 |
| 25 | -75.58457664 | 36.81539703 | 447860.9411 | 4074553.472 |
| 26 | -75.58506944 | 36.81503075 | 447816.7379 | 4074513.108 |
| 27 | -75.58548245 | 36.81476017 | 447779.7166 | 4074483.319 |
| 28 | -75.58591914 | 36.81452196 | 447740.6051 | 4074457.132 |
| 29 | -75.58630956 | 36.81433069 | 447705.6523 | 4074436.127 |
| 30 | -75.58696009 | 36.8140845 | 447647.4625 | 4074409.173 |
| 31 | -75.58767336 | 36.81385266 | 447583.685 | 4074383.846 |
| 32 | -75.59139134 | 36.81258678 | 447251.1952 | 4074245.465 |
| 33 | -75.59156355 | 36.81251779 | 447235.7874 | 4074237.906 |
| 34 | -75.5917187 | 36.81241802 | 447221.8808 | 4074226.924 |
| 35 | -75.59295621 | 36.81148689 | 447110.8594 | 4074124.316 |
| 36 | -75.59333571 | 36.81128566 | 447076.8709 | 4074102.203 |
| 37 | -75.59477108 | 36.81020533 | 446948.0952 | 4073983.157 |
| 38 | -75.59492871 | 36.81011005 | 446933.9695 | 4073972.675 |

| 39 | -75.59505422 | 36.81008168 | 446922.7547 | 4073969.597 |
| 40 | -75.59596262 | 36.80996102 | 446841.643 | 4073956.717 |
| 41 | -75.5989098 | 36.80967878 | 446578.5634 | 4073927.05 |
| 42 | -75.60021767 | 36.8095059 | 446461.7829 | 4073908.604 |
| 43 | -75.6013361 | 36.80940545 | 446361.9495 | 4073898.087 |
| 44 | -75.6022737 | 36.8092474 | 446278.2064 | 4073881.081 |
| 45 | -75.60264893 | 36.80917242 | 446244.6839 | 4073872.974 |
| 46 | -75.60316391 | 36.80904611 | 446198.6599 | 4073859.252 |
| 47 | -75.60356155 | 36.80892714 | 446163.1072 | 4073846.278 |
| 48 | -75.60403602 | 36.80876194 | 446120.6687 | 4073828.22 |
| 49 | -75.60455624 | 36.80854283 | 446074.1118 | 4073804.207 |
| 50 | -75.60484872 | 36.80840131 | 446047.9225 | 4073788.673 |
| 51 | -75.60497479 | 36.80831175 | 446036.6142 | 4073778.808 |
| 52 | -75.60516962 | 36.80808515 | 446019.0763 | 4073753.782 |
| 53 | -75.60537356 | 36.80793529 | 446000.7795 | 4073737.273 |
| 54 | -75.60562042 | 36.80763185 | 445978.5468 | 4073703.751 |
| 55 | -75.60573921 | 36.80753359 | 445967.8812 | 4073692.918 |
| 56 | -75.60637834 | 36.80709521 | 445910.5619 | 4073644.649 |
| 57 | -75.60673069 | 36.80689159 | 445878.988 | 4073622.261 |
| 58 | -75.60699228 | 36.80677029 | 445855.568 | 4073608.953 |
| 59 | -75.60744026 | 36.80660335 | 445815.4897 | 4073590.688 |
| 60 | -75.60803639 | 36.80643636 | 445762.1959 | 4073572.501 |
| 61 | -75.60885158 | 36.8062873 | 445689.3736 | 4073556.429 |
| 62 | -75.60936915 | 36.80623098 | 445643.1649 | 4073550.474 |
| 63 | -75.61021587 | 36.80617206 | 445567.5935 | 4073544.421 |
| 64 | -75.61069925 | 36.80615713 | 445524.4643 | 4073543.04 |
| 65 | -75.6275533 | 36.8059154 | 444020.858 | 4073525.957 |
| 66 | -75.63947349 | 36.80495162 | 442956.8237 | 4073426.088 |
| 67 | -75.64060181 | 36.80484391 | 442856.0926 | 4073414.812 |
| 68 | -75.64149076 | 36.80473572 | 442776.7136 | 4073403.343 |
| 69 | -75.64254531 | 36.80456661 | 442682.5167 | 4073385.215 |
| 70 | -75.64320238 | 36.80440923 | 442623.7855 | 4073368.151 |
| 71 | -75.64395483 | 36.80430235 | 442556.5833 | 4073356.745 |
| 72 | -75.64520906 | 36.80408121 | 442444.5336 | 4073332.968 |
| 73 | -75.64603743 | 36.80391544 | 442370.5148 | 4073315.078 |
| 74 | -75.6464933 | 36.80385995 | 442329.8069 | 4073309.197 |
| 75 | -75.64848143 | 36.803668 | 442152.3094 | 4073289.104 |
| 76 | -75.64893063 | 36.80363328 | 442112.2123 | 4073285.525 |
| 77 | -75.64950749 | 36.80361014 | 442060.7351 | 4073283.307 |
| 78 | -75.65420941 | 36.80360397 | 441641.2909 | 4073285.481 |
| 79 | -75.65483854 | 36.80358541 | 441585.155 | 4073283.807 |
| 80 | -75.65659306 | 36.80345694 | 441428.5435 | 4073270.628 |

