**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION**

|  |  |
|---|---|
| VIRGINIA ELECTRIC AND POWER COMPANY, D/B/A DOMINION ENERGY VIRGINIA; OSW PROJECT LLC,<br>　　　　　　Plaintiffs,<br>v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR; BUREAU OF OCEAN ENERGY MANAGEMENT; DOUGLAS BURGUM, Secretary of the Interior, in his official capacity; MATTHEW GIACONA, Acting Director, Bureau of Ocean Energy Management, in his official capacity,<br><br>　　　　　Defendants. | Case No. 2:25-cv-00830-JKW-LRL |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... iii

INTRODUCTION ................................................................................................................ 1

FACTUAL BACKGROUND ................................................................................................ 4

    A.   Wind Is a Critical and Safe Energy Source for Virginia and DEV Customers. ............ 4

    B.   The Coastal Virginia Offshore Wind Commercial Project. ........................................... 5

    C.   CVOW Is the Product of Extensive Agency and Stakeholder Reviews. ....................... 7

    D.   BOEM Analyzed and Addressed CVOW's Compatibility with National
         Security and Other OCS Uses. ........................................................................................ 8

    E.   BOEM's Unlawful CVOW Suspension Order. ............................................................ 10

    F.   The Government's Stonewalling Since Issuing the Order. ........................................... 12

STANDARD OF REVIEW ................................................................................................. 14

ARGUMENT ...................................................................................................................... 14

I.     DEV Is Likely to Prevail on The Merits. ...................................................................... 14

    A.   DEV Has Standing to Sue. ............................................................................................ 15

    B.   BOEM's Order Constitutes Final Agency Action. ....................................................... 15

    C.   BOEM's Order Violates Legal Constraints and Procedures for a Lease
         Suspension Based on National Security. ....................................................................... 15

    D.   BOEM's Order Is Arbitrary and Capricious. ............................................................... 19

        1.   BOEM's Order Is Unexplained and Unsupported. ................................................. 20

        2.   BOEM's Order Is Internally Inconsistent. ............................................................. 22

        3.   BOEM's Unexplained Reversal in Position Disregarded Reliance Interests. .......... 23

        4.   The Order Is Likely Pretextual. ............................................................................. 25

    E.   BOEM's Order Is Barred by OCSLA. ......................................................................... 26

II.    BOEM's order is causing substantial, imminent, irreparable, and ongoing
       injury to DEV................................................................................................................. 26

III.   The Balance of the Equities and the Public Interest Favor Preliminary
       Injunctive Relief............................................................................................................. 28

    CONCLUSION................................................................................................................ 30

## TABLE OF AUTHORITIES

*Cases*

*Ack for Whales, Inc. v. U.S. Dep't of Com.*,
    No. 2:25-cv-1678-JW (D.D.C. May 27, 2025) .................................................. 11

*Ala. Ass'n of Realtors v. Dep't of Health and Human Servs.*,
    594 U.S. 758 (2021) .............................................................................................. 28

*Aziz v. Trump*,
    234 F. Supp. 3d 724 (E.D. Va. 2017) ......................................................... 20, 21

*Bello v. Gacki*,
    94 F.4th 1067 (D.C. Cir. 2024) .......................................................................... 21

*Bennett v. Spear*,
    520 U.S. 154 (1997) .............................................................................................. 15

*Casa de Maryland, Inc v. Wolf*,
    486 F. Supp. 3d 928 (D. Md. 2020) ................................................................. 14

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971) .............................................................................................. 20

*Comm. For Constructive Tomorrow (CFACT) v. U.S. Dep't of Interior*,
    No. 24-cv-774, 2024 WL 2699895 (D.D.C. May 24, 2024) ......................... 5, 29

*Dep't of Com. v. New York*,
    588 U.S. 752 (2019) ...................................................................................... 21, 25

*DHS  v. Regents of the Univ. of Cal.*,
    591 U.S. 1 (2020) .................................................................................................. 24

*Di Biase v. SPX Corp.*,
    872 F.3d 224 (4th Cir. 2017) ............................................................................. 14

*E. Tenn. Nat. Gas Co. v. Sage*,
    361 F.3d 808 (4th Cir. 2004) ............................................................................. 28

*Encino Motorcars, LLC v. Navarro*,
    579 U.S. 211 (2016) .............................................................................................. 24

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) .............................................................................................. 24

*Fort Stewart Schs. v. FLRA.*,
    495 U.S. 641, 654 (1990) ................................................................................ 16

*FTC v. Standard Oil Co. of Cal.*,
    449 U.S. 232 (1980) ...................................................................................... 15

*Invenergy Renewables, LLC v. United States*,
    422 F. Supp. 3d 1255 (Ct. Int'l. Trade 2019) .................................................. 29

*Kirwa v. U.S. Dep't of Def.*,
    285 F. Supp. 3d 257 (D.D.C. 2018) ........................................................ 16, 20

*Louisiana v. Biden*,
    622 F. Supp. 3d 267 (W.D. La. 2022) .............................................................. 16

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ...................................................................................... 15

*Mayor and City Council of Ocean City, Maryland v. U.S. Dep't of Interior*,
    No. 1:24-cv-03111-SAG (D. Md. Sept. 12, 2025) .......................................... 11

*McDonnell Douglas Corp. v. Dep't of Air Force*,
    375 F.3d 1182 (D.C. Cir. 2004) ...................................................................... 20

*Medicines Co. v. Kappos*,
    699 F. Supp. 2d 804 (E.D. Va. 2010) ............................................................. 22

*Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*,
    60 F.4th 956 (5th Cir. 2023) ........................................................................... 24

*Michigan v. EPA*,
    576 U.S. 743 (2015) ...................................................................................... 19

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ................................................................................. 19, 24

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*,
    915 F.3d 197 (4th Cir. 2019) .......................................................................... 28

*N.H. Indonesian Cmty. Support v. Trump*,
    No. 25-CV-38-JL-TSM, 2025 WL 457609 (D.N.H. Feb. 11, 2025) ................ 30

*Nansemond Indian Nation v. Virginia*,
    795 F. Supp. 3d 733 (E.D. Va. 2025) ............................................................. 17

*Nat'l Council of Nonprofits v. OMB,*
      No. 25-239, 2025 WL 597959 (D.D.C. Feb 25, 2025) .................................................... 16

*Nat'l Fed'n of Indep. Bus. v. U.S. Dep't of Labor,*
      595 U.S. 109 (2022) ..................................................................................................... 16

*Nat'l Institutes of Health v. Am. Pub. Health Ass'n, 606 U.S. ---,*
      No. 25A103, 2025 WL 2415669 (U.S. Aug. 21, 2025) .................................................. 28

*New York v. Trump,*
      No. 25-cv-11221-PBS; 2025 WL 3514301 (D. Mass. Dec. 8, 2025) ............. 11, 19, 20, 24

*Nken v Holder,*
      556 U.S. 418 (2009) ..................................................................................................... 28

*Ohio v. EPA,*
      603 U.S. 279 (2024) ................................................................................................. 19, 20

*Pacito v. Trump,*
      768 F. Supp. 3d 1199 (W.D. Wash. 2025) ..................................................................... 20

*Renew Northeast v. U.S. Dep't of Interior,*
      No. 1:25-cv-13961 (D. Mass. Dec. 23, 2025) ................................................................ 11

*Revolution Wind, LLC v. Burgum,*
      No. 25-cv-02999-RCL (D.D.C. Sept. 4, 2025) .................................................... 11, 19, 21

*Save Long Beach Island, Inc. v. U.S. Dep't of Com.,*
      No. 1:25-cv-02211-JMC (D.D.C. July 11, 2025) ............................................................ 11

*Smiley v. Citibank,*
      517 U.S. 735 (1996) ..................................................................................................... 24

*Telvest, Inc. v. Bradshaw,*
      618 F.2d 1029 (4th Cir. 1980) ...................................................................................... 30

*Thunder Basin Coal Co. v. Reich,*
      510 U.S. 200 (1994) ..................................................................................................... 28

*United States v. Rosen,*
      487 F. Supp. 2d 703 (E.D. Va. 2007) ............................................................................ 20

*Winter v. Nat. Res. Def. Council,*
      555 U.S. 7 (2008) ......................................................................................................... 14

*Federal Statutes*

5 U.S.C. § 551(8) .................................................................................................... 19

5 U.S.C. § 558(c) .................................................................................................... 19

5 U.S.C. § 705 ........................................................................................................ 14

5 U.S.C. § 706(2)(A) ......................................................................................... 15, 19

5 U.S.C. § 706(2)(C) ............................................................................................... 15

5 U.S.C. § 706(2)(D) ............................................................................................... 15

10 U.S.C. § 183a ...................................................................................................... 8

