RECEIVED

JAN 15 2025

Office of Renewable Energy Programs

**AMENDMENT AND RESTATEMENT**

**Renewable Energy Lease OCS-A 0483**

This Amendment and Restatement of Renewable Energy Lease OCS-A 0483 (the "Lease") is made and entered into by and between the United States of America, ("Lessor"), acting through the Bureau of Ocean Energy Management ("BOEM"), its authorized officer, and OSW Project LLC Company (the "Lessee").

<u>WITNESSETH:</u>

THAT WHEREAS the Lease, containing approximately 112,779 acres, was entered into by and between the Lessor and Virginia Electric and Power Company, effective as of November 1, 2013; and

WHEREAS the Lease was amended on March 28, 2016, to strike Stipulation 2.1.3, Addendum "C" from the lease; and

WHEREAS the Lease was amended on December 6, 2023, to adjust language in Addendum "D"; and

WHEREAS BOEM approved the Lessee's Construction and Operations Plan (COP), granted a Project Easement, and amended Addenda A and D, effective January 28, 2024; and

WHEREAS Virginia Electric and Power Company assigned 100% record title interest in the lease to OSW Project LLC, effective October 4, 2024;

NOW, THEREFORE, in consideration of the premises, the Lessor and Lessee hereby agree that Lease OCS-A 0483 is amended and restated in its entirety to read as follows:

| UNITED STATES DEPARTMENT OF THE INTERIOR BUREAU OF OCEAN ENERGY MANAGEMENT<br><br>**COMMERCIAL LEASE OF SUBMERGED LANDS FOR RENEWABLE ENERGY DEVELOPMENT ON THE OUTER CONTINENTAL SHELF**<br><br>***Paperwork Reduction Act of 1995 statement:*** *This form does not constitute an information collection as defined by 44 U.S.C. § 3501 et seq. and therefore does not require approval by the Office of Management and Budget.* | | |
|---|---|---|
| Office<br><br>Sterling, VA | | Renewable Energy Lease Number<br><br>OCS-A 0483 |
| Cash Bonus and/or Acquisition Fee<br>$1,600,000.00 | | Resource Type<br><br>Wind |
| Effective Date<br><br>November 1, 2013 | | Block Number(s)<br><br>See Addendum A |

This lease, which includes any addenda hereto, is hereby entered into by and between the United States of America, ("Lessor"), acting through the Bureau of Ocean Energy Management ("BOEM"), its authorized officer, and

| Lessee | Interest Held |
|---|---|
| OSW Project LLC | 100% |

("Lessee"). This lease is effective on the date written above ("Effective Date") and will continue in effect until the lease terminates as set forth in Addendum "B." In consideration of any cash payment heretofore made by the Lessee to the Lessor and in consideration of the promises, terms, conditions, covenants, and stipulations contained herein and attached hereto, the Lessee and the Lessor agree as follows:

**Section 1:  Statutes and Regulations.**

This lease is issued pursuant to subsection 8(p) of the Outer Continental Shelf Lands Act ("the Act"), 43 U.S.C. §§ 1331 *et seq.* This lease is subject to the Act and regulations promulgated pursuant to the Act, including but not limited to, offshore renewable energy and alternate use regulations at 30 CFR Part 285, 30 CFR Part 585 as well as other applicable statutes and regulations in existence on the Effective Date of this lease. This lease is also subject to those statutes enacted (including amendments to the Act or other statutes) and regulations promulgated thereafter, except to the extent that they explicitly conflict with an express provision of this lease. It is expressly understood that amendments to existing statutes, including but not limited to the Act, and regulations may be made, and/or new statutes may be enacted or new regulations promulgated, which do not explicitly conflict with an express provision of this lease, and that the Lessee bears the risk that such amendments, regulations, and statutes may increase or decrease the Lessee's obligations under the lease.

**Section 2:  Rights of the Lessee.**

(a)  The Lessor hereby grants and leases to the Lessee the exclusive right and privilege, subject to the terms and conditions of this lease and applicable regulations, to: (1) submit to the Lessor for approval a Site Assessment Plan (SAP) and Construction and Operations Plan (COP) for the lease activities identified in Addendum "A" of this lease; and (2) conduct activities in the area identified in Addendum "A" of this lease ("leased area") that are described in a SAP or COP that has been approved by the Lessor.  This lease does not, by itself, authorize any activity within the leased area.

(b)  The rights granted to the Lessee herein are limited to those activities described in any SAP or COP approved by the Lessor.  The rights granted to the Lessee are limited by the lease-specific terms, conditions, and stipulations required by the Lessor in Addendum "C."

(c)  This lease does not authorize the Lessee to conduct activities on the Outer Continental Shelf (OCS) relating to or associated with the exploration for, or development or production of, oil, gas, other seabed minerals, or renewable energy resources other than the renewable energy resources identified in Addendum "A."

(d)  The Lessee may request a suspension of this lease from Lessor under 30 CFR § 585.416 for up to two years per request. The suspension will be in effect for the period specified by Lessor in the suspension order, unless the Lessee requests an earlier termination of the suspension. If the Lessee so requests, the Lessor may end the suspension on the date requested by the Lessee, or at any time before the specified end date. Nothing in this provision should be read to limit BSEE's authority.

**Section 3:  Reservations to the Lessor.**

(a)  All rights in the leased area not expressly granted to the Lessee by the Act, applicable regulations, this lease, or any approved SAP or COP, are hereby reserved to the Lessor.

(b)  The Lessor will decide whether to approve or disapprove a SAP or COP in accordance with the applicable regulations in 30 CFR Part 585, including 30 CFR § 585.102(a).  Disapproval of plans will not subject the Lessor to liability under the lease.  The Lessor also retains the right to approve a SAP or COP with conditions, as provided in applicable regulations.  (c)  The Lessor reserves the right to suspend the Lessee's operations in accordance with the national security and defense provisions of Section 12 of the Act and applicable regulations, provided that compensation must be paid to the Lessee as provided by 43 U.S.C. § 1341(c) and (d).

(d)  The Lessor reserves the right to authorize other uses within the leased area and project easement(s) that will not unreasonably interfere with activities described in a SAP and/or COP, approved pursuant to this lease.

**Section 4:  Payments.**

(a)  The Lessee must make all rent payments to the Lessor in accordance with applicable regulations in 30 CFR Part 585, unless otherwise specified in Addendum "B."

(b)  The Lessee must make all operating fee payments to the Lessor in accordance with applicable regulations in 30 CFR Part 585, as specified in Addendum "B."

**Section 5:  Plans.**

The Lessee may conduct those activities described in Addendum "A" only in accordance with a SAP or COP approved by the Lessor.  The Lessee may not deviate from an approved SAP or COP except as approved by the Lessor pursuant to applicable regulations in 30 CFR Part 585.

**Section 6:  Associated Project Easements.**

Pursuant to 30 CFR §  585.200(b), the Lessee has the right to one or more project easement(s), without further competition, for the purpose of installing, maintaining, repairing and replacing: gathering, transmission, distribution, and inter-array cables; power and pumping stations; facility anchors; pipelines; and associated facilities and other appurtenances on the OCS as necessary for the full enjoyment of the lease, and under applicable regulations in 30 CFR Part 285 and 30 CFR Part 585.  As part of submitting a COP for approval, the Lessee may request that one or more easement(s) be granted by the Lessor. If the Lessee requests that one or more easement(s) be granted when submitting a COP for approval, such project easements will be granted by the Lessor in accordance with the Act and applicable regulations in 30 CFR Part 585 upon approval of the COP in which the Lessee has demonstrated a need for such easements.  Such easements must be in a location acceptable to the Lessor, and will be subject to such conditions as the Lessor may require. The project easement(s) issued in conjunction with an approved COP under this lease will be incorporated into this lease as Addendum "D".

**Section 7:  Conduct of Activities.**

The Lessee must conduct, and agrees to conduct, all activities in the leased area in accordance with an approved SAP or COP, all applicable laws and regulations, and the lease-specific terms, conditions and stipulations in Addendum "C".

The Lessee further agrees that no activities authorized by this lease will be carried out in a manner that:

(a)    could unreasonably interfere with or endanger activities or operations carried out under any lease or grant issued or maintained pursuant to the Act, or under any other license or approval from any Federal agency;

(b)    could cause any undue harm or damage to the environment;

(c)    could create hazardous or unsafe conditions; or

(d)     could adversely affect sites, structures, or objects of historical, cultural, or archaeological significance, without notice to and direction from the Lessor on how to proceed.

## Section 8:  Violations, Suspensions, Cancellations, and Remedies.

If the Lessee fails to comply with (1) any of the applicable provisions of the Act or regulations, (2) the approved SAP or COP, or (3) the terms of this lease, including associated Addenda, the Lessor may exercise any of the remedies that are provided under the Act and applicable regulations, including, without limitation, issuance of cessation of operations orders, suspension or cancellation of the lease, and/or the imposition of penalties, in accordance with the Act and applicable regulations.

The Lessor may also cancel this lease for reasons set forth in subsection 5(a)(2) of the Act (43 U.S.C. § 1334(a)(2)), and for reasons provided by the Lessor pursuant to 30 CFR § 585.422. Any cancellations are subject to the limitations and protections contained in subsections 5(a)(2)(B) and (C) of the Act (43 U.S.C. § 1334 (a)(2)(B) and (C)).

Any cancellation or suspension ordered by the Lessor that is predicated on a threat of serious irreparable, or immediate harm or damage, or on an imminent threat of serious or irreparable harm or damage, requires a finding by the Lessor of particularized harm that it determines can only be feasibly averted by suspension of on-lease activities.

Non-enforcement by the Lessor of a remedy for any particular violation of the applicable provisions of the Act or regulations, or the terms of this lease, will not prevent the Lessor from exercising any remedy, including cancellation of this lease, for any other violation or for the same violation occurring at any other time.

## Section 9:  Indemnification.

The Lessee hereby agrees to indemnify the Lessor for, and hold the Lessor harmless from, any claim caused by or resulting from any of the Lessee's operations or activities on the leased area or project easements or arising out of any activities conducted by or on behalf of the Lessee or its employees, contractors (including Operator, if applicable), subcontractors, or their employees, under this lease, including claims for:

      a.  loss or damage to natural resources,
      b.  the release of any petroleum or any Hazardous Materials,
      c.  other environmental injury of any kind,
      d.  damage to property,
      e.  injury to persons, and/or
      f.  costs or expenses incurred by the Lessor.

Except as provided in any Addenda to this lease, the Lessee will not be liable for any losses or damages proximately caused by the activities of the Lessor or the Lessor's employees,

contractors, subcontractors, or their employees.  The Lessee must pay the Lessor for damage, cost, or expense due and pursuant to this section within 90 days after written demand by the Lessor.  Nothing in this lease will be construed to waive any liability or relieve the Lessee from any penalties, sanctions, or claims that would otherwise apply by statute, regulation, operation of law, or could be imposed by the Lessor or other government agency acting under such laws.

"Hazardous Material" means

1.  Any substance or material defined as hazardous, a pollutant, or a contaminant under the *Comprehensive Environmental Response, Compensation, and Liability Act* at 42 U.S.C. §§ 9601(14) and (33);

2.  Any regulated substance as defined by the Resource Conservation and Recovery Act ("RCRA") at 42 U.S.C. § 6991 (7), whether or not contained in or released from underground storage tanks, and any hazardous waste regulated under RCRA pursuant to 42 U.S.C. §§ 6921 *et seq.*;

3.  Oil, as defined by the Clean Water Act at 33 U.S.C. § 1321(a)(1) and the Oil Pollution Act at 33 U.S.C. § 2701(23); or

4.  Other substances that applicable Federal, state, tribal, or local laws define and regulate as "hazardous."

**Section 10:  Financial Assurance.**

The Lessee must at all times maintain the financial assurance required prior to issuance of this lease, as provided in 30 CFR Part 585.  The Lessee must also provide and maintain a supplemental surety bond(s) or other authorized financial assurance if the Lessor determines that additional financial assurance is necessary to ensure compliance with 30 CFR Part 585, applicable plan approvals, and the terms and conditions of this lease.

