**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION**

|  |  |
|---|---|
| VIRGINIA ELECTRIC AND POWER COMPANY, D/B/A DOMINION ENERGY, VIRGINIA; OSW PROJECT LLC,<br>　　　　　　Plaintiffs,<br>v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR; BUREAU OF OCEAN ENERGY MANAGEMENT; DOUGLAS BURGUM, Secretary of the Interior, in his official capacity; MATTHEW GIACONA, Acting Director, Bureau of Ocean Energy Management, in his official capacity,<br><br>　　　　Defendants. | Case No. 2:25-cv-00830-JKW-LRL |

**DECLARATION OF ADAM S. LEE IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION**

I, Adam S. Lee, certify as follows:

**Declarant's Background, Experience, and Personal Knowledge**

1.　　　I am Vice President and Chief Security Officer for Dominion Energy, Inc. (Dominion Energy) and its subsidiary, Virginia Electric and Power Company, d/b/a Dominion Energy Virginia (DEV).  Since 2018, I have directed the development and implementation of corporate security policies and procedures designed to protect DEV's physical and cyber assets and ensure consistency with national security.  I am DEV's liaison with all outside government and law enforcement agencies on security matters affecting DEV.

2.      Before joining Dominion Energy, I served with the Federal Bureau of Investigation for 22 years, including as Special Agent in Charge of the FBI's Richmond Division, overseeing all national security operations for the majority of counties in the Commonwealth of Virginia.  During my FBI career, I led classified operations in partnership with other U.S. Intelligence Community (IC) agencies and the military while serving on the executive staff of the FBI's Cyber Division and, later, as Acting Special Agent in Charge and Assistant Special Agent in Charge of the Washington Field Office's intelligence program, overseen by the agency's Directorate of Intelligence.  I belong to the FBI's Domestic Security Alliance Council and to the Department of Homeland Security's (DHS) Classified Intelligence Forum, and I am a member of the national Government/Business Executive Forum.

3.      I established an industry-leading, internal Threat Intelligence Group (TIG) in 2019 to examine strategic threats, gaps, and vulnerabilities to critical infrastructure.  The TIG is comprised of former IC analysts, including a former Virginia Fusion Center intelligence analyst, a former Defense Intelligence Agency analyst, and an analyst from the National Geospatial Intelligence Agency.  The TIG maintains collaborative partnerships, sharing insights and intelligence, with members of the IC, Department of Defense (DoD),[1] and DHS (Cybersecurity and Infrastructure Security Agency, Transportation Security Administration, Intelligence and Analysis, and United States Coast Guard (USCG)) as well as with State Fusion Centers and state stakeholder agencies.

---

[1] On September 5, 2025, the president signed Executive Order 14347, entitled *Restoring the United States Department of War*, which states that "[t]he Department of Defense and the Office of the Secretary of Defense may be referred to as the Department of War and the Office of the Secretary of War, respectively, in the contexts described in" that order.  Given that this executive order sets forth additional "secondary" names for the Department of Defense (DoD) and Secretary of Defense and many of the events described in this declaration pre-date this order, references to the Department of Defense and Secretary of Defense herein include the Department of War (DoW) and Secretary of War, respectively.

4.      In 2022, Virginia Governor Glenn Youngkin appointed me to serve a four-year term on his Information Technology Advisory Council, a body "responsible for advising and making recommendations to the Chief Information Officer (CIO) of the Commonwealth and the Secretary of Administration regarding information technology in the Commonwealth." *See* https://www.vita.virginia.gov/about/council-and-committees/information-technology-advisory-council-itac/.  In 2023, Governor Youngkin appointed me to his Secure and Resilient Commonwealth Advisory Panel, an advisory body whose "primary focus" is "emergency management and homeland security within the Commonwealth to ensure that prevention, protection, mitigation, response, and recovery programs, initiatives, and activities, both at the state and local levels, are fully integrated, suitable, and effective in addressing risks from man-made and natural disasters." *See* https://www.pshs.virginia.gov/initiatives/secure-and-resilient-commonwealth-panel/.

5.      I sit on the Coastal Virginia Offshore Wind Commercial Project (CVOW) Information Technology Executive Steering Committee and have been a part of examining cyber risk attending the project.  My security team at Dominion Energy assists the CVOW business team with security and compliance tasks, and members of my team regularly attend meetings with officials from the DoD and USCG.

6.      I have reviewed the December 22, 2025 Director's Order (the Order) issued by the Bureau of Ocean Energy Management (BOEM) Acting Director of BOEM Matthew Giacona to DEV "to suspend all ongoing activities related to the CVOW Wind Project on the Outer Continental Shelf for the next 90 days for reasons of national security." *See* https://www.boem.gov/renewable-energy/state-activities/boem-cvow-suspension-letter.  I have also reviewed the same-day press release subsequently posted on the Department of the Interior's

website titled, "The Trump Administration Protects U.S. National Security by Pausing Offshore Wind Leases" and the December 27 Declaration in this matter from Mr. Giacona. *See* https://www.doi.gov/pressreleases/trump-administration-protects-us-national-security-pausing-offshore-wind-leases; Dkt. 19-1.

7.      I make this declaration based on my personal knowledge and in support of DEV's and OSW Project LLC's Motion for a Preliminary Injunction.  I highlight BOEM's and DoD's highly irregular actions and decision-making over the past six weeks, from the time that DoD allegedly completed its new classified assessment relied upon by BOEM's December 22 CVOW Order (and same-day substantially identical orders to four other offshore wind projects).  These actions include the government's sudden abandonment of normal lines of communication with DEV's security personnel to assess and manage threats to the electrical grid infrastructure and to instead issue the suspension Order that damages energy and national security, including for the critical military installations in DEV's service area.  BOEM's and DoD's abnormal actions also include apparently opting not to work with their respective local operators and experts on the ground who understand CVOW and the numerous security-enhancing measures to which DEV has already committed.  BOEM and DoD have now confirmed that they will refuse to share the new information with DEV, *see* Dkt. No. 30, Attch. A., in either a classified or unclassified setting, for the entirety of this litigation—which almost certainly will extend beyond the Order's 90-day initial and renewable suspension period—thereby clarifying that government's principal interest is in perpetuating the ordered CVOW suspension rather than timely resolving whatever national security concerns may underlie it.

