IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

|  |  |
|---|---|
| VIRGINIA ELECTRIC AND POWER COMPANY, D/B/A DOMINION ENERGY, VIRGINIA; OSW PROJECT LLC, <br> Plaintiffs, <br> v. <br><br> UNITED STATES DEPARTMENT OF THE INTERIOR; BUREAU OF OCEAN ENERGY MANAGEMENT; DOUGLAS BURGUM, Secretary of the Interior, in his official capacity; MATTHEW GIACONA, Acting Director, Bureau of Ocean Energy Management, in his official capacity, <br><br> Defendants. | Case No. 2:25-cv-00830-JKW-LRL |

**DECLARATION OF HOWARD DAVID BELOTE
IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

I, Howard David Belote, certify as follows:

**Declarant's Background, Experience, and Personal Knowledge**

1.    I have been retained by and am providing this declaration on behalf of Virginia Electric and Power Company, d/b/a Dominion Energy, Virginia ("DEV"), due to my unique familiarity with the mission compatibility evaluation process used by the Department of Defense ("DoD")[1] to determine the risks posed by wind projects to national security.    I make this

---

[1] On September 5, 2025, the president signed Executive Order 14347, entitled *Restoring the United States Department of War*, which states that "[t]he Department of Defense and the Office of the Secretary of Defense may be referred to as the Department of War and the Office of the Secretary of War, respectively, in the contexts described in" that order.  Given that this executive order sets forth additional "secondary" names for the Department of Defense (DoD) and Secretary of Defense and many of the events described in this declaration pre-date this order, references to the Department of Defense and Secretary of Defense herein include the Department of War (DoW) and Secretary of War, respectively.

declaration based on my personal knowledge and subject matter expertise and in support of DEV's motion for a preliminary injunction and to assist in the Court's consideration of any classified information received from BOEM *in camera* regarding purported new national security threats from CVOW.

2.      As will be shown below, I created the process and served as the first executive director of DoD's Military Aviation and Installation Assurance Siting Clearinghouse ("Clearinghouse") 15 years ago and have remained engaged with the stakeholders in the process as a wind developer and consultant ever since.  I am intimately familiar with that process and the subject matter experts who conduct those risk assessments.  I have reviewed the suspension Order issued to DEV by the Acting Director of the Bureau of Ocean Energy Management ("BOEM") Matthew Giacona, the public statements of Secretary of the Interior Doug Burgum, communications between DEV and BOEM, and Exhibit A to the declaration of Grant T. Hollett filed on December 23, 2025 ("Hollett Affidavit").   I conclude that the well-defined, 15-year-old Clearinghouse process has not been followed, and those subject matter experts have likely not been consulted, in the November 2025 analysis cited by Mr. Giacona or in BOEM's determination to send the Order to DEV or similar orders to developers of other offshore wind projects in active construction.

3.      I am a native of Norfolk, Virginia who grew up in Virginia Beach and graduated from Kempsville High School in 1980.  I received a Bachelor of Arts in Government and Foreign Affairs from the University of Virginia in 1985, a Master of Airpower Art and Science from Air University's School of Advanced Airpower Studies (now Air and Space Studies) in 1999, and a Master of Science in National Security Strategy from the National War College in 2004.

4.      I served for 24 years and 7 months in the United States Air Force, retiring as an Air Force colonel.  I am a former F-16 pilot who served as installation commander of Nellis Air Force Base, by many measures the largest fighter base in the country, and the 2.9-million-acre Nevada Test and Training Range. During my career, I served as Director of Staff for the 52nd Fighter Wing; Commander of the 32nd Air Operations Squadron, 3d Air Support Operations Group, and 99th Air Base Wing; and as the Joint Staff Chief of Combating Weapons of Mass Destruction, the Pentagon's principal adviser to the Chairman, Joint Chiefs of Staff on global strategic planning issues related to weapons of mass destruction.

5.      From January to May 2003, I commanded the 52-person Air Component Coordination Element in Tel Aviv, Israel, providing senior Israeli Air Force and Joint Staff leaders real-time information about air, missile, and drone threats during the initial phases of Operation Iraqi Freedom.  From September 2004 to February 2005, I commanded the 3rd Expeditionary Air Support Operations Group in Baghdad and concurrently served as the Deputy Joint Fires and Effects Coordinator for Multi-National Corps-Iraq, responsible for providing air cover and close air support across the entire theater of operations—specifically supporting the Second Battle of Fallujah and providing air cover for more than 5800 polling locations during Iraq's first set of elections.  In these combat roles, I developed and exercised a deep understanding of airborne threat detection, assessment, engagement, and neutralization, earning Bronze Stars in each deployment.

6.      After my service in the United States Air Force, I was appointed as the first Executive Director of the DoD's Military Aviation and Installation Assurance Siting Clearinghouse, serving from July 2010 to June 2012.

7.      As the Executive Director, I established the Clearinghouse as the DoD's centralized office to coordinate the Department's evaluation of energy and transmission projects for potential

impacts on homeland defense and military testing and training, with the specific evaluations done by the military services and bases that could potentially be affected by the development.  The Clearinghouse's mission also included identifying and implementing mitigation strategies that would allow for energy development while safeguarding critical military operations and assets.

8.      As Executive Director, I was responsible for developing the governing regulations for the Clearinghouse, published at 32 C.F.R. part 211. Those regulations and the accompanying DoD Instruction 4180.02 created a structured process enabling collaboration among local officials, industry representatives, and military leaders to assess the mission compatibility of a wide range of projects.

9.      Under my leadership, the Clearinghouse reviewed 657 Federal Aviation Administration ("FAA") and Bureau of Land Management ("BLM") project applications and secured DoD approvals for more than 96% of utility-scale project reviews.  I also negotiated the first-ever Memorandum of Understanding between DoD and a wind developer, executed by the Acting Deputy Under Secretary of Defense (Installations and Environment).  This agreement protected military flight paths and radar approaches essential to training operations, while simultaneously promoting large-scale economic development through renewable energy.

10.      Concurrently with these project reviews, I worked with counterparts at the Department of Energy ("DOE"), the Department of Homeland Security ("DHS"), and the FAA to design and conduct the Interagency Field Test and Evaluation ("IFTE") around radars in Tyler, Minnesota; Abilene, Texas; and King Mountain, Texas.  The IFTE conducted three field test campaigns between April 2012 and April 2013 to evaluate eight different radar mitigation technologies (software upgrades, infill radars, and replacement radars) and was formalized by interagency agreement in 2014 to become the Wind Turbine Radar Interference Mitigation

4

("WTRIM") Working Group. The WTRIM Working Group extended its charter in 2023 and submitted a report to Congress in 2024 that summarized its members' understanding of wind projects' impacts to radar capabilities and potential solutions, asserting that "the development and use of radar interference mitigation techniques, and collaboration both among federal agencies and between the federal government and the wind industry have enabled federal radar agencies to continue to perform their missions without significant impacts," and that "[r]eplacement radar and infill radar solutions are the most viable technology mitigation solutions to enhance degraded radar performance in areas above wind turbines."[2]

11.     During my tenure leading the Clearinghouse, offshore project reviews were mainly the purview of the Deputy Under Secretary of Defense (Readiness)("DUSD-R"), with the Clearinghouse in a supporting role. In this role, I assisted my direct counterparts in the Office of DUSD-R as they participated in BOEM-led State Task Forces in Virginia and North Carolina. These task forces ultimately led to lease sales and captured the nascent review processes, which I formalized when I drafted the original version of DoD Instruction ("DoDI") 4180.02. After my departure and the subsequent publication of DoDI 4180.02, all wind energy-related mission compatibility evaluations – terrestrial and offshore – became the responsibility of the Clearinghouse. The Clearinghouse's role as BOEM's single DoD point of contact for mission compatibility issues has been memorialized in a DoD-Department of the Interior ("DOI") interagency memorandum of understanding, most recently updated on October 29, 2024.[3]

---

[2] Update on the Efforts of the Wind Turbine Radar Interference Mitigation Working Group, Report to Congress, February 2024, chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.energy.gov/sites/default/files/2024-02/EXEC-2022-004484%20-%20Report%20to%20Congress%20as%20of%20December%2014%202023%20%282%29.pdf. at Pages ii and iii.

[3] *See* Ex. A, October 29, 2024 Memorandum of Agreement; *see also* https://www.boem.gov/newsroom/press-releases/boem-and-dod-sign-agreement-bolster-interagency-collaboration-offshore-wind.

12.     After leaving the Clearinghouse in 2012, I served as the Vice President for Federal Business at Apex Clean Energy where I generated opportunities to develop wind and solar projects for Federal customers, including the DoD; created teams to bid on renewable generation and energy surety for Army, Navy, and Air Force installations; and represented Apex on the American Council on Renewable Energy's Leadership Council and its National Defense and Security Initiative, as well as the Association of Defense Communities' Defense Energy Council.

