IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

|  |  |
|---|---|
| **Virginia Electric and Power Company, d/b/a Dominion Energy Virginia; OSW Project LLL**,<br><br>Plaintiffs,<br><br>v.<br><br>**U.S. Department of the Interior, et al.**,<br><br>Defendants. | Case No. 2:25-cv-830 (JKW/LRL) |

**OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

## INTRODUCTION

On December 22, the Department of the Interior's Bureau of Ocean Energy Management (BOEM) suspended Plaintiffs' offshore wind lease in light of new national security information provided by the Department of War (DoW).[1] The information DoW provided "includ[ed] the rapid evolution of relevant adversary technologies and the resulting direct impacts to national security from offshore wind projects." Letter from Matthew Giacona to Rob Keiser (Dec. 22, 2025) ("Suspension Order"), Ex. B to Decl. of Jacob Tyner (Jan. 8, 2026).[2] BOEM concluded that those national security considerations are implicated by Dominion's offshore wind project. Tyner Decl. ¶¶ 7, 9.

Dominion now seeks preliminarily to enjoin the entirety of the Suspension Order so it can continue construction activities on a project that poses a serious national security risk. But Dominion has not shown it is entitled to that broad and extraordinary preliminary relief. BOEM had statutory authority to issue the Suspension Order, and it acted reasonably after DoW provided it with new information about national security risks stemming from offshore wind projects. Dominion has not established that it will suffer irreparable harm during the pendency of this litigation. And Dominion too quickly dismisses the national security interests that the Court must consider when balancing harms. BOEM concluded that national security risks "arise from the operation of" the Dominion Project, and it sought to prevent those risks from occurring. *Id.* ¶¶ 4, 10. The government has submitted classified information to the Court related to those risks. Even if the Court finds preliminary relief appropriate, these national security risks mean the Court should at least partly maintain the Suspension Order, and deny Dominion's requested injunction.

---

[1] Plaintiffs are Virginia Electric and Power Company d/b/a Dominion Energy Virginia and OSW Project, LLC (collectively, Dominion).

[2] Mr. Tyner's Declaration and Exhibits are attached hereto.

**BACKGROUND**

**I.   Wind Energy Development on the Outer Continental Shelf**

This case involves a wind energy project on the Outer Continental Shelf (OCS). The OCS consists of the submerged lands beneath the ocean, generally from 3 to 200 miles seaward of the coastline. *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 563 F.3d 466, 472 (D.C. Cir. 2009); 43 U.S.C. § 1331(a). Under the Outer Continental Shelf Lands Act (OCSLA), the United States holds these lands as a "vital national resource reserve" that "should be made available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition *and other national needs*[.]" *Id.* § 1332(3) (emphasis added).

Interior approvals related to wind energy development on the OCS are governed by OCSLA and Interior's implementing regulations. *See* 43 U.S.C. § 1337(p)(1)(C) (authorizing the Secretary of the Interior to "grant a lease, easement, or right-of-way" for activities that "produce or support production, transportation, storage, or transmission of energy from sources other than oil and gas"); *id.* § 1337(p)(8) (authorizing the Secretary to "issue any necessary regulations to carry out this subsection"); *see also id.* § 1334(a) ("The Secretary shall administer the provisions of this subchapter relating to the leasing of the outer Continental Shelf, and shall prescribe such rules and regulations as may be necessary to carry out such provisions.").

In granting Interior that authority, Congress directed that "[t]he Secretary shall ensure that any activity under this subsection is carried out in a manner" that satisfies multiple criteria. *Id.* § 1337(p)(4). Among them are: "protection of national security interests of the United States." *Id.* § 1337(p)(4)(F). Interior regulations delegate to BOEM the responsibility to implement Section 1337(p)(4). *See* 30 C.F.R. § 585.102(a).

Under BOEM's renewable energy regulations and lease terms, a lease issued under OCSLA does not itself authorize development. 30 C.F.R. § 585.200(a). A lessee must first assess the site, obtain BOEM's approval of a site assessment plan, and obtain BOEM's approval of a Construction and Operations Plan (COP). 30 C.F.R. §§ 585.600, 585.605–585.613, 585.620–585.628.

