**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**NORFOLK DIVISION**

|  |  |
|---|---|
| **Virginia Electric & Power Co. d/b/a Dominion Energy Virginia, et al.,** | |
| *Plaintiffs,* | |
| v. | No. 2:25-cv-830 |
| **United States Department of the Interior, et al.,** | |
| *Defendants.* | |

**BRIEF OF AMICUS CURIAE**
**NORTH AMERICA'S BUILDING TRADES UNIONS**
**IN SUPPORT OF PLAINTIFFS' MOTION**
**FOR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

Table of Authorities.................................................................................................iii

Statement of Interest ................................................................................................ 1

Argument ................................................................................................................. 2

      A Preliminary Injunction Will Promote the Public Interest by Saving and
      Preserving Work Hours for Well-Trained, Hard-Working Union Construction
      Workers. .................................................................................................... 2

          A.     Offshore Wind Promotes Efficient Green Infrastructure
                Construction and Guarantees Solid, Middle-Class Union
                Construction Careers....................................................................... 2

          B.     NABTU's Members Are Building Cutting-Edge Offshore Energy
                Facilities. ....................................................................................... 6

          C.     A Preliminary Injunction Will Protect NABTU's Members'
                Livelihoods. ................................................................................. 10

Conclusion ............................................................................................................ 12

Certificate of Service .............................................................................................

# TABLE OF AUTHORITIES

**Cases**                                                                                              **Page(s)**

*Bldg. & Constr. Trades Council of the Metro. Dist. v. Associated Builders & Contractors
    of Mass./R.I., Inc.*, 507 U.S. 218 (1993) ................................................................3

*Bryant v. Better Bus. Bureau of Greater Md., Inc.*,
    923 F. Supp. 720 (D. Md. 1996) .....................................................................3

*E. Tenn. Natural Gas Co. v. Sage*,
    361 F.3d 808 (4th Cir. 2004) .........................................................................10

*Tafas v. Dudas*,
    511 F. Supp. 2d 652 (E.D. Va. 2007) ............................................................3

*Transcon. Gas Pipe Line Co. v. Permanent Easement Totaling 2.322 Acres*,
    No. 14-cv-400, 2014 U.S. Dist. LEXIS 122588 (E.D. Va. Sept. 2, 2014) ......10

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) .........................................................................................10

**Statutes**

29 U.S.C. § 158(e) .........................................................................................3

29 U.S.C. § 158(f).........................................................................................3

**Other Authorities**

Bureau of Ocean Energy Mgmt., Director's Order (Dec. 22, 2025),
    https://www.boem.gov/sites/default/files/documents/renewable-energy/state-
    activities/BOEM%20CVOW%20Suspension%20Letter.pdf ................................1-2, 9-11

Dominion Energy, *Construction and Operations Plan: Coastal Virginia Offshore Wind
    Commercial Project* (Sept. 8, 2023), https://www.boem.gov/sites/default/files/
    documents/renewable-energy/state-activities/Public_Sec-1-3.pdf .................. 7-8

Dominion Energy, *Dominion Energy, Trade Unions Announce Coastal Virginia Offshore
    Wind Partnership* (Sept. 16, 2021), https://investors.dominionenergy.com/news/
    press-release-details/2021/Dominion-Energy-Trade-Unions-Announce-Coastal-
    Virginia-Offshore-Wind-Partnership/default.aspx ...........................................2

Order Granting NABTU's Motion for Leave to File a Brief as Amicus Curiae in Support
    of Plaintiff, Revolution Wind, LLC v. Burgum, No. 25-cv-2999 (D.D.C. Sept. 15,
    2025) .............................................................................................................3

## STATEMENT OF INTEREST

The December 22, 2025, Order issued by the Department of the Interior's Bureau of Ocean Energy Management "to suspend all ongoing activities related to the Coastal Virginia Offshore Wind - Commercial Project on the Outer Continental Shelf" has thrown union construction workers out of work.  Bureau of Ocean Energy Mgmt., Director's Order (Dec. 22, 2025) [hereinafter "Suspension Order"].[1]  Those workers are represented by affiliates of North America's Building Trades Unions ("NABTU") and are working under a collective bargaining agreement to which NABTU and its affiliated national and international unions are signatory.

The union employees working offshore have undergone extensive training, and the offshore work has been underway for over eighteen months.  But now, as a result of the unlawful Suspension Order, they are idled.  A preliminary injunction is necessary, and for the reasons stated herein, is wholly consistent with the public interest.

