Case No. 2:25-cv-00830-JKW-LRL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

### Norfolk Division

VIRGINIA ELECTRIC AND POWER COMPANY, D/B/A DOMINION ENERGY
VIRGINIA; OSW PROJECT LLC,

*Plaintiffs*,

v.

UNITED STATES DEPARTMENT OF THE INTERIOR; BUREAU OF OCEAN ENERGY
MANAGEMENT; DOUGLAS BURGUM, Secretary of the Interior, in his official capacity;
MATTHEW GIACONA, Acting Director, Bureau of Ocean Energy Management, in his
official capacity,

*Defendants*.

## BRIEF OF AMICI CURIAE SENATORS MARK R. WARNER AND TIM KAINE
## AND REPRESENTATIVE BOBBY SCOTT

Shreve Ariail (Bar No. 96321)
Zachary C. Schauf (pro hac pending)
Meghan E. Greenfield (pro hac pending)
Aaron R. Cooper (pro hac pending)
JENNER & BLOCK LLP
1099 New York Ave., NW, Suite 900
Washington, DC 20001
Tel: (202) 639-6000
Fax: (202) 639-6066
sariail@jenner.com
zschauf@jenner.com
mgreenfield@jenner.com
acooper@jenner.com

*Counsel for Amici Curiae Senators Mark R. Warner and Tim Kaine
and Representative Bobby Scott*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES....................................................................................................... ii

IDENTITIES AND INTERESTS OF AMICI CURIAE ........................................................... 1

SUMMARY OF ARGUMENT.................................................................................................. 3

ARGUMENT............................................................................................................................. 6

I.      When this Court Assesses Likelihood of Success on the Merits, It Should Weigh the
        Grave Concerns Raised By BOEM's Suspension of the Project Based on Vague
        Statements about "National Security."........................................................................ 6

II.     When this Court Assesses the Equitable Factors, It Should Weigh that BOEM's
        Unexplained Suspension Is Inflicting Great Harm on Virginia, Which Increases Every
        Day............................................................................................................................. 13

CONCLUSION........................................................................................................................ 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Dames & Moore v. Regan*, 453 U.S. 654 (1981) ...................................................... 13

*Department of Commerce v. New York*, 588 U.S. 752 (2019) ................................. 11

*Motor Vehicle Manufacturers Association of United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983) ......................................... 6

*New York v. Trump*, No. 25-CV-11221, __ F. Supp. 3d __, 2025 WL 3514301 (D. Mass. Dec. 8, 2025) ............................................................................................ 13

*Nixon v. Fitzgerald*, 457 U.S. 731 (1982) ............................................................... 10

*Ocean Container Transport LLC v. Jones*, No. 2:25-CV-543, 2025 WL 3769264 (E.D. Va. Oct. 3, 2025) ........................................................................................... 6

*Ohio v. EPA*, 603 U.S. 279 (2024) ............................................................................. 6

*Perkins Coie LLP v. United States Department of Justice*, 783 F. Supp. 3d 105 (D.D.C. 2025), *appeal docketed*, No. 25-5241 (D.C. Cir. July 2, 2025) ............. 13

*President & Fellows of Harvard College v. United States Department of Homeland Security*, 788 F. Supp. 3d 182 (D. Mass. 2025), *appeal docketed*, No. 25-1627 (1st Cir. July 1, 2025) ...................................................................... 13

*Revolution Wind, LLC v. Burgum*, No. 1:25-cv-02999 (D.D.C. Sept. 22, 2025), ECF No. 36 ............................................................................................................ 13

*Trump v. Mazars USA, LLP*, 591 U.S. 848 (2020) .................................................... 9

*United States v. Stanchich*, 550 F.2d 1294 (2d Cir. 1977) ...................................... 11

*V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir. 2025) ......................... 13

*Watkins v. United States*, 354 U.S. 178 (1957) ......................................................... 9

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008) ................... 6

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) .............................. 10

*Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1 (2015) ....................................... 10

**Statutes**

10 U.S.C. § 183a ............................................................................................... 7

50 U.S.C. § 3091(a)(1) ..................................................................................... 10

**Other Authorities**

30 C.F.R. § 585.417(b) ...................................................................................... 6

*Application of Virginia Electric and Power Company and OSW Project LLC*, No.
    PUR-2024-00206 ......................................................................................... 14

BOEM, *Coastal Virginia Offshore Wind Commercial Project, Construction and
    Operations Plan*, Appendix B (Oct. 30, 2023),
    https://www.boem.gov/renewable-energy/state-activities/cvow-c-record-
    decision ................................................................................................... 4, 8