| 81 | -75.66125653 | 36.8031693 | 441012.3125 | 4073241.586 |
|----|--------------|------------|-------------|-------------|
| 82 | -75.66349319 | 36.80301719 | 440812.6698 | 4073226.094 |
| 83 | -75.66444652 | 36.80296496 | 440727.5862 | 4073220.891 |
| 84 | -75.66609753 | 36.80290867 | 440580.2616 | 4073215.671 |
| 85 | -75.66768397 | 36.80277194 | 440438.6339 | 4073201.49 |
| 86 | -75.66787515 | 36.80274298 | 440421.5571 | 4073198.397 |
| 87 | -75.66879804 | 36.80253368 | 440339.0664 | 4073175.754 |
| 88 | -75.66955145 | 36.80241636 | 440271.7655 | 4073163.21 |
| 89 | -75.67195462 | 36.8021786 | 440057.1992 | 4073138.338 |
| 90 | -75.71754517 | 36.79849339 | 435987.095 | 4072759.075 |
| 91 | -75.71874724 | 36.79840865 | 435879.7854 | 4072750.479 |
| 92 | -75.71920008 | 36.79840906 | 435839.3862 | 4072750.829 |
| 93 | -75.72321959 | 36.79859733 | 435480.954 | 4072774.418 |
| 94 | -75.73760831 | 36.79921487 | 434197.8322 | 4072852.725 |
| 95 | -75.74234568 | 36.79932484 | 433775.2983 | 4072868.194 |
| 96 | -75.76368486 | 36.79932107 | 431871.5943 | 4072882.764 |
| 97 | -75.77038262 | 36.79919645 | 431273.9648 | 4072873.731 |
| 98 | -75.77166244 | 36.79920279 | 431159.7954 | 4072875.356 |
| 99 | -75.78610437 | 36.80003597 | 429872.1636 | 4072978.274 |
| 100 | -75.78734301 | 36.8001203 | 429761.7408 | 4072988.538 |
| 101 | -75.80036737 | 36.80075067 | 428600.4109 | 4073068.111 |
| 102 | -75.80907679 | 36.80118533 | 427823.8504 | 4073122.866 |
| 103 | -75.80941272 | 36.80121163 | 427793.9063 | 4073126.037 |
| 104 | -75.85356449 | 36.80784879 | 423861.7058 | 4073896.562 |
| 105 | -75.85375875 | 36.80789014 | 423844.4187 | 4073901.304 |
| 106 | -75.85464018 | 36.80813607 | 423766.0369 | 4073929.288 |
| 107 | -75.85494315 | 36.80824618 | 423739.1209 | 4073941.744 |
| 108 | -75.85601832 | 36.80881112 | 423643.7749 | 4074005.273 |
| 109 | -75.85642146 | 36.80900781 | 423608.0092 | 4074027.415 |
| 110 | -75.8647187 | 36.81293616 | 422871.8286 | 4074469.86 |
| 111 | -75.86529654 | 36.81312304 | 422820.4745 | 4074491.058 |
| 112 | -75.86972522 | 36.81420906 | 422426.5487 | 4074615.118 |
| 113 | -75.86979275 | 36.81423494 | 422420.5517 | 4074618.043 |
| 114 | -75.86987167 | 36.81429225 | 422413.5702 | 4074624.465 |
| 115 | -75.86997035 | 36.81440786 | 422404.8854 | 4074637.37 |
| 116 | -75.87018406 | 36.81475529 | 422386.1741 | 4074676.085 |
| 117 | -75.87029316 | 36.81497256 | 422376.6624 | 4074700.277 |
| 118 | -75.87033518 | 36.81502723 | 422372.9697 | 4074706.375 |
| 119 | -75.87039123 | 36.81505923 | 422368.0029 | 4074709.971 |
| 120 | -75.87134884 | 36.81526605 | 422282.7985 | 4074733.692 |
| 121 | -75.87193652 | 36.81536476 | 422230.4815 | 4074745.12 |
| 122 | -75.87357595 | 36.81552275 | 422084.4151 | 4074763.981 |

| 123 | -75.87454105 | 36.8155938  | 421998.4063 | 4074772.65  |
| 124 | -75.87493026 | 36.81560532 | 421963.7031 | 4074774.245 |
| 125 | -75.89281621 | 36.81551964 | 420368.3039 | 4074779.489 |
| 126 | -75.90232625 | 36.81538009 | 419519.922  | 4074771.971 |

II.    <u>Rent</u>

The Lessee must begin submitting rent payments for any project easement associated with this lease commencing on the date that BOEM approves the COP. Annual rent for a project easement is $5.00 per acre per year or a minimum of $450.00 per year. The first annual rent payment for the project easement is due within 45 days of the Lessee's receipt of the COP approval letter. The rent for the next year and for each subsequent year is due on or before each lease anniversary.

To calculate the required rent payment for the project easement, BOEM multiplied 9,804 acres by $5, totaling $49,020. Therefore, the total annual project easement rent payment due is $49,020.

Accepted and agreed to:

| OSW Project LLC | The United States of America |
|---|---|
| Lessee | Lessor |

_Mark D. Mitchell (signature)_

| (Signature of Authorized Officer) | (Signature of Authorized Officer) |
|---|---|
| Mark D. Mitchell | David B. Diamond |
| (Name of Signatory) | (Name of Signatory) |
| Authorized Representative | Deputy Associate Director for Operations, Atlantic Outer Continental Shelf, Office of Renewable Energy Programs |
| (Title) | (Title) |
| 15 January 2025 | 1/16/25 |
| (Date) | (Date) |