43 U.S.C. § 1332(3) ................................................................................................ 16

43 U.S.C. § 1334(a)(1) ............................................................................................ 17

43 U.S.C. § 1337(p)(1)(C) ........................................................................................ 5

43 U.S.C. § 1337(p)(5) ............................................................................................ 17

43 U.S.C. § 1341(c) ..................................................................................... 16, 17, 18

43 U.S.C. § 1341(d) ................................................................................................ 16

43 U.S.C. § 1349(3) ................................................................................................ 26

43 U.S.C. § 1349(a)(1) ............................................................................................ 26

43 U.S.C. § 1349(a)(2) ............................................................................................ 26

Energy Policy Act, Pub. L. No. 109-58, 119 Stat. 594 (2005) ................................ 5, 17

*State Statutes*

Va. Code § 56-585.1:11(C)(1) ................................................................................. 30

Va. Code § 56-585.5 ......................................................................................... 27, 30

Va. Code § 56-585.5(C) ........................................................................................... 28

*Federal Regulations*

28 C.F.R. § 17.17 ..................................................................................................... 20

30 C.F.R. § 585.417(b) ...................................................................................... 2, 15, 17

30 C.F.R. § 585.634(b) ............................................................................................. 17

43 C.F.R. § 4.21(a) .................................................................................................. 15

*Executive Orders and Presidential Memoranda*

Exec. Order No. 14102, *Unleashing Prosperity through Deregulation,*
     90 Fed. Reg. 9065 (Feb. 6, 2025). ................................................................. 25

Exec.  Order No. 14154, *Unleashing American Energy*,
     90 Fed. Reg. 8353 (Jan. 20, 2025) ........................................................... 11, 23

Exec. Order No. 14156, *Declaring a National Energy Emergency*,
     90 Fed. Reg. 8433 (Jan. 20, 2025) ........................................................... 11, 30

Exec. Order No. 14219, *Ensuring Lawful Governance and Implementing the*
     *President's 'Department of Government Efficiency' Deregulatory Initiative*,
     90 Fed. Reg. 10583 (Feb. 19, 2025) .............................................................. 23

Exec. Order 14347, *Restoring the United States Department of War*,
     90 Fed. Reg. 43893 (Sept. 10, 2025) ............................................................... 4

Presidential Memorandum, *Temporary Withdrawal of All Areas on the Outer*
     *Continental Shelf From Offshore Wind Leasing and Review of the Federal*
     *Government's Leasing and Permitting Practices for Wind Projects*
     90 Fed. Reg. 5313 (Jan. 29, 2025) ................................................................. 11

## INTRODUCTION

The Bureau of Ocean Energy Management (BOEM) unlawfully stopped a multi-billion construction project critical to the nation's energy supply merely by claiming the existence of "new" and "secret" information. For 18 days and counting, a one-page suspension Order[1] by BOEM's Acting Director has blocked Dominion Energy Virginia's (DEV)[2] "activities related to the Coastal Virginia Offshore Wind - Commercial Project [CVOW] on the Outer Continental Shelf [OCS]" underway since CVOW obtained all approvals two years ago, including work that was scheduled to occur in December and January. The Order already has imposed nearly $100 million in costs and weeks of delay in delivering critically needed energy to meet the growing demands of the region, military facilities, and data centers—amid the government's declared energy emergency—with hundreds of millions more dollars, thousands of jobs, and CVOW's very existence at stake if the Order is not promptly enjoined.

Meanwhile, the government has stonewalled DEV, as well as Congress, States, and other offshore wind developers—including persons cleared to review "secret"-level classified information—from even learning the Order's "reasons of national security," except that they may involve radar. Per the Order's own parlance, DEV's understanding of any "new" "national security threats posed by this project" is an obvious prerequisite to meaningfully "meet and confer" with the government about such threats and the sufficiency of "mitigation measures," including CVOW's myriad existing conditions protecting radar capabilities and other aspects of national security. But Defendants' withholding of all information makes that impossible and belies any true intent to "meet and confer" as described in the Order. BOEM's draconian and

---

[1] https://www.boem.gov/renewable-energy/state-activities/boem-cvow-suspension-letter (Order).
[2] DEV as referenced herein includes both Virginia Electric and Power Company (the recipient of the Order) and OSW Project LLC, which is jointly owned by DEV and by funds managed by Stonepeak Partners LP and is the assigned lessee of CVOW lease OSC-A 0483.

1

bare-bones CVOW Order, coupled with recent Administration actions systemically attacking wind energy projects based on similarly bald invocations of "national security" and other pretextual concerns—largely adjudged or challenged as arbitrary and unlawful—demonstrate that the Order's stated concern is merely pretext for this Administration's purely political and irrational campaign against wind energy.

The Outer Continental Shelf Lands Act (OCSLA) and Administrative Procedure Act (APA) each require BOEM to engage in reasoned decision-making, and citing "national security" creates no exception.  Yet here BOEM suddenly stopped construction of an over $11 billion energy project without explanation other than averring vague and unspecified "national security threats" of "potential" harm due to "new" information that is entirely "secret."  The APA and OCSLA demand more.  Congress' intent in OCSLA was to encourage development of the OCS including for wind energy, and the statute, BOEM regulations, and CVOW lease terms establish a predictable legal framework to facilitate the billions of dollars in requisite capital investments.  BOEM here disregarded that those same authorities expressly limit suspensions for national security to circumstances inapplicable here.  Tellingly, to DEV's knowledge, until now BOEM has *never* utilized 30 C.F.R. § 585.417(b), much less absent any incident or violation.

Apart from these specific constraints, the Order is arbitrary and capricious because it is devoid of a rational basis, bereft of record support, self-contradictory, and pretextual.  The APA requires BOEM to affirmatively explain its action to constitute reasoned decision-making.  The Order also is procedurally deficient by broadly halting CVOW construction without regard to any specific activity's impact on national security.  BOEM's sole "evidence" for its Order is its say-so about information from another agency, disclosed only to certain BOEM officials and today to this Court *ex parte* and *in camera*.  BOEM's position contradicts CVOW's successful

2

multiple multi-year legal reviews and permitting processes by multiple agencies – including the military – across several Administrations and resulting myriad protective conditions.  The surprise Order was never hinted at in DEV's almost daily collaboration with agencies on national security while building CVOW, operating other critical energy infrastructure, serving key military installations, and participating in numerous security partnership organizations.[3]

There is no serious dispute that the Order is causing immediate, severe, and irreparable harm to DEV and its customers.  DEV (and, in turn, its customers) has invested approximately $8.9 billion to develop CVOW to date.  Declaration of Grant Hollett (H.D.) ¶ 31.  *Each day* the Order is in effect, DEV estimates that it incurs *more than $5 million* for idled vessels, equipment, and personnel, and derivative delays.  *Id.* ¶ 28.  Today, CVOW components and personnel are on vessels or in port with nowhere to go.  For example, on the same day as the Order, the primary wind turbine generator (WTG) installation vessel had arrived at the CVOW lease area fully loaded for installation of CVOW's first WTGs, but then was forced to return to port.  *Id.* ¶ 17. The Order's initial 90-day suspension period and contemplated extensions not only compound those harms, but also jeopardize CVOW itself by upending its carefully calibrated overall project schedule, which is necessarily reliant on specialized and scarce resources.  The Order also prevents timely supply of needed energy to the grid, impairs DEV's obligations as a public service company, and risks depriving Virginians of the benefits of their CVOW investment over the last decade while driving up their cost of electricity.  And DEV has no means to recoup from the government DEV's economic, time, and other harms stemming from the unlawful Order.

---

[3] BOEM issued concurrent suspension orders for four other wind projects, which are not the subject of this action.  *See* https://www.doi.gov/pressreleases/trump-administration-protects-us-national-security-pausing-offshore-wind-leases (U.S. DOI Press Release, Dec. 22, 2025). Besides CVOW, three of them also have filed lawsuits and sought preliminary injunctive relief.

Finally, the balance of equities and public interest favor a preliminary injunction. BOEM has identified no particularized risk posed by CVOW construction, including activities undetectable by radar. Nor could it. CVOW has proceeded according to approved conditions and detailed plans undertaken with full transparency to BOEM and other agencies, including on national security issues. Virginians in DEV's service territory are already paying for CVOW, and the Order arbitrarily stopping the project means they may get nothing for their money, and indeed would incur more costs to replace the power not delivered by CVOW. H.D. ¶¶ 8, 32. Thus, a preliminary injunction is necessary to preserve the status quo while this case proceeds.

## FACTUAL BACKGROUND

### A.    Wind Is a Critical and Safe Energy Source for Virginia and DEV Customers.

DEV serves roughly 820 megawatts of all federal load and more than 30 Department of Defense (DoD) installations such as the Pentagon and Naval Station Norfolk (the world's largest naval base), Naval Air Station Oceana, Joint Base Langley-Eustis, Naval Weapons Station Yorktown, Fort Belvoir, Naval Support Facility Dahlgren, Camp Peary, Harvey Point Defense Testing Activity, CIA headquarters, National Reconnaissance Office, and Newport News Shipbuilding (for vessels to DoD and other agencies).[4] H.D. ¶ 7. CVOW will supply 9.5 million megawatt-hours annually and over 10 percent of peak electricity in DEV's system. *Id.* ¶ 6.