**Section 11:  Assignment or Transfer of Lease.**

This lease may not be assigned or transferred in whole or in part without written approval of the Lessor.  The Lessor reserves the right, in its sole discretion, to deny approval of the Lessee's application to transfer or assign all or part of this lease, in accordance with applicable regulations in 30 CFR Part 585.  Any assignment or transfer made in contravention of this section is void.

**Section 12:  Relinquishment of Lease.**

The Lessee may relinquish this entire lease or any officially designated subdivision thereof by filing with the appropriate office of the Lessor a written relinquishment application, in accordance with applicable regulations in 30 CFR Part 585.  No relinquishment of this lease

or any portion thereof will relieve the Lessee or its surety of the obligations accrued hereunder, including but not limited to, the responsibility to remove property and restore the leased area pursuant to section 13 of this lease and applicable regulations.

**Section 13:  Removal of Property and Restoration of the Leased Area on Termination of Lease.**

Unless otherwise authorized by the Lessor, pursuant to the applicable regulations in 30 CFR Part 285 and 30 CFR Part 585, the Lessee must remove or decommission all facilities, projects, cables, pipelines, and obstructions and clear the seafloor of all obstructions created by activities on the leased area, including any project easements within two years following lease termination, whether by expiration, cancellation, contraction, or relinquishment, in accordance with any approved SAP, COP, or approved Decommissioning Application, and applicable regulations in 30 CFR Parts 285, 585, and 586.

**Section 14:  Safety Requirements.**

The Lessee must:

a.  maintain all places of employment for activities authorized under this lease in compliance with occupational safety and health standards and, in addition, free from recognized hazards to employees of the Lessee or of any contractor or subcontractor operating under this lease;

b.  maintain all operations within the leased area in compliance with regulations in 30 CFR Part 285 and 30 CFR Part 585 and orders from the Lessor and other Federal agencies with jurisdiction, intended to protect persons, property and the environment on the OCS; and

c.  provide any requested documents and records, which are pertinent to occupational or public health, safety, or environmental protection, and allow prompt access, at the site of any operation or activity conducted under this lease, to any inspector authorized by the Lessor or other Federal agency with jurisdiction.

**Section 15:  Debarment Compliance.**

The Lessee must comply with the Department of the Interior's non-procurement debarment and suspension regulations set forth in 2 CFR Parts 180 and 1400 and must communicate the requirement to comply with these regulations to persons with whom it does business related to this lease by including this requirement in all relevant contracts and transactions.

**Section 16:  Equal Opportunity Clause.**

During the performance of this lease, the Lessee must fully comply with paragraphs (1) through (7) of Section 202 of Executive Order 11246, as amended (reprinted in 41 CFR 60-1.4(a)), and the implementing regulations, which are for the purpose of preventing employment discrimination against persons on the basis of race, color, religion, sex, or national origin. Paragraphs (1) through (7) of Section 202 of Executive Order 11246, as amended, are incorporated in this lease by reference.

**Section 17:  Certification of Nonsegregated Facilities.**

By entering into this lease, the Lessee certifies, as specified in 41 CFR 60-1.8, that it does not and will not maintain or provide for its employees any segregated facilities at any of its establishments and that it does not and will not permit its employees to perform their services at any location under its control where segregated facilities are maintained. As used in this certification, the term "facilities" means, but is not limited to, any waiting rooms, work areas, restrooms and washrooms, restaurants and other eating areas, timeclocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees. Segregated facilities include those that are segregated by explicit directive or those that are in fact segregated on the basis of race, color, religion, sex, or national origin, because of habit, local custom, or otherwise; provided, that separate or single-user restrooms and necessary dressing or sleeping areas must be provided to assure privacy as appropriate. The Lessee further agrees that it will obtain identical certifications from proposed contractors and subcontractors prior to awarding contracts or subcontracts unless they are exempt under 41 CFR 60-1.5.

**Section 18:  Notices.**

All notices or reports provided from one party to the other under the terms of this lease must be in writing, except as provided herein and in the applicable regulations in 30 CFR Parts 285, 585, and 586. Written notices and reports must be delivered to the Lessee's or Lessor's Lease Representative, as specifically listed in Addendum "A," either electronically, by hand, by facsimile, or by United States first class mail, adequate postage prepaid. Each party must, as soon as practicable, notify the other of a change to their Lessee's or Lessor's Contact Information listed in Addendum "A" by a written notice signed by a duly authorized signatory and delivered by hand or United States first class mail, adequate postage prepaid. Until such notice is delivered as provided in this section, the last recorded contact information for either party will be deemed current for service of all notices and reports required under this lease. For all operational matters, notices and reports must be provided to the party's Operations Representative, as specifically listed in Addendum "A," as well as the Lease Representative.

**Section 19:  Severability Clause.**

If any provision of this lease is held unenforceable, all remaining provisions of this lease will remain in full force and effect.

**Section 20:  Modification.**

Unless otherwise authorized by the applicable regulations in 30 CFR Part 585, this lease may be modified or amended only by mutual agreement of the Lessor and the Lessee. No such modification or amendment will be binding unless it is in writing and signed by duly authorized signatories of the Lessor and the Lessee.


**Section 21:  Variance.**

The Lessee may submit a written request via email to the BOEM Office of Renewable Energy Programs Chief and/or the Bureau of Safety and Environmental Enforcement (BSEE) via TIMSWeb (https://timsweb.bsee.gov/), requesting a variance from the requirements of this lease. The request must explain why compliance with a particular requirement is not technically and/or economically practicable or feasible and any alternative actions the Lessee proposes to take. To the extent not otherwise prohibited by law and after consideration of all relevant facts and applicable legal requirements, BOEM and/or BSEE may grant the request for a variance if the appropriate Bureau(s) determine that the variance: (1) would not result in a change in the project impact levels described in the Environmental Assessment EA and the Finding of No Significant Impact issued for this lease; (2) would not alter obligations or commitments resulting from consultations performed by BOEM and BSEE under federal law in connection with this lease in a manner that would require BOEM to re-initiate or perform additional consultations (e.g., Endangered Species Act (ESA), Coastal Zone Management Act, National Historic Preservation Act (NHPA)); and (3) would not alter BOEM's determination that the activities associated with the project would be conducted in accordance with Section 8(p)(4) of the Outer Continental Shelf Lands Act (OCSLA). After making a determination regarding a request for a variance, BOEM and/or BSEE will notify the Lessee in writing whether the appropriate Bureau(s) will approve the proposed variance from the lease requirement(s) identified above. Approvals of variance requests will be made publicly available.

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF OCEAN ENERGY MANAGEMENT

**ADDENDUM "A"**

DESCRIPTION OF LEASED AREA AND LEASE ACTIVITIES

Lease Number OCS-A 0483

I.    Lessor and Lessee Contact Information

Lessee Company Number:    ___15201_____

(a) Lessor's Contact Information

|  | Lease Representative | Operations Representative |
|---|---|---|
| Title | Deputy Associate Director for Operations, Atlantic Outer Continental Shelf, Office of Renewable Energy Programs | Same as Lease Representative |
| Address | U.S. Department of the Interior Bureau of Ocean Energy Management 45600 Woodland Road, Mail Stop VAM-OREP Sterling, Virginia 20166 | |
| Phone | (703) 787-1300 | |
| Fax | (703) 787-1708 | |
| Email | renewableenergy@boem.gov | |

(b) Lessee's Contact Information

|  | **Lease Representative** | **Operations Representative** |
|---|---|---|
| Name | Joshua J. Bennett | Same as Lease Representative |
| Title | Vice President – Offshore Wind Operations | |
| Address | Virginia Electric and Power Company 120 Tredegar Street Richmond, Virginia 23219 | |
| Phone | (804) 638-0248 | |
| Fax | | |
| Email | joshua.j.bennett@dominionenergy.com | |

II.    <u>Description of Leased Area</u>

The total acreage of the lease area is approximately 112,799.

This area is subject to later adjustment, in accordance with applicable regulations (e.g., contraction, relinquishment, etc.) in 30 CFR Part 585.

The following Blocks or portions of Blocks lying within Official Protraction Diagram Currituck Sound NJ18-11, are depicted on the map below and comprise 112,799 acres, more or less.

| | |
|---|---|
| 1) | Block 6012, E1/2; SE1/4 of NW1/4; SW1/4 |
| 2) | Block 6013, All of Block |
| 3) | Block 6014, All of Block |
| 4) | Block 6015, All of Block |
| 5) | Block 6016, All of Block |
| 6) | Block 6062, All of Block |
| 7) | Block 6063, All of Block |
| 8) | Block 6064, All of Block |
| 9) | Block 6065, All of Block |
| 10) | Block 6066, All of Block |
| 11) | Block 6112, All of Block |
| 12) | Block 6113, All of Block |
| 13) | Block 6114, All of Block |
| 14) | Block 6115, All of Block |
| 15) | Block 6116, All of Block |
| 16) | Block 6162, All of Block |
| 17) | Block 6163, All of Block |
| 18) | Block 6164, All of Block |
| 19) | Block 6165, All of Block |
| 20) | Block 6166, All of Block |

For the purposes of these calculations, a full Block is 2,304 hectares.  The acreage of a hectare is 2.471043930.

Map ID: PACB-2012-1066

## III.   Renewable Energy Resource

Wind

## IV.   Description of Lease Activities

Generation of energy using wind turbine generators and associated offshore substation platforms, inner-array cables, and subsea export cables. Site assessment activities consistent with 30 CFR § 585.600(a)(1).

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF OCEAN ENERGY MANAGEMENT

**ADDENDUM "B"**

LEASE PERIODS AND PAYMENTS

Lease Number OCS-A 0483

I.    <u>Lease Periods</u>

The duration of each period of the lease is described below. The Lessor may extend or otherwise modify the periods in accordance with applicable regulations in 30 CFR Part 585.

| Period | Duration |
|---|---|
| The Preliminary Period | begins on the effective date of the lease and ends either when a COP is received by the Lessor for review or at the expiration of six years, whichever occurs first. |
| The COP Review Period | begins when the Lessor receives a COP from the Lessee and ends upon COP approval, disapproval, or approval with conditions. |
| The Design and Construction Period | begins at COP approval and ends when the operations period begins. |
| The Operations Period | begins when the requirements of 30 CFR 285.637 are met and ends in 35 years or the duration included and approved as part of the Lessee's COP, whichever is lesser. |

Renewal: The Lessee may request renewal for all lease periods for good cause, in accordance with applicable regulations in 30 CFR Part 585. The Lessor, at its discretion, may approve a renewal request to conduct substantially similar activities as were originally authorized under this lease or in an approved plan. Good cause for extension of a Preliminary Period may include Lessee's inability to procure an offtake agreement after reasonable efforts, and good cause for extension of an Operations Period may include if a project's design and verification indicate a useful life longer than the leased Operations Period.

The Lessor, at its discretion, may approve a renewal request to conduct substantially similar activities as were originally authorized under this lease or in an approved plan. The Lessor will not approve a renewal request that involves development of a type of renewable energy not originally authorized in the lease. The Lessor may revise or adjust payment terms of the original lease as a condition of lease renewal.