**DEV's Longstanding History of National Security Coordination**

8.     As part of my role as Chief Security Officer, I maintain a Top Secret (TS) security clearance, which includes and subsumes the lower-level Secret security clearance.[2] A TS clearance for core Intelligence Community agencies, such as the FBI or the CIA, requires an extensive background investigation and a polygraph examination.  Additionally, holders of a TS clearance must report foreign travel and substantive interactions with foreign persons, and they must also disclose financial accounts and transactions for scrutiny by the agency sponsoring the clearance.  By contrast, a Secret clearance is far less rigorous to obtain and maintain; it requires fewer investigative checks to obtain and has fewer reporting requirements.  Classification levels are based upon the potential for harm if the classified information was released outside the viewership with an appropriate clearance and the requisite "need to know."  FBI special agents and CIA case officers, for example, are required to maintain a TS clearance as a condition of employment.

9.     It is impossible for me to imagine new information which Mr. Giacona describes in his December 22, 2025 order as, "including the rapid evolution of relevant adversary technologies and the resulting direct impacts to national security," from CVOW which warrants curtailing construction of the project, but does not warrant TS classification.

10.     My TS clearance is maintained by DOJ/FBI, and I have held it uninterrupted since December 1996 when I entered on duty as a special agent.  Several other Dominion Energy officials maintain necessary security clearances to allow them to review classified information where appropriate and necessary and to facilitate lines of sensitive communication with

---

[2] Under Executive Order 13526 (2009), original classification authorities (OCA) designate information as "Secret" when the unauthorized disclosure of the information "could be expected to cause serious damage to the national security that the original classification authority is able to identify or describe." OCA designates information "Top Secret" when the unauthorized disclosure its unauthorized disclosure "reasonably could be expected to cause exceptionally grave damage to the national security."

government national security officials.  Dominion Energy personnel maintaining at least a

Secret-level security clearance include, but are not limited to:

| Dominion Energy Representatives Needing Security Confirmation | | | |
|---|---|---|---|
| **Name** | **Position** | **Clearance level** | **Issuer** |
| Robert Blue | Dominion Energy Chairman, President and CEO | ██████ ██████ | ████ |
| Ed Baine | Dominion Energy Executive VP (Utility Operations) and DEV Virginia President | ████ | ███ |
| Adam Lee | Dominion Energy VP and Chief Security Officer | █████ | ███ |
| Sean Stalzer | Dominion Energy VP (Cyber Security) | ███ █████ | ████ |

DEV also maintains legal counsel with at least Secret-level security clearances.

11.     Leveraging its deep security background and experience in integrating energy

and national security, DEV has engaged in longstanding, regular collaboration and information

sharing with the federal government to protect DEV's critical energy infrastructure, which

includes transmission lines, substations, and nuclear energy stations, including but not limited to

infrastructure serving critical military installations.  As part of that key responsibility, DEV

works closely with the federal government on a daily basis to monitor and mitigate threats as

they evolve.  DEV therefore has extensive experience in working with federal agency

counterparts to address new issues and concerns as they arise, while maintaining the

confidentiality of sensitive government information.  In addition to its partnership with DoD on

domestic energy resiliency, DEV routinely assists the US Special Operations Command and

other DoD commands to understand, engage, and influence the energy component of the

operational environment abroad. For example, in 2025, Dominion Energy prepared an Army

Civil Affairs team prior to its Ukraine-facing Eastern European deployment, advancing the soldiers' understanding of key energy infrastructure vulnerabilities, defenses, and technological threats and capabilities relevant to the Ukraine theater.

**DEV and CVOW Prioritize National Security**

12.     For the past seven years, my security team supported DEV in the development and permitting of CVOW, with an emphasis on CVOW's implementation of national security-enhancing measures and DEV's coordination and cooperation with federal agencies, including the DoD, Navy (DON), and Air Force (DAF) and the various commands and components of those departments (collectively, "DoD").  Since at least 2021, the DoD Military Aviation and Installation Assurance Siting Clearinghouse (the DoD Clearinghouse) coordinated mitigation-related discussions and negotiations between DEV and DoD.

13.     Beginning in 2023, my security organization initiated extensive liaison efforts with external stakeholders, including the USCG, FBI, DHS, US Attorney's Office (USAO), Port Police, and other agencies. These initiatives have fostered strong relationships, enhanced intelligence sharing, and facilitated two critical incident tabletop exercises, which included US Navy special operations elements, as well as a recent CVOW familiarization event as recently as November 2025.  This event included CVOW and security executive leadership, USCG regional Commander, Lt. Commander, and Lieutenant – Chief of Enforcement, FBI Norfolk Special Agent in Charge, Assistant Special Agent in Charge, and command staff, the Virginia State Police Superintendent, Deputy Superintendent, Chief Intelligence Officer, leaders of the Homeland Security Division, the Virginia Fusion Center, and the Commander of the VSP SWAT team.  A new DoD assessment of national security threats or potential for stopping CVOW construction was never raised with DEV during this coordination.