13.     I then served as Senior Vice President of Cassidy & Associates where I created cost-effective solutions for industry, military communities, and governmental agencies.  There, I created a strategic consulting practice at the intersection of aviation, national security, and clean renewable energy/sustainability.  In this practice, I represented major utilities and energy developers before staff and members of the U.S. Congress; the FAA; DoD, DOE, and DOI; and state, county, and municipal agencies and councils.

14.     Currently, I am the Managing Partner & CEO of DARE Strategies LLC where I've helped wind and solar developers sell renewable power to the military and other federal entities, helped wind and solar developers permit projects compatible with military training and test activities, and advised on federal- and state-level energy policy in Washington DC and a number of state capitals.

15.     During my career I have successfully negotiated 37 Memoranda of Understanding between DoD and wind developers, facilitating the permitting of 45 projects comprising 13.7 GW of wind power while protecting critical military capabilities, including the two largest single-phase wind projects in the U.S.: Apex's 525-MW Aviator project in Texas and Pattern Energy's 1050-MW Western Spirit project in New Mexico.  In the offshore wind space, I represented Trident Wind for more than 4 years in negotiations with DoD, BOEM, the Navy, and the Air Force that

6

led to the Morro Bay lease sale off California.  I was retained by the American Clean Power Association ("ACP") as an advisor to its vice president for offshore wind, and on their behalf in March 2021 briefed newly installed BOEM Director Amanda Lefton on the Morro Bay negotiations and the mitigations necessary to protect Navy, Air Force, and Space Force operations in the vicinity.  In 2022, I researched and drafted the "DOD [*sic*] Activities" section of ACP's response to "BOEM-2022-0023, Call for Information and Nominations for Commercial Leasing for Wind Power Development on the Central Atlantic Outer Continental Shelf."[4]  I was subsequently engaged by Duke Energy to help manage their communications with the Clearinghouse and ensure compliance with all national security provisions relating to their Carolina Long Bay project.

16.     Based on my professional experience, I am intimately familiar with the Clearinghouse review process.  I can testify to the rigor of this process and to the thorough review to which DEV's Coastal Virginia Offshore Wind ("CVOW") project was subjected.  Conversely, I can testify to the apparent lack of rigor to which BOEM's Order and its referenced DoD Assessment were subjected before suspending CVOW activities.

**The DoD Clearinghouse Process**

17.     The DoD Clearinghouse process ensures that national security considerations are addressed at every stage of offshore wind planning, permitting, and development. DoD conducts a thorough evaluation of the potential impact that any given offshore wind project may have on military operations, activities, and technologies, and communicates any concerns identified to BOEM and other stakeholders.  To the extent that such concerns are unable to be resolved, DoD retains the prerogative to object to any offshore wind project that may adversely affect its

---

[4] *See* Ex. B, Re: BOEM-2022-0023, Call for Information and Nominations for Commercial Leasing for Wind Power Development on the Central Atlantic Outer Continental Shelf.

missions, a prerogative that in practice operates as an effective veto. To my knowledge, BOEM has never overridden a DoD objection to moving forward with a specific offshore wind project; quite simply, this process makes sure that a project would not be approved in the first place if it posed an unacceptable threat to national security. Rather, with proper planning and mitigation measures, BOEM, DoD, and other agencies have repeatedly determined that offshore wind developments and national security-related functions can successfully coexist.

18. The Clearinghouse acts as a single point of contact for federal agencies, State and local governments, and developers to facilitate DoD reviews of proposed energy and transmission projects to ensure they do not impinge on national security interests. In the offshore wind energy context, DoD is consulted during each of the area identification, leasing, and permitting stages of project development. The actual evaluations of proposed areas for development and specific project reviews are undertaken by the potentially affected military services, their major commands, or individual bases. The Clearinghouse facilitates the internal coordination among the Services, the Joint Staff, and the Office of the Secretary of Defense, and presents the DoD position to the developer, local communities, and federal agencies.

19. First, through the Clearinghouse process, DoD actively participates in BOEM's identification of areas on the Outer Continental Shelf that may be suitable for wind energy development by providing BOEM with mission compatibility assessments of proposed wind energy areas (WEA), including informing BOEM if certain proposed WEAs are not military mission-compatible or if site-specific stipulations are required to overcome compatibility challenges. If DoD determines that wind energy development would be incompatible with ongoing or planned mission operations in the area, BOEM has typically modified or excluded those areas from the WEA and, therefore, from consideration for future leasing.

20.     Once suitable areas for wind development have been identified, BOEM continues to consult with DoD during the leasing process. Before BOEM offers lease areas, DoD reviews the final lease sale areas for mission compatibility and may request removal of specific lease blocks if they present unresolved operational risks.  Alternatively, DoD may request lease stipulations to ensure that any site-characterization activities performed on the lease before development begins do not unacceptably degrade military testing, training, and operations. The stipulations in the CVOW lease track those that BOEM inserted at DoD's request during my time advising Trident Wind, ACP, and Duke's Carolina Long Bay project and that DoD has consistently considered to be sufficient to mitigate mission impacts. *See, e.g.* Lease OCS-A 0486, available at https://www.boem.gov/oil-gas-energy/executed-lease-ocs-0486 (detailing, in Addendum C, procedures to be employed in the event of an "evacuation or suspension of activities" and for "electromagnetic emissions").

21.     At the permitting and COP development stage, the Clearinghouse coordinates the DoD review of energy project applications and determines whether a project would have an adverse impact on military operations and readiness.  If potential adverse impacts are identified, the Clearinghouse works with the project sponsor and DoD components to identify feasible and affordable actions that can be taken by the Department, the developer of such energy project, or others to mitigate any adverse impact on military operations and readiness.  When agreement is reached, the measures are formalized in a mitigation agreement, incorporated into BOEM's Conditions of Approval for the COP, and binding on the project sponsor.

22.     If the Secretary of Defense concludes that a project, even after mitigation, poses an unacceptable risk to national security, DoD would request that BOEM not issue a lease or approve a COP.  When DoD has requested that certain areas be removed from leasing offers and

has asked for site-specific stipulations, BOEM has agreed to those requests.  When DoD has identified a mission impact from a project, the challenge becomes the primary task of the Mitigation Response Team ("MRT," the formal relationship of DoD, military service, and developers' subject matter experts).

23.    Given the rigorous and time-consuming process for researching, selecting, and conditioning offshore wind operations, any appreciable national security risks these projects may pose would have already been flagged and addressed before construction work began.  Having reviewed Exhibit A to the Hollett Affidavit, I can confidently state these risks were thoroughly evaluated for CVOW.

**Knowledge of Potential Radar Interactions with Wind Turbines**

24.    Within the Clearinghouse's mission compatibility evaluation process, the lead agency for radar issues is the North American Aerospace Defense Command's Domain Awareness Branch, abbreviated NORAD/J32R, whose radar/air defense analysts work with the Air Force's 84th Radar Evaluation Squadron ("84 RADES") to determine precisely how many wind turbines will be within line-of-sight of and interfere with radars used by NORAD for homeland surveillance and defense.

25.    Wind turbine interference, one of many types of unwanted radar energy or clutter, is a long-studied and well-understood issue.  In their analyses, NORAD and 84 RADES determine how interference from the spinning blade will impact a radar's ability to detect and display targets, and consider suitable mitigation options, such as overlapping coverage from adjacent radars that form NORAD's overall radar picture.  NORAD then assesses the concordant risk to nearby population centers, military facilities, and DoD operations not only from the specific impact of a single wind project, but also the cumulative effect of all turbines within the radar's field of view.

26.     Following that risk assessment, NORAD determines which mitigation technologies and strategies will ensure mission accomplishment.  The most common technological fix, Radar Adverse-impact Mitigation ("RAM"), requires voluntary contributions of $80,000 per radar.  This provides funding for experts to optimize the radar settings to reduce the effects of the wind turbine interference and maximize the radar's ability to detect and display targets.

27.     Significantly, all NORAD-drafted mitigation agreements also include emergency curtailment provisions and communications protocols that direct immediate stoppage of the project's turbines for a national security or defense purpose, defined as an "emergency circumstance in which the President of the United States, the Secretary of Defense, or a combatant commander under 10 U.S.C. Section 164 directs a change to the mission of NORAD in support of emergency circumstances," and specifically including NORAD air defense events within the definition.  The Clearinghouse website[5] lists 102 radar mitigation agreements with emergency curtailment (most including the aforementioned definition); CVOW's draft mitigation agreement, as well as all offshore projects whose mitigation agreements are publicly searchable on BOEM's website, contains the emergency curtailment provision.

28.     The curtailment provisions, in the broader context of DoD's suite of reinforcing and redundant security measures and capabilities, provide a final safeguard to remove any radar-related risks from operating turbines.  And curtailment protocols independently undermine BOEM's contention that newly developed adversary capabilities change DoD's longstanding risk calculus on offshore wind and justify the stop-work order and 90-day review period.  Even if there was any basis for BOEM's determination that new adversary capabilities could specifically exploit turbine interference (in the relatively miniscule volume of airspace above the Eastern OCS, see

---

[5] *See* https://www.dodclearinghouse.osd.mil/Project-Review/-Formal-Review/Mitigation-Agreements/ (last visited Jan. 8, 2026).