## II.  Factual Background

The Coastal Virginia Offshore Wind Project (the Project) is an offshore wind energy project planned for Lease Area OCS-A 0483, an area approximately 27 miles east of Virginia Beach.[3] BOEM issued a Record of Decision in October 2023, documenting its intent to approve the COP for the Project. *Id*. BOEM issued its COP approval conditions in January 2024. *See* Tyner Decl. Exh. A. Since that time, the Project has been in different phases of construction.[4]

In January 2025, the President issued a Presidential Memorandum entitled, "Temporary Withdrawal of All Areas on the Outer Continental Shelf From Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects[.]" 90 Fed. Reg. 8363 (Jan. 20, 2025). Section One of that memorandum instructs the Secretary of the Interior to "conduct a comprehensive review of the ecological, economic, and environmental necessity of terminating or amending any existing wind energy leases[.]" *Id.*

"In November 2025, the Department of War (DoW) completed an additional assessment regarding the national security implications of offshore wind projects, and provided senior leadership at the Department of the Interior with new classified information, including the rapid

---

[3] BOEM, Coastal Virginia Offshore Wind Commercial Project, Construction and Operations Plan (Oct. 30, 2023), https://www.boem.gov/renewable-energy/state-activities/cvow-c-record-decision ("Record of Decision.") 7.

[4] A suit challenging BOEM's approval of the COP for the Project is currently stayed in the U.S. District Court for the District of Columbia. Dec. 18, 2025, Minute Order, *Committee for a Constructive Tomorrow v. U.S. Dep't of the Interior* (D.D.C. No. 24-cv-744).

evolution of relevant adversary technologies and the resulting direct impacts to national security from offshore wind projects." Suspension Order at 1. Given the Project's location and "[b]ased on BOEM's initial review of the classified information," BOEM issued an order, "pursuant to 30 C.F.R. § 585.417(b), to suspend all ongoing activities related to the [Project] on the Outer Continental Shelf for the next 90 days for reasons of national security." *Id*.

BOEM based its decision in part on the classified information it received from DoW, assessing that information in the context of existing national security-based mitigation measures for the Project. Tyner Decl. ¶¶ 4, 7, 9-10. BOEM determined that, at current, the Project's activities did not adequately provide for protection of national security interests. *Id.* ¶ 7. And BOEM recognized the national security risks that the Project could pose once it became operational and acted in order to assess whether additional mitigation can be imposed to address those concerns. *Id.* ¶ 9. BOEM "[a]t this time[] is not aware whether the national security risks can be mitigated[.]" *Id.* BOEM also believes "any potential mitigation measures may be more effectively incorporated into the [Project] before construction is completed." *Id.*

### III. Litigation Background and Submission of Classified Materials

On December 23, 2025, Dominion filed a motion for a temporary restraining order (TRO) against the United States Department of the Interior, BOEM, and the heads of both entities (collectively, the government), seeking to enjoin the Suspension Order. ECF No. 11. The Court set a hearing on the motion for December 29. ECF No. 16. The government filed an opposition brief on December 27. ECF Nos. 19, 19-1. On December 28 the Court vacated the TRO hearing, converted the TRO motion to a motion for a preliminary injunction (PI), and set a briefing and hearing schedule for the PI motion. ECF No. 22.

4

The Court's December 29 Order also directed the government, by January 9, to submit for *in camera*, *ex parte* review the classified DoW materials on which the Suspension Order was based (classified information). Following Dominion's filing of a motion for reconsideration, ECF Nos. 23-24, the Court issued Orders and a Memorandum denying reconsideration (ECF Nos. 25, 42) but directing the government "to inform the Court on or before December 31, 2025, whether it intends to share the classified information with Dominion employees and/or counsel who have a secret security clearance." ECF No. 26. The government timely filed the required Notice. *See* ECF No. 30.

On January 9, as directed, Department of Justice security officials were provided with the classified Declaration of Dale R. Marks, together with the classified information, to provide to the Court for *ex parte*, *in camera* review. An unclassified version of Mr. Marks's declaration is attached to this brief. Mr. Mark's declaration explains the classification designations for the information in question. Marks Decl. ¶ 7(e). Dominion's declarants at times appear to be attempting to make their own determination as to classification. *See* Declaration of Adam S. Lee (ECF No. 39-3) ¶¶ 8–9. But the treatment, handling, and authority to determine access to classified information "is committed by law to the appropriate agency of the Executive Branch," and "flows primarily from [a] constitutional investment of power in the President." *Dep't of the Navy v. Egan*, 484 U.S. 518, 527, 529 (1988); *see also, e.g., CIA v. Sims*, 471 U.S. 159, 180-81 (1985).