NABTU is a labor organization composed of fourteen national and international unions and 327 provincial, state, and local building and construction trades councils representing more than three million workers.  Until the Suspension Order issued, members of NABTU's affiliated unions had been working continuously offshore to construct Plaintiffs' (together, "Dominion") Coastal Virginia Offshore Wind ("CVOW") project.  When completed, the project is expected to generate approximately 2.6 gigawatts of renewable energy — enough to power approximately 660,000 homes.  The construction of the project has provided and, but for the Suspension Order, would continue to provide solid, middle-class wages and benefits to skilled union construction craftworkers.  NABTU has a strong interest in this case because the Suspension Order has

---

[1]    https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/BOEM%20CVOW%20Suspension%20Letter.pdf

imperiled the job security of its affiliates' members, who would continue to work offshore on the CVOW project if not for the Suspension Order.

Dominion consents to the filing of this brief, and the Defendants do not oppose NABTU's motion for leave to file the brief. NABTU and its counsel declare that: (1) no party's counsel authored this brief in whole or in part; (2) no party or party's counsel contributed money to fund the preparation or submission of the brief; and (3) no person other than NABTU, its members, or its counsel has contributed money to fund the preparation or submission of the brief.

## ARGUMENT

**A Preliminary Injunction Will Promote the Public Interest by Saving and Preserving Work Hours for Well-Trained, Hard-Working Union Construction Workers.**

### A. *Offshore Wind Promotes Efficient Green Infrastructure Construction and Guarantees Solid, Middle-Class Union Construction Careers.*

In September 2021, NABTU and Dominion Energy, Inc. announced an agreement to promote project labor agreements ("PLAs") for work connected to the CVOW project.[2] Dominion Energy Virginia, one of the Plaintiffs in this case, is a wholly-owned subsidiary of Dominion Energy, Inc., and OSW Project LLC, the other Plaintiff, is an LLC managed by Dominion Energy Virginia that owns the CVOW project. Decl. of Grant T. Hollett in Support of Motion for Preliminary Injunction ¶¶ 3, 5, Dkt. No. 39-2 [hereinafter Hollett Decl.]. The September 2021 agreement between NABTU and Dominion provided a framework for the negotiation of separate PLAs covering (1) construction work performed offshore, (2) construction and assembly of the offshore components that occurs onshore, and (3) the construction of onshore electrical

---

[2] Dominion Energy, *Dominion Energy, Trade Unions Announce Coastal Virginia Offshore Wind Partnership* (Sept. 16, 2021), https://investors.dominionenergy.com/news/press-release-details/2021/Dominion-Energy-Trade-Unions-Announce-Coastal-Virginia-Offshore-Wind-Partnership/default.aspx.

infrastructure necessary to bring the power produced by the project to homes and businesses in the Commonwealth of Virginia.

In 2024, NABTU and Dominion signed a PLA to govern labor relations for the offshore portion of the CVOW project.[3]  *See* Hollett Decl. ¶ 46.  The CVOW PLA is a multi-union and multi-employer prehire collective bargaining agreement that sets terms and conditions for work performed in the ocean (i.e., offshore) for the CVOW project.  Congress authorized the use of PLAs like the CVOW PLA under Sections 8(e) and (f) of the National Labor Relations Act, 29 U.S.C. § 158(e), (f).  A typical construction project involves work performed by multiple contractors, with multiple unions representing the employees working for those contractors.  A PLA brings labor-relations uniformity to a construction project by setting out terms and conditions of employment and work rules applicable across the project, irrespective of the contractor or union involved.  PLAs typically create forums for communication and coordination, include no-strike, no-lockout provisions, and contain speedy dispute-resolution mechanisms.  They also set standard pay and benefit rates and provide for hiring through union job referral systems.  *See, e.g.*, *Bldg. & Constr. Trades Council of the Metro. Dist. v. Associated Builders & Contractors of Mass./R.I., Inc.*, 507 U.S. 218, 221-22, 230-32 (1993).