BOEM, Coastal Virginia Offshore Wind Commercial Project, Final
    Environmental Impact Statement (Sept. 2023),
    https://www.boem.gov/renewable-energy/state-activities/cvow-
    cfeisvolumeifeis ............................................................................................. 8

Director's Order, Matthew Giacona, Acting Director, BOEM (Dec. 22, 2025),
    https://www.boem.gov/sites/default/files/documents/renewable-energy/state-
    activities/BOEM%20CVOW%20Suspension%20Letter.pdf?VersionId=gNdu
    d9mVqG4q5inB1WrlVYJPF2ATcran .................................................... 4, 8

Director's Order, Matthew Giacona, Acting Director, BOEM (Aug. 22, 2025),
    https://www.boem.gov/sites/default/files/documents/renewable-
    energy/Director%26%23039%3BsOrder-20250822.pdf?VersionId=
    Y674sNo8zi7jLu3VWRvq2hFb_8KtMldc ................................................ 12

Director's Order, Walter D. Cruickshank, Acting Director, BOEM (Apr. 16,
    2025), https://www.boem.gov/sites/default/files/documents/renewable-
    energy/state-activities/
    BOEM%20Director%26%23039%3Bs%20Order%20Empire%20Wind.pdf; .................... 12

*Ending Market Distorting Subsidies for Unreliable, Foreign-Controlled Energy
    Sources*, Exec. Order 14,315, 90 Fed. Reg. 30,821 (July 7, 2025) ...................... 12

*Ending Preferential Treatment for Unreliable, Foreign-Controlled Energy
    Sources in Department Decision-Making*, DOI Secretarial Order No. 3,437
    (July 29, 2025), https://www.doi.gov/document-library/secretary-order/so-
    3437-ending-preferential-treatment-unreliable-foreign ...................................... 12

Exec. Order No, 14,194, 90 Fed. Reg. 9,117, 9,118), *cert. granted*, No. 25-250,
    2025 WL 2601020 (U.S. Sept. 9, 2025) .......................................................... 13

Executive Office of the President, *Winning the Race: America's AI Action Plan* (July 2025), https://www.whitehouse.gov/wp-content/uploads/2025/07/Americas-AI-Action-Plan.pdf .................................................... 14

Jack Hobbs, *Trump Declares Windmills are 'Killing New Jersey' and Calls Them 'Stupid and Ugly' in Social Media Rant*, The Mirror (Aug. 19, 2025), https://www.themirror.com/news/politics/trump-declares-windmills-killing-new-1337963 ................................................................................................................. 12

Presidential Memorandum, *Temporary Withdrawal of All Areas on the Outer Continental Shelf From Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects*, 90 Fed. Reg. 8,363 (Jan. 20, 2025) ................................................................................................. 12

Press Release, BOEM, *BOEM Rescinds Designated Wind Energy Areas on the Outer Continental Shelf* (July 30, 2025), https://www.boem.gov/newsroom/notes-stakeholders/boem-rescinds-designated-wind-energy-areas-outer-continental-shelf ...................................... 12

Press Release, Department of Interior, *The Trump Administration Protects U.S. National Security by Pausing Offshore Wind Leases*, (Dec. 22, 2025), https://www.doi.gov/pressreleases/trump-administration-protects-us-national-security-pausing-offshore-wind-leases ................................................................. 8

Press Release, Dominion Energy, *Dominion Energy, Trade Unions Announce Coastal Virginia Offshore Wind Partnership* (Sept. 16, 2021), https://investors.dominionenergy.com/news/press-release-details/2021/Dominion-Energy-Trade-Unions-Announce-Coastal-Virginia-Offshore-Wind-Partnership/default.aspx ............................................................. 15

Will Pavia, *Why is President Trump obsessed with windmills?*, The Times (Sept. 23, 2025), https://www.thetimes.com/us/american-politics/article/why-is-trump-obsessed-with-windmills-wind-turbines-2mr3cvwm3?gaa_at=eafs&gaa_n=AWEtsqelTyopjU-cdX6vh3IwsJAaW06vGYtvMINsd_d3eo5cepJNzGO1naE75ksK3Ps%3D&gaa_ts=69606997&gaa_sig=FEXzrpWcG14Csqe__zbxOa6kOOLs9H-R6JV5xTVk2AMzKGxTl7zJ6JwwSWu7lV9NHxMLSzZIjsNrafgd8zTx4w%3D%3D ................................................................................................... 12

## IDENTITIES AND INTERESTS OF AMICI CURIAE

*Amici curiae* are the United States Senators from Virginia, Mark R. Warner and Tim Kaine, as well as Representative Robert C. "Bobby" Scott (VA-03).