Offshore wind, particularly along the Atlantic seaboard, is a highly reliable energy source. Turbines are many miles out at sea and hundreds of feet up in the air, where the wind is

---

[4] On September 5, 2025, the president signed Executive Order 14347, entitled *Restoring the United States Department of War*, which states that "[t]he Department of Defense and the Office of the Secretary of Defense may be referred to as the Department of War and the Office of the Secretary of War, respectively, in the contexts described in" that order. Given that this executive order sets forth additional "secondary" names for the DoD and Secretary of Defense, and many of the events described herein pre-date this order, this brief refers to the DoD and Secretary of Defense to include the Department of War (DoW) and Secretary of War, respectively.

4

fast and almost constant.  This consistent power generation helps stabilize the grid by providing a reliable source of energy, especially during peak demand periods.  Further, because this generation is located close to coastal population centers, there is limited loss from transmission.[5]

For over two decades, support for wind energy research, development, and deployment has been bipartisan U.S. policy.  Most notably, 20 years ago, Congress amended OCSLA to enable wind leasing and development on the OCS.  43 U.S.C. § 1337(p)(1)(C); Pub. L. No. 109-58, 119 Stat. 594, 746 (2005).  Support for wind energy also has spanned multiple Administrations of both parties; even the first Trump Administration held seven offshore wind lease sales.[6]  Thirty-eight states, including Virginia, have renewable portfolio standards and goals requiring public utilities like DEV to increase production of renewable energy.[7]

BOEM and other agencies have exhaustively evaluated impacts of offshore wind projects and found them safe and compatible with national security.  In litigation, the government has defended federal agency approvals for CVOW and other offshore wind projects.  *See, e.g., Comm. For Constructive Tomorrow (CFACT) v. U.S. Dep't of Interior*, No. 24-cv-774, 2024 WL 2699895 (D.D.C. May 24, 2024) (denying preliminary injunction and administrative stay against CVOW); *id.*, Dkt. No. 37 (government summary judgment brief defending CVOW).[8]

**B.    The Coastal Virginia Offshore Wind Commercial Project.**

In 2013, following a competitive bidding process, BOEM awarded DEV a wind energy

---

[5] U.S. DOE, *Offshore Wind Energy Strategies* 2 (Jan. 2022).
[6] U.S. DOI, Trump Administration Delivers Historic Progress on Offshore Wind (Oct. 18, 2018), https://perma.cc/GX5B-HB6B; BOEM, Lease and Grant Information, https://perma.cc/3GBKAQTK.
[7] NCSL, *State Renewable Portfolio Standards and Goals* (2021), https://www.ncsl.org/energy/state-renewable-portfolio-standards-and-goals; *see also* Richard K. Greene, *States Use Incentives to Attract Renewable Energy Business* (2009), https://www.areadevelopment.com/taxesincentives/nov09/ renewable-business11.shtml.
[8] The government never raised national security concerns or a suspension in or leading up to the parties' December 17, 2025 status report filed in existing litigation by plaintiff groups against CVOW.  *CFACT,* Dkt. No. 48.

lease for a 112,799-acre area located 27 miles off the coast of Virginia Beach.  H.D. ¶ 9.  CVOW features 176 14.7 MW wind turbines capable of generating nearly 2.6 gigawatts (GW) of energy at full buildout.  *Id.* ¶ 6.  This renewable energy will avoid 5 million tons of carbon dioxide emissions annually.  *Id.* CVOW will provide energy for military facilities and the world's largest concentration of data centers.  *Id.* ¶¶ 7-8. CVOW is also needed to ensure grid reliability, foster economic growth, and meet growing energy demand across Virginia and North Carolina.  *Id.*

CVOW involves a total estimated investment of $11.2 billion.  *Id.* ¶ 10.  It has created an estimated 2,000 American jobs and generated approximately $2 billion in American economic activity.  *Id.*  Once operational, CVOW is expected to support up to 1,100 jobs continuously over the life of the project, annually generating almost $210 million in economic output.  *Id.* ¶ 47.  CVOW has generated extensive demand for services from U.S.-flagged vessels, and has stimulated the local economy around Hampton Roads, Virginia.  *Id.* ¶ 11.

At the time of the stop-work order, CVOW was approximately 70% complete.  *Id.* ¶ 12.  If the Order is promptly enjoined, the first delivery of electricity to Virginia customers is projected in early 2026.  *Id*.  As a renewable resource that does not rely on purchased fuel, CVOW is also expected to generate $3 billion in customer fuel savings over its first ten years.  *Id.* ¶ 47.  Construction began in November 2023; all 176 turbine monopiles have been installed as of October 2025, and wind turbines are anticipated to be installed on top of the monopiles as soon as the Order is lifted.  *Id.* ¶¶ 12, 21.  CVOW should be completed and fully in-service by the end of 2026 under the existing construction schedule.  *Id.* ¶ 12.

The criticality of proceeding as scheduled cannot be overstated.  CVOW activities, including wind turbine installation, that BOEM now has stopped are a 365-day-a-year operation, day and night, including holidays.  *Id.* ¶ 22.  Delays in installing wind turbines and conducting

other work, which also rely upon specialized vessels, equipment, and labor in limited supply, jeopardize timely completion of the project and will result in otherwise avoidable millions of dollars of costs and lengthy delays in energy delivery for DEV and its customers. *Id.* ¶¶ 22-32.

### C.    CVOW Is the Product of Extensive Agency and Stakeholder Reviews.

In consultation with myriad regulatory agencies and stakeholders over a decade, DEV has worked to ensure that the CVOW project meets all legal requirements, and has instituted extensive safeguards to ensure that construction and operation meet applicable standards.

Before issuing the CVOW lease, BOEM led a Virginia Intergovernmental Renewable Energy Task Force coordinating with DoD and other federal, state, local, and tribal entities.[9] BOEM in 2012 published an Environmental Assessment and Finding of No Significant Impact under the National Environmental Policy Act (NEPA) assessing potential impacts of, and reasonable alternatives to, wind leasing in the area.[10]  After securing its lease, DEV prepared and submitted a site assessment plan (SAP), which BOEM approved in 2017.[11]  DEV submitted its Construction and Activities Plan (COP) in 2020, with seven updates through September 8, 2023.[12]  Previously, DEV constructed and installed two pilot turbines on an adjacent lease, which have continued to operate since 2020 without incident or national security concerns.[13]

BOEM extensively analyzed DEV's COP, consulting with many stakeholders on a wide range of national security and other issues.  Relevant here, BOEM worked extensively with DoD

---

[9] *See* https://www.boem.gov/renewable-energy/state-activities/virginia-activities (under "Public Engagement").

[10] https://www.boem.gov/sites/default/files/uploadedFiles/BOEM/Renewable_Energy_Program/Smart_from_the_Start/Mid-Atlantic_Final_EA_012012.pdf.

[11] https://www.boem.gov/renewable-energy/state-activities/CVOW-C ("Site Assessment Plan" tab).

[12] https://www.boem.gov/renewable-energy/state-activities/CVOW-C ("Construction and Operations Plan" tab).

[13] *See* https://coastalvawind.com/about/the-project; https://www.boem.gov/renewable-energy/state-activities/virginia-activities ("Research Lease" links).

and others to ensure CVOW will not adversely affect national security, including via the Military Aviation and Installation Assurance Siting Clearinghouse (DoD Clearinghouse). *See* 10 U.S.C. § 183a; H.D. ¶¶ 33-40; Declaration of Adam Lee (L.D.) ¶¶ 12-18; Declaration of H. David Belote (B.D.) ¶¶ 17-23.[14] The Order evidently did not follow that Clearinghouse process. B.D. ¶¶ 29-33.

BOEM approved the COP on January 28, 2024.[15] The COP approval is accompanied by almost 100 pages of terms and conditions for construction and operation and includes extensive safeguards to address potential effects on national security, navigation, and the environment.[16]

### D. BOEM Analyzed and Addressed CVOW's Compatibility with National Security and Other OCS Uses.

The Order generically invokes "national security" to suspend CVOW. But BOEM considered national security in detail for over a decade when reviewing and approving CVOW. BOEM's comprehensive process included consultation with DoD, the U.S. Coast Guard, and other federal and non-federal stakeholders on national security issues.

Before issuing the CVOW lease, BOEM already had conducted analysis to site the lease area so as to deconflict other activities in the vicinity.[17] BOEM therein consulted with DoD and other agencies, considered military needs and radar systems, and found no conflict.[18] Notably, the CVOW lease encompasses only 0.042 percent of BOEM's Atlantic OCS planning area.[19]

---

[14] Consultations with additional agencies appear in Appendix A to the Final Environmental Impact Statement (FEIS). https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/CVOW-C_FEIS_App_A_Required_Permits.pdf.

[15] https://www.boem.gov/renewable-energy/state-activities/cvow-c-cop-approval-letter-ocs-0483.