II.    Definitions

*Day(s)* means calendar day(s) unless otherwise specified.

*Lease Anniversary* means the anniversary of the Effective Date of the lease.
*End Date* means the earlier of a) the last calendar day of the last month of the Operations Period; or b) the date on which the lease terminates for another reason under 30 CFR § 585.432.

*Commercial Operations* means the generation of electricity or other energy product for commercial use, sale, transmission, or distribution.

*Commercial Operations Date*, or *COD*, means the date on which the Lessee first begins commercial operations on the lease.

*Delivery Point* means the meter identified in the Construction and Operations Plan (COP) where the Lessee's facility interconnects with the electric grid to deliver electricity for sale.

*Available for Commercial Operations* means the date on which an individual wind turbine generator (WTG) is engaged in Commercial Operations on the lease. An individual WTG is no longer available for Commercial Operations on the first day that it is permanently decommissioned.  These dates are determined by the COP, the Facility Design Report (FDR) or the Fabrication Installation Report (FIR).

III.    <u>Lease Payments</u>

Unless otherwise authorized by the Lessor in accordance with the applicable regulations in 30 CFR Part 585, the Lessee must make payments as described below.

(a)    ***Rent.***  The Lessee must pay rent as described below:

Rent payments prior to the COD, or prior to the lease End Date in the event that the lease terminates prior to the COD, are calculated by multiplying the acres in the leased area times the rental rate per acre.  The acreage for the lease is documented in Addendum "A".  For example:

- Acres: 100,000

- Annual Rental Rate: $3.00 per acre or fraction thereof

- Rental Fee for Entire Leased Area: $3.00 x 100,000 = $300,000

The first year's rent payment will be separated into two 6-month payments.  The first 6-month payment of $169,198 is due within 45 days of the date that the lease is received by the Lessee for execution.  The second 6-month payment of $169,199 is due by the first day of the seventh month after the Effective Date of the lease.  Rent for the entire leased area for the next year and for each subsequent year is due on or before each Lease Anniversary through the year in which the COD

occurs.  The rent for each year subsequent to the COD on the portion of the lease not authorized for Commercial Operations is due on or before each Lease Anniversary.

Rental payments account for lease acreage that will begin commercial operations during the upcoming lease year.  Rent will only be due for the undeveloped or non-operating acreage.  The rent calculation becomes a three-step process:

> (1) rent is calculated on the portion of the lease not authorized for commercial operations.

> (2) rent is calculated on the portion of the lease authorized for commercial operations but without operating turbines.

> (3) the sum of (1) and (2) yield the rent due.

**Step (1)**:  The Lessee will continue to pay rent at the lease rate for acreage outside the approved commercial project area.  The demarcation between acreage for a commercial project and undeveloped acreage will be defined in the COP or supplemental documents approved by BOEM.  For example, if the total lease acreage is 100,000 acres and exactly one-quarter of the lease acreage is approved for commercial operations, 75,000 acres is not authorized for commercial operations.

- Acres: 75,000

- Annual Rental Rate: $3.00 per acre or fraction thereof

- Rental Fee for Undeveloped Leased Area: $3.00 x 75,000 = $225,000


**Step (2)**:  The portion of the acreage covered by approved Commercial Operations subject to rent will be equal to one minus the operating nameplate capacity divided by the total nameplate capacity, $\frac{M_t}{\sum N_w}$, as defined in Section III (b) (4) below, prior to any adjustments as specified in the most recent approved COP for turbine maintenance, replacements, repowering, or decommissioning.  If contiguous acreage for an approved project cannot be developed due to buffers or other surface occupancy restrictions, it will be considered part of the operating area of the lease and covered by the lease's operating fee payment.

- Acres: 25,000

- Annual Rental Rate: $3.00 per acre or fraction thereof

- Rental Fee for Undeveloped Acreage Authorized for Commercial Operations: $3.00 x 25,000 x $(1 - \frac{M_t}{\sum N_w})$ = $Rent

Using the summed capacity of 14.21 megawatts (MW) from the 30 MW project in Table 1 from Section III (b) (4) below, the rental calculation for the project area is:  $3.00 x 25,000 x (1 - 0.473667) = $39,475

**Step (3)**:  Summing the rent due in steps (1) & (2):  $225,000 + $39,475 = $264,475.

- The Adjusted Annual Rent Payment will be rounded up to the nearest dollar.

All rent payments must be made as required in 30 CFR 1218.51.  Late rent payments will be charged underpayment interest in accordance with 30 CFR 1218.54.

All rent payments, including the last rent payment, are payable for the full year.

During the construction and decommissioning periods, the rental paid can be adjusted following a reconciliation process.  The adjustment of rent for the commercial project area will be calculated based on actual construction and decommissioning dates and will equal the fractional remainder of the operating nameplate capacity as calculated for $M_t$ in (b)(4) below.  The Lessee should work with BOEM's Office of Renewable Energy Programs and the Office of Natural Resources Revenue (ONRR) on any payment reconciliation as instructed in Section III (c).

   (1) ***Project Easement.***

Rent for any project easement(s) is described in Addendum "D."

   (2) ***Relinquishment.***

If the Lessee submits an application for relinquishment of a portion of the leased area within the first 45 days following the date that the lease is received by the Lessee for execution, and the Lessor approves that application, no rent payment will be due on that relinquished portion of the leased area.  Later relinquishments of any leased area will reduce the Lessee's rent payments due the year following the Lessor's approval of the relinquishment, through a reduction in the acres in the leased area, the corresponding rent payment for the entire leased area, and any related adjusted annual rent payments.

(b)  ***Operating Fee.***  The Lessee must pay an operating fee as described below:
   (1) **Initial Operating Fee Payment.**

The Lessee must pay an initial prorated operating fee within 90 days after the COD.  The initial operating fee payment covers the first year of Commercial Operations on the lease and will be calculated in accordance with subsection (4), below, using an operating fee rate of 0.02 and a capacity factor of 0.4.

   (2) **Annual Operating Fee Payments.**

The Lessee must pay the operating fee for each subsequent year of Commercial Operations on or before each Lease Anniversary following the formula in subsection (4).  The Lessee must calculate each operating fee annually subsequent to the initial operating fee payment using an operating fee rate of 0.02 through the operations period of the lease.  The capacity factor of 0.4 will remain in effect until the Lease Anniversary of the year in which the Lessor adjusts the capacity factor.

   (3) **Final Operating Fee Payment.**

The final operating fee payment is due on the Lease Anniversary prior to the End Date.  The final operating fee payment covers the last year of Commercial Operations on the lease and will be calculated in accordance with the formula in subsection (4) below.

   (4) **Formula for Calculating the Operating Fee in Year *t*.**

| $F_t$ | = | $M_t$ | * | H | * | $c_p$ | * | $P_t$ | * | $r_t$ |
|---|---|---|---|---|---|---|---|---|---|---|

| (annual operating fee) | | (nameplate capacity) | | (hours per year) | | (capacity factor) | | (power price) | | (operating fee rate) |
|---|---|---|---|---|---|---|---|---|---|---|

Where:

| | |
|---|---|
| t = | the year of Commercial Operations on the lease starting from each Lease Anniversary, where $t$ equals 1 represents the year beginning on the Lease Anniversary prior to, or on, the COD. |
| $F_t$ = | the dollar amount of the annual operating fee in year $t$. |
| $M_t$ = | the nameplate capacity expressed in megawatts (MW) rounded to the nearest second decimal place in year $t$ of Commercial Operations on the lease. The capacity calculation is a two-step process: (1) scaling each turbine's nameplate capacity in proportion to the number of days in the year that it is operational and (2) summing these scaled values across all turbines.<br><br>The value of $M_t$, reflecting the availability of turbines, will be determined based on the FDR or FIR. This value will be adjusted to reflect any changes to installed capacity approved by BOEM as of the date each operating fee payment is due, in accordance with the calculation in Equation 1, for each year of Commercial Operations on the lease.<br><br>$$(1) \quad M_t = \sum_{w=1}^{W_t} \left( N_w \; x \; \left[ \frac{Y_{w,t}}{D} \right] \right)$$<br><br>Where:<br><br>$W_t$ = Number of individual wind generation turbines, $w$, that will be available for Commercial Operations during any day of the year, $t$, per the FDR or FIR.<br><br>$N_w$ = Nameplate capacity of individual wind generation turbine, $w$, per the FDR or FIR expressed in MW.<br><br>$Y_{w,t}$ = Number of days that turbine $w$ is commercially available during year.<br><br>$D$ = Days in the year set equal to 365 in all years for purposes of this calculation.<br><br>$M_t$ may be reduced only in the event that installed capacity is permanently decommissioned. $M_t$ will not be changed in response to routine or unplanned maintenance of units, including the temporary removal of a nacelle for off-site repair or replacement with a similar unit. |

EXAMPLE:  Table 1 illustrates the calculations represented by Equation (1) for a single lease year for a lease on which the Lessee plans to erect six turbines, each with a nameplate capacity of 5 MW.  Based on the days in each turbine's Commercial Operations period (column B), the exhibit shows the number of days during the year that the turbine is available for Commercial Operations.  Dividing this value by 365 (column D) yields the percent of days during the year that the turbine is available for Commercial Operations (column E).  For each turbine, the resulting percentage (column E) is multiplied by its nameplate capacity (column A) to calculate its scaled capacity for the year (column F).  The individual values in column F are then summed across all six turbines to calculate total capacity (Mt).

### Table 1:  Example of $M_t$ Calculations for Installation

| Turbine | Nameplate Capacity $(N_w)$ [A] | Days in Turbine's Commercial Operations Period [B] | Number of days available for Commercial Operations in year t $(Y_{w,t})$ [C] | Number of days in the Year [D] | Percent of days available for Commercial Operations $\left(\frac{Y_{w,t}}{D}\right)$ [E = C ÷ D] | Turbine capacity scaled based on percent of days in Commercial Operations $N_w \times \frac{Y_{w,t}}{D}$ [F = A × E] |
|---|---|---|---|---|---|---|
| #1 | 5 | January 1 to December 31 | 365 | 365 | 100% | 5.00 |
| #2 | 5 | January 1 to December 31 | 365 | 365 | 100% | 5.00 |
| #3 | 5 | October 1 to December 31 | 92 | 365 | 25.2% | 1.26 |
| #4 | 5 | October 1 to December 31 | 92 | 365 | 25.2% | 1.26 |
| #5 | 5 | October 1 to December 31 | 92 | 365 | 25.2% | 1.26 |
| #6 | 5 | December 1 to December 31 | 31 | 365 | 8.5% | 0.42 |

| | |
|---|---|
| | Available capacity summed across all turbines: $M_t = \sum_{w=1}^{W_t}\left(N_w \times \left[\frac{Y_{w,t}}{D}\right]\right) = 14.21$<br><br>The same calculation would be performed for the lease during the decommissioning phase. |
| H = | the number of hours in the year for billing purposes which is equal to 8,760 for all years of Commercial Operations on the lease. |
| $c_p$ = | the "Capacity Factor" in Performance Period p, which represents the share of anticipated generation of the facility that is delivered to where the Lessee's facility interconnects with the electric grid (i.e. the Delivery Point) relative to its generation at continuous full power operation at the nameplate capacity, expressed as a decimal between zero and one. Performance Period *(p)* is the period of Commercial Operation Years (*t*) during which each year has the same capacity factor.<br><br>The initial Capacity Factor ($c_0$) will be set to 0.4.<br><br>The Capacity Factor will be subject to adjustment at the end of each Performance Period. After the sixth year of Commercial Operations on the lease has concluded, the Lessee will utilize data gathered from years two through six of Commercial Operations on the lease and propose a revised Capacity Factor to be used to calculate subsequent annual payments, as provided for in Table 2 below.  A similar process will be conducted at the conclusion of each five-year Performance Period, thereafter.<br><br>**Table 2:  Definition of Performance Periods[1]**<br><br>{{TBL}} |

| Performance Period (*p*) | Commercial Operation Years (*t*) | Payments Affected by Adjustment | Capacity Factor (*c*) | |
|---|---|---|---|---|
| 0 (COD) | Not Applicable | Payments 1 to 7 | $c_0$=0.4 | -- |
| 1 | *t* = 2 to 6 | Payments 8 to 12 | $c_1$ | $n_1$=6 |
| 2 | *t* = 7 to 11 | Payments 13 to 17 | $c_2$ | $n_2$=11 |
| 3 | *t* = 12 to 16 | Payments 18 to 22 | $c_3$ | $n_3$=16 |
| 4 | *t* = 17 to 21 | Payments 23 to 27 | $c_4$ | $n_4$=21 |