14.     These engagements are significant to ensure key partners are aware of the scope of CVOW operations and jurisdictional considerations.  As a result, DEV is now positioned as an active participant in USCG-led maritime coordination meetings, maritime security training opportunities, and intelligence-sharing platforms.  Additionally, in August 2025, the company strengthened its capabilities by hiring a former FBI agent supervisor with extensive experience and strong relationships in the Virginia Tidewater region.  More tactical than the TIG relationships outlined above, this new role is focused on CVOW critical incident and investigative response, intelligence collection and sharing, and maintaining consistent liaison with internal and external stakeholders, including DoD and its components.

15.     I am aware of meetings between CVOW and DoD personnel, including DoD Clearinghouse personnel, to identify and mitigate potential risks to national security missions from CVOW's construction and future operations.

16.     DEV's discussions with DoD about potential impacts to military testing and training or to defense radar system capabilities always occurred in unclassified settings.  US government officials always held these meetings at an unclassified security level because the meetings did not require the disclosure or discussion of any information that the government represented as having been classified.  On the contrary, the discussions about potential risks to military testing and training and to radar systems exclusively involved publicly available information.

17.     DEV's engagements with DoD have resulted in several agreed-upon national security risk mitigation measures allowing CVOW to go forward without any significant risk to national security, including radar systems.  These measures include DEV's agreement to provide funds to the North American Aerospace Defense Command (NORAD) for radar upgrades, and DEV's agreement to follow protocols for curtailment of CVOW operations to reduce radar

interference for DON radar testing. *See, e.g.*, Conditions on COP Approval ¶ 4.2 (NORAD mitigations), ¶ 4.3.3 (NAVAIR mitigations).[3]  DEV and DoD have been working cooperatively to prepare a mitigation agreement containing these and other measures to ensure that CVOW would enhance the defense and national security posture of the mid-Atlantic United States, with the expectation that the finalized mitigation agreement will be incorporated into DEV's Construction and Operations Plan (COP).

18.     As recently as December 16, 2025, DEV communicated with DoD regarding the CVOW mitigation agreement, mere days before BOEM issued the Order and well after DoD allegedly issued the November 2025 "new" classified assessment.  At no time during that discussion—or any discussion in the months leading up to BOEM's Stop Work Order—did DoD or other agency officials cite any new intelligence about emerging adversary capabilities or any previously unconsidered risk to military radar systems from offshore wind turbines, or from CVOW specifically.

**The December 22, 2025 BOEM Order**

19.     BOEM's Order summarily identifies "new classified information, including the rapid evolution of relevant adversary technologies and the resulting direct impacts to national security from offshore wind projects" as its rationale to suddenly stop CVOW construction offshore.  Similarly, Mr. Giacona's December 27, 2025 declaration filed in this litigation states "[t]he Department of War has designated the [new] classified material with a secret designation" and that Mr. Giacona reviewed this material on November 26, 2025 and again "in early December 2025."  Mr. Giacona also asserts that the new material identifies "previously

---

[3] https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/CVOW-C-Conditions-COP-Approval-OCS-A-0483.pdf.

undisclosed specific national security risks posed by offshore wind projects." Dkt. 19-1 ¶¶ 10 and 11.

20.        While a sentence in Mr. Giacona's declaration concludes that he personally conducted a "review of [sic] CVOW Project's current mitigations" and "determined that CVOW Project's activities did not adequately provide for the protection of national security interests …. absent potential mitigation measures," he provides no details of this review or specific mitigation measures and does not harmonize this claim with the Order's indication of only an "initial review" to date, identify anyone else with whom he consulted, or explain why his personal experience or judgment should override the many subject matter experts who worked to fashion CVOW's suite of mitigation measures and ongoing agreements.  Dkt. 19-1 ¶ 12.  Additionally, Mr. Giacona did not explain why BOEM and DoD did not attempt to work through the established, secure channels of classified information-sharing between DEV and DoD to analyze and address the threats he references in his declaration.  Nor does he explain why BOEM and DoD did not even provide DEV with an unclassified explanation of why CVOW or wind turbines generally are the particular focus of whatever adversary capability is addressed in the classified materials.

21.        Further, based on my review of the Giacona declaration and my knowledge of the parallel discussions between DEV and DoD, including with the DoD Clearinghouse or with other DoD personnel involved in negotiating mitigation agreements, it does not appear that Mr. Giacona or other Department of Interior officials before issuing the Order worked with Clearinghouse or DON officials who have knowledge about CVOW's mitigation measures to determine whether any new information changed DoD's prior assessment that the CVOW mitigation measures would sufficiently resolve any national security concerns, particularly those

arising from radar "clutter," as described in BOEM's December 23 press release regarding the Order for CVOW and orders for other offshore wind projects.

**DEV's Unsuccessful Efforts to Obtain Access to the "New" Information**

22.     BOEM's order "invites" DEV to "meet and confer" about whether the "national security threats relating to this project can be mitigated."   BOEM made no such offer before issuing the Order, and BOEM, DoD, and the Department of Justice have all now confirmed that the government will not provide any information to DEV indefinitely.  As a result, my security team and other components of DEV cannot meaningfully engage on "mitigating" any threats that BOEM has failed to disclose to DEV.

23.     Despite consistent communications between DEV and DoD and BOEM officials in November and December 2025—when Mr. Giacona asserts that he reviewed the new DoD classified assessment—and despite several DEV personnel, including myself, maintaining requisite security clearances to review secret-level classified information, BOEM has not provided DEV any opportunity to review and address this information, whether as part of or outside this litigation, thus preventing DEV from collaboratively addressing any real emerging threats to DEV's infrastructure and the military installations that rely on that infrastructure.

24.     Since the December 22 Order, DEV has made several requests to agency officials to access the DoD assessment on which BOEM purportedly based its Order, and to expeditiously resolve the Order's stated concerns to allow CVOW construction to resume.  DEV requested that BOEM provide DEV representatives with security clearances access to the new classified material, identifying for BOEM the DEV representatives with Secret-and-above clearances and offering for those individuals to travel as necessary to review materials in a secure location.