11

para.28, below), curtailment measures negate any theoretical vulnerability: once the turbines have stopped operating, any interference from the moving blades ceases. And while the turbine towers themselves reflect some radar energy, moving target filters in the radar processor will remove the interference from these stationary objects. This combination creates a "clean" radar picture for the radar operator, regardless of a potential adversary's technology or tactics.

### CVOW's National Security Mitigation Measures and BOEM and DoD's Departure from Process

29.     My review of the detailed Hollett Affidavit and subsequent meetings with DEV's MRT members demonstrate that in its discussions with Clearinghouse, Navy, and NORAD personnel, DEV has agreed to every mitigation measure requested by DoD. The 102 existing mitigation agreements and the February 2024 WTRIM Working Group Report to Congress show that the affected radars can operate at or near their designed capabilities to detect adversary threats. There is no indication that DoD's subject matter experts on the ground have departed from this consensus: in meetings with Navy and NORAD subject matter experts on December 2 and a follow-up email with the same personnel on December 16 (after DoD's allegedly "new" classified assessment), neither the Navy Secretariat's lead negotiator nor NORAD J32R's Senior Radar/Air Defense Analyst—the two government civilians responsible for analyzing the risk posed by CVOW's spinning turbines—mentioned any new threat analyses that could lead to DoD changing its assessment that the mitigation measures sufficiently protected national security.[6] Indeed, it does not appear that any new concerns were communicated through regular channels—inside or outside the government—before the stop-work order on December 22. BOEM leadership's decision to issue the Order without working through these on-the-ground experts represents a significant

---

[6] See Ex. C, December 16, 2025 email thread titled "ARSR-4/ASR-11 Mitigation Agreement for CVOW Commercial" between DEV and Matthew Senska, Office of Assistant Secretary of the Navy for Energy, Installations, and Environment.

departure from the 15-year-old Clearinghouse process in which DoD's lead stakeholders activate the MRT to identify potential risks to the mission and work with wind developers to mitigate those risks.

30.     Similarly, DoD's normal process in addressing potential risks entails sharing unclassified characterizations of the challenge or areas of concern with MRT members.  DoD has demonstrated that it can do so without divulging classified requirements, capabilities, or means and methods.  Yet DoD has refused to do so here, without explanation.

31.     Further supporting that the established process was not followed for the assessment forming the basis of Mr. Giacona's Order is the government's inconsistent actions on other, related fronts on which I heard no such exigent concerns regarding radar and wind projects. Between December 15 and 16, 2025, I received approvals from NORAD/J32R for the standard RAM and curtailment mitigation provisions on five separate terrestrial wind projects.  These approvals indicate that NORAD's experts are either unaware of the November threat assessment— which is unlikely, given their mission—or they continue to believe the RAM and curtailment provisions adequately mitigate the risk to its terrestrial mission.

32.     NORAD's continuity on the terrestrial project side cannot reasonably be explained by the Administration's apparent theory that offshore wind projects present a unique vulnerability.  In fact, RAM and curtailment are at least equally effective to protect the East Coast than the interior U.S.  From my command experience overseeing air operations for U.S. European Command and Multi-national Corps-Iraq, terrestrial wind turbines present a greater tactical challenge for homeland surveillance and defense than the relative handful of offshore turbines halted by Mr. Giacona's order.  CVOW's nearly 113,000 acres represent only approximately 0.042% of the 269,000,000 acres on the Atlantic Outer Continental Shelf.  Our Nation's defense

and intelligence capabilities are multi-layered and would, for example, allow combatant commanders to deploy F-22s from Langley AFB or F/A-18s from NAS Oceana to surveil the areas behind the small amount of sea- and airspace where offshore turbines are or will be located.

33.     From the foregoing circumstances, I conclude that Director Giacona has not followed the process as established in Title 10 nor the DoD/BOEM MOU that is designed to identify challenges and collaborate on solutions.  His stop-work order is premature because it did not fully avail itself of a well-understood, fully vetted Clearinghouse mission compatibility evaluation, and it lacks any possible rational basis in national security.

34.      Further, BOEM's order is overbroad in stopping construction activities that have minimal to no effect on NORAD's surveillance mission. DoD's coastal defense capabilities are not impaired while vessels like *Charybdis* install tower components and turbine blades.  And several other CVOW offshore components (e.g., offshore substations, subsea cables) do not significantly impair radar surveillance.  Resumption of CVOW construction, as over the past two years, in parallel with DoD's, NORAD's, and the Navy's longstanding and effective collaboration with DEV in the Clearinghouse process, presents negligible overall national security risk (and none with respect to radar interference).

35.     Recognizing the difficulty in translating these esoteric concepts of radar theory and coastal defense in a written declaration, I am available upon request to assist the Court with live testimony, including *in camera* review of information provided by BOEM.  I possess an active SECRET clearance and can provide context up to that level of classification.

14

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, 28 U.S.C. § 1746.

Dated: January 9, 2026

_____
Howard David Belote

# Exhibit A

MEMORANDUM OF UNDERSTANDING BETWEEN THE DEPARTMENT OF DEFENSE AND THE DEPARTMENT OF THE INTERIOR REGARDING RENEWABLE ENERGY DEVELOPMENT ON THE OUTER CONTINENTAL SHELF

The Department of Defense (DoD) and the Department of the Interior (DOI), through the Bureau of Ocean Energy Management (BOEM) (collectively, the "Parties"), enter into this Memorandum of Understanding (MOU) to identify and clarify the roles and responsibilities of the Parties in the issuance of offshore renewable energy leases and the review and approval of all associated project plans[1] for offshore renewable energy installations on the Nation's Outer Continental Shelf (OCS).  This MOU expands on and complements the July 1983 "Memorandum of Agreement Between the Department of Defense and the Department of the Interior on Mutual Concerns on the Outer Continental Shelf" that continues to provide a framework for coordination between the Parties regarding energy development on the OCS.

**A.  Purpose**

1. The Parties are committed to ensuring the long-term protection of military testing, training, and operations while facilitating new domestic renewable energy on the OCS to the greatest extent practicable.

2. DoD recognizes that offshore wind is a key element of national renewable energy generation strategies.

3. DOI acknowledges the critical nature of current and future military testing, training and operations and acknowledges that ensuring the operational integrity thereof is a national security imperative.

4. The Parties are committed to finding solutions that support renewable energy in a manner compatible with essential military operations. The Parties additionally recognize that some defense-related activities must take place in a particular area of the OCS due to their relation to fixed infrastructure that cannot be moved without compromise of their mission and at significant expense.

5. The process outlined in this MOU will identify and attempt to seek mutually acceptable solutions to conflicts to enable the Parties to identify and execute the appropriate balancing between long-term protection of military testing, training, and operations and national renewable energy generation initiatives.

---

[1] For purposes of this MOU, "project plans" means the Site Assessment Plans (SAPs, Title 30, Code of Federal Regulations (CFR), Section 585.605), General Activities Plans (GAPs, 30 CFR 585.640), Construction and Operations Plans (COPs, 30 CFR 585.620), as well as any and all associated Right-of-Way and Right-of-Use and Easement grants (ROW and RUE, respectively, 30 CFR 585.300).

**B. Background**

1.  Renewable energy leasing on the OCS is currently focused on offshore wind. Many U.S. States have set offshore wind procurement goals as part of their energy portfolio.

2.  The Department of the Interior has established a shared goal with the Departments of Energy and Commerce to deploy 30 gigawatts of offshore wind in the United States by 2030, and 15 gigawatts of floating offshore wind by 2035. This goal will drive new jobs and economic opportunity, as well as spawn new supply chains, such as those to support shipbuilding for offshore wind construction and operations vessels.

3.  Consideration of offshore wind development on the OCS may include locations in at-sea warning areas used by DoD for at-sea military readiness activities.

4.  Access to unobstructed air, shore, and sea space is necessary to support military testing, training, and operations.  These at-sea and sea-to-shore activities are supported by specialized shore infrastructure, built up over decades of investment, and a skilled local workforce. Continued access to these areas ensures continuity of national defense operations, and the timely generation of forces and advanced capabilities to satisfy the President's national security objectives.

**C. Offshore Wind Planning and Leasing Process**

1.  The Parties are committed to a collaborative planning and analysis process to support potential leasing activities starting as early as is feasible in the BOEM planning process. This includes DoD's commitment to participate in any Intergovernmental Renewable Energy Task Forces.

2.  Call Area Development

    a.  BOEM will provide advance notice to DoD when beginning the planning and analysis process for energy leasing prior to the identification of Call Areas.

    b.  Specifically, when the information is available, BOEM will provide potential leasing locations, desired scope and size of the Call Area(s), and expected type and size of infrastructure to the DoD Military Aviation and Installation Assurance Siting Clearinghouse ("Clearinghouse"). This information sharing is necessary to facilitate a DoD mission compatibility assessment of the area(s) under consideration.

    c.  DoD will provide the results of the mission compatibility assessment within 60 calendar days of receipt of the request and all information necessary to complete the assessment.
        i.  This response will identify areas that are expected to be incompatible for energy leasing and that, therefore, may require deferral from leasing; are potentially compatible with mitigation measures applied; or are compatible with energy development, with supporting rationale.