The government here confirms its position, as reflected in its December 31 Notice, that access of Dominion personnel (having appropriate clearances) to the classified information will be governed by DoW's case-by-case determination of Dominion's "need to know," as is the case with any individual's access to classified materials. The pendency of the instant litigation neither confers, nor negates, Dominion's need to know. Interior continues to "coordinat[e] with DoW on

5

whether access to the classified material with a secret designation by the Virginia Electric and Power Company is possible and/or whether certain information can be declassified or an unclassified summary could be created."[5]  *See* Tyner Decl. ¶ 10.

## STANDARD OF REVIEW

Dominion seeks a preliminary injunction under Federal Rule of Civil Procedure 65(a).  "A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted).  The movant must make a "clear showing" that it satisfies four factors: (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm in the absence of relief, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest.  *Id.* at 22; *see also id.* at 20.  The balance of equities and public interest merge when preliminary relief is sought against the government, because "the government's interest is the public interest."  *Toure v. Hott*, 458 F. Supp. 3d 387, 408 (E.D. Va. 2020); *see also Nken v. Holder*, 556 U.S. 418, 435 (2009).  Courts "should pay particular regard for the public consequences in employing the extraordinary remedy of [an] injunction."  *Winter*, 555 U.S. at 24 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).

---

[5] Dominion voices frustration at the fact that it has not been given access to the classified information in the context of this litigation. Pls.' Mem. In Support of Mot. for Prelim. Injunction 12-14, Dkt. No. 39 (Pls.' Br.)  But prosecuting a civil suit challenging agency action does not create the requisite "need to know" classified information under Exec. Order No. 13,526, § 6.1(dd), 75 Fed. Reg. at 707, 729 (Dec. 29, 2009) (defining need to know as "a determination within the executive branch . . . that a prospective recipient requires access to specific classified information *in order to perform or assist in a lawful and authorized governmental function*." (emphasis added)). Courts regularly accept *ex parte* and *in camera* classified information that is part of the administrative record and upon which the agency intends to rely to defend the challenged agency action. *See, e.g.*, *United States v. Holland*, 48 F. Supp. 2d 571, 577 (E.D. Va. 1999), *aff'd*, 214 F.3d 523 (4th Cir. 2000); *Rusaviainvest, OOO v. Yellen*, No. 18 CIV. 5676 (PGG), 2023 WL 6198256, at *1 n. 3 (S.D.N.Y. Sept. 21, 2023); *Jifry v. FAA*, 370 F.3d 1174, 1181-82 (D.C. Cir. 2004).

Dominion also requests preliminary relief under Section 705 of the Administrative Procedure Act ("APA"), which authorizes "the reviewing court" to "postpone the effective date of an agency action or to preserve status or rights pending" judicial review "to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705. The factors governing relief under Section 705 "are essentially the same" as those governing preliminary injunctions. *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, No. 25-1411, 2025 WL 1249608, at *61 (4th Cir. Apr. 30, 2025). The relief available under Section 705, however, is not the same, since the relief allowed under Section 705 can only "postpone the effective date of an agency action" or "preserve status or rights" through a stay. 5 U.S.C. § 705.

## ARGUMENT

Dominion alleges that the Suspension Order is contrary to the APA and that BOEM lacked authority for its issuance. *See* Pls.' Br. 15-26. Dominion tethers its alleged irreparable harms to costs associated with construction delays that could allegedly result in delaying operation of the Project and argues that preliminarily enjoining the Suspension Order would be in the public interest. *See id.* 26-30.

The movant seeking preliminary relief holds the burden to demonstrate *all four* factors. Addressing the merits first, BOEM had authority under OCSLA to issue the Suspension Order. Dominion also fails to show that the purely economic injuries it describes satisfy the irreparable harm requirement, especially given the national security concerns the Project poses. Even if it had shown some irreparable harm, the Supreme Court has made clear that, as here, national security interests can outweigh irreparable harm. Finally, the injunction requested is in all events overbroad. Preliminary injunctive relief, if appropriate, must be narrowly tailored to remedy the specific harm shown.