By signing the CVOW PLA, NABTU and Dominion sought to promote efficient

---

[3]    "The Court has broad discretion in deciding whether to allow a non-party to participate as an *amicus curiae*," *Tafas v. Dudas*, 511 F. Supp. 2d 652, 659 (E.D. Va. 2007), and regularly allows amicus participation when the information provided by the amicus is "timely and useful," *id.* (quoting *Bryant v. Better Bus. Bureau of Greater Md., Inc.*, 923 F. Supp. 720, 728 (D. Md. 1996)). To the extent this brief refers to facts outside the record, those facts are merely intended to provide perspective on labor relations governing the CVOW project. *See, e.g.*, Order Granting NABTU's Motion for Leave to File a Brief as Amicus Curiae in Support of Plaintiff, *Revolution Wind, LLC v. Burgum*, No. 25-cv-2999 (D.D.C. Sept. 15, 2025) (allowing NABTU to participate as amicus curiae in similar preliminary injunction-stage case challenging order to stop offshore wind construction).

completion of a high-quality offshore wind project. The CVOW PLA streamlines hiring procedures to ensure a reliable supply of skilled U.S. labor on offshore wind projects. Under the PLA, NABTU's affiliated national and international unions each designated a local union with expertise in the relevant trades. When contractors need employees, they contact the designated local union for a referral, and the union provides applicants for employment. The unions promise to share training requirements with applicants and commit to recruiting enough employees to meet project demands. Offshore wind construction workers need unique, specialized training, such as Helicopter Underwater Escape Training and Global Wind Organization Sea Survival Training. That training requires significant investments of resources and time.

The CVOW PLA sets standard workweek and workday lengths for all covered employees, allowing contractors to plan work on the project well in advance. The agreement also sets out covered employees' wages and benefits, allowing contractors to predict their labor costs in advance. Employees covered by the PLA earn family-sustaining compensation, ranging from $34.57 to $58.34 per hour in total wages and benefits.

The CVOW PLA also ensures that once work is underway, projects are completed smoothly and on time. It establishes a five-step grievance process that includes input from union and employer representatives. The grievance process includes fast turnarounds between steps, making sure that any dispute is settled quickly and without disrupting construction. The agreement also prohibits all work stoppages, including strikes and lockouts, meaning work continues while disputes are resolved. If such a work stoppage ever occurs, the PLA provides for an expedited arbitration procedure to resume work within twenty-four hours. The agreement also provides for speedy resolution of craft jurisdictional disputes between unions.

The CVOW PLA contains a "Standard of Excellence" provision to "reinforce the pride of

every construction worker and the commitment to be the most skilled, most productive, and safest workforce available to construction employers and users in the United States."   Under that provision, both labor and management make commitments to each other.   The members represented by NABTU's affiliates agree to:

1.    Provide a full day's work for a full day's pay;

2.    Safely work toward the timely completion of the job;

3.    Arrive to the assigned work location on time and work until the established quitting time;

4.    Adhere to established meal periods;

5.    Promote a drug- and alcohol-free work site;

6.    Work in accordance with all applicable safety rules and procedures;

7.    Allow union representatives to handle jobsite disputes and grievances without resort to slowdowns or unlawful job disruptions;

8.    Respect management directives that are safe, reasonable, and legitimate;

9.    Respect the rights of coworkers;

10.    Respect the property rights of the owner, prime contractor, and contractors;

11.    Adhere to all contractor and vessel rules, policies, and procedures;

12.    Participate in and comply with the contractor's safety management system onboard and on site; and

13.    Participate in and comply with drug and alcohol testing in accordance with contractor requirements for the project.

Management, in turn, agrees that the unions should expect the following from contractors working on the project:

1.      Management adherence to the CVOW PLA;

2.      Communication and cooperation with trade foremen and stewards;

3.      Efficient, safe, and sanitary management of the jobsite;

4.      Efficient job scheduling to mitigate and minimize unproductive time;

5.      Efficient and adequate staffing by properly trained employees by trade;

6.      Availability of equipment and tools to ensure efficient job progress;

7.      The provision of proper blueprints, specification, direction, and materials in a timely manner;

8.      The promotion of jobsite dispute resolution and leadership skills to mitigate such disputes; and

9.      The treatment of all employees in a respectful and dignified manner, acknowledging their contributions to a successful project.

CVOW contractors have further agreed to provide comprehensive safety, equipment, and other training to building trades workers, fueling the growth of a U.S. base of qualified offshore wind workers.  The PLA prioritizes worker safety and reduces the risk of lost time due to injuries by requiring contractors to follow strict safety standards.  All applicants for employment offshore must be certified as fit for duty and must have passed a recent medical examination.

**B.    *NABTU's Members Are Building Cutting-Edge Offshore Energy Facilities.***

Dominion acquired its offshore lease in 2013.  Hollett Decl. ¶ 9.  After several years of surveys and permitting processes, including coordination with the Department of Defense to develop safeguard measures, construction began in November 2023.  *Id.* ¶¶ 12, 33.  Employees working under the CVOW PLA are set to install 176 14.7-megawatt wind turbines twenty-seven miles off the coast of Virginia Beach.  *Id.* ¶¶ 6, 9.