Senator Warner is the Vice Chairman of the United States Senate Select Committee on Intelligence. As Vice Chairman, Senator Warner is responsible for providing oversight of all United States intelligence agencies. In this role, Senator Warner co-leads the annual Intelligence Authorization Act, which authorizes the funding and legal authorities for the United States Intelligence Community and ensures vigorous congressional oversight of national security threats. He is a member of the Gang of Eight, a bipartisan group of congressional leaders who receive regular briefings by the executive branch on highly sensitive, classified national security and intelligence matters. He co-founded and co-chairs the bipartisan Senate Cybersecurity Caucus. He has been a key author and negotiator of several pieces of critical legislation aimed at protecting national security and rebuilding our nation's infrastructure, often working at the intersection of national security and energy policy. He introduced and oversaw the passage of bipartisan cybersecurity reporting legislation, known as the Cyber Incident Reporting for Critical Infrastructure Act of 2022, following attacks on SolarWinds and Colonial Pipeline; championed restrictions on the purchase of defense technologies from nations that pose a national security threat, passed in the Fiscal Year 2024 National Defense Authorization Act; and successfully advocated for the creation of an Advanced Nuclear Working Group in the Fiscal Year 2026 National Defense Authorization Act to accelerate the adoption of advanced nuclear technologies to support national security.

Senator Kaine is a member of the Senate Armed Services Committee, the Ranking Member of its Subcommittee on Seapower, and a member of its Subcommittee on Readiness and Management Support. He also serves on the Senate Foreign Relations Committee and is the

Ranking Member of its Subcommittee on Western Hemisphere, Transnational Crime, Civilian Security, Democracy, Human Rights, and Global Women's Issues. Throughout his career, Senator Kaine has championed national security, energy, and climate change issues, particularly where these policies intersect with one another and/or impact Virginia. He was instrumental to the passage of the Inflation Reduction Act of 2022 and the Bipartisan Infrastructure Investment and Jobs Act, both of which made significant investments in energy infrastructure. Alongside Senator Warner and Representative Scott, Senator Kaine introduced and helped oversee the successful passage of the Enhancing Military Base Resilience and Conserving Ecosystems through Stormwater Management (EMBRACE) Act in the Fiscal Year 2022 National Defense Authorization Act, which addresses the threat of sea level rise and flooding to military bases.

He has secured key Virginia priorities in naval bills, including the refueling and complex overhaul of the Norfolk-based U.S.S. George Washington and the procurement of aircraft carriers, submarines, and other naval platforms to ensure our flexible fleet is ready to defend the nation.

Representative Scott is a veteran of the Massachusetts National Guard and the United States Army Reserve, an experience that informs his commitment to national security issues. He represents Virginia's third congressional district, which is home to Hampton Roads, one of the country's most significant military and naval centers. Throughout his congressional career, he has supported investments in Virginia's defense sector. He has also served as a conferee for the House and Senate conference committee on the National Defense Authorization Act, giving him a major role in defense policy. Congressman Scott has prioritized national security through his committee service as well, including on the Select Committee on U.S. National and Military/Commercial Concerns with the People's Republic of China and as Chairman (2007-2011) and Ranking Member (1999-2007, 2011-2015) of the Subcommittee on Crime, Terrorism, and Homeland Security of the

House Judiciary Committee. Congressman Scott also has deep expertise on energy issues. He co-chairs the bipartisan Congressional Offshore Wind Caucus, through which he has developed an extensive knowledge of offshore wind issues. Representative Scott has been recognized for his energy leadership, including as a McEachin Circle Honoree for climate and environmental justice advocacy.

Senators Warner and Kaine and Congressman Scott represent the Commonwealth of Virginia, home to the Pentagon, the largest naval station in the world (Naval Station Norfolk), the only aircraft carrier builder in the United States (Newport News Shipbuilding), and military bases for every service branch. Virginia boasts the largest concentration of active and reserve Coast Guard personnel in the country, as well as one of the nation's largest populations of civilians working in the defense sector. The commonwealth hosts several major intelligence agencies, including the Central Intelligence Agency and National Geospatial-Intelligence Agency, and is home to one of the largest concentrations of intelligence community staff in the country. Virginia's substantial influence on national security, combined with their extensive experience, gives *Amici* particular insight into defense and intelligence matters. Virginia also has unique energy needs. Home to the world's largest concentration of data centers, the commonwealth has made considerable investments in clean, economical energy generation to support this burgeoning industry. These issues are of the utmost importance to Senators Warner and Kaine and Representative Scott.

## SUMMARY OF ARGUMENT

*Amici* write to provide their perspective on two aspects of the preliminary injunction standard—likelihood of success and the equitable factors.