[16] https://www.boem.gov/renewable-energy/state-activities/cvow-c-conditions-cop-approval-ocs-0483 (COP Conditions). The COP itself is thousands of pages. https://www.boem.gov/renewable-energy/state-activities/coastal-virginia-offshore-wind-project-construction-and-0.

[17] Final Environmental Assessment & Finding of No Significant Impact, *supra* note 10, at iii-xiv (analyzing leasing options and previous "Smart from the Start" Atlantic Wind Energy Initiative).

[18] *Id.* at 149, 155 ("interference would be negligible from meteorological towers to radar systems unless the towers are situated within a quarter mile of active radar, which is not anticipated").

[19] *See* https://www.boem.gov/oil-gas-energy/atlantic-ocs-facts-and-figures.

The FEIS for the COP further analyzed national security; DoD was a cooperating agency. FEIS 3.17-20.[20]  The FEIS discussed risks of collisions, navigational complexity, and potential effects on radar systems such as "clutter," among other issues.  FEIS 3.17-6, 3.17-12 (finding CVOW's effects on radar systems to be "negligible to moderate").  BOEM's 2023 Record of Decision (ROD) for CVOW explains how "[w]hile reviewing the COP, BOEM coordinated with DoD to develop measures necessary to safeguard against potential liabilities and impacts on DoD activities" via the DoD Clearinghouse.[21]  BOEM's ROD and later Conditions of COP Approval imposed conditions mirroring the specific mitigation measures identified by the DoD Clearinghouse.  *Id.* ("To protect the national security interests of the United States, BOEM has included these measures as conditions of COP approval in Appendix A of the ROD."); COP Conditions at 30-35 ("Navigational and Aviation Safety Conditions" and "National Security Conditions").  Key mitigation includes Radar Adverse Impact Management (RAM), emergency curtailment procedures, and an Aircraft Detection Lighting System.  COP Conditions at 31-36.

DEV has complied with this mandatory and robust suite of measures protective of national security, such as by coordinating and entering into mitigation agreements with DoD and other agencies to address turbine placement, spacing, and curtailment to avoid radar interference. H.D. ¶¶ 33-40, Exhibit B.  For example, CVOW has coordinated radar tuning with DoD and the North American Aerospace Defense Command (NORAD), and the NORAD air surveillance mitigation agreement when final will provide for immediate speed controls on operational CVOW turbines upon receiving DoD direction. H.D. ¶ 34; B.D. ¶ 27; L.D. ¶ 17. CVOW conditions also *enhance* national security, e.g., by modernizing Oceana Naval Air Station's aging

---

[20] https://www.boem.gov/renewable-energy/state-activities/cvow-cfeisvolumeifeis.
[21] ROD, Appendix B, at 20, https://www.boem.gov/renewable-energy/state-activities/cvow-c-record-decision.

electrical infrastructure and supporting its radar monitoring capabilities.  H.D. ¶¶ 34-35, 37.

E.    **BOEM's Unlawful CVOW Suspension Order.**

On December 22, 2025, BOEM Acting Director Matthew Giacona abruptly ordered DEV to immediately "suspend all ongoing activities related to the Coastal Virginia Offshore Wind - Commercial Project [CVOW] on the Outer Continental Shelf [OCS] for the next 90 days for reasons of national security," except activities necessary to prevent interim health, safety, and environmental impacts.[22]  It says that "BOEM may further extend the 90-day suspension period." *Id.*  The Order alleges no CVOW violation or flaw; rather, it orders a suspension while BOEM "determine[s]" if any deficiency exists based on nebulous "national security threats."[23]  *Id.*

Per the Order, the "threats" were raised in a DoD "additional assessment" in "November 2025" of "national security implications of offshore wind projects," "including the rapid evolution of relevant adversary technologies and the resulting direct impacts to national security from offshore wind projects."  *Id.*  It summarily deems this "new" information "classified."  *Id.*

The Order further posits, based on "an initial review," that "the particularized harm posed by this project can only be feasibly averted by suspension of on-lease activities."  But it omits any CVOW-specific claim and exhaustive mitigation measures already in place.  No agency afforded DEV a warning or due process about the Order stopping CVOW in its tracks, even in meetings and communications occurring mere days before the Order.  L.D. ¶ 18.  Rather, the Order's position is that, despite years of close DEV and interagency coordination, now any "discussions" about national security should occur only while CVOW work has stopped.  *Id.*

The Order parallels a series of agency actions aimed at shutting down the U.S. wind

---

[22] *See* Order, *supra* note 1 (linking to BOEM's Order to CVOW).
[23] *Id.*  The Order is ambiguous on if it suspends the CVOW lease itself.  *See* Order ("suspend all ongoing activities"); U.S. DOI Press Release, *supra* note 3 ("pausing offshore wind leases"). DEV now understands from the government's subsequent filings in this case that it does.

industry that similarly rely on cursory "national security" and other non-specific concerns.  Just four days earlier, a court vacated BOEM's (and other agencies') blanket ban on federal permitting for wind projects as arbitrary and capricious and contrary to law.  *New York v. Trump*,  No. 25-cv-11221-PBS, 2025 WL 3514301 (D. Mass. Dec. 8, 2025); *id.*, Dkt. No. 240 (Dec. 18, 2025) (judgment).  That ban was predicated solely on an Inauguration Day presidential directive referencing "national security interests."[24]  In August 2025, Interior shut down another offshore wind project that, like CVOW, was already largely constructed, baldly claiming "BOEM is seeking to address concerns related to the protection of national security interests of the United States."[25]  But a court soon rejected that premise as "the height of arbitrary and capricious action" and let construction resume—the government did not appeal.  *Revolution Wind, LLC v. Burgum*, No. 25-cv-02999-RCL (D.D.C. Sept. 4, 2025), Dkt. No. 39, at 41 (Prelim. Inj. Hearing Transcript) (Sept. 22, 2025).  BOEM also is pursuing remand and reconsideration of its COP approvals for some offshore wind projects.[26]  Other agency anti-wind actions are at issue in *Renew Northeast v. U.S. Dep't of Interior*, 1:25-cv-13961 (D. Mass. Dec. 23, 2025).

Meanwhile, the CVOW Order fails to explain how it is consistent with the declared "national energy emergency" or current policies to expedite rather than restrict domestic energy production.  *E.g.*, Exec. Order No. 14156, *Declaring a National Energy Emergency*, Section 8(a), 90 Fed. Reg. 8433, 8436 (Jan. 20, 2025) (excluding wind from "energy" definition); Exec.

---

[24] Presidential Memorandum, *Temporary Withdrawal of All Areas on the Outer Continental Shelf From Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects*, § 2, 90 Fed. Reg. 5313 (Jan. 29, 2025).

[25] https://www.boem.gov/renewable-energy/directorsorder-20250822pdf.

[26] *E.g.*, *Mayor and City Council of Ocean City, Maryland v. U.S. Dep't of Interior*, 1:24-cv-03111-SAG (D. Md. Sept. 12, 2025), Dkt. No. 81; *Save Long Beach Island, Inc. v. U.S. Dep't of Com.*, 1:25-cv-02211-JMC (D.D.C. July 11, 2025), Dkt. No. 13; *Ack for Whales, Inc. v. U.S. Dep't of Com.*, 2:25-cv-1678-JW (D.D.C. May 27, 2025), Dkt. No. 18.

Order No. 14154, *Unleashing American Energy*, Section 3, 90 Fed. Reg. 8353, 8354 (Jan. 20, 2025) (same).  Further highlighting pretext, the government's contemporaneous statements and conduct indicate the Order has little to do with national security, much less new or exigent concerns.  *See* L.D. ¶ 35 (collecting government media statements about the Order).  For example, the Interior Secretary celebrated the Order with media rounds accusing wind energy as being "expensive, unreliable, heavily subsidized" and inferior to natural gas.[27]  The White House commented: "President Trump has been clear: wind energy is the scam of the century…. For years, Americans have been forced to pay billions more for the least reliable forms of energy."[28]

### F.    The Government's Stonewalling Since Issuing the Order.

DEV in good faith took immediate action to comply with the Order and continues to do so, even though the Order lacks any legal or factual basis.  DEV has diligently engaged with BOEM to understand and resolve its concern so construction can resume.  Yet, despite its Order claiming an exigent new threat to national security, almost three weeks later BOEM still has not disclosed even what the threat is.  And the government now states that it *will not even consider* sharing that information with CVOW during this litigation, even outside the context of the litigation in accordance with the agency's own practices and procedures.  Such opacity shows that BOEM's main interest in its Order is stopping not national security threats but wind projects.

DEV has tried repeatedly and via various means to gain insight into the DoD assessment forming the sole basis of BOEM Order, to no avail.  DEV informed BOEM of several personnel holding security clearances to review classified information, and also invited an unclassified summary.  L.D. ¶¶ 24-30.  DEV personnel with secret-level clearances met in person with

---

[27] https://x.com/SecretaryBurgum/status/2003094666040787213.

[28] https://www.politico.com/news/2025/12/22/trump-leaves-wind-industry-reeling-at-a-perilous-moment-for-his-party-00704170.