[1] The Lessor acknowledges that there is a potential scenario where the design and construction period under 585.235(a)(3) may significantly overlap commercial operations as defined in Section II of this Addendum "B". In the event that the payment schedule appears likely to extend beyond 37 payments, the Lessor will provide an updated payment schedule to the Lessee.

| 5 | $t = 22$ to $26$ | Payments 28 to 32 | $c_5$ | $n_5 = 26$ |
|---|---|---|---|---|
| 6 | $t = 27$ to $31$ | Payments 33 through 37 (as applicable) | $c_6$ | $n_6 = 31$ |

**Adjustments to the Capacity Factor**

The Actual 5-year Average Capacity Factor ($Xp$) is calculated for each Performance Period after COD ($p > 0$) per Equation 2 below. $Xp$ represents the sum of actual, metered electricity generation in megawatt-hours (MWh) at the Delivery Point to the electric grid ($A_t$) divided by the amount of electricity generation in MWh that would have been produced if the facility operated continuously at its full, stated capacity ($M_t$) in all of the hours ($h_t$) in each year, $t$, of the corresponding five-year period.

$$(2)\quad X_p = \frac{\sum_{t=n-4}^{n} A_t}{\left(\sum_{t=n-4}^{n} M_t \ x \ h_t\right)}$$

Where:

$M_t$ = Nameplate Capacity as defined above.

$n$ = "Date End Year" value for the Performance Period, $p$, as defined in Table 2.

$p$ = Performance Period as defined in Table 2.

$A_t$ = Actual generation in MWh associated with each year of Commercial Operations, $t$, on the lease that is transferred at the Delivery Point; Delivery Point meter data supporting the values submitted for annual actual generation must be recorded, preserved, and timely provided to the Lessor upon request. The generation data for the facility must be the same data reported on the Energy Information Administration's EIA-923.

$h_t$ = Hours in the year on which the Actual Generation associated with each year of Commercial Operations, $t$, on the lease is based; this definition of "hours in the year" differs from the definition of H in the operating fee equation above. The hours in the year for purposes of calculating the capacity factor must take into account the actual number of hours, including those in leap years.

The value of the Capacity Factor at the outset of Commercial Operations ($p = 0$) is set to 0.4 as stated in equation 3:

$$(3)\quad c_0 = 0.4$$

| $P_t$ = | a measure of the annual average wholesale electric power price expressed in dollars per MW hour. |
|---|---|

| | The Lessee must calculate Pt at the time each operating fee payment is due, subject to approval by the Lessor.  The Price ($P_t$) must equal the simple average of the "on-the-hour" spot price indices for the PJM Dominion power market (PJM DOM Zone) for the most recent calendar year of data available. Aggregated data from commercial subscription services such as S&P Global Market Intelligence Platform or Hitachi ABB Velocity Suite can also be used and may be posted by BOEM for reference.  BOEM may post the power price data it intends to use for the Lessee's reference at boem.gov.

The source of data used in the calculations must be noted in the Lessee's documentation supporting its estimate of the value of Pt each year for review and approval by the Lessor. BOEM will use the posted prices to verify the Lessee's calculations. |
|---|---|
| $r_t$ = | the operating fee rate of 0.02 (2%). |

(c)    **Reporting, Validation, Audits, and Late Payments.**

The Lessee must submit the values used in the operating fee formula to the Lessor at the time the annual payment based on these values is made.  Submission of this and other reporting, validation, audit and late payment information as requested by the Lessor must be sent to the Lessor using the contact information indicated in Addendum "A", unless the Lessor directs otherwise.  Failure to submit the estimated values and the associated documentation on time to the Lessor may result in penalties as specified in applicable regulations.

Within 60 days of the submission by the Lessee of the annual payment, the Lessor will review the data submitted and validate that the operating fee formula was applied correctly.  If the Lessor validation results in a different operating fee amount, the amount of the annual operating fee payment will be revised to the amount determined by the Lessor.

The Lessor also reserves the right to audit the meter data upon which the Actual 5-year Average Capacity Factor is based at any time during the lease term.  If, as a result of such audit, the Lessor determines that any annual operating fee payment was calculated incorrectly, the Lessor has the right to correct any errors and collect the correct annual operating fee payment amount.

If the annual operating fee is revised downward as a result of the Lessee's calculations, as validated by the Lessor, or an audit of meter data conducted by the Lessee or Lessor, the Lessee will be refunded the difference between the amount of the payment received and the amount of the revised annual operating fee, without interest.  Similarly, if the payment amount is revised upward, the Lessee is required to pay the difference between the amount of the payment received and the amount of the revised annual operating fee, plus underpayment interest on the balance, in accordance with 30 CFR § 1218.54.

Late operating fee payments will be charged underpayment interest in accordance with 30 CFR § 1218.54.

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF OCEAN ENERGY MANAGEMENT

**ADDENDUM "C"**

LEASE-SPECIFIC TERMS, CONDITIONS, AND STIPULATIONS

Lease Number OCS-A 0483

The Lessee's rights to conduct activities on the leased area are subject to the following terms, conditions, and stipulations. The Lessor reserves the right to impose additional terms, and conditions incident to the future approval or approval with modifications of plans, such as a Site Assessment Plan (SAP) or Construction and Operations Plan (COP).

1   DEFINITIONS ................................................................................................................ 2
2   SCHEDULE.................................................................................................................... 3
   2.1   Site Characterization................................................................................................ 3
   2.2   Progress Reporting ................................................................................................. 4
3   NATIONAL SECURITY AND MILITARY OPERATIONS ....................................... 4
   3.1   Hold and Save Harmless ........................................................................................ 4
   3.2   Evacuation or Suspension of Activities ................................................................. 5
   3.3   Electromagnetic Emissions .................................................................................... 6
4   STANDARD OPERATING CONDITIONS ................................................................. 6
   4.1   General .................................................................................................................... 6
   4.2   Archaeological Survey Requirements..................................................................... 8
   4.3   Geological and Geophysical (G&G) Survey Requirements.................................... 11
   4.4   Protected-Species Reporting Requirements........................................................... 14
5   COORDINATION ........................................................................................................ 15
   5.1   Notification ............................................................................................................. 15

# 1   DEFINITIONS

1.1   Definition of "Archaeological Resource":  The term "archaeological resource" has the same meaning as "archaeological resource" in BOEM regulations provided in 30 CFR 585.113.

1.2   Definition of "Dynamic Management Area (DMA)":  The term "DMA" refers to a temporary area designated by the National Oceanic and Atmospheric Administration (NOAA) National Marine Fisheries Service (NMFS) and consisting of a circle around a confirmed North Atlantic right whale sighting.  The radius of this circle expands incrementally with the number of whales sighted, and a buffer is included beyond the core area to allow for whale movement.  Mandatory or voluntary speed restrictions may be applied by NOAA NMFS within DMAs.  Information regarding the location and status of applicable DMAs is available from the NMFS Office of Protected Resources.

1.3   Definition of "Effective Date":  The term "Effective Date" has the same meaning as "effective date" in BOEM regulations provided in 30 CFR 585.237.

1.4   Definition of "Geological and Geophysical Survey (G&G Survey)":  The term "G&G Survey" serves as a collective term for surveys that collect data on the geology of the seafloor and landforms below the seafloor.  High resolution geophysical surveys and geotechnical (sub-bottom) sampling are components of G&G surveys.

1.5   Definition of "Geotechnical Exploration":  The term "Geotechnical Exploration" is used to refer to site-specific sediment and underlying geologic data acquired from the seafloor and the sub-bottom and includes geotechnical surveys utilizing borings, vibracores, and cone penetration tests.

1.6   Definition of "High Resolution Geophysical Survey (HRG Survey)":  The term "HRG Survey" means a marine remote-sensing survey using electromechanical survey equipment.  This equipment includes, but is not limited to, such equipment as side-scan sonar, magnetometer, shallow and medium (Seismic) penetration sub-bottom profiler systems, narrow beam or multibeam echo sounder, or other such equipment employed for the purposes of providing data on geological conditions, identifying shallow hazards, identifying archaeological resources, charting bathymetry, and gathering other site characterization information.

1.7   Definition of "Listed Species":  The term "listed species," also referred to in adjective form as "listed," means any species of fish, wildlife, or plant that has been determined to be endangered or threatened under Section 4 of the Endangered Species Act.  Listed species are provided in 50 CFR 17.11-17.12.

1.8   Definition of "Protected-Species Observer":  The term "protected-species observer," or "observer," means an individual who is trained in the shipboard identification and behavior of protected species.  Protected species include marine mammals (those protected under the Endangered Species Act and those protected under the Marine Mammal Protection Act) and sea turtles.

1.9    Definition of "Ramp-up":  The term "ramp-up" means the process of incrementally increasing the acoustic source level of the survey equipment when conducting HRG surveys until it reaches the operational setting.

1.10   Definition of "Site Assessment Activities":  The term "site assessment activities" or "site assessment," has the same meaning as "site assessment activities" in 30 CFR 585.113.

1.11   Definition of "Qualified Marine Archaeologist":  The term "qualified marine archaeologist" means a person retained by the Lessee who meets the Secretary of the Interior's Professional Qualifications Standards for Archaeology (48 FR 44738-44739), and has experience analyzing marine geophysical data.

1.12   Definition of "Take":  The terms "Takes" and "Taken" and "Taking" have the same meaning as the term "take" as defined in 16 U.S.C. § 1532(19).

## 2    SCHEDULE

## 2.1    Site Characterization

2.1.1    <u>Survey Plans</u>.

2.1.1.1    <u>SAP Survey Plan</u>.  If the Lessee proposes to conduct site assessment activities during the site assessment term, then the Lessee must submit to the Lessor a complete SAP survey plan.  This SAP survey plan must include details of any surveys to be conducted on this lease necessary to support the submission of a SAP (i.e., necessary to satisfy the information requirements in the applicable regulations, including but not limited to 30 CFR 585.606, 610, 611).

The Lessee must submit the SAP survey plan to the Lessor 30 calendar days prior to the date of the required pre-survey meeting with the Lessor (See 2.1.2).  The Lessor may require that the Lessee modify the SAP survey plan to address any comments the Lessor submits to the Lessee on the contents of the SAP survey plan in a manner deemed satisfactory to the Lessor prior to the commencement of any survey activities described in the SAP survey plan.