25.      These efforts also included an in-person meeting with BOEM on December 30, 2025, which I attended accompanied by DEV's president, senior vice president overseeing the construction of CVOW, vice president of federal affairs, and in-house counsel.  BOEM's attendees included Mr. Giacona, Chris Danley (Senior Adviser to the Interior Solicitor), Jacob Tyner (Interior Deputy Assistant Secretary for Land and Minerals Management), and Matthew Palmer.  No one from DoD was present.  The DEV attendees at the December 30, 2025 meeting provided a strategic-level overview of the essential nature of the CVOW project.  DEV catalogued the many good-faith and productive collaborations to mitigate all security concerns expressed by DoD and its components over several years of engagement and DEV's investments in information sharing with military, USIC, law enforcement, state consequence management agencies, *etc.,* including sharing at the highest levels of classification.  The DEV attendees also provided a clear understanding of the impact Mr. Giacona's curtailment on DEV's customers, on the company's ability to meet demand, and on the supply of critical energy resources to key military assets, such as Naval Station Norfolk, the world's largest naval base, Naval Air Station Oceana, the primary base of operations for the Navy's air fleet on the East Coast, Joint Expeditionary Base Little Creek-Fort Story, the nation's leading base for housing and training the nation's Expeditionary Forces, *etc.*

26.      Though Mr. Giacona, Acting Director of BOEM and author of the curtailment order of December 22, 2025, was present for the December 30, 2025 meeting, Christopher Danley led BOEM's side of the discussion.  He made requests for material supporting DEV's engagements with DoD and its stakeholder components.  Danley told the DEV attendees that he would make an attempt to obtain approval from DoD to share the classified information cited in Mr. Giacona's order.

27.     DEV's efforts to obtain access to the new classified information also included phone calls and emails to the Department of Justice proposing that a small, select number of DEV employees or representatives with the requisite security clearances be allowed to access the information.

28.     On December 29, DEV provided a list of employees and outside counsel who maintain at least Secret-level security clearances. *See* Ex. A (email thread between outside counsel for DEV and DOJ counsel of record containing or referencing requests for access to information for specified individuals).  On December 30, 2025, DEV's counsel, at DOJ's request, provided personal identifying information (PII) for those individuals for whom DEV requested access the classified reports so that the U.S. Government could verify their respective clearances.

29.     Despite DEV providing that PII to DOJ counsel, DOJ on December 31, 2025 informed DEV and then the Court that it does not intend to share the information with DEV or its counsel in connection with the litigation.  Dkt. 30.  The government therein represented that "the Interior and War Departments will determine, in the normal course, whether classified information in question can be shared with the appropriate Dominion representatives." *Id*. at 2.

30.     On January 2, 2026, DEV again communicated with BOEM and shared a document entitled "Dominion Energy, Inc. – Security Capabilities and National Security Community Collaboration Overview" sent to BOEM, attached hereto as Exhibit B.  DEV explained to BOEM how the government routinely shares national security information with DEV and DEV's role in protecting grid from threats, notwithstanding that BOEM and DoD should already have been aware of this information.  At that time, DEV also expressly reiterated its request for an unclassified summary of the relevant information.

31.      On January 6, 2026, BOEM replied that "DOW has informed [BOEM] that they are awaiting the resolution of the litigation before they would consider sharing the classified information with CVOW."  *See* ECF No. 37 at Ex. A at 2.  The government's December 31 and January 6 communications have foreclosed any possibility that DoD and BOEM will follow normal protocols and timely share what they have characterized as important national security information.  BOEM's and DoD's refusal to share a claimed national security threat with DEV in this instance is a sharp and unexplained departure from established practice and undermines DEV's ability to provide its expertise to the government to address any emerging threats.

32.      Based upon my 30 years of experience in handling classified information, I am aware that appropriate sharing of classified information requires the requisite clearance at the level of classification and an articulable "need to know."  In this instance, the BOEM order curtailed an $11 billion project, costing Virginia ratepayers $5 million every day the project construction is delayed and threatening the reliable flow of energy to critical military facilities in Virginia's Tidewater Region.  There is a clear, unambiguous, and articulable need for DEV to know what the "rapid evolution of relevant adversarial technologies and the direct impacts to national security" are which Mr. Giacona references.  Dkt. 19-1 ¶ 9.  The failure to share the basis for BOEM's extreme Order is a dramatic departure from the history of good faith engagement between DEV and DoD, and it undermines, rather than protects, national security.

**The Secretary of the Interior's Public Comments on the Order and the Classified Material**

33.      In contrast to the government's refusal to share relevant information with DEV, Interior Secretary Doug Burgum has frequently commented in the media, including on December 22 when BOEM issued its Order, regarding BOEM's Order to CVOW and similar orders stopping construction work on other offshore wind projects.  The Secretary of the Interior's

comments have characterized the content of the classified assessment as "zero[ing] in on" new adversarial drone capabilities that change the risk calculus in connection with radar 'clutter' and that "the basis of this understanding," presumably from the classified information, is that "[i]f you wanted to attack a population center on the East Coast of our country, you would send a swarm of drones right through one of these wind farms." *See*

https://www.youtube.com/watch?v=zaGVeJSdy30

34.     The Secretary's public comments about the classified assessment are inconsistent with the federal government's unwillingness to provide even an unclassified summary of the assessment to DEV and its security experts.  Based upon my training and experience handling classified information, it is unusual to characterize classified documents to the media, as that characterization could risk spillage of derivative classified information.  It is particularly unusual for an official to do so while denying stakeholders with a need to know access to the classified material, leaving them unable to help the government properly address any legitimate security risks or concerns.