2

    d.   Identification of conflicts requiring resolution will be addressed as agreed upon in Section F prior to designation of a Call Area and communicated to relevant stakeholders as described in Section E.2.

3.   Wind Energy Area (WEA) Identification

    a.   BOEM will provide advance notice to the Clearinghouse of draft WEAs and related pertinent information regarding potential areas for leasing and development that have not been considered in a DoD mission compatibility assessment.

    b.   If a new mission compatibility assessment is required, DoD will perform an assessment and provide the results to BOEM within 60 calendar days of receipt of the draft WEAs.
        i.   The assessment results will identify areas: expected to be incompatible that require deferral from leasing; potentially compatible with mitigation measures applied; or compatible with energy development, with supporting rationale.

    c.   BOEM will respond within 60 calendar days of receiving the DoD submission with agreement to accommodate the DoD assessment or request for further discussion.

    d.   The Parties will identify conflicts requiring resolution, and they will be resolved as agreed upon in Section F prior to designation of a WEA and communicated to relevant stakeholders as described in Section E.2.

    e.   The Parties will communicate any agreements to proceed with a WEA to relevant stakeholders as described in Section E.2.

4.   Areas Requiring Deferral from Leasing

    a.   The Parties agree that the nature of certain defense-related activities conducted on the OCS may be irreconcilable with energy development in certain areas and those areas will require deferral from leasing.

    b.   Collectively, DoD and DOI may determine that deferral from leasing is necessary to enable the performance of DoD activities in specific areas because such activities are fundamentally incompatible with energy development and the impacts of development cannot be sufficiently mitigated. These may include DoD activities that:
        i.   Must take place in a particular area of the OCS due to their relation to a fixed monitoring or control station which cannot be moved without great expense or compromise to the mission;
        ii.   Relate to classified operations or activities, which DoD will disclose to appropriately cleared DOI/BOEM personnel; or
        iii.   Pose a direct danger to energy development structures and/or personnel.
        iv.   Examples of activities that could meet one or more above criteria include:

3

1. Research, development, test, and evaluation ranges involving hazardous weapons.
2. Training, testing, and military operations by air, land, surface, or subsurface units whose activities may be impacted, to include disruptions to military communications, aviation and navigation, by proximity to such structures within the proposed project area.
3. Intense operations by air, surface, or subsurface units whose activities are hazardous to non-DoD structures, equipment, and personnel, and that if forced to take place in close proximity to such structures would become hazardous to DoD activities.
4. Submarine transit lanes.

c. DoD acknowledges that seeking deferral of certain areas from leasing may result in negative effects on initiatives to expand domestic energy development on the OCS and agrees to accompany requests for deferrals with appropriately detailed justifications.

d. Areas deferred from leasing for the purpose of protecting national defense will be communicated to relevant stakeholders as described in Section E.2.

**D. Offshore Wind Project Plan Review Process**

1. BOEM will share any Site Assessment Plans, General Activity Plans, or Construction and Operation Plans with the Clearinghouse for their review.
   a. The Clearinghouse will coordinate the review of the Wind Project Plan within DoD and recommend to BOEM any mitigation measures necessary to avoid and minimize impacts on DoD training, testing, and operations.
   b. BOEM and DoD will seek to avoid measures that may result in lengthy delays to energy generation after any plan approval.
   c. DoD and BOEM may further discuss and amend the recommended measures, as necessary.
   d. BOEM will incorporate the mitigation measures with any amendments into draft conditions of plan approval and share the draft conditions with the Clearinghouse and the identified DoD point of contact prior to finalizing.

2. Project Plans Requiring NEPA review.
   a. Upon a notification from BOEM and within the structure of the NEPA process, DoD may choose to be a cooperating agency and, in those situations, will provide timely input on any NEPA documents, including the proposed action, alternatives, discussion of impacts, and any mitigation measures germane to DoD.

4

**E. Communication**

1. As part of the Parties' commitment to collaborative planning, DoD and BOEM agree to regularly communicate between their agencies at the staff and leadership levels. The contacts are further detailed in Enclosure 1.
   a. For staff level communication, the point of contact at BOEM is the Office of Renewable Energy Programs or appropriate Regional Office. The point of contact at DoD is the Clearinghouse or Military Department designee.
   b. For leadership level communication, the point of contact at BOEM is the BOEM Director. The point of contact for DoD is the Assistant Secretary of Defense for Energy, Installations, and Environment or Military Department designee.
   c. DoD will regularly participate in the Offshore Wind Permitting Subgroup hosted by BOEM.

2. DoD and BOEM also agree to regularly communicate the results of coordination with relevant stakeholders. As BOEM is the convening authority for renewable energy development on the OCS, BOEM will act as the communications lead when communicating coordination results to stakeholders outside of the Federal agencies. Such stakeholders may include:
   a. Relevant state governments and agencies;
   b. Congressional committees of jurisdiction, including the Congressional Defense Committees, Senate Energy and Natural Resources, and House Natural Resources Committees;
   c. Members of Congressional delegations;
   d. Tribal Nation representatives; and
   e. Others as agreed to by the Parties.

**F. Resolution of Conflict**

1. BOEM and DoD will meet in the 60 days following BOEM or DoD request for further discussion.
   a. The meeting will consider possible next steps including:
      - Inclusion of incompatible areas in the next phase of Planning and Leasing Process to allow for DoD to consider additional information that may become available as the proposal matures.
      - Consideration of areas that do not intersect at-sea warning and operating areas.
      - Elevation of the issue to respective agency senior leadership.
      - Any applicable mitigations to the project plans.
   b. The Parties agree to pursue resolution of conflicts at the lowest possible level. When conflicts in the planning review process cannot be resolved, the conflicts must initially be elevated to the BOEM Director or Assistant Secretary of the Interior for Land and Minerals Management and the Assistant Secretary of Defense for Energy, Installations and Environment. The Parties acknowledge that issues may require elevation to include the Secretary of the Interior and Secretary of Defense, or Secretary of a designated Military Department.

c.  The Department of the Interior is the authority for final decision under the Outer Continental Shelf Lands Act.

**G.  Commitments and Limitations**

1.  This MOU is intended to establish a mechanism for the Parties to continue to cooperate as Federal partners and facilitate centralized tracking and knowledge of this cooperation.

2.  This MOU does not constitute a legally binding agreement.

3.  Activities under this MOU are subject to the applicable laws, regulations, and policies of each Party.

4.  Nothing herein is intended to conflict with current DoD or DOI/BOEM directives or applicable law. If the terms of this MOU are inconsistent with applicable laws or existing directives of either Party, those portions of the MOU that are inconsistent are severed from the MOU and do not affect the continued applicability of all remaining terms. The Parties may occasionally review the MOU and implement any changes deemed necessary through amendments to the current MOU or through revocation and replacement of the MOU, whichever is deemed expedient to the interest of both Parties. This MOU makes no financial or other legally enforceable contractual commitments on the part of either Party. This MOU is neither a fiscal nor a funds obligation document. Nothing in this MOU authorizes or is intended to obligate the Parties to expend, exchange, or reimburse funds, services, or supplies, or to transfer or receive anything of value. Subject to the availability of funding, each Party intends to assume responsibility for its respective costs and expenses arising from any activity related to this MOU.

**H.  Duration, Amendments, and Termination**

1.  The MOU will become effective on the date of the last signature by the Parties.

2.  The MOU will remain in effect until terminated by mutual written agreement of the Parties.

3.  The MOU may be amended only by mutual written agreement of the Parties.

*(this space left intentionally blank)*

6

**I.   Approving Officials**

<u>For the Department of Defense</u>

Printed Name: Brendan Owens

Title: Assistant Secretary of Defense for Energy, Installations, and Environment

Date: 10-29-2024

<u>For the Bureau of Ocean Energy Management</u>

Printed Name: Elizabeth Klein

Title: Director of the Bureau of Ocean Energy Management

Date: 10|29|24

**ENCLOSURE 1**
**POINTS OF CONTACT**
Last Updated: September 2024

<u>Points of Contact for the Department of Defense</u>
Position:
Office Symbol:
Name:
Phone:
Email:

<u>Points of Contact for the Bureau of Ocean Energy Management</u>
Staff Level Contact for Atlantic, Caribbean, or National Items
Position:            Chief of the Office of Renewable Energy Programs
Office Symbol:       OREP
Name:               Karen J. Baker
Phone:              202-531-0667
Email:              karen.baker@boem.gov

    <u>Staff Level BOEM Contact for Gulf of Mexico Items</u>
    Position:            Regional Director for the Gulf of Mexico
    Office Symbol:       GOMR
    Name:               James J. Kendall
    Phone:              504-736-2448
    Email:              james.kendall@boem.gov