### I. BOEM Had Authority to Issue the Suspension Order.

Plaintiffs argue that BOEM acted contrary to law because OCSLA and its implementing regulations do not authorize, and the lease prohibits, the Order. Pls.' Br. 15-19. Plaintiffs showing is insufficient to warrant a preliminary injunction.

BOEM regulations explicitly set forth the authority to issue the Order: "BOEM may order a suspension … [w]hen the suspension is necessary for reasons of national security or defense." 30 C.F.R. § 585.417(b). Plaintiffs argue that OCSLA does not authorize the Suspension Order because: (1) 43 U.S.C. § 1341(c), in Plaintiffs' view, is the sole authority for national security-related suspensions, and (2) there is no recommendation from the Secretary of War or national emergency that would trigger §1341(c). Pls.' Br. 16-17. But Section 1341(c) is not the sole source of statutory authority related to national security issues.

Section 1337(p)(4) grants the Secretary of the Interior broad authority to ensure "protection of national security interests of the United States[.]" 43 U.S.C. § 1337(p)(4)(F). It does not limit the United States' interest in national security to times of war or national emergency and does not require that Interior be prompted by "a recommendation of the Secretary of Defense." *Compare* 43 U.S.C. § 1341(c) *with id.* § 1337(p)(4)(F). Indeed, OCSLA allows the Secretary to *cancel* leases for national security reasons. *See* 43 U.S.C. § 1334(a)(2)(A)(i). Dominion notes (Pls.' Br. 17) that *Section 1334(a)(1)* (within the statute's general delegation of rulemaking authority) does not include national security as a basis for lease suspension, but this overlooks the fact that *Section 1334(a)(2)(A)(i)* does include "serious harm or damage . . . to the national security or defense" as a basis for lease *cancellation*. It would be incongruous with this statutory scheme to assume Congress meant to withhold the lesser authority to suspend leases for national security reasons.

Plaintiffs (Pls.' Br. 16-17) also invoke § 1341(d), which "reserves and retains the right to designate by and through the Secretary of Defense, with the approval of the President, as areas

8

restricted from exploration and operation that part of the [OCS] needed for national defense[.]" The rights Section 1341(d) retains "through the Secretary of Defense" are separate from the obligations Section 1337(p) places on the Secretary of the Interior. And national security interests go beyond "need[ing]" "part of the [OCS] . . . for national defense[.]" 43 U.S.C. § 1341(d).

Plaintiffs suggest that BOEM did not follow the suspension procedures for violations of any COP approval conditions, or those for revising a COP. Pls.' Br. 18. But Plaintiffs themselves acknowledge that COP compliance is not the issue here. *See* Pls.' Br. 18 n. 32. And BOEM has not directed any COP revisions.

Plaintiffs claim that the Suspension Order contravenes BOEM regulations by failing to explain itself. *Id*. 17 (citing 30 C.F.R. § 585.418(c)). But the Order adequately stated its bases. The Order explained that DoW had provided the Department of the Interior with classified information, that the information relates to advances in adversary technologies, and that those advances could raise national security issues with offshore wind projects. *See* Suspension Order at 1. This fully satisfies the regulations, particularly given that the information at issue is duly classified. Marks Decl. ¶ 7(e).

Plaintiffs argue that the Suspension Order violates the terms of Dominion's lease. Pls. Br. 17-18. But any claim that BOEM has violated the lease is a breach of contract claim over which the Court lacks jurisdiction. The APA's waiver of sovereign immunity does not apply where "any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702; *see also id.* § 704 (the APA is only available to challenge "final agency action for which there is no other adequate remedy in a court."). The Tucker Act waives sovereign immunity for suits against the United States alleging a breach of contract, placing jurisdiction exclusively in the Court of Federal Claims for any claim for more than $10,000. 28 U.S.C. § 1491(a)(1). Where

9

"a plaintiff has an adequate remedy by suit under the Tucker Act, they are precluded from review under the APA." *Coleman v. Kendall*, 74 F.4th 610, 615 (4th Cir. 2023) (citation modified and citation omitted). And an injunction based on the alleged violation of a contract is in essence an order for specific performance, which the Tucker Act forbids. The "Tucker and Little Tucker Acts impliedly forbid federal courts from ordering declaratory or injunctive relief, at least in the form of specific performance, for contract claims against the government, and ... the [Administrative Procedure Act] thus does not waive sovereign immunity for such claims." *Stritzinger v. U. S. Off. of the Gen. Servs. Admin.*, No. CV 3:15-2978-TLW-PJG, 2016 WL 3035087, at *2 n.4 (D.S.C. Jan. 29, 2016), *R. & R. adopted*, No. 3:15-CV-2978-TLW, 2016 WL 3027582 (D.S.C. May 27, 2016), *appeal dismissed*, 658 F. App'x 687 (4th Cir. 2016) (citation modified) ).