The CVOW construction project is extremely complex.  Employees must install monopile

foundations to support the turbines.  Hollett Decl. ¶ 14.  The monopiles are steel tubes with diameters between twenty-three and thirty-one feet that are driven between 82 and 197 feet into the seabed.  Dominion Energy, *Construction and Operations Plan: Coastal Virginia Offshore Wind Commercial Project* 2-30, 3-13 (Sept. 8, 2023) [hereinafter Dominion Energy, *COP*].[4]  Employees use a vessel called the *Yellowstone* to transport and install large rocks around the bases of the monopiles to prevent against scour (removal of sediment around the base of the monopile due to currents and waves).  Hollett Decl. ¶ 21, Ex. A.  Using a heavy lift installation vessel called the *Orion*, employees attach transition pieces to connect the monopiles to the turbine towers.  *Id.* ¶ 23.

Employees use a highly specialized vessel called the *Charybdis* to install the turbine towers, nacelles, and blades on top of the monopiles.  Hollett Decl. ¶ 17.  The *Charybdis* (pictured below) is a highly sought-after, one-of-a-kind U.S.-flagged vessel designed for installing wind turbines that arrived in Virginia in late 2025.  Dominion Energy, *COP*, *supra*, at 1-8.  All of the construction workers aboard the *Charybdis* are represented by NABTU's affiliates and are working under the CVOW PLA.  Hollett Decl. ¶ 46.

---

[4]    https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Public_Sec-1-3.pdf



Photograph of the *Charybdis*, *in* Hollett Decl. at 8 fig. 3.

The turbines are connected to the offshore substations by miles of inter-array cables. Hollett Decl. ¶ 14.  The cables consist of bundled copper or aluminum cores and a fiber optic cable surrounded by insulation and protective shielding, with diameters between 5.1 and 7.9 inches and lengths between 228.6 and 300.7 miles.  Dominion Energy, *COP*, *supra*, at 3-15, 3-18 to 3-19. Employees install the inter-array cables using a vessel called the *Livingstone*.  Hollett Decl. Ex. A. The offshore substations (the topsides of which are installed by the *Orion* vessel, *id.* ¶ 23, Ex. A) transform the energy generated by the turbines into higher voltage electricity for transmission onshore through offshore export cables.  *Id.* ¶ 15.  Each substation will contain transformers, high voltage shunt reactors, heating and ventilation systems, generators, pollution prevention systems, safety and communications systems, and other equipment.  Dominion Energy, *COP*, *supra*, at 3-22.

The CVOW project requires the installation of nine offshore export cables.  Dominion Energy, *COP*, *supra*, at 3-26.  The offshore export cables have diameters between 10.2 and 11.4 inches and will run between 36.6 and 49.01 miles.  *Id.* at 3-28.  Employees install the offshore

export cables using the *Livingstone*. Hollett Decl. Ex. A. After reaching the onshore cable landing location, the electricity will be transmitted to the cable landing location onshore. *Id.* ¶ 15.

Employees working under the CVOW PLA finished installing the monopiles in October 2025. Hollett Decl. ¶ 21. Employees then started to install scour protection. At the time the Suspension Order issued, scour protection was ongoing. *Id.* Monopiles without scour protection risk being destabilized by ocean currents, which increases the risk of tilting or failure. When the Suspension Order issued, the *Charybdis* was on site and fully loaded with four towers, four nacelles, and twelve blades, and workers represented by NABTU's affiliates and working under the CVOW PLA were ready to perform the intricate work of placing that equipment on monopiles. *Id.* ¶ 17. So far, sections for 113 towers, 121 nacelles, and 141 blades are ready for installation. *Id.* ¶ 21. And but for the Suspension Order, all of the turbines were expected to be placed by the end of the year. *Id.* ¶ 12.

Employees have also laid and trenched approximately 286 miles of export cable. Hollett Decl. ¶ 21. Workers still have to remediate areas where the export cable was not buried far enough under the seafloor, trench approximately 164 miles of inter-array cable, and protect cable crossings. *Id.* At the time of the Suspension Order, 651 employees and nearly forty vessels (including crew transfer vessels, work support vessels, cable lay vessels, tugs, guard vessels, dive vessels, service operation vessels, and heavy transport vessels) were working offshore to finish the CVOW project. *Id.* ¶ 16.