I. The Bureau of Ocean Energy Management ("BOEM") suspended work on the Coastal Virginia Offshore Wind – Commercial Project ("the Project")—which is in an advanced stage of

construction—based on unspecified "reasons of national security."[1] BOEM took this step even though the Project has undergone years of rigorous review and even though the agency consulted with the Department of Defense ("DoD") "[a]t each stage of the regulatory process" "for the purposes of assessing national security."[2] When this Court evaluates likelihood of success on the merits, BOEM's national security justification will be a focus. And careful evaluation will be especially essential because this Court will be reviewing *ex parte*, *in camera* submissions that the executive branch has not otherwise made available.

*Amici* have deep experience with issues of national security. *Amici* have regularly consulted with and received classified briefings from administrations of both parties on the Nation's most sensitive matters, as part of carrying out their constitutional duties as members of Congress and including via service on congressional committees with oversight responsibilities for such matters. *Amici* have requested the information on which BOEM's sudden reversal is based. If *Amici* received that information, they would be well-positioned—by virtue of their experience—to evaluate that information and determine whether it genuinely supports BOEM's reversal. But the Administration has not shared any information with *Amici* or, as far as *Amici* are aware, with any of the stakeholders affected by BOEM's suspension of the Project or other similar projects. And *Amici* are aware of no new information that would support this precipitous action.

This lack of transparency raises grave concerns, which should inform this Court's review. Highly sensitive, classified information can be and often is shared in appropriate settings with

---

[1] Director's Order at 1, Matthew Giacona, Acting Director, BOEM (Dec. 22, 2025), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/BOEM%20CVOW%20Suspension%20Letter.pdf?VersionId=gNdud9mVqG4q5inB1WrlVYJPF2ATcran ("Giacona Order").
[2] BOEM, *Coastal Virginia Offshore Wind Commercial Project, Construction and Operations Plan*, Appendix B at 19–20 (Oct. 30, 2023), https://www.boem.gov/renewable-energy/state-activities/cvow-c-record-decision ("Record of Decision").

individuals who are able to securely receive it.   *Amici*, as members of a co-equal branch of government, are entitled to receive and assess for themselves the information on which such momentous actions are based, particularly when those actions affect so directly the commonwealth and constituents they represent.  A refusal to share such information does not just undermine the separation of powers; it also eliminates a crucial check on erroneous and unsupported decision-making. When information is not timely shared, it is reasonable to ask why.  And asking that question is especially essential given the many steps the Administration has taken to target offshore wind projects in particular, several of which have been declared unlawful or are currently being challenged.  The question is whether the action reflects genuinely new national security evidence or whether instead "national security" is being invoked to support an action chosen for other reasons.

II. This Court should also carefully consider the equitable factors governing injunctive relief.  While genuine national security considerations properly carry significant weight in that inquiry, *Amici* thus far have received no information to substantiate BOEM's stated concerns about national security.  Meanwhile, *Amici* are keenly aware of the severe impact of BOEM's action on the people of Virginia, whom *Amici* are privileged to represent.  The order endangers Virginia's energy security and its status as a global leader in clean, reliable electricity.  It endangers billions of dollars in investment.  It harms Virginia customers, who may have to pay twice—not just losing the benefits that the Project will provide, but also bearing the cost of delay.  And the order puts at risk good paying jobs and economic development that benefit local communities.  Those harms are proliferating every day, and they cannot be justified by generalized and unvetted assertions about "national security."

## ARGUMENT

Plaintiffs are entitled to a preliminary injunction if they show they are "likely to succeed on the merits ..., likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Ocean Container Transp. LLC v. Jones*, No. 2:25-CV-543, 2025 WL 3769264, at *1 (E.D. Va. Oct. 3, 2025) (Walker, J.) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Here, *Amici* write to address two aspects of this test. First, on the merits, this Court will be called on to evaluate BOEM's "national security" justification. *Amici* have decades of experience with national security, and BOEM's vague invocation of national security raises grave concerns—concerns that should inform this Court's evaluation. Second, as representatives of the Virginians who face grave harm from BOEM's sudden suspension, *Amici* write to provide their perspective on the equitable factors governing injunctive relief.