BOEM on December 30, but BOEM's attendees (DoD was absent) did not discuss or share further details underlying the Order.  *Id.* 25.  Following the Court's December 28 Order (Dkt. No. 26), DEV's counsel undertook the same exercise with DOJ.  After initially working to verify clearances and logistics to view the information, *id.* ¶ 28, on December 31 DOJ terminated those efforts and notified the Court that it would not share the information with DEV.  Dkt. No. 30.  It directed DEV to a "separate" process with BOEM and DoD "in the normal course."  *Id.*  But on January 6, BOEM closed that door too, telling DEV that "DOW has informed [BOEM] that they are awaiting the resolution of the litigation before they would consider sharing the classified information with CVOW"—a point likely months away and with no bearing on national security.  Dkt. Nos. 37, 37-1.  Refusing even an unclassified summary until litigation ends is irreconcilable with any urgent threat.

It is DEV's understanding that BOEM (and DoD) likewise have not shared the relevant information with recipients of similar December 22 BOEM suspension orders, or with members of Congress with oversight of the CVOW area and national security threats, including Virginia Senator Mark Warner who is Vice Chairman of the Senate Intelligence Committee and part of the "Gang of Eight" routinely briefed on sensitive matters, and Virginia Senator Tim Kaine who is a senior member of the Senate Armed Services Committee with oversight over DoD.[29]

BOEM's refusal to discuss the crux of its Order also belies the Order's invitation to DEV to "meet and confer," and "quickly," about "whether the national security threats relating to this project can be mitigated."  Indeed, BOEM has met with DEV only once about the Order.  That meeting did not yield meaningful information from BOEM or resolution of the Order. L.D. ¶¶

---

[29] *See* https://www.warner.senate.gov/public/index.cfm/2025/12/warner-kaine-scott-slam-trump-administration-s-sudden-halt-of-virginia-offshore-wind-project.

25-26.  DEV also provided substantial information to BOEM regarding DEV's national security

protection efforts for CVOW and generally—which BOEM and DoD should already know—but

BOEM to date has failed to substantively respond.  And the government "do[es] not interpret the

Court's December 28 order as contemplating the presentation or discussion of classified

information at the January 16 hearing," despite it stating that the "Court views that information

as critical to evaluating the plaintiff's request" for a preliminary injunction.  Dkt. Nos. 30, 22.

This persistent black box departs from regular government collaboration with DEV to

promptly share and resolve national security concerns for critical energy infrastructure.  L.D. ¶¶

11, 32.  BOEM's aim appears to be hamstringing DEV's ability to resume CVOW construction.

## STANDARD OF REVIEW

A plaintiff may obtain preliminary injunctive relief preserving the status quo by showing:

(1) a likelihood of success on the merits, (2) that plaintiff will be irreparably harmed absent

preliminary relief, (3) a lack of harm to other parties from an injunction; and (4) that the public

interest favors an injunction.  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008) (citations

omitted).  Similarly, under Section 705 of the Administrative Procedure Act, as "necessary to

prevent irreparable injury," a court may "issue all necessary and appropriate process to postpone

the effective date of an agency action or to preserve status or rights pending conclusion of review

proceedings."  5 U.S.C. § 705.  "The factors governing … issuance of a Section 705 stay" are the

same as those "governing issuance of a preliminary injunction."  *Casa de Maryland, Inc v. Wolf*,

486 F. Supp. 3d 928, 950 (D. Md. 2020) (citation omitted).

## ARGUMENT

## I.    DEV IS LIKELY TO PREVAIL ON THE MERITS.

A plaintiff "need not establish a certainty of success" to obtain preliminary relief, and

must only "make a clear showing that [they are] likely to succeed at trial."  *Di Biase v. SPX*

*Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (cleaned up).  DEV meets this standard.

### A.    DEV Has Standing to Sue.

DEV satisfies all three elements of Article III standing: (1) injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that it is likely to be redressed by a favorable decision.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).  The Order directly affects DEV's ability to proceed with CVOW and is causing immediate harm, as set forth herein, that can be redressed by an order of this Court allowing CVOW activities to resume.

### B.    BOEM's Order Constitutes Final Agency Action.

BOEM's Order is final agency action because it consummates BOEM's decision to shut down CVOW for at least 90 days and has legal consequences for DEV.  *Bennett v. Spear*, 520 U.S. 154, 178 (1997); *FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 239 (1980) (final agency action has a "direct and immediate … effect on [DEV's] day-to-day business").  It is immediately effective and thus obviates any administrative appeal within Interior.  43 C.F.R. § 4.21(a).

### C.    BOEM's Order Violates Legal Constraints and Procedures for a Lease Suspension Based on National Security.

The Acting BOEM Director cannot order a suspension at whim.  Specifically, the Order's sole cited authority, 30 C.F.R. § 585.417(b), does not allow BOEM to suspend CVOW simply by invoking "national security."  Rather, OCSLA, BOEM regulations, and the CVOW lease and COP approval terms define the narrow circumstances under which BOEM can issue such an order to DEV.  Because they are absent here, the Order is unlawful under OCSLA and the APA.

A "reviewing court *shall* … hold unlawful and set aside agency action … found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id*. § 706(2)(C), or "without observance of procedure required by law," *id*. § 706(2)(D)

(emphasis added).  Agencies "are creatures of statute" and are therefore subject to the limits prescribed by Congress.  *Nat'l Fed'n of Indep. Bus. v. U.S. Dep't of Labor*, 595 U.S. 109, 117 (2022).  In other words, they "literally have no power to act except to the extent Congress has authorized."  *Nat'l Council of Nonprofits v. OMB*, No. 25-239, 2025 WL 597959, at *15 (D.D.C. Feb 25, 2025).  Moreover, "[i]t is a familiar rule of administrative law that an agency must abide by its own regulations."  *Fort Stewart Schs. v. FLRA*., 495 U.S. 641, 654 (1990); *see also Louisiana v. Biden*, 622 F. Supp. 3d 267, 277-78 (W.D. La. 2022) (reviewing OCSLA's structure and "strict regulations" in the context of a pause on oil and gas leasing and finding no statutory authority for the pause); *Kirwa v. U.S. Dep't of Def.*, 285 F. Supp. 3d 257, 266-67 (D.D.C. 2018) ("while courts should exercise caution when adjudicating claims involving matters of military affairs and national security, that caution does not give DOD carte blanche authority to act in contravention of the Constitution or applicable statutes") (citations omitted).

Here, BOEM's suspension authority derives from OCSLA.  Enacted in 1953, OCSLA states that it is "the policy of the United States" that the OCS "should be made available for *expeditious and orderly development,* subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs."  43 U.S.C. § 1332(3) (emphasis added).  The "national security clause" in OCSLA Section 12 requires that all leases "contain a provision" authorizing the Secretary of the Interior to "suspend operations under any lease," but only "upon a recommendation of the Secretary of Defense, during a state of war or national emergency declared by Congress or the President of the United States."  43 U.S.C. § 1341(c).  No such circumstance exists here.  The CVOW lease also has not been "designate[d] by and through the Secretary of Defense, with the approval of the President, as areas" that are "needed for national defense."  43 U.S.C. § 1341(d).  Another OCSLA provision on suspensions

applies only "if there is a threat of serious, irreparable, or immediate harm or damage" to life, property, mineral deposits, or the environment, and not for national security.  43 U.S.C. § 1334(a)(1).  The CVOW Order invokes none of these grounds.  Finally, 43 U.S.C. § 1337(p)(5) only provides generally for non-oil and gas lease-related actions including suspensions, and nothing in its 2005 addition to OCSLA creates broader suspension discretion for wind than oil and gas.  *See* Pub. L. No. 109-58, § 388.  In any event, OCSLA's specific provision at 43 U.S.C. § 1341(c) governs national security-based suspensions.  *See, e.g.*, *Nansemond Indian Nation v. Virginia,* 795 F. Supp. 3d 733, 763-64 (E.D. Va. 2025) ("[a] commonplace of statutory construction [is] that the specific governs the general") (citation omitted).

BOEM's regulations necessarily adhere to statutory limits on suspensions.  The Order cites 30 C.F.R. § 585.417(b) stating that BOEM "may" order a lease suspension when "necessary for reasons of national security or defense."  The regulations, however, also require a "written order" that "explain[s] the reasons for its issuance and describe the effect of the suspension order on [the] lease or grant and any associated activities."  *Id.* § 585.418(c).  Here, BOEM's Order offers only bare conclusions that fail to explain why a suspension is "necessary."[30]

The CVOW lease entered into by BOEM further limits suspensions.[31]  Section 2(a) authorizes DEV to "conduct activities in the [leased area] that are described in a SAP or COP that has been approved by [BOEM]."  Section 3(c) "reserves the right to suspend the Lessee's operations in accordance with the national security and defense provisions of Section 12 of the Act and applicable regulations, provided that compensation must be paid to the Lessee as

---

[30] Consistently, BOEM's regulations afford only narrow circumstances to revisit an approved COP, typically for lessee noncompliance.  *See, e.g.*, 30 C.F.R. §§ 585.634(b), (c).  Here, however, BOEM has not invoked these regulations and has not identified any CVOW violation or material changes to CVOW as approved.