2.1.1.2    <u>COP Survey Plan</u>.  The Lessee must submit to the Lessor for review a complete COP survey plan providing details and timelines of the surveys to be conducted on this lease that are necessary to support the submission of a COP (i.e., necessary to satisfy the information requirements in the applicable regulations, including but not limited to 30 CFR 585.621, 626, 627).  The COP survey plan must be submitted to the Lessor no later than on the first anniversary of this lease's Effective Date and at least 30 calendar days prior to the date of the pre-survey meeting with the Lessor (see 2.1.2).  The Lessee must modify the COP survey plan to address any comments the Lessor submits to the Lessee on the contents of the COP survey plan in a manner deemed satisfactory to the Lessor prior to the commencement of these survey activities.

2.1.2  <u>Pre-Survey Meeting with the Lessor</u>.  At least 60 calendar days prior to the initiation of survey activities in support of the submission of a plan (i.e., SAP and COP), the Lessee must hold a pre-survey meeting with the Lessor to discuss the applicable proposed survey plan and timelines.  The Lessee must ensure the presence of a Qualified Marine Archaeologist at this meeting (See 4.2.2).

## 2.2  Progress Reporting

2.2.1  <u>Semi-Annual Progress Report</u>.  The Lessee must submit to the Lessor a semi-annual (i.e., every six months) progress report through the duration of the site assessment term that includes a brief narrative of the overall progress since the last progress report, or – in the case of the first report – since the Effective Date.  The progress report must include an update regarding progress in executing the activities included in the survey plans, and include as an enclosure updated survey plans accounting for any modifications in schedule.

# 3    NATIONAL SECURITY AND MILITARY OPERATIONS

The Lessee must comply with the requirements specified in stipulations 3.1, 3.2, and 3.3 when conducting site characterization activities in support of plan (i.e., SAP and COP) submittal.

## 3.1  Hold and Save Harmless

Whether compensation for such damage or injury might be due under a theory of strict or absolute liability or otherwise, the Lessee assumes all risks of damage or injury to persons or property, which occur in, on, or above the OCS, to any persons or to any property of any person or persons in connection with any activities being performed by the Lessee in, on, or above the OCS, if such injury or damage to such person or property occurs by reason of the activities of any agency of the United States Government, its contractors, or subcontractors, or any of its officers, agents or employees, being conducted as a part of, or in connection with, the programs or activities of the individual military command headquarters (hereinafter "the appropriate command headquarters") listed in the contact information provided as an enclosure to this lease.

Notwithstanding any limitation of the Lessee's liability in Section 9 of the lease, the Lessee assumes this risk whether such injury or damage is caused in whole or in part by any act or omission, regardless of negligence or fault, of the United States, its contractors or subcontractors, or any of its officers, agents, or employees.  The Lessee further agrees to indemnify and save harmless the United States against all claims for loss, damage, or injury in connection with the programs or activities of the command headquarters, whether the same be caused in whole or in part by the negligence or fault of the United States, its contractors, or subcontractors, or any of its officers, agents, or employees and whether such claims might be sustained under a theory of strict or absolute liability or otherwise.

## 3.2   Evacuation or Suspension of Activities

3.2.1   <u>General</u>.  The Lessee hereby recognizes and agrees that the United States reserves and has the right to temporarily suspend operations and/or require evacuation on this lease in the interest of national security pursuant to Section 3(c) of this lease.

3.2.2   <u>Notification</u>.  Every effort will be made by the appropriate military agency to provide as much advance notice as possible of the need to suspend operations and/or evacuate.  Advance notice will normally be given before requiring a suspension or evacuation.  Temporary suspension of operations may include but is not limited to the evacuation of personnel and appropriate sheltering of personnel not evacuated.

"Appropriate sheltering" means the protection of all Lessee personnel for the entire duration of any Department of Defense activity from flying or falling objects or substances and will be implemented by an order (oral and/or written) from the BOEM Office of Renewable Energy Programs (OREP) Program Manager, after consultation with the appropriate command headquarters or other appropriate military agency or higher Federal authority.  The appropriate command headquarters, military agency or higher authority will provide information to allow the Lessee to assess the degree of risk to, and provide sufficient protection for, the Lessee's personnel and property.

3.2.3   <u>Duration</u>.  Suspensions or evacuations for national security reasons will not generally exceed 72 hours; however, any such suspension may be extended by order of the OREP Program Manager.  During such periods, equipment may remain in place, but all operations, if any, must cease for the duration of the temporary suspension if so directed by the OREP Program Manager.  Upon cessation of any temporary suspension, the OREP Program Manager will immediately notify the Lessee such suspension has terminated and operations on the leased area can resume.

3.2.4   <u>Lessee Point-of-Contact for Evacuation/Suspension Notifications</u>.  The Lessee must inform the Lessor of the persons/offices to be notified to implement the terms of 3.2.2 and 3.2.3.

3.2.5   <u>Coordination with Command Headquarters</u>.  The Lessee must establish and maintain early contact and coordination with the appropriate command headquarters, in order to avoid or minimize the potential to conflict with and minimize the potential effects of conflicts with military operations.

3.2.6   <u>Reimbursement</u>.  The Lessee is not entitled to reimbursement for any costs or expenses associated with the suspension of operations or activities or the evacuation of property or personnel in fulfillment of the military mission in accordance with 3.2.1 through 3.2.5 above.

## 3.3   Electromagnetic Emissions

The Lessee, prior to entry into any designated defense operating area, warning area, or water test area for the purpose of commencing survey activities undertaken to support SAP or COP submittal, must enter into an agreement with the commander of the appropriate command headquarters to coordinate the electromagnetic emissions associated with such survey activities.  The Lessee must ensure that all electromagnetic emissions associated with such survey activities are controlled as directed by the commander of the appropriate command headquarters.

# 4   STANDARD OPERATING CONDITIONS

## 4.1   General

4.1.1   <u>Vessel Strike Avoidance Measures</u>.  The Lessee must ensure that all vessels conducting activities in support of plan (i.e., SAP and COP) submittal comply with the vessel-strike avoidance measures specified in stipulations 4.1.1.1 through 4.1.1.7, except under extraordinary circumstances when the safety of the vessel or crew is in doubt or the safety of life at sea is in question.

4.1.1.1   The Lessee must ensure that vessel operators and crews maintain a vigilant watch for cetaceans, pinnipeds, and sea turtles and slow down or stop their vessel to avoid striking these protected species.

4.1.1.2    The Lessee must ensure that all vessel operators comply with 10 knot (18.5 km/hr) speed restrictions in any Dynamic Management Area (DMA).  In addition, the Lessee must ensure that all vessels operating from November 1 through April 30 operate at speeds of 10 knots (18.5 km/hr) or less.

4.1.1.3    <u>North Atlantic right whales.</u>

4.1.1.3.1    The Lessee must ensure all vessels maintain a separation distance of 500 meters (1,640 ft) or greater from any sighted North Atlantic right whale.

4.1.1.3.2    The Lessee must ensure that the following avoidance measures are taken if a vessel comes within 500 meters (1,640 ft) of any North Atlantic right whale:

4.1.1.3.2.1    If underway, any vessel must steer a course away from the North Atlantic right whale at 10 knots (18.5 km/h) or less until the 500 meters (1,640 ft) minimum separation distance has been established (except as provided in 4.1.1.3.2.2).

4.1.1.3.2.2    If a North Atlantic right whale is sighted within 100 meters (328 ft) to an underway vessel, the vessel operator must immediately reduce speed and promptly shift the engine to neutral.  The vessel operator must not engage the engines until the North Atlantic right whale has moved beyond 100 meters (328 ft).

4.1.1.3.2.3    If a vessel is stationary, the vessel must not engage engines until the North Atlantic right whale has moved beyond 100 meters (328 ft), at which point the Lessee must comply with 4.1.1.3.2.1.

4.1.1.4    <u>Non-delphinoid cetaceans other than the North Atlantic right whale.</u>

4.1.1.4.1    The Lessee must ensure all vessels maintain a separation distance of 100 meters (328 ft) or greater from any sighted non-delphinoid cetacean.

4.1.1.4.2    The Lessee must ensure that the following avoidance measures are taken if a vessel comes within 100 meters (328 ft) of any non-delphinoid cetacean:

4.1.1.4.2.1    If any non-delphinoid cetacean is sighted, the vessel underway must reduce speed and shift the engine to neutral, and must not engage the engines until the non-delphinoid cetacean has moved beyond 100 meters (328 ft).

4.1.1.4.2.2    If a vessel is stationary, the vessel must not engage engines until the non-delphinoid cetacean has moved beyond 100 meters (328 ft).

4.1.1.5    Delphinoid cetaceans.

4.1.1.5.1    The Lessee must ensure that all vessels maintain a separation distance of 50 meters (164 ft) or greater from any sighted delphinoid cetacean.

4.1.1.5.2    The Lessee must ensure that the following avoidance measures are taken if the vessel comes within 50 meters (164 ft) of any delphinoid cetacean:

4.1.1.5.2.1    The Lessee must ensure that any vessel underway remain parallel to a sighted delphinoid cetacean's course whenever possible, and avoid excessive speed or abrupt changes in direction.  The Lessee may not adjust course and speed until the delphinoid cetacean has moved beyond 50 meters (164 ft) or the delphinoid cetacean has moved abeam of the underway vessel.

4.1.1.5.2.2    The Lessee must ensure that any vessel underway reduce vessel speed to 10 knots (18.5 km/h) or less when pods (including mother/calf pairs) or large assemblages of delphinoid cetaceans are observed.  The Lessee may not adjust course and speed until the delphinoid cetaceans have moved beyond 50 meters (164 ft) or abeam of the underway vessel.

4.1.1.6    Sea Turtles and Pinnipeds.

4.1.1.6.1    The Lessee must ensure all vessels maintain a separation distance of 50 meters (164 ft) or greater from any sighted sea turtle or pinniped.

4.1.1.7    Vessel Operator Briefing.  The Lessee must ensure that all vessel operators are briefed to ensure they are familiar with the requirements specified in 4.1.1.

4.1.2    Marine Trash and Debris Prevention.  The Lessee must ensure that vessel operators, employees, and contractors actively engaged in activity in support of plan (i.e., SAP and COP) submittal are briefed on marine trash and debris awareness and elimination, as described in the BSEE NTL No. 2012-G01 ("Marine Trash and Debris Awareness and Elimination") or any NTL that supercedes this NTL, except that the Lessor will not require the Lessee, vessel operators, employees, and contractors to undergo formal training or post placards.  The Lessee must ensure that these vessel operator employees and contractors are made aware of the environmental and socioeconomic impacts associated with marine trash and debris and their responsibilities for ensuring that trash and debris are not intentionally or accidentally discharged into the marine environment.  The above-referenced NTL provides information the Lessee may use for this awareness training.

## 4.2    Archaeological Survey Requirements

4.2.1    Archaeological Survey Required.  The Lessee must provide the results of an archaeological survey with its SAP and COP.

4.2.2   <u>Qualified Marine Archaeologist</u>.  The Lessee must ensure that the analysis of archaeological survey data collected in support of plan (i.e., SAP and COP) submittal and the preparation of archaeological reports in support of plan submittal are conducted by a Qualified Marine Archaeologist.