35.      The Administration's public comments, a selection of which are included below, have also articulated alternative bases for the Order that are not related to national security and do not appear on the face of the Order itself, including assertions about the wisdom, cost, and reliability of wind energy.

      a.  The White House's comment on BOEM's issuance of stop-work orders, issued on December 22, 2025, was "President Trump has been clear: wind energy is the scam of the century. . . . For years, Americans have been forced to pay billions more for the least reliable forms of energy."

15

https://www.politico.com/news/2025/12/22/trump-leaves-wind-industry-reeling-at-a-perilous-moment-for-his-party-00704170

b.  On December 22, shortly after issuance of the BOEM Order, Secretary
Burgum posted a thread on X that said "Due to national security concerns
identified by @DeptofWar, @Interior is PAUSING leases for 5 expensive,
unreliable, heavily subsidized offshore wind farms!  One natural gas pipeline
supplies as much energy as these 5 projects COMBINED.  @POTUS is
bringing common sense back to energy policy & putting security FIRST!"
*See* https://x.com/SecretaryBurgum/status/2003094666040787213.  The
White House posted a similar tweet, which similarly referenced the lease
suspensions and said "FACT: Just one natural gas pipeline can supply as
much energy as these five projects combined."
https://x.com/RapidResponse47/status/2003125425879629936

c.  Later that day, he posted a thread that said "Offshore wind is one of the most
expensive, unreliable, subsidy-dependent schemes ever pushed upon
American taxpayers.  Here's why @POTUS is prioritizing energy projects
like clean, beautiful coal & U.S. natural gas that actually WORK."  The thread
also described offshore wind as "killing marine life," said that manufacturing
processes for turbines and blades "are emissions-heavy, threaten our supply
chains and enrich foreign nations," and "distort electricity markets with long-
term contracts."  The thread said "At the core of the Green New Scam: high
cost, fake emissions reductions, foreign supply chains, and BILLIONS in
taxpayer subsidies.  America deserves energy that is affordable, reliable and

secure – not this." *See*

https://x.com/SecretaryBurgum/status/2003199842152251802

d.  Also that day, he posted:  "Offshore wind s the MOST EXPENSIVE form of electricity in our country.   This is a self inflicted pricing issue for residents in New England when we have abundant natural gas nearby in Pennsylvania!"  The post was accompanied by a video clip of Secretary Burgum discussing the stop work order issued to offshore wind projects that same day.  *See*

https://x.com/secretaryburgum/status/2003163435320926688?s=46&t=2OX0XDS4fI8KXB3Rn-yp9w

e.  Also that day, he reposted a post by Secretary Kennedy that read:  "Offshore wind is bad energy policy, bad environmental policy, and bad economic policy.  It kills whales, destroys local ground fisheries, and decimates shoreline communities.  The turbines – some of them twice the height of the Washington Monument – pose navigational hazards, and disrupt marine and aviation radar, endangering American lives and national security.  They produce energy that is three times the cost of the average price per kilowatt-hour.  This boondoggle benefits only the big financial houses like BlackRock and Goldman and foreign construction firms.  Thank you to President Trump and @Secretary Burgum for this decisive action."  *See*

https://x.com/seckennedy/status/2003220315720044740?s=46&t=2OX0XDS4fI8KXB3Rn-yp9w

f.  Also on December 22, he gave an interview on Fox Business in which he referenced radar "clutter" associated with large offshore wind towers located near East Coast population centers, and said "And we know that with the advances that have happened, the wars that are happening between Russia and Ukraine, largely those are aerial drone wars. We know what was going on

between Iran and Israel: that wasn't piloted, that was aerial drone wars that were occurring there, sometimes, you know, Iran launching as many as 500 aircraft missiles or drones at Israel in a single day just this last year, during 2025. So, the adversarial threats have really changed, and so this new report from the War Department really zeroes in on that."

https://www.facebook.com/purpleroompolitics/videos/on-december-22-2025-interior-secretary-doug-burgum-announced-that-the-trump-admi/777945785302771

g.  On that same day, he gave an interview to Fox News citing "recently completed, classified reports from the Department of War focused around radar and radar interference" as grounds for the Department's order halting construction on five offshore wind projects. He stated that offshore wind projects are "unreliable, unaffordable, and they were built primarily with foreign sourced companies and foreign sourced equipment."

https://www.foxnews.com/video/6386850294112.

h.  On December 23, 2025, he gave an interview to Fox News in which he stated that "modern warfare is drone warfare" and discussed "the radar interference caused by these massive, gargantuan projects." He said: "These things are moving at 150 miles-an-hour. Our ground-based radar is designed to pick up movement. If you wanted to attack a population center on the East Coast of our country, you would send a swarm of drones right through one of these wind farms. That's the basis of this understanding." In the interview, he also described offshore wind as "highly subsidized," "really expensive," "not

reliable," dependent on "foreign suppliers."  He further referenced environmental concerns including "whale groundings" and concerns expressed by fishermen. https://www.youtube.com/watch?v=zaGVeJSdy30

i. On December 23, Secretary Burgum posted the following on X: "Offshore wind will DRIVE UP electricity prices in the Northeast.  As one example, the Empire Wind project off the coast of New York is charging New Yorkers over TWO TIMES the local grid price for their energy.  The Green New Scam is not just a waste of money on weather-dependent projcets – it's a con job forced on the American people."  *See*

https://x.com/secretaryburgum/status/2003573523147817368?s=46&t=2OX0XDS4fI8KXB3Rn-yp9w

j. Also on December 23, Secretary Burgum posted a thread of posts on X that began: "Offshore wind is a GIANT rip off for every American consumer. Here's what $34 billion is buying, and what it could have bought instead. Consumers are being forced to spend $34 BILLION on 5 offshore wind projects that will only generate HALF of their total power capacity because wind doesn't blow 24/7."