    <u>Staff Level BOEM Contact for Pacific Items</u>
    Position:            Regional Director for the Pacific
    Office Symbol:       PACR
    Name:               Douglas Boren
    Phone:              805-384-6384
    Email:              douglas.boren@boem.gov

# Exhibit B

 

June 28, 2022

Ms. Bridgette Duplantis
Office of Leasing and Plans, Leasing and Financial Responsibility Section
Bureau of Ocean Energy Management
201 Elmwood Park Boulevard
New Orleans, Louisiana 70123

Re: BOEM-2022-0023, Call for Information and Nominations for Commercial Leasing for Wind Power Development on the Central Atlantic Outer Continental Shelf

Submitted via www.regulations.gov

Dear Ms. Duplantis:

The American Clean Power Association[1] (ACP) and MAREC Action[2] (MAREC informally stands for "Mid-Atlantic Renewable Energy Coalition") appreciate this opportunity to comment on the Call for Information and Nominations for Commercial Leasing for Wind Power Development on the Outer Continental Shelf Offshore Central Atlantic. ACP and MAREC Action strongly support moving forward with lease area designations and commercial leasing in the Central Atlantic. Maximizing leasing opportunities in areas suitable for fixed bottom foundations is of significant importance to provide needed certainty for supply chain and industry development. The Central Atlantic is not just one of the most promising locations available for fixed foundation development off the east coast of the United States due to its proximity to population centers and potential for grid interconnectivity across multiple states that will benefit from the clean energy and economic development produced by offshore wind. It is also BOEM's *last* chance in the near

---

[1] The American Clean Power Association (ACP) is the national trade association representing the renewable energy industry in the United States, bringing together hundreds of member companies and a national workforce located across all 50 states with a common interest in encouraging the deployment and expansion of renewable energy resources in the United States. In the Central Atlantic, ACP represents several developers interested in building commercial-scale offshore wind projects.

[2] MAREC Action is a nonprofit organization formed to advance utility-scale renewable energy development within the PJM Interconnection and adjacent areas. MAREC Action's footprint includes ten jurisdictions within PJM (nine states and Washington, D.C.). MAREC Action members include utility scale wind, offshore wind, solar and battery storage developers, wind turbine manufacturers and non-profit organizations dedicated to the growth of renewable energy technologies.

1

 

term to issue new shallow water leases that can help extend the pipeline of projects needed to grow an east coast supply chain.[3]

ACP and MAREC Action are pleased to see areas appropriate for fixed bottom and floating technologies to be included in the Central Atlantic call areas. A proactive and diverse offering of lease opportunities throughout the Central Atlantic is essential to efficiently utilizing the region's offshore wind resources. Fully utilizing the potential of the Central Atlantic wind resources will help meet President Biden's offshore wind target[4] to deploy 30 gigawatts (GW) by 2030 and 110 GW by 2050, as well as and his broader agenda to address the climate crisis.[5] It is critical to continue setting and achieving both national and state goals of aggressive carbon emission reductions. Offshore wind is also a critical element of a diversified American energy supply, enhancing U.S. energy independence and strengthening trans-Atlantic cooperation among NATO allies.

We recommend that BOEM set a goal of leasing shallow water lease areas large enough to generate an estimated at least 12 GW within the Central Atlantic call areas using its standard National Renewable Energy Laboratories (NREL) conversion rates.  We believe this goal is attainable in a variety of ways, and this letter does not advocate for the removal of any particular lease blocks from consideration. But we think it is possible to lease the majority of the call areas (at least 10 leases of at least 100,000 acres (~1200 MW)), each while still addressing the needs of other ocean users. We also commend BOEM for having the vision to identify potential lease areas further east and in deeper water, which will facilitate this country's long-term clean energy goals as floating offshore wind technology and regional offshore transmission networks develop in the coming decade.[6] Finally, we urge BOEM to prioritize the commercial considerations contained in ACP members' nominations. Developers have unique knowledge regarding which areas are most commercially viable—and will reach the lowest cost delivery of offshore wind energy. The comments that follow provide additional details on these points.

## I.    The Importance of Offshore Wind to the Central Atlantic, the Nation and Global Climate

---

[3] The only other Atlantic lease sale in BOEM's Path Forward 2021-2025 is in the Gulf of Maine, whose water depths are widely considered only suitable for floating technology—which has distinct supply chain and vessel needs.

[4] https://www.whitehouse.gov/briefing-room/statements-releases/2021/03/29/fact-sheet-biden-administration-jumpstarts-offshore-wind-energy-projects-to-create-jobs/

[5] https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/27/executive-order-on-tackling-the-climate-crisis-at-home-and-abroad/

[6] https://www.boem.gov/renewable-energy/state-activities/new-york-bight

 

As a zero-emission energy generation source, offshore wind energy will play an important role in combatting climate change and is central to achieving the President's climate goals.  Recent studies from Lawrence Berkeley National Lab,[7] Princeton University,[8] and the University of California at Berkeley[9] found that to achieve the carbon reductions by 2050 that scientists believe are necessary to avert the worst impacts of climate change requires increasing annual deployment of renewable energy, primarily wind and solar, by two to three and a half times the level achieved in 2020.  This requires expanding deployment of wind and solar from roughly 32 gigawatts per year as in 2020 to 60-70 gigawatts per year, every year for the next couple of decades.  Offshore wind is essential to achieve this level of deployment.

In the climate executive order (EO), signed on January 27, 2021, President Biden called deployment of clean energy technologies, such as offshore wind, "critical for climate protection" and established that "[i]t is the policy of my Administration to organize and deploy the full capacity of its agencies to combat the climate crisis to implement a Government-wide approach that reduces climate pollution in every sector of the economy… especially through innovation, commercialization, and deployment of clean energy technologies and infrastructure."  The EO further called on the Administration to "accelerate the deployment of clean energy and transmission projects in an environmentally stable manner."[10] In addition, on March 29, 2021, President Biden set a goal of deploying 30 GW of offshore wind by 2030 and 110 GW of offshore wind by 2050.[11]  Meeting the goal of 30 GW trigger more than $12 billion per year in capital investment in projects on both U.S. coasts, create tens of thousands of good-paying, union jobs, with more than 44,000 workers employed in offshore wind by 2030 and nearly 33,000 additional jobs in communities supported by offshore wind activity. It would also unlock a pathway to deploy 110 GW or more of offshore wind by 2050, supporting 135,000 total jobs, including 77,000 jobs in offshore wind and 58,000 induced jobs in communities with offshore wind activity. It will also generate enough power to meet the demand

---

[7] Williams, J. et al., *Carbon-Neutral Pathways for the United States* (2021) available at https://agupubs.onlinelibrary.wiley.com/doi/10.1029/2020AV000284, Wiser, R., et al., *Halfway to Zero: Progress towards a Carbon-Free Power Sector* (2021) available at https://emp.lbl.gov/publications/halfway-zero-progress-towards-carbon.

[8] Jones, R., *Net-Zero America: Potential Pathways, Infrastructure, and Impacts* (2020) available at https://www.evolved.energy/post/princeton-net-zero-america-project.

[9]Univ. of California-Berkeley, Goldman School of Public Policy, *The 2035 Project* (2021) available at https://www.2035report.com/electricity/downloads/.

[10] Executive Order 14008, available at https://www.federalregister.gov/documents/2021/02/01/2021-02177/tackling-the-climate-crisis-at-home-and-abroad.

[11] https://www.whitehouse.gov/briefing-room/statements-releases/2021/03/29/fact-sheet-biden-administration-jumpstarts-offshore-wind-energy-projects-to-create-jobs/

 

of more than 10 million American homes for a year, and avoid 78 million metric tons of CO2 emissions. In addition to creating new jobs for the American worker in this burgeoning industry, we can also call on the experience of the skilled workers in existing U.S. companies who have decades of experience developing ocean energy infrastructure for the oil and gas industry.