BOEM had the authority to issue the Suspension Order. And even if Dominion has some chance of success on certain aspects of its remaining claims, the movant seeking preliminary relief holds the burden to demonstrate all four injunction factors. *Henderson ex rel. NLRB v. Bluefield Hosp. Co., LLC*, 902 F.3d 432, 439 (4th Cir. 2018) ("*Winter* made clear that *each* of these four factors must be satisfied to obtain preliminary injunctive relief."). "Denying a preliminary injunction only takes the rejection of a single factor." *Jensen v. Maryland Cannabis Admin.*, 151 F.4th 169, 174 (4th Cir. 2025) (quoting *N. Va. Hemp and Agric., LLC v. Virginia*, 125 F.4th 472, 497 (4th Cir. 2025) (quoting *Frazier v. Prince George's Cnty.*, 86 F.4th 537, 544 (4th Cir. 2023))).

## II.   The Balance of Harms Argues Against an Injunction

Purely economic losses, such as Dominion describes, rarely satisfy the irreparable harm requirement, and Dominion has not shown that any of the recognized exceptions applies. Particularly in light of the national security issues at stake, the balance of harms also argues against the injunction requested.

### A. Dominion Has Not Shown Irreparable Harm

Dominion argues it will suffer irreparable harm in three ways: (1) immediate monetary costs stemming from "daily vessel costs" as well as "equipment storage, idle workforce," unspecified "contractual penalties, and similar costs"; (2) construction delays resulting in increased costs; and (3) "delay[s] [to Project] delivery of electricity" as a result of "Dominion's inability to complete [Project] construction[.]" Pls.' Br. 26-27. Dominion has not shown that its alleged injuries warrant the "extraordinary remedy" of a preliminary injunction.

The three harms listed above are strictly financial and strictly financial harms rarely constitute irreparable injury. As to the third, Dominion does not clearly establish it would suffer irreparable harm by virtue of "postponed operations" during the initial ninety-day suspension period or, even if that were extended, during the time it would take to litigate Dominion's claims on the merits. Pls.' Br. 27 (capitalization altered). Dominion acknowledges that under its current schedule the Project was not expected to be "completed and fully in-service" until "the end of 2026[.]" Pls.' Br. 6 (citing Hollett Decl. ¶ 12). Dominion's APA lawsuit — which is properly resolved on motions for summary judgment, *see Shipbuilders Council of America. v. U.S. Department of Homeland Security*., (E.D. Va. 2011) — is likely to be litigated on the merits before the end of 2026. Thus, even if Dominion had established it would suffer irreparable harm if it missed its expected date for being fully operational, it has not established any such harm would be suffered before the Court could adjudicate Dominion's claims on the merits. In turn, any such harm would not justify issuance of a preliminary injunction as to the suspension of operations. *See Di Biase v. SPX Corp.,* 872 F.3d 224, 230 (4th Cir. 2017); *S.C. Dep't of Wildlife & Marine Res. v. Marsh*, 866 F.2d 97, 100 (4th Cir. 1989) (affirming only in part a decision granting preliminary injunction because the scope of the injunction was "broader than necessary to protect

11

against the environmental risk"). And while Dominion had projected the Project's "first delivery of electricity to customers . . . at the end of Q1 2026," First Hollett Aff. ¶ 20 (ECF No. 11-2), it does not identify how much electricity it was projected to deliver or, more critically, connect any inability to make partial delivery to an irreparable harm to Dominion. Similarly, postponed delivery of electricity to customers (Pls.' Br. at 27) cannot serve as a basis for irreparable harm. That is because the harm must be *to the plaintiff*. *Winter*, 555 U.S. at 20 ("A plaintiff seeking a preliminary injunction must establish … *that he is* likely to suffer irreparable harm[.]" (emphasis added)).