All of the above make clear that although much work has been performed by members of NABTU's affiliated unions, much work remains to be done. The Suspension Order, however, has thrown skilled union trades workers out of work and has left a massive semi-completed construction project standing still twenty-seven miles off the coast of Virginia. The Suspension

Order also threatens the completion of certain onshore work dependent on offshore activities, much of which is being performed by members of NABTU's affiliates.  Hollett Decl. ¶ 46.

### C.    A Preliminary Injunction Will Protect NABTU's Members' Livelihoods.

Dominion is entitled to a preliminary injunction because it is likely to succeed on the merits of its claims; it is likely to suffer irreparable harm in the absence of preliminary relief; the balance of equities tips in its favor; and an injunction is in the public interest.  *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  The public has an interest in timely completion of energy projects where delay could increase costs to consumers and threaten the jobs of individuals hired to work on those projects.  *E.g.*, *Transcon. Gas Pipe Line Co. v. Permanent Easement Totaling 2.322 Acres*, No. 14-cv-400, 2014 U.S. Dist. LEXIS 122588, at *15-16 (E.D. Va. Sept. 2, 2014); *see also E. Tenn. Natural Gas Co. v. Sage*, 361 F.3d 808, 830 (4th Cir. 2004) (evaluating public interest under pre-*Winter* standard).[5]

The Suspension Order jeopardizes not only the just transition to clean energy, but also the livelihoods of construction workers represented by NABTU's affiliates.  The project — both offshore and onshore — has provided steady employment and solid, middle-class wages and benefits to thousands of building trades workers.  Dominion contractors, unions, and joint labor-management apprenticeship programs provide training opportunities for the next generation of building trades workers, securing a pipeline of expert offshore wind employees for the future and providing those workers with the credentials and experience they need to support their families.

At the time of the Suspension Order, Dominion expected that two million more hours of

---

[5]    For the reasons explained in Dominion's motion and brief, NABTU agrees that a preliminary injunction is appropriate here due to the likelihood of success on the merits, the irreparable harm that will be suffered, and the balance of equities.  This brief addresses only the public interest prong.

work would be required to finish the CVOW project.  Hollett Decl. ¶ 46.  Many of those hours would be worked by members of NABTU's affiliates.  *Id.*  But now, the offshore workers who have invested the time to obtain the specialized skills necessary to work offshore have been forced to seek work elsewhere.  Even if the Suspension Order is eventually declared unlawful, without an injunction, those workers trained to work on the CVOW project will need to find work elsewhere to support their families.  As a result, without a preliminary injunction, other workers will have to be trained, which will delay the project even further.

The apparent temporary nature of the Suspension Order does not lessen these harms.  Though the order suspends activities only "for the next 90 days," the federal government retains the authority to "further extend the 90-day suspension period."  Suspension Order, *supra*.  Therefore, members of NABTU's affiliates forced out of work are effectively out of work *indefinitely*.  And as Dominion explains in its brief, even a ninety-day delay jeopardizes future project timelines.  Employees working under the CVOW PLA cannot put their bills on hold for three (or probably more) months, waiting for a permanent injunction.  They will have to find new employment, and new workers will have to be trained to perform the specialized offshore construction work.

This Court should promptly protect the wages, benefits, training, and livelihoods of the U.S. unionized offshore construction workforce by enjoining the Suspension Order.

## CONCLUSION

This Court should grant Dominion's motion for a preliminary injunction.

Respectfully submitted,

/s/ Lucas R. Aubrey
Jonathan D. Newman*
Lucas R. Aubrey
    Va. Bar No. 74641
Jacob J. Demree*
*Attorneys for North America's*
*Building Trades Unions*
SHERMAN DUNN, P.C.
900 Seventh Street, N.W.
Suite 1000
Washington, D.C. 20001
Phone: (202) 785-9300
Fax: (202) 775-1950
newman@shermandunn.com
aubrey@shermandunn.com
demree@shermandunn.com

* Pro hac vice admission pending

January 9, 2026

## CERTIFICATE OF SERVICE

I certify that on January 9, 2026, this brief was filed using the Court's CM/ECF system. All attorney participants in the case are registered CM/ECF users and will be served electronically via that system.

/s/ Lucas R. Aubrey
Lucas R. Aubrey
   Va. Bar No. 74641
*Attorney for North America's*
*Building Trades Unions*
SHERMAN DUNN, P.C.
900 Seventh Street, N.W.
Suite 1000
Washington, D.C. 20001
Phone: (202) 785-9300
Fax: (202) 775-1950
aubrey@shermandunn.com

January 9, 2026