I.    **When this Court Assesses Likelihood of Success on the Merits, It Should Weigh the Grave Concerns Raised By BOEM's Suspension of the Project Based on Vague Statements about "National Security."**

Key to this case is BOEM's stated justification for its sudden suspension—vague "reasons of national security." For example, BOEM cites for legal authority only 30 C.F.R. § 585.417(b), which states that BOEM "may order a suspension" when "necessary for reasons of national security or defense." BOEM's regulations further specify that a written suspension order must "explain the reasons for its issuance and describe the effect of the suspension order on [the] lease … and any associated activities." *Id.* § 585.418(c). BOEM must also comply with the Administrative Procedure Act ("APA"), which requires that agencies provide a "satisfactory explanation for [their] action[,] including a rational connection between the facts found and the choice made." *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983)) (second

6

alteration in original).  Because the Court's evaluation will include *ex parte* and *in camera* submissions that the executive branch has not otherwise made available, *Amici* write to underscore why BOEM's stated justification and unusual actions raise such grave concerns.

*Amici* are deeply committed to national security.  And precisely because *Amici* are so committed to national security, they recognize that it is imperative that national security issues be addressed deliberately and treated with the seriousness they deserve.  Through decades of collective service—including on the Senate Armed Services, Foreign Relations, and Intelligence Committees, and on the House Select Committee on U.S. National and Military/Commercial Concerns with the People's Republic of China and the Subcommittee on Crime, Terrorism, and Homeland Security of the House Judiciary Committee—*Amici* have worked closely with the executive branch across administrations to address sensitive national security issues.  They have seen many critical national security issues addressed rigorously and appropriately.  From everything *Amici* have seen here, BOEM's sudden and unexplained suspension of the Project, based on vague "national security" concerns, departs dramatically from the rigorous national security processes with which they are familiar.  And despite requests for the information underlying this decision, the executive branch has failed to provide it.  This lack of transparency raises grave concerns.

Offshore wind projects undergo substantial regulatory review by the federal government before they are approved.  Dominion Energy Virginia ran the requisite regulatory gauntlet for the Project, cooperating with the federal government through more than a decade of rigorous review, including under the first Trump administration.  Consistent with its statutory mandate, BOEM closely assessed and addressed all national security concerns raised by the Project, consulting with the Department of Defense specifically.  *See* 10 U.S.C. § 183a.  As BOEM explained, the agency

consulted with the Department "[a]t each stage of the regulatory process" "for the purposes of assessing national security considerations," and "coordinated with DoD to develop measures necessary to safeguard against potential liabilities and impacts on DoD activities."[3]  In January 2024, the Project received all necessary approvals for construction and operation, with a BOEM-approved Constructions and Operations Plan that contained extensive safeguards to address potential effects on national security.

Despite that review and those approvals, BOEM on December 22, 2025 issued an order immediately halting activities related to the Project—even as the project was nearing its scheduled start of operations.  The stated basis for BOEM's suspension was a confidential "national security" assessment by the Department of Defense from November 2025.  But BOEM provided no information regarding the content of that assessment, aside from a cursory and unexplained reference to "classified information" on "the rapid evolution of relevant adversary technologies."[4]  BOEM also issued its suspension order with no notice to Congress, to Dominion, or to any other relevant stakeholders—and, as far as *Amici* are aware, without previously having identified the specific national security issues allegedly presented by the Project to Congress or anyone else.

---

[3] Record of Decision, Appendix B at 19–20.

[4] Giacona Order at 1.  In a statement regarding the administration's suspension of offshore wind projects generally, the Department of Interior invoked concerns about wind turbines creating "radar interference called 'clutter.'"  Press Release, Dep't of Interior, *The Trump Administration Protects U.S. National Security by Pausing Offshore Wind Leases*, (Dec. 22, 2025), https://www.doi.gov/pressreleases/trump-administration-protects-us-national-security-pausing-offshore-wind-leases.  But even assuming that radar "clutter" could pose a problem, awareness of potential interference with radar is not a new development, as the Department's statement itself recognized.  *Id.*  Indeed, the potential effects of the CVOW Project on radar systems were addressed as part of the regulatory review process.  *See* BOEM, Coastal Virginia Offshore Wind Commercial Project, Final Environmental Impact Statement at 3.17-12 (Sept. 2023), https://www.boem.gov/renewable-energy/state-activities/cvow-cfeisvolumeifeis.  BOEM has identified no new information regarding radar "clutter" to support its last-minute change.

BOEM's sudden and unexplained halt to the Project, and other offshore wind projects, raises grave concerns. While national security is dynamic, the executive branch across administrations routinely engages with Congress and other stakeholders on even the most sensitive of national security issues. And based on *Amici*'s long experience, *Amici* would expect the executive branch to have made an effort to engage with Congress regarding issues like the ones here—particularly where, as here, an after-the-fact "assessment" upends a substantial energy project that already underwent extensive regulatory and national security review. Especially given their senior position on committees with significant national security oversight responsibilities, and as Senators and Representatives whose home state is directly impacted by the order regarding the Project, *Amici* would have expected notice of this type of action. And even when the executive branch does not provide advance notice, it often provides briefings after the fact, in appropriate classified settings as necessary. Here, two months after the November 2025 assessment, and one month after the stop-order, the administration thus far has done nothing of the sort.