[31] *See* Attachment A for a copy of the current CVOW Lease.

provided by 43 U.S.C. § 1341(c) and (d)."  Addendum C further addresses temporary suspensions of operations "in the interest of national security," but such suspensions must be "pursuant to Section 3(c) of this lease" above.  It further provides that any such suspension "for national security reasons will not generally exceed 72 hours."  It also states: "Every effort will be made by the appropriate military agency to provide as much advance notice as possible of the need to suspend operations and/or evacuate. Advance notice will normally be given before requiring a suspension or evacuation."  Finally, Section 8 omits national security as a suspension ground, and additionally provides that any suspension "predicated on a threat of serious irreparable, or immediate harm or damage, or on an imminent threat of serious or irreparable harm or damage," first "requires a finding by the Lessor of particularized harm that it determines can only be feasibly averted by suspension of on-lease activities or cancellation of the lease."[32]

The Order failed to adhere to any, let alone all, of these preconditions to suspend CVOW for national security.  BOEM acted unilaterally.  BOEM points to no declared "state of war" or "national emergency."  BOEM's 90-day initial suspension exceeds the presumptive 72-hour limit under the lease.  BOEM gave DEV no prior notice.  Though the Order parrots inapposite lease Section 8 text that "the particularized harm posed by this project can only be feasibly averted by suspension of on-lease activities," it identifies no particularized harm from CVOW, and provides no "finding" other than that bald conclusion based on BOEM's "initial review."  The Order does not even aver that "potential" harm from CVOW is in fact imminent, serious, or irreparable.

The Order also contravenes APA Section 558, which provides that the "suspension" of a "license" is "lawful" only if preceded by "notice" and an "opportunity to demonstrate or achieve

---

[32] Section 8 provides for suspensions "if the Lessee fails to comply with (1) any of the approved provisions of the Act or regulations, (2) the approved SAP or COP, or (3) the terms of this lease, including associated Addenda[.]"  The CVOW Order does not allege any of these conditions.

compliance with all lawful requirements."  5 U.S.C. § 558(c).  The APA defines the term

"license" broadly to include a "permit, certificate, approval … or other form of permission,"

thereby encompassing both the CVOW lease and COP approval.  5 U.S.C. § 551(8).  Section 558

has exceptions for "willfulness" or "public health, interest or safety," but the Order neither cites

nor supports these exceptions.  5 U.S.C. § 558(c).  BOEM's sudden and unilateral interference

with prior decisions upsets the APA's directives for prompt and durable agency decision-

making.  *See New York*, 2025 WL 3514301, at *15-17 (discussing 5 U.S.C. § 558(c) mandates).

 In sum, the Order is contrary to the legal requirements of OCSLA and the APA.  It defies

OCSLA's mandate that OCS development be "expeditious" and "orderly."  It upends BOEM

approvals and ignores requisite grounds and procedures.  A preliminary injunction is warranted.

### D. BOEM's Order Is Arbitrary and Capricious.

 In addition to BOEM's Order being contrary to law, DEV is likely to prevail on its

separate APA claim that the Order is arbitrary, capricious, or an abuse of discretion.  5 U.S.C.

§ 706(2)(A).  BOEM must offer a "satisfactory explanation for its action[,] including a rational

connection between the facts found and the choice made."  *Ohio v. EPA*, 603 U.S. 279, 292

(2024).  The Order is arbitrary and capricious "if the agency has relied on factors which

Congress has not intended it to consider, entirely failed to consider an important aspect of the

problem, offered an explanation for its decision that runs counter to the evidence before the

agency, or is so implausible that it could not be ascribed to a difference in view or the product of

agency expertise."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43

(1983).  BOEM is limited to its record when it acted and cannot bolster its Order after the fact.

*Id.* at 50; *Michigan v. EPA,* 576 U.S. 743, 758 (2015); *Revolution Wind*, Dkt. No. 39 at 41

(rejecting BOEM's "additional reasons" in litigation "because they were not offered at the time

that BOEM issued the order" stopping work on offshore wind project).  The Court's "inquiry …

is to be searching and careful." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402,

416 (1971). *Any* of multiple grounds suffices to find the Order arbitrary and capricious.

### 1.    BOEM's Order Is Unexplained and Unsupported.

BOEM's halting of a critical, multi-billion dollar project via a one-page Order was not

"reasonable and reasonably explained." *See Ohio*, 603 U.S. at 292. Bare conclusions or silence

do not suffice. *McDonnell Douglas Corp. v. Dep't of Air Force*, 375 F.3d 1182, 1187 (D.C. Cir.

2004) ("[W]e do not defer to the agency's conclusory or unsupported suppositions."); *Pacito v.

Trump*, 768 F. Supp. 3d 1199, 1232 (W.D. Wash. 2025) ("[W]e may not infer an agency's

reasoning from mere silence."); *New York*, 2025 WL 3514301, at *14 ("the sole factor [agencies]

considered in deciding to stop issuing [wind] permits was the President's direction to do so").

Invoking national security does not excuse BOEM from reasoned decision-making under

the APA. Courts do not blindly accept an agency's say-so, even on national security. *E.g.*, *Aziz

v. Trump*, 234 F. Supp. 3d 724, 734 (E.D. Va. 2017) (courts may "look behind [the agency

action's] proffered national security rationale"); *United States v. Rosen*, 487 F. Supp. 2d 703

716-17 (E.D. Va. 2007) ("The government's *ipse dixit* that information is damaging to national

security is not sufficient to close the courtroom doors …."); *Kirwa*, 285 F. Supp. 3d at 270 (APA

review "involves more than a court rubberstamping action based on bare declarations from the

agency amounting to 'trust us, we had good national security reasons for what we did'")

(citations omitted).

Nor does the government get a free pass by cloaking any justification as "classified."

"[T]he government's *ipse dixit* is insufficient whether it appears by way of classified status, or

the bald assertion of counsel that information is damaging to national security." *Rosen*, 487 F.

Supp. 2d at 717. Even if information truly is "secret," established procedures enable its proper

sharing with parties in litigation. 28 C.F.R. §§ 17.17, 17.46. Yet BOEM arbitrarily eschewed

them here and bypassed anyone at DEV with clearance to review "secret" (and even "top secret") information.  H.D. ¶ 32; *see* 75 Fed. Reg. 707, 708 (Jan. 5, 2010); *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) ("The reasoned explanation requirement of administrative law, after all, is meant to ensure that agencies offer genuine justifications for important decisions, reasons *that can be scrutinized by courts and the interested public*") (emphasis added).  The Interior Secretary's media statements about the classified information also demonstrate that at minimum the government can prepare an unclassified summary that would allow DEV to more fully respond and permit adversary presentation to the Court, as required by due process.  *Bello v. Gacki*, 94 F.4th 1067, 1075-76 (D.C. Cir. 2024).  Indeed, DEV's discussions with DoD about military and radar issues have always occurred in unclassified settings.  L.D. ¶ 16.  But not here.

"Historical context" also matters.  *Aziz*, 234 F. Supp. 3d at 734.  In *Aziz*, "the 'specific sequence of events' leading to the adoption of the [agency action] bolsters the [plaintiff's] argument that the [action] was not motivated by rational national security concerns."  *Id.* at 736. There, the government "ha[d] not … produced any evidence, beyond the text of the [action] itself, to support their contention that the [action] was primarily motivated by national security concerns" and "there is no evidence that such a deliberative process took place."  *Id.*  Likewise, a court recently preliminarily enjoined an offshore wind project's stop-work order where BOEM cited only "the mere potential for national security concerns" and did "not actually point to any factual findings that lead them to believe that concern was implicated by the project or that "rise[s] to such a level that work must cease immediately."  *Revolution Wind*, Dkt. No. 39 at 40.

So too here.  BOEM's Order, and Mr. Giacona's later declaration (Dkt. No. 19-1) largely parroting the Order, provide no actual "evidence" of "new classified information" or "national security" concerns.  The Order's vanilla reference to "rapid evolution of relevant adversarial

technologies" lacks any meaning as to the source, nature, or effect of any threat. *See also* Dkt. No. 19-1 ¶ 9 (same). BOEM does not specify: (i) how continued construction activities pose concerns; (ii) what or how CVOW components pose concerns; (iii) how the "new" information differs from agencies' extensive prior analyses, or who besides Mr. Giacona believed "BOEM had not considered [the risks]," *id.* ¶ 11; or (iv) if anyone other than Mr. Giacona found that CVOW's "current mitigations" developed by a multi-disciplinary interagency team, as discussed above, were inadequate or that only a suspension was "feasibl[e]," *id.* ¶¶ 12, 14. And the government has obstructed DEV at every turn from resolving the Order outside litigation. Nor is the Order an isolated event; it is part of the Administration's pattern of recent attacks on wind and renewables more broadly. Given this historical context, the Court should view any information BOEM provides *in camera* with skepticism.