4.2.3   <u>Tribal Pre-Survey Meeting</u>.  Subsequent to any pre-survey meeting with the Lessor (see 2.1.2) and at least 45 calendar days prior to commencing survey activities performed in support of plan (i.e., SAP and COP) submittal, the Lessee must invite by certified mail the Narragansett Indian Tribe, the Shinnecock Indian Nation, and the Lenape Tribe of Delaware to a tribal pre-survey meeting.  The purpose of this meeting will be for the Lessee and the Qualified Marine Archaeologist to discuss the Lessee's Survey Plan and consider requests to monitor portions of the archaeological survey and the geotechnical sampling activities, including the visual logging and analysis of geotechnical samples (e.g., cores).  The meeting must be scheduled for a date at least 30 calendar days prior to commencing survey and at a location and time that affords the participants a reasonable opportunity to participate.  The anticipated date for the meeting must be identified in the timeline of activities described in the applicable survey plan (see 2.1.1).

4.2.4   <u>Geotechnical Exploration</u>.  The Lessee may only conduct geotechnical exploration activities, including geotechnical sampling or other direct sampling or investigation techniques, which are performed in support of plan (i.e., SAP and COP) submittal, in locations where an analysis of the results of geophysical surveys has been completed.  This analysis must include a determination by a Qualified Marine Archaeologist as to whether any potential archaeological resources are present in the area.  Except as allowed by the Lessor under 4.2.6, the geotechnical exploration activities must avoid potential archaeological resources by a minimum of 50 meters, and the avoidance distance must be calculated from the maximum discernible extent of the archaeological resource.  A Qualified Marine Archaeologist must certify, in the Lessee's archaeological reports, that geotechnical exploration activities did not impact potential historic properties identified as a result of the HRG surveys performed in support of plan submittal, except as follows:  in the event that the geotechnical exploration activities did impact potential historic properties identified in the archaeological surveys without the Lessor's prior approval, the Lessee and the Qualified Marine Archaeologist who prepared the report must instead provide a statement documenting the extent of these impacts.

4.2.5   <u>Monitoring and Avoidance</u>.  The Lessee must inform the Qualified Marine Archaeologist that he or she may be present during HRG surveys and bottom-disturbing activities performed in support of plan (i.e., SAP and COP) submittal to ensure avoidance of potential archaeological resources, as determined by the Qualified Marine Archaeologist (including bathymetric, seismic, and magnetic anomalies; side scan sonar contacts; and other seafloor or sub-surface features that exhibit potential to represent or contain potential archaeological sites or other historic properties).  In the event that this Qualified Marine Archaeologist indicates that he or she wishes to be present, the Lessee must facilitate the Qualified Marine Archaeologist's presence, as requested by the Qualified Marine Archaeologist, and provide the Qualified Marine Archaeologist the opportunity to inspect data quality.

4.2.6   <u>No Impact without Approval</u>.  In no case may the Lessee knowingly impact a potential archaeological resource without the Lessor's prior approval.

4.2.7   <u>Post-Review Discovery Clauses</u>.  If the Lessee, while conducting site characterization activities in support of plan (i.e., SAP and COP) submittal, discovers a potential archaeological resource, such as the presence of a shipwreck (e.g., a sonar image or visual confirmation of an iron, steel, or wooden hull, wooden timbers, anchors, concentrations of historic objects, piles of ballast rock), prehistoric artifacts, or relict landforms, etc. within the project area, the Lessee must:

4.2.7.1   Immediately halt seafloor/bottom-disturbing activities within the area of discovery;

4.2.7.2   Notify the Lessor within 24 hours of discovery;

4.2.7.3   Notify the Lessor in writing via report to the Lessor within 72 hours of its discovery;

4.2.7.4   Keep the location of the discovery confidential and take no action that may adversely affect the archaeological resource until the Lessor has made an evaluation and instructs the applicant on how to proceed; and

4.2.7.5   Conduct any additional investigations as directed by the Lessor to determine if the resource is eligible for listing in the National Register of Historic Places (30 CFR 585.802(b)).  The Lessor will do this if:  (1) the site has been impacted by the Lessee's project activities; or (2) impacts to the site or to the area of potential effect cannot be avoided.  If investigations indicate that the resource is potentially eligible for listing in the National Register of Historic Places, the Lessor will tell the Lessee how to protect the resource or how to mitigate adverse effects to the site.  If the Lessor incurs costs in protecting the resource, under Section 110(g) of the National Historic Preservation Act, the Lessor may charge the Lessee reasonable costs for carrying out preservation responsibilities under the OCS Lands Act (30 CFR 585.802(c-d)).

## 4.3    Geological and Geophysical (G&G) Survey Requirements

4.3.1    <u>General</u>.  The Lessee must ensure that all vessels conducting activity in support of a plan (i.e., SAP and COP) submittal comply with the geological and geophysical survey requirements specified in 4.3 except under extraordinary circumstances when the safety of the vessel or crew are in doubt or the safety of life at sea is in question.

4.3.2    <u>Visibility</u>.  The Lessee must not conduct G&G surveys in support of plan (i.e., SAP and COP) submittal at any time when lighting or weather conditions (e.g., darkness, rain, fog, sea state) prevents visual monitoring of the HRG survey exclusion zone (see 4.3.6) or the geotechnical sampling exclusion zone (see 4.3.7), except as allowed under 4.3.3.

4.3.3    <u>Modification of Visibility Requirement.</u>  If the Lessee intends to conduct G&G survey operations in support of plan submittal at night or when visual observation is otherwise impaired, the Lessee must submit to the Lessor an alternative monitoring plan detailing the alternative monitoring methodology (e.g., active or passive acoustic monitoring technologies).  The Lessor may decide to allow the Lessee to conduct G&G surveys in support of plan submittal at night or when visual observation is otherwise impaired using the proposed alternative monitoring methodology.

4.3.4    <u>Protected-Species Observer</u>.  The Lessee must ensure that the exclusion zone for all G&G surveys performed in support of plan (i.e., SAP and COP) submittal is monitored by one or more NMFS-approved protected-species observers around the sound source.  The Lessee must provide to the Lessor a list of observers and their résumés no later than 45 calendar days prior to the scheduled start of surveys performed in support of plan submittal.  The résumés of any additional observers must be provided at least 15 calendar days prior to each observer's start date.  The Lessor will send the observer information to NMFS for approval.

4.3.5    <u>Optical Device Availability</u>.  The Lessee must ensure that reticle binoculars and other suitable equipment are available to each observer to adequately perceive and monitor protected marine species within the exclusion zone during surveys conducted in support of plan (i.e., SAP and COP) submittal.

4.3.6    <u>High-Resolution Geophysical (HRG) Surveys.</u>  Stipulations specific to HRG surveys conducted in support of plan (i.e., SAP and COP) submittal where one or more acoustic sound sources is operating at frequencies below 200 kHz are provided in 4.3.6.1 through 4.3.6.9:

4.3.6.1 <u>Establishment of Default Exclusion Zone</u>.  The Lessee must ensure a 200-meter radius exclusion zone for cetaceans, pinnipeds, and sea turtles.  The Lessee may not use HRG survey devices that emit sound levels that exceed the 180 dB Level A harassment radius (200 meter) boundary without approval by the Lessor.  If the Lessor determines that the exclusion zone does not encompass the 180 dB Level A harassment radius, the Lessor may impose additional, relevant requirements on the Lessee, including but not limited to, required expansion of this exclusion zone.

4.3.6.2 <u>HRG Survey Chesapeake Bay Seasonal Management Area (SMA) Right Whale Monitoring</u>.  The Lessee must ensure that between November 1 and April 30 vessel operators monitor National Marine Fisheries Service (NMFS) North Atlantic Right Whale reporting systems (e.g., the Early Warning System, Sighting Advisory System, and Mandatory Ship Reporting System) for the presence of North Atlantic right whales during HRG survey operations within or adjacent to this SMA.

4.3.6.3 <u>Dynamic Management Area Shutdown Requirement</u>.  The Lessee must ensure that vessels cease HRG survey activities within 24 hours of NMFS establishing a DMA in the Lessee's HRG survey area.  HRG surveys may resume in the affected area after the DMA has expired.

4.3.6.4 <u>Clearance of Exclusion Zone.</u>  The Lessee must ensure that active acoustic sound sources will not be activated until the protected species observer has reported the exclusion zone clear of all cetaceans, pinnipeds, and sea turtles for 60 minutes.

4.3.6.5 <u>Electromechanical Survey Equipment Ramp-Up</u>.  The Lessee must ensure that, when technically feasible, a "ramp-up" of the electromechanical survey equipment occurs at the start or re-start of HRG survey activities.  A ramp-up would begin with the power of the smallest acoustic equipment for the HRG survey at its lowest power output.  The power output would be gradually turned up and other acoustic sources added in a way such that the source level would increase in steps not exceeding 6 dB per 5-minute period.

4.3.6.6 <u>Shutdown for Non-Delphinoid Cetaceans and Sea Turtles</u>.  If a non-delphinoid cetacean or sea turtle is sighted at or within the exclusion zone, an immediate shutdown of the electromechanical survey equipment is required.  The vessel operator must comply immediately with such a call by the observer.  Any disagreement or discussion must occur only after shutdown.  Subsequent restart of the electromechanical survey equipment may only occur following clearance of the exclusion zone (see 4.3.6.4) and implementation of ramp-up procedures (see 4.3.6.5).

4.3.6.7 <u>Power Down for Delphinoid Cetaceans and Pinnipeds.</u>  If a delphinoid cetacean or pinniped is sighted at or within the exclusion zone, the electromechanical survey equipment must be powered down to the lowest power output that is technically feasible.  The vessel operator must comply immediately with such a call by the observer.  Any disagreement or discussion must occur only after power-down.  Subsequent power up of the electromechanical survey equipment must use the ramp-up provisions described in 4.3.6.5 and may occur after (1) the exclusion zone is clear of delphinoid cetaceans and pinnipeds or (2) a determination by the observer after a minimum of 10 minutes of observation that the delphinoid cetacean or pinniped is approaching the vessel or towed equipment at a speed and vector that indicates voluntary approach to bow-ride or chase towed equipment.  An incursion into the exclusion zone by a non-delphinoid cetacean or sea turtle during a power-down requires implementation of the shutdown procedures described in 4.3.6.6.

4.3.6.8 <u>Pauses in Electromechanical Survey Sound Source.</u>  The Lessee must ensure that, if the electromechanical sound source shuts down for reasons other than encroachment into the exclusion zone by a non-delphinoid cetacean or sea turtle, including reasons such as, but not limited to, mechanical or electronic failure, resulting in the cessation of the sound source for a period greater than 20 minutes, restart of the electromechanical survey equipment commences only after clearance of the exclusion zone (see 4.3.6.4) and implementation of ramp-up procedures (see 4.3.6.5).  If the pause is less than 20 minutes the equipment may be restarted as soon as practicable at its operational level as long as visual surveys were continued diligently throughout the silent period and the exclusion zone remained clear of cetaceans, pinnipeds, and sea turtles.  If visual surveys were not continued diligently during the pause of 20-minutes or less, the Lessee must restart the electromechanical survey equipment following clearance of the exclusion zone (see 4.3.6.4) and implementation of ramp-up procedures (see 4.3.6.5).

4.3.6.9 <u>Compliance with Equipment Noise Standards.</u>  All HRG survey equipment used by the Lessee must comply with applicable equipment noise standards of the U.S. Environmental Protection Agency (EPA), unless directed otherwise by the Lessor.  All HRG survey equipment, even if modified from the original, must have noise-control devices no less effective than those provided on the original equipment.

4.3.7 <u>Geotechnical Exploration.</u>  Stipulations specific to geotechnical exploration limited to borings and vibracores and conducted in support of plan (i.e., SAP and COP) submittal are provided in 4.3.7.1 through 4.3.7.4.