https://x.com/secretaryburgum/status/2003542182930842066?s=46&t=2OX0XDS4fI8KXB3Rn-yp9w

**Conclusion**

36.    BOEM's sudden Order contradicts its and DoD's prior determinations after more than a decade of study that the CVOW project, with agreed upon mitigations, protects national security interests.  This action is even more unusual and irregular because it does not appear that

BOEM worked with the DoD Clearinghouse—the DoD office with the statutory directive and expertise to lead DoD's evaluation and resolution of wind energy-related national security risks—to assess the supposedly new classified information and its significance in light of existing agreed-upon mitigation measures. Accordingly, the Order's stated "new" national security concern has not been handled in the way that a national security issue would be addressed in the ordinary course.

37.    DEV's access to the new information is essential both to inform the Court's perspective and to work with BOEM to resolve its stated concerns.

38.    <u>I and other DEV experts stand ready to offer the Court any assistance it may desire for its review of any BOEM information provided *in camera*.</u> DEV will abide by any constraints imposed by this Court in accessing and protecting the information to ensure that its limited disclosure to DEV does not present any risks of release to individuals without the requisite security clearance level.

39.    Coordination among the government, DEV, and the Court can continue while CVOW construction resumes, just as DEV routinely coordinates with the government on a variety of national security issues as they arise in the operation and protection of our nation's critical energy infrastructure.

I certify under penalty of perjury under the laws of the United States that the foregoing is true and correct, 28 U.S.C. § 1746.

Dated: January 9, 2026

Adam S. Lee

# Exhibit A

| | |
|---|---|
| **From:** | James M. Auslander |
| **Sent:** | Monday, December 29, 2025 11:05 AM |
| **To:** | Dykema, Peter (ENRD) |
| **Cc:** | Nessa Horewitch Coppinger |
| **Subject:** | RE: Virginia Electric v. Interior |

Peter, thanks for the email. I can provide the following names for now; I may add others after further internal inquiry.

- Robert Blue, Chair, President and CEO

  o Issued by ▉▉▉▉▉ - in process for ▉▉▉▉▉)

- Ed Baine, Executive Vice President – Utility Operations and President – Dominion Energy Virginia

  o Issued by ▉▉▉▉▉

- Adam Lee, Vice President and Chief Security Officer

  o Issued by ▉▉▉▉▉

- Sean Stalzer, Vice President – Cyber Security

  o Issued by ▉▉▉▉▉ (in process for ▉▉▉)

- Matthew Gardner, Vice President Planning & Operations (Electric Transmission)

  o Issued by ▉▉▉▉▉

Taylor Ferrell, Beveridge & Diamond, issued by ▉▉▉▉▉

--Jamie


-------- Original message --------
From: "Dykema, Peter (ENRD)" <Peter.Dykema@usdoj.gov>
Date: 12/29/25 8:57 AM (GMT-05:00)
To: "James M. Auslander" <JAuslander@bdlaw.com>
Subject: Virginia Electric v. Interior


Jamie

Pursuant to the Court's Order (DKT 26) can you let me know what members of your team have security clearance? I believe the relevant materials are classified **secret** (not top secret).

Thank you. Let me know if we need to chat.

Peter

PETER KRYN DYKEMA
Senior Trial Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
Telephone: (202) 305 0436
Facsimile: (202) 305-0506

Standard Mail and Express Mail:
4 Constitution Square
150 M Street, N.E., Suite 3.120
Washington, D.C. 20002

# Exhibit B



# Dominion Energy, Inc. – Security Capabilities and National Security Community Collaboration Overview

Dominion Energy maintains strong, collaborative security partnerships with the US Government (USG), including the Department of War (DOW) and the Intelligence Community (USIC). The company's efforts go beyond standard electric sector USG engagement, such as receiving publicly released threat information provided by the USIC (*e.g.,* FBI Private Industry Notifications), DOW (*e.g.,* National Security Agency advisories and guidance), and Dept. of Homeland Security (DHS) (*e.g.,* Cybersecurity and Infrastructure Security Agency (CISA) advisories and guidance) and include unique collaborative relationships.

Dominion Energy is a key member of the Electric Subsector Coordinating Council (ESCC) which liaises with the USG on efforts to prepare for, and respond to, national-level disasters or threats to critical infrastructure. The ESCC works with its USG counterparts (e.g., DOW, Dept. of Energy (DOE), DHS, *etc.*) to prepare for, and react to, challenges which threaten the electric system.[1]

Dominion Energy actively engages with the USG across its security organization's operational branches (*i.e.,* physical, cyber, and intelligence) and unmanned systems programs. Dominion Energy cultivates and maintains mutually beneficial partnerships between its security organization and USG and USIC agencies including the FBI, DHS (Transportation Security Agency (TSA), CISA, and US Coast Guard (USCG)), DOE, and DOW elements.

**Cybersecurity**

<u>Dominion Energy's Cyber Fortress</u>

Dominion Energy maintains an internally developed, bespoke cyber range which serves as a copy, also known as a "digital twin," of key company systems, such as IT systems, power plant operational technology environments, substation networks, *etc.*, including those systems which control Coastal Virginia Offshore Wind (CVOW) operations. Within the cyber range, Dominion Energy's cybersecurity technologists perform simulation exercises throughout the year to ensure the defenders are prepared to respond to malign attacks by hostile nation states or sophisticated criminal actors which are designed to impact the grid/bulk electric system.