Finally, the war in Ukraine highlights a critical need for the U.S. to build domestic sources of energy that are not tied to global markets. Offshore wind represents a uniquely large-scale source of homegrown, zero-emissions energy that has no fuel cost. Furthermore, offshore wind offers increasingly competitive, stable electricity rates for consumers that are untethered from overseas markets, as electricity cannot be transported in large amounts without a direct transmission line connection. Offshore wind developers and manufacturers continue to make U.S. supply chain investments a priority. Many components of the existing international offshore wind supply chain are situated in friendly European nations, including NATO allies like Denmark, Germany, Norway, and the United Kingdom. Building an offshore wind industry strengthens trans-Atlantic cooperation with these key security partners. As the White House stated in its recent Executive Order to spur domestic clean energy manufacturing, "With a stronger clean energy arsenal, the United States can be an even stronger partner to our allies, especially in the face of Putin's war in Ukraine."[12]

In determining how much acreage to lease in the Central Atlantic, we urge BOEM to look beyond the Administration's 30 GW by 2030 goal and consider an array of other clean energy and climate objectives that will require us to scale our offshore wind ambitions considerably:

- **Regional transmission means consideration of the energy needs of multiple states.** The Biden Administration and states are implementing policies to spur coordinated transmission development to integrate offshore wind on the Atlantic coast.[13] Once constructed, these lines will scale up the

---

[12] https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/06/fact-sheet-president-biden-takes-bold-executive-action-to-spur-domestic-clean-energy-manufacturing/

[13] *See, e.g.* National Renewable Energy Laboratory, *Atlantic Offshore Wind Transmission Study* (2022) (study intended for completion in 2023, evaluating coordinated offshore wind transmission options from Maine to South Carolina), https://www.nrel.gov/wind/atlantic-offshore-wind-transmission-study.html; *Biden Administration Launches New Federal-State Offshore Wind Partnership to Grow American-Made Clean Energy* (June 23, 2022) (announcing partnership with states to address transmission and interconnection needs, among other offshore wind policies), https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/23/fact-sheet-biden-administration-launches-new-federal-state-offshore-wind-partnership-to-grow-american-made-clean-energy/; New Jersey Board of Public Utilities, *PJM State Agreement Approach* (2021)

4

 

amount of offshore wind energy that can be integrated into the grid, as well as increase grid reliability.  A wind farm off the coast of Virginia or North Carolina could provide clean energy to New Jersey, Pennsylvania, Ohio, West Virginia or beyond. Therefore, BOEM's analysis of load demand during its leasing process should look well beyond just the coastal states to which these lease areas will interconnect.

- **Future expansion of state offshore wind goals.**  We expect already-robust state offshore wind goals in the region to expand substantially in the next few years.

  o New Jersey's Energy Master Plan projects at least 10.6 GW of offshore wind under the least-cost scenario, far exceeding the existing 7.5 GW goal.

  o Maryland's adoption of the 2022 Climate Solutions Now Act requires net-zero emissions economy-wide by 2045, representing a significant expansion in clean energy demand beyond the existing RPS. We estimate that Maryland would need approximately 31 GW of additional zero carbon electricity generation (at an average capacity factor of 40 percent) to attain net-zero carbon emissions by 2045 in line with the Climate Solutions Now Act of 2022. This rough projection assumes aggressive electrification of residential, commercial, and industrial end uses as well as road vehicle transportation. Given Maryland's small landmass and siting constraints, it is safe to assume a large portion of this additional capacity would need to come from offshore wind.  We also note that in the February Task Force Meeting, Samuel Beirne of the Maryland Energy Administration requested up to five lease areas of up to 2000 MW each to address the state's energy needs.[14]

  o Though Delaware does not currently have an offshore wind target, Delaware's Department of Natural Resources and Environmental Control requested a report in February 2022, from the Special Initiative on Offshore Wind at the University of Delaware, analyzing market conditions and options for offshore wind.[15] The report looked at project sizes between 800 and 1,200 MW as the most viable and

---

(announcing collaboration between New Jersey and PJM Interconnection to develop transmission for 7.5 GW of offshore wind), https://www.nj.gov/bpu/about/divisions/ferc/saa.html.

[14] *See* https://www.boem.gov/renewable-energy/state-states-task-force-reports-and-feedback-draft-call (at 13:00).

[15] https://documents.dnrec.delaware.gov/energy/offshore-wind/SIOW-report.pdf

 

outlines a range of potential merits should Delaware put an offshore wind procurement target in place.

- o Offshore wind development can help these states achieve their goals; siting offshore projects near these states allows for delivery of electricity directly to coastal cities, where prices are the highest (thereby enabling offshore wind to provide greater consumer benefits), demand is greatest, and generation and transmission siting are the most challenging. These ambitious and growing targets cannot be met solely through the issuance of Central Atlantic leases as outlined in these comments, but those targets cannot be achieved without bringing substantial new offshore wind lease areas to market in the next few years.

- **2050 Federal Offshore Wind Goals**.  Finally, there is the Administration's much more ambitious 110 GW by 2050 goal as it moves through the nomination and leasing process in the Central Atlantic. Meeting the 110 GW by 2050 will require development of 80 GW in a 20-year period—which is achievable with a reliable supply chain, a trained U.S. workforce, and increased investment. BOEM's leadership is key to sending the market signals needed for this development. In considering which call areas to advance, BOEM should strategically consider the Administration's goals beyond 2030 and make decisions that would allow for faster and more regular development in the Central Atlantic and beyond. The Administration's goals should also inform BOEM's consideration of state and regional goals.  While many Central Atlantic states have GHG reduction and offshore wind goals, there is room for them to become even more ambitious, especially with respect to offshore wind. Rather than tailoring the nominated areas to meet the current state goals in the Central Atlantic, BOEM should demonstrate leadership in this area and make available for leasing enough area to inspire more ambitious state goals.  Therefore, BOEM should ensure it leases enough areas to provide offshore wind capacity that *exceeds* current state procurement targets and anticipates the proliferation of state targets in the future.

6

 

## II.     BOEM Should Make Areas Available for Leasing Large Enough to Accommodate Utility-Scale Projects, to Achieve Economies of Scale

### A.  BOEM Should Lift Limits On The Size Of Nominations

We urge BOEM to make available for leasing at least 10 lease areas in the Central Atlantic that can accommodate projects that are at least 1,200 MWs in size or larger, which translates to no less than 100,000 acres under NREL conversion rates. In the Call, BOEM stated that nominations that "considerably exceed" approximately 80,000 acres may be deemed unreasonable and not accepted by BOEM. While we recognize that BOEM's intention to limit lease area size stem in part from anti-competitive concerns, we caution BOEM against the creation of any unnecessary restrictions on the size of nominations that might limit the evaluation of viable locations for offshore wind development. Limiting nominations to a certain size fails to capture nuance, and could inaccurately imply that non-nominated areas would not be acceptable for development.  We recommend that developers be permitted to nominate *all* of the portions of the Call Areas that they deem to be commercially viable, but express their strong interest in specific sub-portions of these areas by designating them as "preferred for development."  The more detailed information BOEM has about commercial interest in an area—the better BOEM will be able to make decisions on setting future lease areas.

There are two reasons for this request.  First, as projects get further from shore, HVDC transmission becomes the more economical option for grid interconnection. A project using HVDC cabling can easily be 1200 MW based on current technology,[16] and larger projects are being developed in Europe. In addition, the 80,000 acre limit is based on current technology, which is rapidly changing. Even setting that aside, the 1 GW project size is unwieldy. The optimal size of projects will change with technological advancements over time.  For instance, while 800 MW might have been standard a few years ago under HVAC technology, HVDC projects are most efficient at 1,200 MW. Rather than pre-judge the optimal size for a project, BOEM

---

[16] *See* New Jersey Board of Public Utilities, *Offshore Wind Transmission Study Comparison of Options* at 32 (2020) ("Current marine HVDC cable and converter technology can transmit up to about 1,200 MW."), https://www.nj.gov/bpu/pdf/publicnotice/Transmission%20Study%20Report%2029Dec2020%20202nd%20FINAL.pdf . *See also, e.g.* Pfeifenberger et al, *The Benefit and Cost of Preserving the Option to Create a Meshed Offshore Grid for New York* at 5, 11 (Nov. 9, 2021), (noting the higher transfer capability of HVDC cables as compared to alternating current, and evaluating 1200 MW to allow for transfers between onshore points of interconnection) *https://www.brattle.com/wp-content/uploads/2021/12/The-Benefit-and-Cost-of-Preserving-the-Option-to-Create-a-Meshed-Offshore-Grid-for-New-York.pdf*; Alassia et al., *HVDC Transmission: Technology Review, Market Trends and Future Outlook* at 28 (2019) (citing the SydVastlanken (South-West) link between Norway and Sweden, which is rated at 1,200 MW, as an example of underground cabling

7

 

should leave any such evaluation to the proposed and final sale notices, which will provide BOEM and the public with an additional opportunity for further refinement and comment.

Second, larger leases mean larger projects, which creates economies of scale that drive down costs and increase supply chain investments. To achieve economies of scale, projects must be large enough to minimize development costs and to warrant investment in a new offshore wind industry and the associated supply chain. Economies of scale from large-scale lease areas, which can support larger projects, are necessary to drive cost reduction, optimize layout and attract a regional supply chain.  Smaller lease areas will require multiple projects to achieve the same installed capacity levels and, therefore, will typically come at a significantly higher cost; because the activities required for permitting, development, procurement, construction and operation will be compounded. In addition, as an increase in MW capacity of a project is heavily reliant on the size of a lease area, it is important that any offshore wind project installed off the Central Atlantic be sized appropriately in order to be cost-competitive with other sources of energy available in the state. Allowing BOEM set lease areas to allow for multiple projects of at least 1,200 MW (requiring roughly 100,000 acres) will help achieve those economies of scale in the Central Atlantic. Although some projects may be developed in phases, lease areas should be maximized to allow for 1,200 MW or more of total development per project area.