As to the first two categories of harm listed above, Plaintiffs have not cleared the very high bar to establish irreparable harm from purely economic injuries, which are the focus of Plaintiffs' injury argument. *See* First Hollett Aff. ¶¶ 33–37. To be sure, the alleged amounts involved are large. But financial losses alone do not typically constitute irreparable injury. *See, e.g., Di Biase*, 872 F.3d at 230 ("Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough." (citation omitted)); *O'Brien v. Appomattox Cnty.*, 213 F. Supp. 2d 627, 631 (W.D. Va. 2002), *aff'd*, 71 F. App'x 176 (4th Cir. 2003) ("[G]enerally, a mere economic injury, standing alone, is insufficient to show an *irreparable* harm." (citations omitted)).

A party *can* show irreparable harm from purely economic harms where "the anticipated economic injury is of such severity that the company will be put out of business altogether." *Montgomery Cnty. Ass'n of Realtors, Inc. v. Realty Photo Master Corp.*, 783 F. Supp. 952, 958 (D. Md. 1992), a*ff'd*, 993 F.2d 1538 (4th Cir. 1993) (citing *Fed. Leasing, Inc. v. Underwriters at Lloyd's*, 650 F.2d 495, 500 (4th Cir.1981) (when company "sought to preserve its existence," appellate court found no error in district court's granting of injunction)). But Plaintiffs have not made any

12

showing that the financial losses it describes from construction delays are existential. On the contrary, Plaintiffs point out that Dominion is "a wholly owned subsidiary of Dominion Energy, Inc," Second Hollet Aff. ¶ 3 (ECF No. 39-2), and that "Dominion and other Dominion Energy, Inc. subsidiaries are among the country's largest producers and distributers of energy." First Hollett Aff. ¶4. *Compare Sandoz, Inc. v. Food & Drug Admin.*, 439 F. Supp. 2d 26, 32 (D.D.C. 2006) (pointing to plaintiff company's status as "one of the largest pharmaceutical companies in the world" in discussing significance of economic harm).

Also, economic injuries may be irreparable where the losses are not recoverable. *N.C. Growers' Ass'n v. Solis*, 644 F. Supp. 2d 664, 671 (M.D.N.C. 2009) ("While it is beyond dispute that economic losses generally do not constitute irreparable harm, this general rule rests on the assumption that economic losses are recoverable" (citing cases)). But whether any economic loss resulting from a federal government action is recoverable as monetary damages would depend on the nature of the action and any future claim. If Plaintiffs are correct in their telling (Pls.' Br. 16-17) that the suspension order here arises under 43 U.S.C. § 1341(c)—which we do not concede at this stage—the provision explicitly provides for the recovery of "just compensation." *See* 43 U.S.C. § 1341(c) ("[A]ll such leases shall contain or be construed to contain provisions for the payment of just compensation to the lessee whose operations are thus suspended."). But even unrecoverable economic harm would not necessarily create *per se* irreparability. *See Scotts Valley Band of Pomo Indians v. Burgum*, No. 1:25-cv-958, 2025 WL 1639901, at *5 (D.D.C. June 10, 2025). The harm would still likely need to be "enormous and severe." *Id.* (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 221 (1994) (Scalia, J., concurring)). And the burden to show irreparable harm rests with Plaintiffs.

13

Plaintiffs' primary case, *Mountain Valley Pipeline LLC v. 6.56 Acres of Land*, 915 F.3d 197 (4th Cir. 2019), is distinguishable on the facts. There, the utility company sought to build a natural gas pipeline, and the certificate of public convenience and necessity issued by the Federal Energy Regulatory Commission (FERC) required that the pipeline be in service by a date certain. *Id*. at 208–09. The case concerned eminent domain proceedings, where the utility company sought to acquire rights-of-way from property owners who had not reached agreement with the utility on easement purchase prices. *Id.* at 210. The utility company sought a preliminary injunction granting the easements immediately so it could complete the pipeline installation before the deadline set by FERC. *Id*. Three separate district courts granted the injunctions sought. *Id*. at 211-12.