Congressional consultation, absent here, is critical. It reflects Congress's role as a co-equal branch of government charged by the Constitution with substantial national security and oversight responsibilities. *See, e.g.*, *Watkins v. United States*, 354 U.S. 178, 187 (1957) ("The power of the Congress to conduct investigations is inherent in the legislative process. That power is broad. It encompasses inquiries concerning the administration of existing laws as well as proposed or possibly needed statutes. It includes surveys of defects in our social, economic or political system for the purpose of enabling the Congress to remedy them. It comprehends probes into departments of the Federal Government to expose corruption, inefficiency or waste."); *accord Trump v. Mazars USA, LLP*, 591 U.S. 848, 862 (2020) (emphasizing that "[t]he congressional power to obtain information is 'broad' and 'indispensable'"). Congress has a variety of established avenues to

conduct oversight on issues related to national security, including via the Senate Select Committee on Intelligence, the House Permanent Select Committee on Intelligence, the Senate and House Armed Services Committees, and the Senate and House Judiciary Committees, among others. The "Gang of Eight" congressional leaders regularly receive briefings on the Nation's most sensitive matters—a group that includes *Amicus* Senator Warner. And in certain areas, the Executive is required by statute to keep Congress apprised of national security-related matters. *See, e.g.*, 50 U.S.C. § 3091(a)(1) ("The President shall ensure that the congressional intelligence committees are kept fully and currently informed of the intelligence activities of the United States[.]").

Congress's involvement in national security matters isn't a mere formality; congressional consultation helps get things right: The way to work through genuine national security concerns, especially concerns with so direct an impact on domestic constituents, is not unilateral executive action based on secret evidence. Instead, both the Constitution and sound policy-making call for engagement with Congress and other stakeholders who possess relevant expertise, using established mechanisms to protect classified and sensitive information as appropriate. *See Nixon v. Fitzgerald*, 457 U.S. 731, 757 (1982) (emphasizing that "[v]igilant oversight by Congress … may serve to deter Presidential abuses of office"); *cf. Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 16 (2015) ("In foreign affairs, as in the domestic realm, the Constitution 'enjoins upon its branches separateness but interdependence, autonomy but reciprocity.'" (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring))).

More to the point: *Amici*, via staff, have requested the information on which BOEM's sudden reversal is based. But the Administration has not shared any information with *Amici* or, as far as *Amici* are aware, with any of the myriad stakeholders affected by BOEM's suspension of the Project or other similar projects. If *Amici* had received this information, *Amici* would be well-

positioned to evaluate it.  Given *Amici*'s experience with national security issues and positions on relevant committees, *Amici* could assess the evidence supporting the "assessment," whether that evidence was genuinely new, and whether that evidence in fact supported the categorical suspension of offshore wind projects—or whether, instead, any such evidence would suggest a more calibrated response.  Yet here, neither BOEM nor DoD has made available the "national security" assessment used to justify BOEM's stoppage, even in a classified setting.  Thus, as we sit here today—two months after the November 2025 assessment, and three weeks after BOEM issued its order to Dominion—the administration has failed to share any information.  Moreover, to even colorably justify the order's extraordinary step—halting, at an advanced stage of construction a multi-billion dollar investment, and one that is itself critical to supporting national security, energy independence, and good-paying jobs—the new information would need to be significant indeed.  That type of information is unlikely to reside in an unshared assessment produced by unidentified individuals via an unidentified process.  *Amici* are not aware of any information that would support this precipitous action.

When the executive branch is so reluctant to share with Congress the evidence assertedly supporting its actions, it is important to ask why.  As the Supreme Court has emphasized, courts are "not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) (quoting *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977)).  They instead must hold executive agencies to their burden to "offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public"— because "[a]ccepting contrived reasons would defeat the purpose of the enterprise," turning "judicial review" into little "more than an empty ritual." *Id.*

Those admonitions resonate powerfully here. On the one hand, the President has made no secret of his personal view of offshore wind. On the President's very first day in office, he stated that "[w]e are not going to do the wind thing," and he has called wind farms "big" and "pathetic."[5] In July 2025, the President declared it a "shame" that he could "look over the horizon" from his Scotland golf course and "see … windmills."[6] On the other hand, the Administration has taken a series of actions targeting wind energy in general and offshore wind in particular. These include a directive stopping all new and renewed federal permitting for wind energy projects,[7] an executive order and order from the Secretary of the Interior aimed at ending subsidies for wind energy,[8] a BOEM announcement de-designating over 3.5 million acres of federal waters that were previously pre-approved for wind energy lease auctions,[9] and prior stop-work orders.[10] Several of those