### 2.    BOEM's Order Is Internally Inconsistent.

Even accepting *arguendo* BOEM's Order and declaration statements at face value, several contradictions undercut any rational connection between the facts and Order. *E.g., Medicines Co. v. Kappos*, 699 F. Supp. 2d 804, 809-10 (E.D. Va. 2010) ("Agency action resting on an inconsistent or self-contradictory explanation is, by definition, arbitrary and capricious."). *First,* if BOEM's concern is spinning wind turbines' interaction with radar, that does not square with BOEM's carve-out for wind turbines already generating power.[33] *Second*, such a concern is incongruent with the Order's sheer breadth of covered CVOW activities with indisputably no

---

[33] Offshore wind project with operating turbines unaffected by BOEM's December 22 orders, and thus presumably posing no national security threat, include the CVOW pilot project (https://coastalvawind.com/about/the-project), Vineyard Wind I (https://www.boem.gov/renewable-energy/state-activities/vineyard-wind-1), South Fork Wind (https://www.boem.gov/renewable-energy/state-activities/south-fork), and Block Island Wind (https://www.doi.gov/news/pressreleases/interior-offers-first-right-of-way-for-renewable-energy-transmission-in-federal-waters)."

radar effects (e.g., transition pieces, subsea cabling, testing).  *Third*, BOEM's assertion that CVOW's Virginia location drove the Order (Dkt. No. 19-1 ¶ 9) ignores that BOEM sent same-day similar orders to each offshore wind project under active construction.[34]  *Fourth*, the Order's claim of "new" information contradicts Interior's claim of "long found" (and unsubstantiated) "radar interference called 'clutter'" from wind towers and blades.[35]  *Fifth*, if an exigency existed, BOEM presumably would not have waited a month after reviewing the "November 2025" DoD assessment, and would actively be working with DEV to resolve it rather than stonewalling.

BOEM's adverse treatment of CVOW and other wind projects also stands in sharp contrast with the Administration's active promotion of other energy production and reducing agency review and approval timeframes discussed above.  Indeed, the stop-work order is precisely an "undue burden on the identification, development, or use of domestic energy resources" of the kind that Executive Order No. 14154 directs agencies to "suspend, revise, or rescind."  Such an inconsistency requires substantial justification, but the Order offers none.[36]

3.    **BOEM's Unexplained Reversal in Position Disregarded Reliance Interests.**

---

[34] *See* U.S. DOI Press Release, *supra* note 3.  Also, CVOW is 27 miles offshore.  H.D. ¶ 9.

[35] *See* U.S. DOI Press Release, *supra* note 3.  Interior also miscites a 2024 report (at ii) to claim that increased radar detection thresholds could "miss actual targets."  But that same report a few sentences later found that "the development and use of radar interference mitigation techniques, and collaboration both among federal agencies and between the federal government and the wind industry have enabled federal radar agencies to continue to perform their missions without significant impacts, and have also enabled significant wind energy deployments throughout the United States which produced more than 9% of the United States' electricity in 2021."  *Id.*

[36] Similarly, another executive order directs agencies to "de-prioritize" "enforcement actions" that "go beyond the powers vested in the Federal Government by the Constitution" and "direct the termination of all such enforcement proceedings that do not comply with the Constitution, laws, or administration policy."  It defines an "enforcement action" as "all attempts, civil or criminal, by any agency to deprive a private party of life, liberty or property, *or in any way affect a private party's rights or obligations, regardless of the label the agency has historically placed on the action*."  Exec. Order No. 14219, 90 Fed. Reg. 10,583 (Feb. 19, 2025), sections 3, 6(d) (emphasis added).  BOEM cannot justify its Order impairing DEV's investment in CVOW.

The Order's abrupt about-face from BOEM's prior approvals for this same CVOW project also is arbitrary and capricious. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) ("[u]nexplained inconsistency" is grounds to invalidate agency action); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009) (BOEM must provide a "reasoned explanation" for the change, particularly where it relies on contradictory factual findings). Moreover, "when an agency changes course … it must be 'cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *DHS  v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (quoting *Navarro*, 579 U.S. at 222).

DEV has invested billions of dollars and entered into countless contractual agreements in reliance on long-held CVOW approvals and policies encouraging development of wind energy. BOEM also has defended CVOW in court.  Yet the Order now suspends BOEM's awarded CVOW lease and activities thereon.  BOEM's failure to consider DEV's reliance interests before impairing them by fiat is arbitrary and capricious.  *See Smiley v. Citibank*, 517 U.S. 735, 742 (1996) ("sudden and unexplained change … or change that does not take account of legitimate reliance on prior interpretation may be arbitrary, capricious, or an abuse of discretion") (citation omitted); *New York*, 2025 WL 3514301, at *14 (agencies' wind permitting ban failed to "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns, let alone provide the 'more detailed justification' required upon determining that serious reliance interests exist").

Relatedly, agency action is arbitrary and capricious if it fails "to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43.  That includes failure to consider less harmful alternatives and the costs and benefits of a decision.  *Id.* at 48; *Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956, 973 (5th Cir. 2023).  The current Administration has

recently acknowledged the importance of addressing the "massive costs" and "restraint[s] on … economic growth and ability to build and innovate" associated with federal regulation.  Exec. Order No. 14102, *Unleashing Prosperity through Deregulation,* 90 Fed. Reg. 9065 (Feb. 6, 2025).  Yet the Order imposes extensive costs on DEV and the public, including compromising jobs and economic development in the area of the CVOW project, and interfering with development of a critical, highly reliable energy source for DEV's customers during a declared energy emergency, in exchange for likely nonexistent benefits of project interruption.

Because BOEM's Order failed to, *inter alia*, provide a reasoned explanation, reconcile internal contradictions, account for its prior CVOW decisions, consider important aspects of the problem, and weigh reliance interests and alternatives, the Order is arbitrary and capricious.

### 4.    The Order Is Likely Pretextual.

The record and reasonable inferences point to BOEM's stated national security reason for its Order being pretext for the Administration's widely publicized animus to wind energy. Where there is a "significant mismatch" between an agency's decision and the rationale the agency provides, courts conclude that the agency's justification is "contrived" and cannot support the agency's decision.  *Dep't of Com.*, 588 U.S. at 783-85.

BOEM has provided no concrete explanation for suddenly walking away from the result of the extensive process by which it approved and now oversees CVOW construction.  The government's own statements divorced from national security and its refusal to work with DEV on purported national security threats undercut the Order's stated rationale.  *See* L.D. ¶¶ 32-35. So does the Order's timing amidst the Administration's systematic obstruction of wind energy development.  DEV anticipates that the administrative record and any discovery in this matter will yield no substantive basis for the Order.  But in the near term, the Order cannot remain effective, or it will realize its arbitrary and punitive ends despite its illegality.

25

### E.    BOEM's Order Is Barred by OCSLA.

OCSLA provides a remedy to "compel compliance" in the event of a violation of OCSLA, its implementing regulations, "or the terms of any permit or lease."  43 U.S.C. § 1349(a)(1).  As discussed above, the Order violates limits on BOEM's authority.  These violations immediately affect DEV's legal interests and are thus actionable immediately after notification.  43 U.S.C. §§ 1349(a)(2), (3).  DEV likely will succeed on this claim as well.

## II.    BOEM'S ORDER IS CAUSING SUBSTANTIAL, IMMINENT, IRREPARABLE, AND ONGOING INJURY TO DEV.

Even solely economic harms (which do not fully describe DEV's harms as a public utility) that are immediate, severe, and unrecoverable support a preliminary injunction.  CVOW is a multi-billion investment for DEV and its customers.  Every day of delay in construction causes DEV to incur more than $5 million, with more than $125 million total lost by the time of the hearing on this motion.  H.D. ¶ 28.  Given project realities and contract deadlines, this harm will increase exponentially—to hundreds of millions of dollars or more—during the Order's initial 90-day period.  *Id*.  And DEV has no means to recoup its losses from the government.

Substantial Immediate Costs of Delay.  BOEM's stop-work order immediately began to cause DEV irreparable harm.  *Id.* ¶¶ 22-32.  Beyond daily vessel costs, DEV is also paying for equipment storage, idle workforce, contractual penalties, and similar costs, *Id.* ¶¶ 29-30, which imperil the project's completion and the delivery of 2.6 crucial gigawatts (GW) of clean energy annually, *Id.* ¶ 6.  These costs and losses alone suffice to establish DEV's irreparable harm.

Risks of Construction Delays.  Delaying CVOW construction for even a short time could cause construction delays of a year or more.  *Id.* ¶ 20, 22.  The schedule relies on interdependent steps and is structured around the availability of key vessels, equipment, and labor during specific construction windows.  *Id.*  CVOW is focused on installing offshore wind turbine

generators, a third substation, inter-array cables, and other infrastructure. *Id.* ¶ 21. Specialized transportation and installation vessels owned by third parties are required to perform these activities and, due to their scarcity, must be booked years in advance. *Id.* ¶ 16. The need to install this infrastructure will increase the total time that construction vessels must be on lease. The result will be a substantially higher total CVOW construction cost, borne by DEV customers not only through rates but also the non-delivery of renewable energy to the grid. *Id.* ¶ 31.