4.3.7.1   <u>Establishment of Default Exclusion Zone</u>.  The Lessee must ensure a 200-meter default exclusion zone for cetaceans, pinnipeds, and sea turtles.  The Lessee may not use geotechnical survey equipment that emits sound levels that exceed the 120 dB Level B harassment radius (200 meter) boundary without approval by the Lessor.  If the Lessor determines that the exclusion zone does not encompass the 120 dB Level B harassment radius, the Lessor may impose additional, relevant requirements on the Lessee, including but not limited to, required expansion of this exclusion zone.

4.3.7.2   <u>Clearance of Exclusion Zone.</u>  The Lessee must ensure that the geotechnical sound source is not activated until the observer has reported the exclusion zone clear of all cetaceans, pinnipeds, and sea turtles for 60 minutes.

4.3.7.3   <u>Shutdown for Non-Delphinoid Cetaceans and Sea Turtles</u>.  If any non-delphinoid cetaceans or sea turtles are sighted at or within the exclusion zone, an immediate shutdown of the geotechnical survey equipment is required.  The vessel operator must comply immediately with such a call by the observer.  Any disagreement or discussion must occur only after shutdown.  Subsequent restart of the geotechnical survey equipment may only occur following clearance of the exclusion zone (see 4.3.7.2).

4.3.7.4   <u>Pauses in Geotechnical Survey Sound Source.</u>  The Lessee must ensure that, if the geotechnical sound source shuts down for reasons other than encroachment into the exclusion zone by a non-delphinoid cetacean or sea turtle, including reasons such as, but not limited to, mechanical or electronic failure, resulting in the cessation of the sound source for a period greater than 20 minutes, restart of the geotechnical survey equipment commences only following clearance of the exclusion zone (see 4.3.7.2).  If the pause is less than 20 minutes, the equipment may be restarted as soon as practicable as long as visual surveys were continued diligently throughout the silent period and the exclusion zone remained clear of cetaceans, pinnipeds, and sea turtles.  If visual surveys were not continued diligently during the pause of 20 minutes or less, the Lessee may restart the geotechnical survey equipment only after clearance of the exclusion zone (see 4.3.7.2).

## 4.4   Protected-Species Reporting Requirements

The Lessee must ensure compliance with the following reporting requirements for site characterization activities performed in support of plan (i.e., SAP and COP) submittal and must use the contact information provided as an enclosure to this lease, or updated contact information as provided by the Lessor, to fulfill these requirements:

4.4.1 <u>Reporting Injured or Dead Protected Species</u>.  The Lessee must ensure that sightings of any injured or dead protected species (e.g., marine mammals, sea turtles or sturgeon) are reported to the Lessor, NMFS, and the NMFS Northeast Regional Stranding Hotline within 24 hours of sighting, regardless of whether the injury or death is caused by a vessel.  In addition, if the injury or death was caused by a collision with a project-related vessel, the Lessee must ensure that the Lessor is notified of the incident within 24 hours.  The Lessee must use the form provided in Appendix A to ADDENDUM "C" to report the sighting or incident.  If the Lessee's activity is responsible for the injury or death, the Lessee must ensure that the vessel assist in any salvage effort as requested by NMFS.

4.4.2 <u>Protected Species Observer Reports</u>.  The Lessee must ensure that the protected-species observer record all observations of protected species using standard marine mammal observer data collection protocols.  The list of required data elements for these reports is provided in Appendix B to ADDENDUM "C".

4.4.3 <u>Final Report of G&G Survey Activities and Observations</u>.  The Lessee must provide the Lessor with a report within 90 calendar days following the commencement of HRG or geotechnical sampling activities that includes a summary of survey activities, all protected-species observer reports, a summary of the survey activities and an estimate of the number of listed marine mammals and sea turtles observed and/or Taken during these survey activities.

4.4.4 <u>Marine Mammal Protection Act Authorization(s)</u>.  If the Lessee is required to obtain an authorization pursuant to section 101(a)(5) of the Marine Mammal Protection Act prior to conducting survey activities, then the Lessee must provide to the Lessor a copy of the authorization prior to commencing these activities.

# 5   COORDINATION

5.1 <u>Notification</u>.  The Lessor will endeavor to notify the Lessee of any activity that the Lessor authorizes or funds that the Lessor has determined may affect the activities of the Lessee within the lease area.

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF OCEAN ENERGY MANAGEMENT

**APPENDIX "A" TO ADDENDUM C**

Lease Number OCS-A 0483

INCIDENT REPORT:  PROTECTED SPECIES INJURY OR MORTALITY

*Photographs and/or video footage should be taken of all injured or dead animals, if possible.*

Observer's full name and/or Reporter's full name: _____

Date and Time animal observed: _____

Date and Time animal/samples collected: _____

Location of Incident (Latitude/Longitude): _____

Species Identification (closest taxonomic level possible): _____

Photograph/Video footage collected:  YES  /  NO    If Yes, was the data provided to NMFS?  YES  /  NO

Name of vessel, vessel speed at time of incident, and activity ongoing at time of observation (e.g., transit, survey, pile driving): _____

_____

Environmental conditions at time of observation (i.e., Beaufort sea state, cloud cover, wind speed, glare):

_____

_____

Water temperature (°C) and depth at site of observation: _____

Describe location of animal and events leading up to, including, and after, the incident: _____

_____

Status of all sound-source use in the 24 hours preceding the incident: _____

_____

Describe all marine mammal, sea turtle, and sturgeon observations in the 24 hours preceding the incident:

_____

_____

_____

**Marine Mammal information:**

Injuries observed: _____

Condition/description of animal: _____

_____

_____

Other remarks: _____

_____

_____

Date and time incident reported to NMFS Stranding Hotline: _____

_____

--------------------------------------------------------------------------------------------------------------------

**Sturgeon Information:**

Fork length (or total length): _____ Weight: _____

Condition of specimen/description of animal:

_____

_____

_____

_____

Fish Decomposed:          NO          SLIGHTLY          MODERATELY          SEVERELY

Fish tagged: YES / NO   *Please record all tag numbers.* Tag #: _____

Photograph taken: YES / NO
(please label *species, date, geographic site* and *vessel name* when transmitting photo)

Genetics sample taken: YES / NO

Genetics sample transmitted to: _____ on (mm/dd/yyyy)_____

--------------------------------------------------------------------------------------------------------------------

**Sea Turtle Species Information:** *(please designate cm/m or inches)*

Weight (kg or lbs): _____

Sex (circle):  Male    Female    Unknown        How was sex determined? _____

Straight carapace length: _____Straight carapace width: _____

Curved carapace length: _____ Curved carapace width: _____

Plastron length: _____    Plastron width: _____

Tail length: _____    Head width: _____

Condition of specimen/description of animal: _____

_____

_____

_____

**Existing Flipper Tag Information**

Left: _____ Right: _____

PIT Tag #: _____

**Miscellaneous:**

Genetic biopsy taken: YES  /  NO

Photos taken:        YES  /  NO

**Turtle Release Information:**

Date: _____ Time: _____

Latitude: _____Longitude: _____

State: _____ County: _____

**Remarks:** (note if turtle was involved with tar or oil, gear or debris entanglement, wounds or mutilations, propeller damage, papillomas, old tag locations, etc.):

_____

_____

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF OCEAN ENERGY MANAGEMENT

**Appendix B to ADDENDUM "C"**

Lease Number OCS-A 0483

REQUIRED DATA ELEMENTS FOR PROTECTED SPECIES OBSERVER REPORTS

Per ADDENDUM "C", 4.4.2, the Lessee must ensure that the protected-species observer record all observations of protected species using standard marine mammal observer data collection protocols.  The list of required data elements for these reports is provided below:

1. Vessel name;

2. Observers' names and affiliations;

3. Date;

4. Time and latitude/longitude when daily visual survey began;

5. Time and latitude/longitude when daily visual survey ended; and

6. Average environmental conditions during visual surveys including:

    a. Wind speed and direction;

    b. Sea state (glassy, slight, choppy, rough, or Beaufort scale);

    c. Swell (low, medium, high, or swell height in meters); and

    d. Overall visibility (poor, moderate, good).

7. Species (or identification to lowest possible taxonomic level);

8. Certainty of identification (sure, most likely, best guess);

9. Total number of animals;

10. Number of juveniles;

11. Description (as many distinguishing features as possible of each individual seen, including length, shape, color and pattern, scars or marks, shape and size of dorsal fin, shape of head, and blow characteristics);

12. Direction of animal's travel – related to the vessel (drawing preferably);

13. Behavior (as explicit and detailed as possible; note any observed changes in behavior);

14. Activity of vessel when sighting occurred.

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF OCEAN ENERGY MANAGEMENT

**ADDENDUM D**

PROJECT EASEMENT
Lease Number OCS-A 0483
**Granted:** January 28, 2024

This section includes a description of the offshore export cable corridor and Project Easement for this lease, and a calculation of the associated rent for the area within the project easement.

I.    Project Easement Description

This project easement is subject to: all terms and conditions of Lease OCS-A 0483, executed effective November 1, 2013; the Construction and Operations Plan (COP); the terms and conditions of the COP approval issued January 28, 2024 ; and any subsequent revisions, amendments, or supplements to any of these .

The map in Figure 1 below depicts the offshore export cable corridor for the project described in the COP. The corridor is of variable width, ranging from a maximum width of 4,867.6 ft (1,483.6 m) to a minimum width of 1,668.5 feet (ft; 508.6 meters [m]) (exact width dependent upon water depth at any given location, existing telecommunications cables, and crossings, and the DOD exclusion areas to the south as well as other existing factors). The corridor will extend approximately 24.34 statute miles from the OCS-A 0483 western lease boundary through federal waters to the Submerged Lands Act Boundary offshore of the Virginia coastline.

Within Figure 1, the project easement is bounded by solid lines and by BOEM aliquots (OCS sub-blocks). The project easement extends approximately 24.34 statute miles and includes approximately 9,804 acres.

The project easement's centerline can be determined by interconnecting the points indicated by the centerline coordinates in Table 1 below. The centerline coordinates follow an order from east to west and are provided in both geographic NAD(83) (longitude, latitude) and UTM Zone 19N, NAD(83) (eastings, northings).