---

[1] https://www.electricitysubsector.org/

Each year in September, Dominion Energy plans, prepares, equips, and deploys the five-day Cyber Fortress exercise. Technologists from the US Marine Corps Cyberspace Warfare Group serve in the role of the hostile nation state attackers. The US Marine Corps also supports the defensive response, along with the FBI, United States Secret Service, DHS CISA and Intelligence & Analysis (I&A), US Army National Guard Cyber Brigade, and the Drug Enforcement Agency. Other participants include the US Air Force, Federal Emergency Management Agency, Virginia State Police and Virginia Department of Emergency Management. Both the US Navy Civil Affairs teams and the Federal Bureau of Investigation recognized the Cyber Fortress exercise with their top civilian awards for cyber excellence.

Cyber Sentry (DHS CISA Information Sharing)

Dominion Energy was the first electric utility to partner with DHS CISA to deploy the agency's Cyber Sentry program which places sensors within the Dominion Energy network and on the perimeter to monitor traffic for malign actors. Analysts at DHS partner with the company's Cybersecurity Operations Center analysts in real-time to evaluate all threats, close intelligence gaps, and identify vulnerabilities and process improvements for incident response. This singular collaboration is at the edge of public/private engagement and informs the wider defense of the United States.

Marine Corps Cyber Command Fellow

Dominion Energy is the only utility to have a full-time US Marine Corps Cyber Command officer on staff in its Cybersecurity Operations Center. The relationship is in its fourth year and allows the US Marine Corps to learn how to defend a power grid, incorporate new technologies, such as Artificial Intelligence, into its cyber disciplines, and respond in the event of a nation state attack on the grid.

NSA Bi-Directional Information Sharing

Dominion Energy serves as the power company to critical US Intelligence Community, DOW, and Defense Industrial Base entities. As a result, Dominion Energy also is rightly considered a critical national asset and a target for malign cyber activity. NSA established real-time information sharing with Dominion Energy relative to cyber threats. NSA monitors all perimeter traffic in and out of Dominion Energy's network to identify threats. NSA is able to collaborate in real-time with Dominion Energy's Cybersecurity Operations Center analysts and supply heretofore unknown threat intelligence that is loaded into our defenses in near real-time. As with Cyber Fortress, Cyber Sentry, the Marine Corps Cyber Command Fellows program, this NSA sharing platform is unique to the utility industry.

FBI Information Sharing

Dominion Energy perimeter information is passed directly to the FBI's system known as Griffin Citadel. Griffin Citadel correlates attempted attacks on Dominion Energy against all known classified indicators of compromise within the FBI and the wider USIC. This collaboration helps advance USIC operations, existing FBI cases, and collectively locate new threats to protect the nation.

Operational Technology Cybersecurity

Dominion Energy considers operational technology systems - those systems which make, move, or control the flow of electricity – as the commercial analog to US Government classified networks in terms of their importance. The company has made significant investments to ensure those networks are properly defended against attacks from malign nation states and sophisticated criminal actors. Dominion Energy's security organization crafted enterprise minimum cybersecurity standards to align the company's business segments with best practices benchmarked against government, energy, and other critical infrastructure sectors. Those standards go well beyond what is required by regulatory compliance and are mandated on every computerized asset within the operational technology space. The standards are comprehensive and rigorous to include disallowing any and all Dominion Energy operational technology systems to be accessed from the internet. Dominion operates over ten thousand miles of its own fiber optic cables over which the company's operational technology traffic communicates.

Another component of the standards is rigorous, persistent monitoring of Dominion Energy's operational technology, which is facilitated by the company's best-in-class cybersecurity operations center as well as our investment in the Dragos platform of sensors. Dominion Energy is the largest Dragos customer and has deployed hundreds of sensors across key assets which detect new access violations and anomalies in three milliseconds. No company in the world has a superior comprehensive cybersecurity detection and mitigation capability in its operational technology systems than Dominion Energy.


**Intelligence**

Dominion Energy established an industry leading, internal Threat Intelligence Group (TIG) in 2019 to deliver security intelligence products to company leaders and government partners. TIG analysts examine strategic threats, gaps, and vulnerabilities to critical infrastructure, with a special focus on the energy sector. The team is comprised of former USIC and State intelligence analysts including a former Virginia Fusion Center intelligence analyst, a former Defense Intelligence Agency analyst, and an analyst from the National Geospatial Intelligence Agency.

Leveraging structured intelligence techniques comparable to those found in the USIC and open-source tradecraft, Dominion Energy's intelligence analysts provide strategic intelligence assessments for company leadership on topics ranging from:

- Cyber threats (*e.g.,* ransomware, artificial intelligence, quantum computing, *etc.*),
- Sector threats (*e.g.,* threats to small modular reactors, threats from unmanned aerial systems, *etc.*),
- Physical security threats (*e.g.,* foreign terrorism threats, threats to electric substations, *etc.),* and
- Threats from nation-states (*e.g.,* China, Russia, Iran, and North Korea, *etc.*).

The TIG maintains collaborative partnerships, sharing insights and intelligence, with members of the USIC, DOW, and DHS (CISA, TSA, Intelligence and Analysis, and Coast Guard) as well as with State Fusion Centers.  Examples of recurring intelligence sharing between the analysts, the USG, and USIC include:

- Quarterly intelligence sharing discussions with the FBI Richmond Field Office.
- Dominion Energy hosts a quarterly intelligence exchange with DOW, FBI, DHS CISA, USCG, Customs and Border Patrol, and other intelligence partners for CVOW.
- Intelligence discussions with DHS I&A and attend monthly, classified Critical Infrastructure Intelligence Initiative (CI3) threat briefings.
- Participate in TSA's Surface Information Sharing Cell (SISC) daily briefs.