**B.  BOEM Should Consider Transmission Options in Determining Lease Areas**

The potential lease areas within the Central Atlantic Call Areas may be able to interconnect at multiple locations in the Mid-Atlantic, due to the potential development of regional or mesh transmission. Although all currently leased offshore wind projects intend to use radial interconnections to shore, BOEM should consider the potential for coordinated transmission approaches in adjacent or nearby lease areas. These could take the form of a true meshed network, with multiple points of interconnection and multiple offshore substations linked by high-voltage cables, or a coordinated radial approach in which projects share offshore substations, cable routes, or points of interconnection to realize economies of scale and reduce cabling costs and impacts. The optimal transmission solutions will ultimately depend upon the selected lease areas and the technological maturity of floating turbines and deep-water cabling when these areas are developed, but we recommend that BOEM begin to consider the potential applicability of transmission approaches other than single-project radial lines.

**III.      <u>Offshore Wind Compatibility and Co-existence</u>**

8

 

At the outset, unless development is prohibited by statute, we caution BOEM against classifying any areas as entirely excluded from wind energy development at this early stage. Without a firm project plan in place, which is not feasibly developed until a much later stage in the leasing process, it is impossible to know the definite impacts or conflicts that wind energy development might have with other types of development or other uses of the ocean and ocean floor. That being the case, it is unwise and unnecessary for BOEM at this stage to designate areas as absolute "no-go" areas for wind development. While we understand that more consideration may be necessary at a later stage in development in specific areas due to their multiple use potential, at this time these areas should still be available for full consideration by BOEM as offshore wind leasing areas. This will enable offshore wind development project to be determined and designed in a way that best utilizes the space for each of the multiple ocean users.

### A. DOD Activities

We are grateful for the efforts of the DOI, BOEM, DOD, over the last few years to jointly assess and resolve potential conflicts over sea-space for offshore wind in other coastal areas.  We appreciate the years of hard work, collaboration and cooperation required to reach that point. Our members look forward to collaborating with the DOD through the Military Aviation and Installation Assurance Siting Clearinghouse and the BOEM permitting process to assess specific lease areas and proposed projects when the time comes to ensures compatibility between the military mission sets in the region and deployment of offshore wind.  Furthermore, we appreciate the amount and intensity of military training and test activities off the Virginia and North Carolina coasts, and we believe these areas are vital to the future of the offshore wind industry.  As noted above, to create economies of scale discussed above and promote the development of shore facilities adequate to the nascent industry, the industry will require multiple shallow water leases among the Central Atlantic call areas, each large enough to support at least a 1200 MW project. Wholesale exclusion of offshore turbines from DOD Warning Areas W-386, W-72A, and W-72B could stifle the industry's growth on the East Coast.

We therefore implore BOEM, DOD, and the Services to examine every viable possibility for collocated activities using technical mitigations, prescribed flight and/or surface corridors, and limited curtailment for test activities that require electromagnetically quiet environments. [17]  .

---

[17] Although it was not specifically highlighted in BOEM's Call for Information, we also look forward to working with the National Aeronautics and Space Administration (NASA) to ensure that offshore wind does not conflict with its activities at and around the Wallops Island Flight Facility. Preliminarily, we believe such activities are not likely to conflict with offshore wind construction and

9




### B. Vessel Navigation

In general, we are confident that offshore wind, once constructed, will be compatible with safe vessel navigation.  Navigation of various types of vessels (cargo, tug and tow, commercial and recreational fishing etc.) is a key consideration in where call areas (and future WEAs) are established. In enacting the Ports and Waterways Safety Act (PWSA), Congress explicitly contemplated that navigation areas may be subject to multiple reasonable uses. Specifically, the PWSA requires the Coast Guard to: "reconcile the need for safe access routes with the needs of all other reasonable uses of the area[.]"[18] The offshore wind industry supports these overlapping activities by employing responsible, effective mitigation measures to alleviate some of the Coast Guard navigational safety concerns. Offshore wind farms have several characteristics that reduce the risk to marine navigation: they are constructed in a regular, grid-like pattern; spaced far apart, more than half nautical mile from one another generally, to minimize the wake effect of wind turbines on one another; and are installed on relatively narrow towers, approximately 5-10 meters in diameter, so that vessels will be aware of the presence of one another. These characteristics collectively contribute to an overall low collision risk.

In addition, without project specifics being known, it is hard to know how wind energy development in a certain area will impact marine navigation. We urge BOEM to continue to analyze maritime navigations conflicts and mitigation measures during site-specific NEPA reviews. Each potential offshore wind facility is subject to two separate NEPA reviews. The first review is an environmental assessment that is conducted with respect to the site assessment plan, which the lessee must submit to BOEM no later than 12 months after receipt of the lease. The lessee must also submit a construction and operations plan to BOEM at least 6 months prior to the completion of the site assessment term, which requires an environmental impact statement. Site assessment considerations during these reviews specifically include coastal and marine uses, including vessel traffic. These reviews are crucial elements of the siting process because they are site- and project-specific and therefore provide the best basis for evaluating a particular project's impacts on the overall environment, including navigation safety. Moreover, during the site assessment, specific traffic patterns and particular mitigation measures that would be most effective at avoiding navigational safety issues can be analyzed with respect to each project.

---

operation within the Call Areas, but rather could be managed through lease stipulations (perhaps similar to the "hold harmless" provisions in Appendix C, section 3.1 of the Virginia commercial lease OCS-0483) and reasonable and project-specific conditions on COP approval.

[18] 33 U.S.C. § 1223(c).

 

We appreciate that BOEM has already taken into account most anticipated USCG fairways and precautionary areas in the region in crafting the proposed call areas. We urge BOEM and the USCG to collaborate to minimize reduction of Call Areas A and B while still achieving the navigational objectives of USCG and the maritime industry.  We look forward to working further with BOEM, USCG and the maritime industries to strike the right balance between multiple uses.

C.  **Fishing Activities**

We appreciate that BOEM has avoided the most-fished areas in the Central Atlantic in creating the Call Areas, and we believe no further reductions are necessary to avoid prime fishing areas. A review of the Marine Cadastre data from 2007-2012 that included top 30 species in the area confirms that BOEM avoided the most-fished areas in creating the call areas.[19] This map was developed from the Bureau of Ocean Energy Management (BOEM) study entitled "Socio-Economic Impact of Outer Continental Shelf Wind Energy Development on Fishing in the U.S. Atlantic." Recent sea scallop fishery data shows that fisheries are mainly concentrated north of the Central Atlantic Call Areas on the shelf out to the shelf break, with more fishing nearer the shelf break. The map below makes clear that BOEM effectively avoided the areas of most fishing concerns.

---

[19] These species include : Ocean Quahog, Surf Clam, Little Skate, Squid (Illex & Loligo), Menhaden, Winter Skate, Channeled Whelk, Red Grouper, Atlantic Herring, Vermillion Snapper, Atlantic Croaker, Jonah Crab, Red Hake, Atlantic Mackerel, Silver Hake, King Mackerel, Butterfish, Yellowtail Founder, Winter Flounder, Summer Flounder, Black Sea Bass, Monkfish, Bluefish, Lobster, Spiny Dogfish, Scup, Skates, Cod, and Sea Scallop.

 



Moreover, the evidence shows that that offshore wind and fishing industries can co-exist. Offshore wind provides multiple benefits for the marine environment--biological productivity and fish biodiversity can actually increase with the creation of new structures producing additional habitats.[20] Structures in the water can create habitat for benthic organisms, including commercially important fish and invertebrates, which can have benefits to marine communities and fisheries. In Europe, for example, up to 90% of Danish annual gillnet fleet landings of plaice from 2010 to 2012 were from areas overlapping with windfarms. Therefore,  fisheries, especially those structure-oriented species such as black sea bass and Atlantic cod, stand to reap long-term benefits from such installations.

Mitigation measures—both existing and innovative technologies--used by offshore wind developers can help offset any temporary shifts in community assemblages of marine species during construction, even though scientific data

---

[20] D.H. Wilber et. Al. "Demersal fish and invertebrate catches relative to construction and operation of North America's first offshore wind farm," ICEA Journal of Marine Science, (79, 4) May 2022, pgs 1274-1288, available at: https://academic.oup.com/icesjms/article/79/4/1274/6555702?login=true.

12

 

suggests that population-level impacts are unlikely. There is a considerable body of literature on marine structures, pile driving sound, wind farms in Europe, and other disturbances and their effects on fish, as   well as a wide variety of mitigation measures that have been developed to avoid and minimize potential effects. Some examples of mitigation measures include seasonal construction windows and sound dampening technologies for pile driving. By considering these techniques, BOEM has previously determined that impacts from construction activities would be negligible to minor.[21]

The BOEM permitting process, especially at the site-specific construction and operation plan phase, can effectively assess and address these concerns. Even then, reductions in the areas identified as hotspots on fishing maps should be made only if there are multiple uses to be avoided (i.e., DOD, navigation) and not simply on the basis of a fishery's existence. BOEM should work with National Marine Fisheries Service (NMFS) and National Centers for Coastal Ocean Science (NCCOS) to determine overall relative suitability of areas in the Central Atlantic call areas to maximize suitability and minimize risk across various conflicts.