The court in *Mountain Valley* held that the district courts' preliminary injunctions were neither clear error nor an abuse of discretion. *Id*. at 216. The key factor in the court's view was that "it is undisputed that without preliminary relief, Mountain Valley almost certainly would be unable to meet FERC's October 2020 in service deadline." *Id.* "The combined effect is that without a preliminary injunction, Mountain Valley likely would lose the right to construct the pipeline altogether—an outcome that qualifies as an irreparable injury[.]" *Id*. at 217. In reaching this conclusion, *Mountain Valley* relied on an earlier decision in *East Tennessee Natural Gas Co. v. Sage*, 361 F.3d 808 (4th Cir. 2004), which presented the same fact pattern.

Here, Plaintiffs' harms relate primarily to increased costs associated with delayed development. And delayed development does not amount to irreparable harm. *See Lost Lake Holdings LLC v. Town of Forestburgh*, No. 22-cv-10656, 2023 WL 8947154, at *8 (S.D.N.Y. Dec. 28, 2023).

Dominion also acknowledges that whatever "higher total . . . construction costs" it incurs will be "borne by [Dominion] customers not only through rates but also the non-delivery of renewable energy to the grid." Pls.' Br. 27. As noted above, harm to entities other than Dominion

14

cannot entitle Dominion to a preliminary injunction. *Winter*, 555 U.S. at 20 ("A plaintiff seeking a preliminary injunction must establish … *that he is* likely to suffer irreparable harm[.]" (emphasis added)); *Sierra Club v. Env't Prot. Agency*, 793 F. Supp. 3d 158, 164 n.3 (D.D.C. 2025) ("[A]ny downstream effects that may be borne by unnamed third parties, including the public, do not constitute irreparable harm."); *Clear Blue Ins. Co. v. Yachtinsure Servs., Inc.*, No. 25-cv-109-MOK-DCK, 2025 WL 1782579, at *3 n.3 (W.D.N.C. June 2, 2025).

Dominion has not met its burden to demonstrate irreparable harm.

### B. National Security Concerns Can Outweigh a Plaintiff's Irreparable Harm When Balancing the Harms.

Even if Dominion had made a showing of irreparable harm, that harm would need to be balanced against the public interest. In balancing the equities the "public interest is most important" where it implicates "national security and national defense." *Blackhawk Indus. Prods. Grp. Unlimited, LLC. v. U.S. Gen. Servs. Admin.*, 348 F. Supp. 2d 649, 655 (E.D. Va. 2004). BOEM's Suspension Order was based in part on classified national security information from DoW. Tyner Decl. ¶¶ 4-7, 9-10; Marks Decl. ¶ 7(e). The government has provided an unredacted, classified version of the Marks Declaration to the Court for *ex parte*, *in camera* review.

In assessing the balance of the harms here, the Court must "give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest." *Winter*, 555 U.S. at 24 (quoting *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986)). Courts do not "second-guess decisions made about national security needs." *Elhady v. Kable*, 993 F.3d 208, 228 (4th Cir. 2021). Indeed, in *Winter*, the Supreme Court concluded that the Navy's (and therefore the public's) interest in military readiness "plainly outweighed" harms to marine mammals that could impact the plaintiffs' ability to study and observe them. *Winter*, 555 U.S. at 33. Other courts have similarly highlighted the importance of national security

15

concerns in considering injunctive relief.  *See Stagg, P.C. v. U.S. Dep't of State*, 673 F. App'x 93, 95-96 (2d. Cir. 2016) (noting "matters of national security . . . present the most compelling national interest"); *Strait Shipbrokers Pte. Ltd. v. Blinken*, 560 F. Supp. 3d 81, 100 (D.D.C. 2021) (agency actions that "are particularly important to national security . . . are subject to significant deference").

Based on the classified information from DoW, BOEM issued the Suspension Order to address the national security risk that would arise if the Project becomes operational and because further mitigation measures would be necessary before the Project reaches that stage.  Tyner Decl. ¶¶ 4, 7, 9-12.  Dominion does not have the benefit of the classified information in asserting that "[t]he public and government [will] not [be] harmed" if the Court grants its requested preliminary injunction.  Pls.' Br. 30.  The Court is thus better positioned to balance the harms here.

With respect to the other side of that balance, Dominion (as explained above) has not shown that it will suffer irreparable harm from the Suspension Order.  But if the Court disagrees with the government on that point, Dominion has certainly not made any showing of irreparable harm related to Project *operations* during the ninety-day suspension period or, even if that period was extended, during the pendency of this suit.