---

[5] Will Pavia, *Why is President Trump obsessed with windmills?*, The Times (Sept. 23, 2025), https://www.thetimes.com/us/american-politics/article/why-is-trump-obsessed-with-windmills-wind-turbines-2mr3cvwm3?gaa_at=eafs&gaa_n=AWEtsqelTyopjU-cdX6vh3IwsJAaW06vGYtvMINsd_d3eo5cepJNzGO1naE75ksK3Ps%3D&gaa_ts=69606997&gaa_sig=FEXzrpWcG14Csqe__zbxOa6kOOLs9H-R6JV5xTVk2AMzKGxTl7zJ6JwwSWu7lV9NHxMLSzZIjsNrafgd8zTx4w%3D%3D.

[6] Jack Hobbs, *Trump Declares Windmills are 'Killing New Jersey' and Calls Them 'Stupid and Ugly' in Social Media Rant*, The Mirror (Aug. 19, 2025), https://www.themirror.com/news/politics/trump-declares-windmills-killing-new-1337963.

[7] Presidential Memorandum, *Temporary Withdrawal of All Areas on the Outer Continental Shelf From Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects*, 90 Fed. Reg. 8,363 (Jan. 20, 2025).

[8] *Ending Market Distorting Subsidies for Unreliable, Foreign-Controlled Energy Sources*, Exec. Order 14,315, 90 Fed. Reg. 30,821 (July 7, 2025); *Ending Preferential Treatment for Unreliable, Foreign-Controlled Energy Sources in Department Decision-Making*, DOI Secretarial Order No. 3,437 (July 29, 2025), https://www.doi.gov/document-library/secretary-order/so-3437-ending-preferential-treatment-unreliable-foreign.

[9] Press Release, BOEM, *BOEM Rescinds Designated Wind Energy Areas on the Outer Continental Shelf* (July 30, 2025), https://www.boem.gov/newsroom/notes-stakeholders/boem-rescinds-designated-wind-energy-areas-outer-continental-shelf.

[10] *See, e.g.*, Director's Order, Walter D. Cruickshank, Acting Director, BOEM (Apr. 16, 2025), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/BOEM%20Director%26%23039%3Bs%20Order%20Empire%20Wind.pdf; Director's Order, Matthew Giacona, Acting Director, BOEM (Aug. 22, 2025), https://www.boem.gov/sites/default/

actions have been declared unlawful or are currently being challenged.[11]  When the executive branch against this backdrop orders a sudden suspension based on general "national security" concerns that it fails to disclose, there is every reason to ask whether that suspension reflects genuine evidence, or rather a search for a justification for a predetermined result.  "National security" cannot become a talisman that forces other branches to relinquish their proper roles.[12]  Instead, national security powers, "like every other governmental power, must be exercised in subordination to the applicable provisions of the Constitution" and applicable law.  *Dames & Moore v. Regan*, 453 U.S. 654, 661 (1981) (quotation marks omitted).

## II.    When this Court Assesses the Equitable Factors, It Should Weigh that BOEM's Unexplained Suspension Is Inflicting Great Harm on Virginia, Which Increases Every Day.

*Amici* also have a perspective on the equitable factors governing preliminary injunctive relief—irreparable harm, the balance of equities, and the public interest.  While genuine national security considerations should carry significant weight in that inquiry, *Amici* thus far have received no information to substantiate BOEM's stated concerns about national security that would justify according them weight here.  Meanwhile, *Amici* are acutely aware of how severely the order harms

---

files/documents/renewable-energy/Director%26%23039%3BsOrder-20250822.pdf?VersionId= Y674sNo8zi7jLu3VWRvq2hFb_8KtMldc.

[11] *New York v. Trump*, No. 25-CV-11221, ___ F. Supp. 3d ___, 2025 WL 3514301 (D. Mass. Dec. 8, 2025); Order Granting Preliminary Injunction, *Revolution Wind, LLC v. Burgum*, No. 1:25-cv-02999 (D.D.C. Sept. 22, 2025), ECF No. 36.