Delay also causes other compounding and cascading harms to DEV, including storage and maintenance costs and administrative burdens associated with the components that cannot be installed as scheduled. *Id.* ¶¶ 26, 29-30. DEV also incurs costs to demobilize deployed vessels and crews and then remobilize them at a different, undetermined date. *Id.* DEV may not be able to reengage with certain vessels at all due to their scarcity and high demand. *Id.* ¶ 22

Though specifying an initial suspension of 90 days, the Order indicates its total duration is indefinite, so DEV is not able to plan or schedule future construction on the OCS while the Order is in place. BOEM's Order thus will not only have severe monetary costs but also affect employment and the national and regional economy, jeopardizing CVOW's generated thousands of jobs and billions of dollars in economic activity. *Id.* ¶ 45.

<u>Risks of Postponed Operations</u>. DEV's inability to complete CVOW construction inherently also delays CVOW's delivery of electricity to the grid and DEV's customers. That includes prompt supply of electricity to meet the continuous and increasing needs of military installations and data centers. And as discussed above, thousands of local jobs and millions of dollars of economic, tax, and fuel savings benefits depend on CVOW's timely completion.

In addition, the Virginia Clean Economy Act (VCEA) requires the transition of Virginia's electric grid to 100% non-carbon producing energy generation by 2045. Va. Code

§ 56-585.5.  CVOW's delay could impair DEV's ability to meet these requirements.  Under the VCEA, DEV could be forced to make deficiency payments or purchase a substantial amount of renewable energy credits each year CVOW is delayed.  Va. Code § 56-585.5(C); H.D. ¶ 42.

DEV's Harms Are Unrecoverable.  Because the government has sovereign immunity from damages claims, DEV has no remedy to recover the Order's imposed costs, and its harms are thus irreparable.  In a case on point, the Fourth Circuit found that delaying construction of a natural gas pipeline would cause irreparable harm.  *Mountain Valley Pipeline*, *LLC v. 6.56 Acres of Land*, 915 F.3d 197, 217-19 (4th Cir. 2019).  The harms identified by the pipeline included "lost revenues from the delay in pipeline service …; charges and penalties for the breach of construction contracts ...; and carrying costs to prolong the project, such as storage and personnel expenses." *Id.* at 217.  These "economic losses would *not* be recoverable at the end of litigation" (as here) and therefore constituted "irreparable injury justifying preliminary relief." *Id.* at 218 (emphasis in original); *see also E. Tenn. Nat. Gas Co. v. Sage*, 361 F.3d 808, 828-29 (4th Cir. 2004); *Ala. Ass'n of Realtors v. Dep't of Health and Human Servs.*, 594 U.S. 758, 765 (2021). Here too, DEV's compliance with an order "later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs." *See Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220-21 (1994) (Scalia, J., concurring in part and concurring in the judgment); *Nat'l Institutes of Health v. Am. Pub. Health Ass'n*, 606 U.S. ---, No. 25A103, 2025 WL 2415669, at *1 (U.S. Aug. 21, 2025) (loss of money is irreparable harm "if the funds 'cannot be recouped' and are thus 'irrevocably expended'") (citation omitted).

## III.  THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST FAVOR PRELIMINARY INJUNCTIVE RELIEF.

The remaining preliminary injunction factors also favor DEV here.  As the government is the opposing party, these two factors merge. *Nken v Holder*, 556 U.S. 418, 435 (2009).

Applying predictable legal rules to OCS development is in the public interest.  OCS wind projects such as CVOW are capital-intensive and businesses cannot make investment decisions if agencies will not honor their issued permits.  *See Invenergy Renewables, LLC v. United States*, 422 F. Supp. 3d 1255, 1291 (Ct. Int'l. Trade 2019) (harms of "eliminating the business certainty required by the solar industry to plan and develop future projects").  The Order's suspension of advanced construction based on nebulous national security concerns that already have been exhaustively studied deters future investment in wind and other capital-intensive technologies.

Indeed, the government in separate CVOW litigation recognized "a strong public interest in the certainty and reliability of Federal Defendants' approvals" for CVOW.  *CFACT*, 24-cv-774, Dkt. No. 19 at 36.  There, the government opposed enjoining CVOW "after significant onshore and offshore construction have already occurred."  *Id.*  "Where, as here, an offshore energy developer has complied with agency rules and satisfied federal statutory requirements to the agencies' satisfaction, the developer should be able to rely on its permits, as it may need to make business and financial decisions in furtherance of completing the authorized activity."  *Id.*

More generally, the public has an interest in a reliable, affordable energy supply.  CVOW will supply affordable electricity as part of an "all of the above" national energy strategy amidst a declared energy emergency caused by surging load growth.[37]  The North American Electric Reliability Corporation (NERC) has estimated that over 79 GW of generation capacity will retire within the next decade, whereas load growth from data centers and semiconductor chip manufacturing facilities could increase demand by as much as 128 GW by 2029.[38]  Future

---

[37] *See, e.g.*, DEV, 2024 Integrated Resource Plan at 1, 2, 53, https://cdn-dominionenergy-prd-001.azureedge.net/-/media/content/about/our-company/irp/pdfs/2024-irp-w_o-appendices.pdf?rev=5b28b014e4814135bb2fcec470dcc92b.
[38] NERC, *2024 Long-Term Reliability Assessment*, (July 15, 2025); John D. Wilson, *et al.*, *Strategic Industries Surging: Driving US Power Demand*, Grid Strategies (Dec. 1, 2024).

electricity supply constraints not only threaten to dramatically increase electricity prices for DEV customers but also "leave[] us vulnerable to hostile foreign actors and pose[] an imminent and growing threat to the United States' national security."  Exec. Order No. 14156.  CVOW is expected to help meet this demand and save billions of dollars in customer fuel costs.  H.D. ¶ 47.

Moreover, Virginia law renders Virginia offshore clean energy, and specifically wind, in the public interest, Va. Code § 56-585.1:11(C)(1), and mandates that the State's electric grid transition to 100% non-carbon-producing energy generation by 2045.  Va. Code § 56-585.5.  The Court should give that legislative determination significant weight.  *Telvest, Inc. v. Bradshaw*, 618 F.2d 1029, 1036 (4th Cir. 1980) (giving weight to a state statute in analyzing the public interest factor).  Halting CVOW not only threatens jobs that generate $143 million in economic output, but also imperils substantial economic development that is transforming the Hampton Roads area into an offshore wind support hub—and the hundreds of millions of dollars in spurred tax revenue, salary and benefits, and economic activity.  H.D. ¶¶ 11, 45-50.

Since BOEM's Order is not in the public's or government's interest, while harming DEV and its public customers, the balance of equities tips sharply in favor of a preliminary injunction to maintain the status quo.  The public and government are not harmed by "a continuation of the status quo during the pendency of … litigation [which] only shortly prolong[s] the longstanding practice and policy of the United States government."  *See N.H. Indonesian Cmty. Support v. Trump*, No. 25-CV-38-JL-TSM, 2025 WL 457609, at *5 (D.N.H. Feb. 11, 2025).

## CONCLUSION

For the foregoing reasons, DEV respectfully requests that this Court preliminarily enjoin BOEM's Order and bar further actions by BOEM to enforce the Order while this case proceeds.

Dated: January 9, 2026

Respectfully submitted,

*/s/ Nessa Horewitch Coppinger*
NESSA HOREWITCH COPPINGER,
VA Bar No. 65566
JAMES M. AUSLANDER (*pro hac vice*)
R. JUSTIN SMITH (*pro hac vice pending*)
HILARY T. JACOBS (*pro hac vice*)
JULIUS M. REDD (*pro hac vice*)
TAYLOR N. FERRELL (*pro hac vice*)
Beveridge & Diamond, P.C.
1900 N Street, NW, Suite 100
Washington, D.C. 20036
Telephone: 202-789-6000
Fax: 202-789-6190
ncoppinger@bdlaw.com
jauslander@bdlaw.com
jsmith@bdlaw.com
hjacobs@bdlaw.com
jredd@bdlaw.com
tferrell@bdlaw.com

*Counsel for Virginia Electric and Power Company,
d/b/a Dominion Energy Virginia, and OSW Project
LLC*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was electronically filed on January 9, 2026.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

*/s/ Nessa Horewitch Coppinger*
NESSA HOREWITCH COPPINGER,
VA Bar No. 65566
Beveridge & Diamond, P.C.
1900 N Street, NW, Suite 100
Washington, D.C. 20036
Telephone: 202-789-6000
Fax: 202-789-6190
ncoppinger@bdlaw.com

*Counsel for Virginia Electric and Power Company, d/b/a Dominion Energy Virginia, and OSW Project LLC*