**Figure 1. Offshore Export Cable Corridor and Project Easement (OCS-A 0483)**

**Table 1: Project Easement Centerline Coordinates**

| Point Number | LONGITUDE | LATITUDE | EASTING | NORTHING |
|---|---|---|---|---|
| 1 | -75.48457307 | 36.85015708 | 456799.9907 | 4078359.577 |
| 2 | -75.48713012 | 36.84966751 | 456571.7497 | 4078306.428 |
| 3 | -75.51590793 | 36.84350163 | 454002.4597 | 4077635.905 |
| 4 | -75.53210903 | 36.84018602 | 452555.9352 | 4077276.021 |
| 5 | -75.53544294 | 36.83947084 | 452258.2297 | 4077198.345 |
| 6 | -75.5630887 | 36.83380626 | 449789.5219 | 4076584.132 |
| 7 | -75.56443631 | 36.83347435 | 449669.1377 | 4076548.022 |
| 8 | -75.56701624 | 36.83249742 | 449438.44 | 4076441.011 |
| 9 | -75.56806732 | 36.83204028 | 449344.4109 | 4076390.856 |
| 10 | -75.57192677 | 36.83050645 | 448999.2361 | 4076222.759 |
| 11 | -75.57314068 | 36.8298256 | 448890.5331 | 4076147.879 |
| 12 | -75.57466182 | 36.82901855 | 448754.3466 | 4076059.167 |
| 13 | -75.57513307 | 36.82872785 | 448712.1289 | 4076027.172 |
| 14 | -75.5754966 | 36.82844219 | 448679.5193 | 4075995.678 |
| 15 | -75.5758079 | 36.82811786 | 448651.5421 | 4075959.867 |
| 16 | -75.57625869 | 36.82753584 | 448610.9524 | 4075895.545 |
| 17 | -75.57666143 | 36.8269785 | 448574.6643 | 4075833.935 |
| 18 | -75.57699815 | 36.8264492 | 448544.2816 | 4075775.399 |
| 19 | -75.5802162 | 36.82067943 | 448253.4136 | 4075137.087 |
| 20 | -75.58089072 | 36.81938349 | 448192.3819 | 4074993.692 |
| 21 | -75.58098086 | 36.81924048 | 448184.2462 | 4074977.876 |
| 22 | -75.58361377 | 36.81629389 | 447947.4284 | 4074652.437 |
| 23 | -75.58394424 | 36.81594697 | 447917.7187 | 4074614.133 |
| 24 | -75.58424921 | 36.81566552 | 447890.327 | 4074583.077 |
| 25 | -75.58457664 | 36.81539703 | 447860.9411 | 4074553.472 |
| 26 | -75.58506944 | 36.81503075 | 447816.7379 | 4074513.108 |
| 27 | -75.58548245 | 36.81476017 | 447779.7166 | 4074483.319 |
| 28 | -75.58591914 | 36.81452196 | 447740.6051 | 4074457.132 |
| 29 | -75.58630956 | 36.81433069 | 447705.6523 | 4074436.127 |
| 30 | -75.58696009 | 36.8140845 | 447647.4625 | 4074409.173 |
| 31 | -75.58767336 | 36.81385266 | 447583.685 | 4074383.846 |
| 32 | -75.59139134 | 36.81258678 | 447251.1952 | 4074245.465 |
| 33 | -75.59156355 | 36.81251779 | 447235.7874 | 4074237.906 |
| 34 | -75.5917187 | 36.81241802 | 447221.8808 | 4074226.924 |
| 35 | -75.59295621 | 36.81148689 | 447110.8594 | 4074124.316 |
| 36 | -75.59333571 | 36.81128566 | 447076.8709 | 4074102.203 |
| 37 | -75.59477108 | 36.81020533 | 446948.0952 | 4073983.157 |
| 38 | -75.59492871 | 36.81011005 | 446933.9695 | 4073972.675 |

| 39 | -75.59505422 | 36.81008168 | 446922.7547 | 4073969.597 |
| 40 | -75.59596262 | 36.80996102 | 446841.643 | 4073956.717 |
| 41 | -75.5989098 | 36.80967878 | 446578.5634 | 4073927.05 |
| 42 | -75.60021767 | 36.8095059 | 446461.7829 | 4073908.604 |
| 43 | -75.6013361 | 36.80940545 | 446361.9495 | 4073898.087 |
| 44 | -75.6022737 | 36.8092474 | 446278.2064 | 4073881.081 |
| 45 | -75.60264893 | 36.80917242 | 446244.6839 | 4073872.974 |
| 46 | -75.60316931 | 36.80904611 | 446198.6599 | 4073859.252 |
| 47 | -75.60356155 | 36.80892714 | 446163.1072 | 4073846.278 |
| 48 | -75.60403602 | 36.80876194 | 446120.6687 | 4073828.22 |
| 49 | -75.60455624 | 36.80854283 | 446074.1118 | 4073804.207 |
| 50 | -75.60484872 | 36.80840131 | 446047.9225 | 4073788.673 |
| 51 | -75.60497479 | 36.80831175 | 446036.6142 | 4073778.808 |
| 52 | -75.60516962 | 36.80808515 | 446019.0763 | 4073753.782 |
| 53 | -75.60537356 | 36.80793529 | 446000.7795 | 4073737.273 |
| 54 | -75.60562042 | 36.80763185 | 445978.5468 | 4073703.751 |
| 55 | -75.60573921 | 36.80753359 | 445967.8812 | 4073692.918 |
| 56 | -75.60637834 | 36.80709521 | 445910.5619 | 4073644.649 |
| 57 | -75.60673069 | 36.80689159 | 445878.988 | 4073622.261 |
| 58 | -75.60699228 | 36.80677029 | 445855.568 | 4073608.953 |
| 59 | -75.60744026 | 36.80660335 | 445815.4897 | 4073590.688 |
| 60 | -75.60803639 | 36.80643636 | 445762.1959 | 4073572.501 |
| 61 | -75.60885158 | 36.8062873 | 445689.3736 | 4073556.429 |
| 62 | -75.60936915 | 36.80623098 | 445643.1649 | 4073550.474 |
| 63 | -75.61021587 | 36.80617206 | 445567.5935 | 4073544.421 |
| 64 | -75.61069925 | 36.80615713 | 445524.4643 | 4073543.04 |
| 65 | -75.6275533 | 36.8059154 | 444020.858 | 4073525.957 |
| 66 | -75.63947349 | 36.80495162 | 442956.8237 | 4073426.088 |
| 67 | -75.64060181 | 36.80484391 | 442856.0926 | 4073414.812 |
| 68 | -75.64149076 | 36.80473572 | 442776.7136 | 4073403.343 |
| 69 | -75.64254531 | 36.80456661 | 442682.5167 | 4073385.215 |
| 70 | -75.64320238 | 36.80440923 | 442623.7855 | 4073368.151 |
| 71 | -75.64395483 | 36.80430235 | 442556.5833 | 4073356.745 |
| 72 | -75.64520906 | 36.80408121 | 442444.5336 | 4073332.968 |
| 73 | -75.64603743 | 36.80391544 | 442370.5148 | 4073315.078 |
| 74 | -75.6464933 | 36.80385995 | 442329.8069 | 4073309.197 |
| 75 | -75.64848143 | 36.803668 | 442152.3094 | 4073289.104 |
| 76 | -75.64893063 | 36.80363328 | 442112.2123 | 4073285.525 |
| 77 | -75.64950749 | 36.80361014 | 442060.7351 | 4073283.307 |
| 78 | -75.65420941 | 36.80360397 | 441641.2909 | 4073285.481 |
| 79 | -75.65483854 | 36.80358541 | 441585.155 | 4073283.807 |
| 80 | -75.65659306 | 36.80345694 | 441428.5435 | 4073270.628 |

| 81 | -75.66125653 | 36.8031693 | 441012.3125 | 4073241.586 |
| 82 | -75.66349319 | 36.80301719 | 440812.6698 | 4073226.094 |
| 83 | -75.66444652 | 36.80296496 | 440727.5862 | 4073220.891 |
| 84 | -75.66609753 | 36.80290867 | 440580.2616 | 4073215.671 |
| 85 | -75.66768397 | 36.80277194 | 440438.6339 | 4073201.49 |
| 86 | -75.66787515 | 36.80274298 | 440421.5571 | 4073198.397 |
| 87 | -75.66879804 | 36.80253368 | 440339.0664 | 4073175.754 |
| 88 | -75.66955145 | 36.80241636 | 440271.7655 | 4073163.21 |
| 89 | -75.67195462 | 36.8021786 | 440057.1992 | 4073138.338 |
| 90 | -75.71754517 | 36.79849339 | 435987.095 | 4072759.075 |
| 91 | -75.71874724 | 36.79840865 | 435879.7854 | 4072750.479 |
| 92 | -75.71920008 | 36.79840906 | 435839.3862 | 4072750.829 |
| 93 | -75.72321959 | 36.79859733 | 435480.954 | 4072774.418 |
| 94 | -75.73760831 | 36.79921487 | 434197.8322 | 4072852.725 |
| 95 | -75.74234568 | 36.79932484 | 433775.2983 | 4072868.194 |
| 96 | -75.76368486 | 36.79932107 | 431871.5943 | 4072882.764 |
| 97 | -75.77038262 | 36.79919645 | 431273.9648 | 4072873.731 |
| 98 | -75.77166244 | 36.79920279 | 431159.7954 | 4072875.356 |
| 99 | -75.78610437 | 36.80003597 | 429872.1636 | 4072978.274 |
| 100 | -75.78734301 | 36.8001203 | 429761.7408 | 4072988.538 |
| 101 | -75.80036372 | 36.80075067 | 428600.4109 | 4073068.111 |
| 102 | -75.80907679 | 36.80118533 | 427823.8504 | 4073122.866 |
| 103 | -75.80941272 | 36.80121163 | 427793.9063 | 4073126.037 |
| 104 | -75.85356449 | 36.80784879 | 423861.7058 | 4073896.562 |
| 105 | -75.85375875 | 36.80789014 | 423844.4187 | 4073901.304 |
| 106 | -75.85464018 | 36.80813607 | 423766.0369 | 4073929.288 |
| 107 | -75.85494315 | 36.80824618 | 423739.1209 | 4073941.744 |
| 108 | -75.85601832 | 36.80881112 | 423643.7749 | 4074005.273 |
| 109 | -75.85642146 | 36.80900781 | 423608.0092 | 4074027.415 |
| 110 | -75.8647187 | 36.81293616 | 422871.8286 | 4074469.86 |
| 111 | -75.86529654 | 36.81312304 | 422820.4745 | 4074491.058 |
| 112 | -75.86972522 | 36.81420906 | 422426.5487 | 4074615.118 |
| 113 | -75.86979275 | 36.81423494 | 422420.5517 | 4074618.043 |
| 114 | -75.86987167 | 36.81429225 | 422413.5702 | 4074624.465 |
| 115 | -75.86997035 | 36.81440786 | 422404.8854 | 4074637.37 |
| 116 | -75.87018406 | 36.81475529 | 422386.1741 | 4074676.085 |
| 117 | -75.87029316 | 36.81497256 | 422376.6624 | 4074700.277 |
| 118 | -75.87033518 | 36.81502723 | 422372.9697 | 4074706.375 |
| 119 | -75.87039123 | 36.81505923 | 422368.0029 | 4074709.971 |
| 120 | -75.87134884 | 36.81526605 | 422282.7985 | 4074733.692 |
| 121 | -75.87193652 | 36.81536476 | 422230.4815 | 4074745.12 |
| 122 | -75.87357595 | 36.81552275 | 422084.4151 | 4074763.981 |

| 123 | -75.87454105 | 36.8155938 | 421998.4063 | 4074772.65 |
| 124 | -75.87493026 | 36.81560532 | 421963.7031 | 4074774.245 |
| 125 | -75.89281621 | 36.81551964 | 420368.3039 | 4074779.489 |
| 126 | -75.90232625 | 36.81538009 | 419519.922 | 4074771.971 |

II.    Rent

The Lessee must begin submitting rent payments for any project easement associated with this lease commencing on the date that BOEM approves the COP. Annual rent for a project easement is $5.00 per acre per year or a minimum of $450.00 per year. The first annual rent payment for the project easement is due within 45 days of the Lessee's receipt of the COP approval letter. The rent for the next year and for each subsequent year is due on or before each lease anniversary.

To calculate the required rent payment for the project easement, BOEM multiplied 9,804 acres by $5, totaling $49,020. Therefore, the total annual project easement rent payment due is $49,020.

Accepted and agreed to:

| OSW Project LLC | The United States of America |
|---|---|
| Lessee | Lessor |

(Signature of Authorized Officer)                    (Signature of Authorized Officer)

Mark D. Mitchell                                                      David B. Diamond

(Name of Signatory)                                            (Name of Signatory)

Authorized Representative                            Deputy Associate Director for Operations, Atlantic Outer
                                                                          Continental Shelf, Office of Renewable Energy Programs

(Title)                                                                      (Title)

15 January 2025

(Date)                                                                      (Date)