**Physical Security**

Beginning in 2023, Dominion Energy Investigations has actively engaged with CVOW leadership and initiated extensive liaison efforts with external stakeholders, including the USCG, FBI, DHS, US Attorney's Office (USAO), Port Police, and other local agencies. These proactive initiatives have fostered strong relationships, enhanced intelligence sharing, and facilitated two critical incident tabletop exercises, which included US Navy special operations elements, as well as a recent CVOW familiarization event in November 2025. This event included CVOW and security executive leadership, US Coast Guard regional Commander, Lt. Commander, and Lieutenant – Chief of Enforcement, FBI Norfolk Special Agent in Charge, Assistant Special Agent in Charge, and command staff, The Virginia State Police Superintendent, Deputy Superintendent, Chief Intelligence Officer, leaders of the Homeland Security Division, the Virginia Fusion Center, and the Commander of the VSP SWAT team.

These engagements are significant, as several key partners were previously unaware of the scope of CVOW operations and jurisdictional considerations. As a result, Dominion Energy is now positioned as an active participant in USCG-led maritime coordination meetings, maritime security training opportunities, and intelligence-sharing platforms. Additionally, in August 2025,

the company strengthened its capabilities by hiring a Senior Investigator with extensive federal law enforcement experience and established relationships in the Virginia Tidewater region. This role is dedicated to representing security in Dominion Energy interests, with a focus on CVOW critical incident and investigative response, intelligence collection and sharing, and maintaining consistent liaison with internal and external stakeholders, including the DOW and its components.

**Unmanned Systems**

Dominion Energy created an enterprise Unmanned Systems Group within its security organization in 2021 to facilitate utilization of drones for infrastructure inspection.  To date, the company maintains more than 200 unmanned aerial systems (UAS or drones) use cases to enable it to operate more safely, securely and efficiently.  Throughout the development of the Unmanned Systems Group, Dominion Energy has closely partnered and collaborated with Virginia Tech's Mid-Atlantic Aviation Program (MAAP) and is an active participant in the FAA's BEYOND Program to proliferate the use of drones Beyond Visual Line of Site (BVLOS).  The company was an early recipient of a FAA Waiver to operate drones BVLOS across 41 Dominion Energy power generations stations.  More recently, the company obtained a FAA BVLOS waiver to fly drones across its enterprise infrastructure.  These capabilities enable Dominion Energy to inspect critical infrastructure and anticipate potential disruptions to the bulk electric system and distribution assets and remediate immediately to reduce, for instance, storm risk.  The company uses drones and robotic systems more generally to ensure power is maintained to critical DOW and USIC facilities as well as critical data center facilities in Northern Virginia.

Dominion Energy currently has over 20 drone-in-a-box systems spread across critical enterprise assets allowing for immediate deployment to conduct inspections or surveillance of potential hostile actors.  More than 100 drone-in-a-box systems are anticipated in the next four years.  To accomplish this, the company recently completed the construction of a Drone Remote Operations Center (DROC) to enable Dominion Energy Remote Pilots In Command (RPICs) to operate drones across our infrastructure.

Dominion Energy is preparing to deploy drone-in-a-box systems at its three CVOW offshore sub stations.  Dominion Energy has worked closely with the FAA, MAAP, and DOW in contemplating offshore operations as it relates to International Civil Aviation Organization (ICAO) treaties that limit some offshore drone operations.  Once the company is able to operate remotely from these locations, drones will assist Dominion Energy operators with eyes-on views of the windfarm assets for operations and maintenance purposes, but also to monitor for active threats, respond to remote technical security sensors, and provide real-time surveillance feeds to USCG and DOW assets in the area of responsibility, as well as provide intelligence to USIC partners including the FBI.

Dominion Energy recognizes drones are a force multiplier in its efforts to provide safe and reliable energy to its critical partners, but drones also present an increasingly realistic threat to our operations. The company has engaged with industry partners in the drone detection and mitigation space. Dominion Energy participates in the Commercial Drone Alliance (CDA) and the Edison Electric Institute (EEI) Working Group to advocate for increased drone detection and mitigation capabilities for our State, Local, Territorial, and Tribal law enforcement authorities. Dominion Energy has piloted various drone detection systems and is engaged with VT-MAAP in an assessment of the ever-growing counter UAS (cUAS) technology available to industry. MAAP has worked with several federal law enforcement agencies to conduct similar assessments, and Dominion Energy looks to enhance our understanding of cUAS options in light of their other collaborations. The company also engages regularly with various DHS CISA groups to share best UAS practices.

**Ongoing Collaboration and Information Sharing**

Dominion Energy regularly hosts members of the US Military and USG to collaborate and share intelligence, educates on how the electric system functions, demonstrates how the company secures the grid above and beyond all regulatory requirements, and builds relationships for joint response in the event of a hostile nation state attack on the grid. In support of this part of Dominion Energy's security mission, over the past seven years, members of the US Marine Corps, Naval Criminal Investigative Services, Civil Affairs, FBI, DHS CISA, DHS I&A, DOE, and other branches, agencies, and functions. The Central Intelligence Agency partnered with Dominion to investigate what was known as the Havana Syndrome in an effort to understand if power lines could be used to propagate the attack.

Additional collaboration with DOW includes:

- In January 2025, a member of Dominion Energy's intelligence group participated in DOW VISTA GLADIATOR 2025 wargame as an energy sector subject matter expert.
- In January 2025, Dominion Energy security leadership travelled to NORAD / NORTHCOM for a threat briefing and provided an overview of Dominion Energy security.
- In December 2025, the Deputy Assistant Secretary of the Navy for Energy, Chris Grisafe, was at Dominion Energy to learn about how the company protects the grid and to establish a relationship. He indicated his intention to bring our VP of Cybersecurity to his offices to deepen the collaboration and establish real-time information sharing, in early 2026.