### D.  Biological Resources

In general, we appreciate BOEM's efforts to understand potential interactions between offshore wind and marine mammals and benthic resources and to establish the call areas that avoid the majority of these interactions. Based on this robust review, we do not believe that BOEM should further reduce call areas due to interactions with biological resources. ACP agrees with BOEM's siting of the call areas in the region and recognizes that BOEM has made efforts to avoid the biologically important habitat for North Atlantic Right Whales and the designated Habitat Areas of Particular Concern for regional fisheries.[22] We request that BOEM work with NCCOS, NMFS, USFWS, and relevant state agencies to refine and update wildlife and habitat maps and support the ability to make them available on Marine Cadastre and other databases, and work to prepare and provide updated guidance as appropriate for archaeological resources, fisheries, tribal engagement, benthic

---

[21] South Fork Wind

[22] Roberts JJ, Best BD, Mannocci L, Fujioka EI, Halpin PN, Palka DL, Garrison LP, Mullin KD, Cole TV, Khan CB, McLellan WA. Habitat-based cetacean density models for the US Atlantic and Gulf of Mexico. Scientific reports. 2016 Mar 3;6(1):1-2;
LaBrecque E, Curtice C, Harrison J, Van Parijs SM, Halpin PN. 2. Biologically Important Areas for Cetaceans Within US Waters-East Coast Region. Aquatic Mammals. 2015;41(1):17, available at https://cetsound.noaa.gov/biologically-important-area-map;
NOAA Essential Fish Habitat Mapper available at
https://www.fisheries.noaa.gov/resource/map/essential-fish-habitat-mapper.

13

 

habitat data collection.  Our understanding is that NCCOS is already working with BOEM to look at suitability in these Call Areas, similar to work done for suitability of aquaculture opportunity areas[23]. BOEM should encourage and support collaboration and data sharing among Delaware, Virginia, Maryland, and North Carolina for wildlife and fisheries distribution and use mapping, conversion of aggregated and anonymized datasets for fishing activity into publicly available map products, and integration of data products into existing modeling frameworks, such as those developed by NCCOS in the Gulf of Mexico for aquaculture suitability mapping.

As noted above, there is plenty of mitigation technology available and BOEM has previously considered these technologies in conducting site-specific assessments of wind projects. With vessel speed and noise propagation technology constantly improving, we expect proposed mitigation measures to be much more advanced by the time leasing takes place in the call areas.  We also encourage BOEM to take the same forward-thinking approach when creating guidelines for future leasing activities, and collaborate with other state and federal agencies to use the best available science and models for understanding suitability (including NCCOS suitability modeling techniques). We also encourage BOEM to collaborate directly with industry on the logistical, engineering, and practical issues associate with areas and allow for flexibility in technologies to apply for site assessment and characterization activities, including underwater autonomous vehicles and other new technologies throughout the leasing and development process. Innovations in site characterization technologies are underway, and we suggest asking BOEM to allow for maximum flexibility in site characterization equipment.

### IV.    <u>**Floating Offshore Technology**</u>

We appreciate President Biden's leadership in supporting offshore wind nationally in the United States, including by investing $100 million in researching and developing floating wind technology in America.[24] Floating technologies are technologically and economically ready for lease sales to be offered in the depths

---

[23] Riley, K.L., Wickliffe, L.C., Jossart, J.A., MacKay, J.K., Randall, A.L., Bath, G.E., Balling, M.B., Jensen, B.M., and Morris, J.A. Jr. 2021. An Aquaculture Opportunity Area Atlas for the U.S. Gulf of Mexico. NOAA Technical Memorandum NOS NCCOS 299. Beaufort, NC. 545 pp. https://doi.org/10.25923/8cb3-3r66. Available at https://coastalscience.noaa.gov/data_reports/an-aquaculture-opportunity-area-atlas-for-the-u-s-gulf-of-mexico/.

[24] The White House, *FACT SHEET: Biden Administration Opens Pacific Coast to New Jobs and Clean Energy Production with Offshore Wind Development* (May 25, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/05/25/fact-sheet-biden-administration-opens-pacific-coast-to-new-jobs-and-clean-energy-production-with-offshore-wind-development/.

14

 

available in the Central Atlantic call areas. We urge BOEM to maximize utilization of the areas appropriate for fixed and floating technology development in the Central Atlantic because of the clear regional interest in developing offshore wind, the high estimates of wind resources present in the area, and the close proximity of the areas to major population and interconnection potential.

To best facilitate the first floating wind project lease sale in the Atlantic, we recommend that BOEM carry out lease sales in the Central Atlantic promptly and offer extended site assessment terms for floating leases to allow for additional surveys and time to mature the technologies and installation techniques necessary to develop these deeper areas in a cost-effective manner.  The technologies and timing for fixed and floating wind farms in the Central Atlantic are on different tracks. These newer technologies and processes would benefit from flexibility in those timelines to accommodate the highest quality assessments and data collection that will need to be performed.

**V.      Conclusion**

We appreciate the opportunity to comment on this Call for Information and looks forward to continuing engagement with BOEM and offshore wind stakeholders going forward.

Sincerely,

| | |
|---|---|
| Evan Vaughan, *Deputy Director* [EVaughan@marec.us](mailto:EVaughan@marec.us) | Johanna Jochum, *Counsel* Alexandra Carter, *Director of Environment & Wildlife Policy, Offshore Wind* Josh Kaplowitz, *Vice President, Offshore Wind* [JKaplowitz@cleanpower.org](mailto:JKaplowitz@cleanpower.org) |

**MAREC Action**



**American Clean Power Association**



15

# Exhibit C

 Outlook

---

### Re: ARSR-4/ASR-11 Mitigation Agreement for CVOW Commercial

---

**From** Jerry R Barnes (Services - 6) <jerry.r.barnes@dominionenergy.com>

**Date** Tue 12/16/2025 1:57 PM

**To** Senska, Matthew C CIV USN ASSTSECNAV EIE DC (USA) <matthew.c.senska.civ@us.navy.mil>

**Cc** Ramos, Thomas R CIV NORAD-USNC NJ3 (USA) <thomas.r.ramos.civ@mail.mil>

---

Ok, I'll pull the meeting and shift the next to after the holidays.

---

**From:** Senska, Matthew C CIV USN ASSTSECNAV EIE DC (USA) <matthew.c.senska.civ@us.navy.mil>
**Sent:** Tuesday, December 16, 2025 1:55 PM
**To:** Jerry R Barnes (Services - 6) <jerry.r.barnes@dominionenergy.com>
**Cc:** Ramos, Thomas R CIV NORAD-USNC NJ3 (USA) <thomas.r.ramos.civ@mail.mil>
**Subject:** [EXTERNAL] RE: ARSR-4/ASR-11 Mitigation Agreement for CVOW Commercial

**CAUTION! This message was NOT SENT from DOMINION ENERGY**

**Are you expecting this message to your DE email? Suspicious? Use PhishAlarm to report the message. Open a browser and type in the name of the trusted website instead of clicking on links. DO NOT click links or open attachments until you verify with the sender using a known-good phone number. Never provide your DE password.**

Jerry  - To possibly return the time for the meeting this afternoon.  I've sent my proposed edits to the standard agreement to the Clearinghouse.  I'll need to follow up with them on proceeding with what I've proposed.

-----Original Appointment-----
**From:** jerry.r.barnes@dominionenergy.com <jerry.r.barnes@dominionenergy.com>
**Sent:** Wednesday, December 3, 2025 11:37
**To:** jerry.r.barnes@dominionenergy.com; Ramos, Thomas R CIV NORAD-USNC NJ3 (USA); Senska, Matthew C CIV USN ASSTSECNAV EIE DC (USA); Eddison, Justin J CAPT FM (CAN)
**Cc:** Wiener, Ronald L CIV NORAD-USNC NJ3 (USA)
**Subject:** ARSR-4/ASR-11 Mitigation Agreement for CVOW Commercial
**When:** Tuesday, December 16, 2025 3:00 PM-3:30 PM (UTC-05:00) Eastern Time (US & Canada).
**Where:** Microsoft Teams Meeting

Status update on agreement.

---

# Microsoft Teams [Need help?](#)

## [Join the meeting now](#)

Meeting ID: 231 910 947 746 8

Passcode: oj7Lj9rB

---

## Join on a video conferencing device

Tenant key: dominionenergy@m.webex.com

Video ID: 112 396 721 8

[More info](#)
For organizers: [Meeting options](#)

Dominion Energy does not consent to the recording of this meeting unless stated otherwise.

[Privacy and security](#)

---

CONFIDENTIALITY NOTICE: This electronic message contains information which may be legally confidential and or privileged and does not in any case represent a firm ENERGY COMMODITY bid or offer relating thereto which binds the sender without an additional express written confirmation to that effect. The information is intended solely for the individual or entity named above and access by anyone else is unauthorized. If you are not the intended recipient, any disclosure, copying, distribution, or use of the contents of this information is prohibited and may be unlawful. If you have received this electronic transmission in error, please reply immediately to the sender that you have received the message in error, and delete it. Thank you.