Regardless of when operations could start, "mitigation measures will need to be in place before the [Dominion] Project becomes operational."  Tyner Decl. ¶ 9.  Those of undersigned counsel who have reviewed the classified information submit that it provides a reasonable basis on which to find that, when it comes to operation of the Project, the public interest in national security outweighs Dominion's alleged economic harms.  In balancing the national security risks identified by DoW against the costs alleged by Dominion, "the Executive Branch's judgments in the national security area. . . [are] entitled to deference." *Elhady*, 993 F.3d at 228; *see also Blinken*,

16

560 F. Supp. 3d at 100 (denying preliminary injunction despite plaintiffs' "substantial harm" because "[i]n light of the national security interests involved, the equities and public interest d[id] not favor preliminary injunctive relief.").

### III. Any Preliminary Injunction Must be Narrowly Tailored to Prevent Demonstrated Irreparable Harm.

Finally, even if the Court finds preliminary relief appropriate, that relief must be narrowly tailored. Given the reasonable time frame in BOEM's Suspension Order and given that the balance of the harms that could occur during the pendency of the suit weighs in favor of the national security interests related to Project operations, Dominion's request to enjoin the Suspension Order in full is overly broad. "It is . . . well-established that any injunction must be narrowly tailored to the facts of the case." *Bone v. Univ. of N.C. Health Care Sys.*, 678 F. Supp. 3d 660, 686 (M.D.N.C. 2023) (citing *PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 128 (4th Cir. 2011). The narrow tailoring requirement serves "the general rule that injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *State of Maryland v. U.S. Dep't of Agric.*, 151 F.4th 197, 212 (4th Cir. 2025) (quoting *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765, (1994) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979))). Further, the harm must be suffered "while the case is pending." *Nat'l Treasury Emps. Union v. Trump*, No. 25-5157, 2025 WL 1441563, at * 1 (D.C. Cir. May 16, 2025) (citing *Winter*, 555 U.S. at 20, 32). Applying those principles here means that any preliminary injunction should be denied, but, if granted, then tailored to maintain the suspension of operational activities.

Dominion makes no showing of irreparable harm concerning Project operations—which, again, implicate national security concerns—before this suit can be litigated on the merits. Thus, any injunction—assuming the Court finds one appropriate—should retain the suspension of Project operations.

17

## CONCLUSION

Dominion has not shown it is entitled to the broad preliminary injunction it seeks. Dominion has not met the standard for demonstrating irreparable harm. BOEM had authority under OCSLA to issue the Suspension Order. Any likelihood of success on the merits may be outweighed by the balance of equities and public interest in national security, which the Court may assess through *ex parte*, *in camera* review of the classified information BOEM relied on. Even if the Court concludes preliminary relief is appropriate, the Court should allow Federal Defendants to maintain suspension of Project operations as stated in the Suspension Order.

January 12, 2026

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General

/s/ PETER M. TORSTENSEN
PETER M. TORSTENSEN, JR.
Deputy Assistant Attorney General

KRISTOFOR R. SWANSON*
(Colo. Bar. No. 39378)
PETER KRYN DYKEMA*
JOHN K. ADAMS
Natural Resources Section
Environment & Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: (202) 598-9646 (Torstensen)
Telephone: (202) 598-1937 (Swanson)
Telephone: (202) 532-3084 (Dykema)
peter.torstensen@usdoj.gov
kristofor.swanson@usdoj.gov
peter.dykema@usdoj.gov

LINDSEY HALLIGAN
U.S. ATTORNEY AND SPECIAL ATTORNEY

TODD W. BLANCHE
DEPUTY ATTORNEY GENERAL

/s/ *Kent P. Porter*\*

        KENT P. PORTER, VSB No. 22853  
        Supervisory Assistant U.S. Attorney  
        Office of the United States Attorney  
        8000 World Trade Center  
        101 W. Main Street  
        Norfolk, Virginia 23505  
        Tel:    (757) 441-6331  
        Fax:   (757) 441-6689  
        Email: kent.porter@usdoj.gov  

        *Attorneys for Defendants*

\*Counsel contributed to the drafting of this brief but did not have access to review the classified information.