[12] *See, e.g.*, *V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312, 1320 (Fed. Cir. 2025) (invalidating unprecedented tariffs based on alleged "unusual and extraordinary threat[s]" to national security (quoting Exec. Order No, 14,194, 90 Fed. Reg. 9,117, 9,118), *cert. granted*, No. 25-250, 2025 WL 2601020 (U.S. Sept. 9, 2025); *President & Fellows of Harvard Coll. v. U.S. Dep't of Homeland Sec.*, 788 F. Supp. 3d 182, 194 (D. Mass. 2025) (enjoining presidential proclamation based on purported national security concerns), *appeal docketed*, No. 25-1627 (1st Cir. July 1, 2025); *Perkins Coie LLP v. U.S. Dep't of Just.*, 783 F. Supp. 3d 105, 144 (D.D.C. 2025) (enjoining executive order based on purported national security concerns), *appeal docketed*, No. 25-5241 (D.C. Cir. July 2, 2025).

the people of Virginia, whom *Amici* are privileged to represent and serve, as well as the Nation as a whole. These harms should carry great weight.

*First*, the order endangers Virginia's energy security and its status as a global leader. As an innovator in the artificial intelligence industry, Virginia is home to the world's largest concentration of data centers. Data centers increase demand and, accordingly, require a growing supply of reliable energy. The Project here is designed to do just that: provide reliable energy that ensures energy is affordable for Virginian families. The stop order does the opposite, putting Virginia's leadership in artificial intelligence and national security at risk. More than that: By stopping the development of infrastructure that is necessary to reliably serve and expand Virginia's data centers, the order undermines the national security of our country as a whole.[13]

*Second*, the suspension order endangers billions of dollars in investment in critical energy generation. Dominion has already spent approximately $8.9 billion on the Project. ECF No. 11-1 at 3. The order could strand that enormous investment. That would deprive Virginians of a vast amount of clean energy and harm Virginia customers, who will not only be denied the benefits of the project but also bear additional costs. The Virginia State Corporation Commission approved a regulatory agreement under which the costs of the Project will be paid in part by Virginia ratepayers.[14] The suspension order offers no means of compensating Virginia's residents for this loss, including a projection of roughly $3 billion in savings in just the first ten years of operation. Meanwhile, the stop order alone is imposing costs of more than $5 million per day.

---

[13] *Cf.* Executive Office of the President, *Winning the Race: America's AI Action Plan* at 15 (July 2025), https://www.whitehouse.gov/wp-content/uploads/2025/07/Americas-AI-Action-Plan.pdf (emphasizing the national security need to accelerate data center buildout, including by "enhanc[ing] and expand[ing] the power grid" to do so).

[14] *See generally Application of Virginia Electric and Power Company and OSW Project LLC*, No. PUR-2024-00206 (Va. State Corp. Comm'n).

*Third*, the suspension order puts good paying jobs and economic development that benefits local communities at risk. The Project, once operational, will generate over $200 million in annual economic output and approximately 1,100 well-paying jobs.[15] These jobs will be concentrated in Hampton Roads, Virginia, where the Project is anchored. That local community stands to benefit from hundreds of millions of dollars in tax revenue, salary and benefits, and economic activity. But if the suspension order is allowed to stand, these considerable economic benefits will disappear, and Virginians will suffer as a result.

## CONCLUSION

*Amici* respectfully request that the Court take these views into account as it considers the motion for a preliminary injunction.

Dated: January 11, 2026

Respectfully submitted,

*/s/ Shreve Ariail*
Shreve Ariail (Bar No. 96321)
Zachary C. Schauf (pro hac pending)
Meghan E. Greenfield (pro hac pending)
Aaron R. Cooper (pro hac pending)
JENNER & BLOCK LLP
1099 New York Ave., NW, Suite 900
Washington, DC 20001
Tel: (202) 639-6000
Fax: (202) 639-6066
sariail@jenner.com
zschauf@jenner.com
mgreenfield@jenner.com
acooper@jenner.com
*Counsel for Amici Curiae Senators Mark R.*
*Warner and Tim Kaine and Representative*
*Bobby Scott*

---

[15] *See* Press Release, Dominion Energy, *Dominion Energy, Trade Unions Announce Coastal Virginia Offshore Wind Partnership* (Sept. 16, 2021), https://investors.dominionenergy.com/news/press-release-details/2021/Dominion-Energy-Trade-Unions-Announce-Coastal-Virginia-Offshore-Wind-Partnership/default.aspx.

## CERTIFICATE OF SERVICE

I hereby certify that, on January 11, 2026 I caused the foregoing to be electronically filed with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all parties of record.

*/s/ Shreve Ariail*
Shreve Ariail (Bar No. 96321)
JENNER & BLOCK LLP
1099 New York Ave., NW, Suite 900
Washington, DC 20001
Tel: (202) 639-6000
Fax: (202) 639-6066
sariail@jenner.com

*Counsel for Amici Curiae Senators Mark R. Warner and Tim Kaine and Representative Bobby Scott*
