**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION**

|  |  |
|---|---|
| VIRGINIA ELECTRIC AND POWER COMPANY, D/B/A DOMINION ENERGY VIRGINIA; OSW PROJECT LLC,<br><br>        Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR; BUREAU OF OCEAN ENERGY MANAGEMENT; DOUGLAS BURGUM, Secretary of the Interior, in his official capacity; MATTHEW GIACONA, Acting Director, Bureau of Ocean Energy Management, in his official capacity,<br><br>        Defendants. | Case No. 2:25-cv-00830-JKW-LRL |

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................ iii

INTRODUCTION ......................................................................................................... 1

ARGUMENT ................................................................................................................ 3

I.     DEV Has Determonstrated Likelihood of Success on the Merits.................................... 3

II.    DEV Has Determonstrated Immediate, Severe, Irreparable Harm................................ 7

    A.   DEV's Harm Is Cognizable and Irreparable Under Applicable Law. ........................... 8

    B.   An Injunction Excluding CVOW Operations Would Not Prevent Irreparable
       Harm. ....................................................................................................... 11

III.    DEV Has Demonstrated that the Balance of the Equities and the Public
       Interest Favor Preliminary Injunctive Relief. ................................................... 12

CONCLUSION ............................................................................................................ 17

ii

# TABLE OF AUTHORITIES

***Cases***

*Bello v. Gacki*,
    94 F.4th 1067 (D.C. Cir. 2024) ....................................................................................... 13

*De Biase v. SPX Corp*,
    872 F.3d 224 (4th Cir. 2017) ............................................................................................. 9

*DHS v. Regents of Univ. of Cal.*,
    591 U.S. 1 (2020) ............................................................................................................. 17

*Dickson v. Sec'y of Def.*,
    68 F.3d 1396 (D.C. Cir. 1995) ........................................................................................ 13

*E. Tenn. Nat. Gas Co. v. Sage*,
    361 F.3d 808 (4th Cir. 2004) .................................................................................. 8, 9, 11

*Empire Leaseholder LLC v. Burgum*,
    No. 26-0004 (D.D.C. Jan. 13, 2026) ............................................................................... 14

*Evans v. City of Lynchburg*,
    766 F. Supp. 3d 614 (W.D. Va. 2025) ............................................................................... 3

*Kirwa v. U.S. Dep't of Def.*,
    285 F. Supp. 3d 257 (D.D.C. 2018) ................................................................................. 12

*Life Techs. Corp. v. Promega Corp.*,
    580 U.S. 140 (2017) ........................................................................................................... 5

*Lost Lake Holdings LLC v. Town of Forestburgh*,
    No. 22-10656, 2023 WL 8947154 (S.D.N.Y. Dec. 28, 2023) ........................................... 9

*Louisiana v. Biden*,
    622 F. Supp. 3d 267 (W.D. La. 2022) ............................................................................... 8

*Montgomery Cnty. Ass'n of Realtors, Inc. v. Realty Photo Master Corp.*,
    783 F. Supp. 952 (D. Md. 1992) ................................................................................... 9, 16

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ............................................................................................................. 4

*Mountain Valley Pipeline LLC v. 6.56 Acres of Land*,
    915 F.3d 197 (4th Cir. 2019) .......................................................................................... 8, 9

*N.C. Growers Association v. Solis*,
　644 F. Supp. 2d 664 (M.D.N.C. 2009) ................................................................. 9

*Nansemond Indian Nation v. Virginia*,
　795 F. Supp. 3d 733 (E.D. Va. 2025) .................................................................. 5

*Noble Energy, Inc. v. Salazar*,
　671 F.3d 1241 (D.C. Cir. 2012) ........................................................................... 7

*O'Brien v. Appomattox Cnty.*,
　213 F. Supp. 2d 627 (W.D. Va. 2002) ................................................................. 9

*Olivares v. TSA*,
　819 F.3d 454 (D.C. Cir. 2016) ........................................................................... 13

*President and Fellows of Harvard Coll. v. U.S. Dep't of Homeland Sec.*,
　788 F. Supp. 3d 182 (D. Mass. 2025) ................................................................ 13

*Randall v. United States*,
　95 F.3d 339 (4th Cir. 1996) ................................................................................. 7

*Real Time Med. Sys., Inc. v. PointClickCare Tech., Inc.*,
　131 F.4th 205 (4th Cir. 2025) ............................................................................. 3

*Revolution Wind, LLC v. Burgum*,
　No. 25-cv-02999-RCL (D.D.C. Sept. 4, 2025) ........................................ 2, 3, 4, 5, 15, 17

*Roetenberg v. Sec'y of the Air Force*,
　73 F. Supp. 2d 631 (E.D. Va. 1999) .................................................................... 7

*Rubin v. Islamic Republic of Iran*,
　583 U.S. 202 (2018) ............................................................................................. 5

*Russello v. United States*,
　464 U.S. 16 (1983) ............................................................................................... 5

*Sampson v. Murray*,
　415 U.S. 61 (1974) ............................................................................................... 9

*Texas v. United States*,
　798 F.3d 1108 (D.C. Cir. 2015) ........................................................................... 3

*Winter v. Nat. Res. Def. Council, Inc.*,
　555 U.S. 7 (2008) ............................................................................................... 14

iv

*Federal Statutes*

5 U.S.C. § 706(2)(A) .............................................................................................................. 3

43 U.S.C. § 1334 .................................................................................................................... 6

43 U.S.C. § 1334(2)(B) .......................................................................................................... 6

43 U.S.C. § 1334(a)(1) ........................................................................................................... 6

43 U.S.C. § 1334(a)(2)(A) ...................................................................................................... 6

43 U.S.C. § 1337(p) ............................................................................................................... 4

43 U.S.C. § 1337(p)(4) ....................................................................................................... 4, 6

43 U.S.C. § 1337(p)(5) ........................................................................................................... 6

43 U.S.C. § 1341 .................................................................................................................... 6

43 U.S.C. § 1341(c) ....................................................................................................... 4, 5, 10

43 U.S.C. § 1349(a) ............................................................................................................. 3, 7

43 U.S.C. § 1349(b)(1) ........................................................................................................... 7

*State Statutes*

Va. Code § 56-585.1:11(C)(1) ............................................................................................... 10

Va. Code § 56.585.1(A)(6). ................................................................................................... 10

Va. Code § 56.585.1(D). ........................................................................................................ 10

*Federal Regulations*

30 C.F.R. § 585.417 ................................................................................................................ 4

**INTRODUCTION**

As Dominion Energy Virginia (DEV) has demonstrated, this Court should immediately grant a preliminary injunction enjoining the Bureau of Ocean Energy Management (BOEM) Acting Director's Order suddenly halting construction of the vital Coastal Virginia Offshore Wind - Commercial Project (CVOW) on the Outer Continental Shelf (OCS). The government's half-hearted opposition does not dispute that the Order is arbitrary and capricious under Administrative Procedure Act (APA), contravenes APA Section 558, or violates the Outer Continental Shelf Lands Act (OCSLA), thereby conceding DEV's likelihood of success on the merits of those claims. As to DEV's claim that the Order is contrary to law under the APA, BOEM's novel assertion that it has plenary suspension authority tries to rewrite plain statutory, regulatory, and lease terms—and still fails to make any assertion particularized to CVOW. The government also fails to address or rebut extensive evidence of the Order's imposed harm of millions of dollars per day, delays in delivering needed energy, and existential risk to CVOW and Plaintiff OSW Project LLC; nor does the government identify how such harms would be recoverable or reparable under these circumstances. The government now concedes that CVOW construction poses no new risk; its attempt to then salvage its argument in opposition is impermissibly post hoc and baseless.

The government's opposition (Dkt. No. 55) chiefly posits that—notwithstanding that the Order is unlawful and imposes severe, irreparable harm—its invocation of "national security" inexorably balances the equities against DEV for a preliminary injunction. It does not. The government cannot base equity arguments on an asserted national security rationale that it does not even defend on the merits. And whatever information the government provided the Court *ex parte* and *in camera*, the government's conduct in delaying, bypassing established national security processes, and wholly excluding persons most equipped to respond to threats indicates

1

that any concern is neither "new" nor exigent, but rather is likely pretextual, rendering the Order

arbitrary and capricious.[1]  Indeed, BOEM's Order does not appear to be focused on stopping

national security threats, but rather wind energy development.  Meanwhile, the government

ignores CVOW's numerous safeguards and *enhancements* to national security, as well as its

energy security, economic, and job benefits, as the *amici curiae* submissions by the regional grid

operator PJM, labor unions, and Members of Congress further highlight.  *See* Dkt. Nos. 67, 68,

69.  These final preliminary injunction factors thus also favor DEV and a preliminary injunction.

Earlier this week, another court preliminarily enjoined a nearly identical BOEM

suspension order for another offshore wind project.  *Revolution Wind*, *LLC v. Burgum*, No. 25-

cv-02999-RCL (D.D.C. Sept. 4, 2025), Dkt. No. 63 (Jan. 12, 2025); *id.* Dkt. No. 65, at 40-46

(oral ruling within Prelim. Inj. Hearing Transcript, attached as Attachment A).[2]  In doing so, that

court validated the same legal and factual arguments DEV raises here.  Most notably, that court

was in receipt of ostensibly the same "secret" classified information BOEM provided to this

Court, and concluded that BOEM had not "provided any evidence of a new finding of

particularized harm such that the government could order an immediate suspension."  *Revolution*

*Wind*, Attachment A at 44-45.  That court found BOEM's order was arbitrary and unsupported,

*id.* at 42 ("Pointing to ongoing national security concerns based on purportedly new classified

information does not constitute a sufficient explanation for the Bureau's decision to entirely stop

work on the Revolution Wind project.").  Moreover, that court found that BOEM's order may be

---

[1] Unlike in other cases challenging BOEM's other December 22 suspension orders, the government here filed no notice of its sharing classified information with the Court.  *E.g.*, *Revolution Wind*, Dkt. No. 61.  DEV can only assume that the government did so as the Court ordered.  Dkt. No. 22.

[2] *Compare* https://www.boem.gov/renewable-energy/state-activities/boem-cvow-suspension-letter (CVOW Order), *with* https://www.boem.gov/renewable-energy/state-activities/boem-revolution-wind-suspension-letter (Revolution Wind Order).

pretextual, *id*. at 44; daily losses of millions of dollars and project delays supported immediate

irreparable harm, *id*. at 45; and "the balance of equities clearly cut in favor of Revolution Wind

continuing work while the government considers ways to mitigate any national security concerns

that the project may implicate." *Id*. at 45-46.  The same conclusions should apply here.

**ARGUMENT**

## I.      DEV HAS DEMONSTRATED LIKELIHOOD OF SUCCESS ON THE MERITS.

The government does not respond at all to DEV's claims that the Order is arbitrary and

capricious under the APA, 5 U.S.C. § 706(2)(A), and violates OCSLA, 43 U.S.C. § 1349(a).  *See*

Dkt. No. 39 (Pl. Mem. ISO Mot. for Prelim. Inj.) at 19-26; Dkt. No. 1 (DEV Complaint) at 36-41

(Counts II and III).  Among other things, the government does not dispute that its Order lacks

support, is internally inconsistent, is an unexplained change in position, disregarded serious

reliance interests, and is likely pretextual.  *See id.*  "Failure to respond to conspicuous,

nonfrivolous arguments in an opponent's brief constitutes a waiver of the corresponding claims."

*Evans v. City of Lynchburg*, 766 F. Supp. 3d 614, 618-19 (W.D. Va. 2025); *see also Texas v.

United States*, 798 F.3d 1108, 1110 (D.C. Cir. 2015) (construing D.D.C. local rule and finding

"if a party files an opposition to a motion and therein addresses only some of the movant's

arguments, the court may treat the unaddressed arguments as conceded").  This principle applies

equally to preliminary injunction or other expedited proceedings.  *Real Time Med. Sys., Inc. v.

PointClickCare Tech., Inc.*, 131 F.4th 205, 223 (4th Cir. 2025) (waiver applies to issues not

adequately raised in the district court on a preliminary injunction motion).  Thus, for purposes of

the present motion, the Court need go no further to find that DEV has demonstrated likelihood of

success on at least these claims where the government has waived any defense at this stage.

Nor does BOEM contest its failure to adhere to OCSLA's express limits on suspensions,

including specifically for national security, and to BOEM's regulations and lease terms

3

implementing those limits.  *See* Dkt. No. 39 at 15-19; Dkt. No. 55 at 8-10.  BOEM's attempt to fashion plenary suspension authority under 43 U.S.C. § 1337(p)(4) cannot save its Order either.

*First*, this is impermissible post hoc reasoning by BOEM and its counsel.  *See* Dkt. No. 39 at 19-20 (citations omitted).  The Order does not even mention 43 U.S.C. § 1337(p)(4), and relies solely on 30 C.F.R. § 585.417.  BOEM's new ground first appears in the government's brief and supporting declarations.  Dkt. No. 55 at 8-9; Dkt. No. 55-1 ¶ 7; Dkt. No. 19-1 ¶ 12.  The Court thus should afford it no weight.  *See Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) ("courts may not accept appellate counsel's post hoc rationalizations for agency action"); *Revolution Wind*, Attachment A at 42-43 (rejecting rationales not stated in BOEM suspension order almost identical to CVOW Order).

*Second*, for suspensions, BOEM's assertion that OCSLA "Section 1341(c) is not the sole source of statutory authority related to national security issues" is novel and incorrect.  Dkt. No. 55 at 8.  From OCSLA's inception in 1953, Congress in Section 12's "national security clause" expressly and distinctly provided for suspensions on national security grounds.  43 U.S.C. § 1341(c); Pub. L. No. 83-212 § 12(c), 67 Stat. 462 (Aug 7, 1953).  This statutory provision explicitly applies to "all leases issued under this subchapter" and therefore also governs wind energy leases issued under 43 U.S.C. § 1337(p).  *Id.*  In turn, BOEM's lease terms for CVOW provide for lease suspensions on national security grounds only per OSCLA Section 12, and subject to additional constraints (e.g., prior notice, presumed 72-hour maximum, and a finding of particularized harm beyond a merely stated conclusion) not followed here.  *See* Dkt. No. 39 at 17-18; Dkt. No. 39-1 (current CVOW lease).  The district court in *Revolution Wind* concluded that these provisions limit BOEM's suspension authority, and that BOEM had not complied with the lease's requirement to make findings of particularized harm.  Attachment A at 44-45.

4

BOEM's effort to now downplay 43 U.S.C. § 1341(c) would negate it, here and elsewhere, by excusing its preconditions for a lease suspension based on national security.  43 U.S.C. § 1341(c) (requiring a "recommendation of the Secretary of Defense [DoD], during a state of war or national emergency declared by the Congress or the President").  That is, BOEM would have no cause to ever resort to § 1341(c)'s narrow terms.  And this is not merely academic—the text of § 1341(c) (along with § 1341(d)) reflects Congress' decision to place the responsibility on DoD rather than BOEM to deem a lease suspension necessary on national security grounds.  BOEM is not a "military authorit[y]," and here the evidence does not even show that DoD recommended a lease suspension.  *Cf.* Dkt. No. 55 at 15; Dkt. No. 55-2.  This Court should not condone BOEM utilizing § 1337(p)(4) as a loophole to afford BOEM power to make unilateral national security judgments to suspend leases on a whim, or to displace any other of OCSLA's specific protections.  *See, e.g.*, *Nansemond Indian Nation v. Virginia,* 795 F. Supp. 3d 733, 763-64 (E.D. Va. 2025) ("[a] commonplace of statutory construction [is] that the specific governs the general") (citation and internal quotation marks omitted); *Rubin v. Islamic Republic of Iran*, 583 U.S. 202, 213 (2018) ("[O]ne of the most basic interpretive canons" is "that [a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.") (citation and internal quotation marks omitted); *Life Techs. Corp. v. Promega Corp.*, 580 U.S. 140, 141 (2017) ("Whenever possible, however, we should favor an interpretation that gives meaning to each statutory provision."); *Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (citation omitted).

*Third*, 43 U.S.C. § 1337(p)(4) by its terms does not afford *any* suspension authority, or even allow BOEM to freely revisit its CVOW lease or COP approvals. Congress knew how to provide for suspensions in OCSLA, and BOEM's opposition does not invoke *any* of those provisions.[3] Moreover, BOEM after years of analysis already determined that CVOW satisfied 43 U.S.C. § 1337(p)(4), including specifically paragraph (F) on "protection of national security interests of the United States."[4] The Order gives no basis to disturb that reasoned and well-supported conclusion, and proffers no particularized allegations as to CVOW whatsoever.

*Fourth*, BOEM's citation to OCSLA's lease cancellation provision does not help BOEM either. *See* Dkt. No. 55 at 8. That provision addresses "cancellation of any lease," if "continued activity" would "probably cause serious harm or damage" including to "the national security or defense," and if other conditions are met. 43 U.S.C. § 1334(a)(2)(A). But the CVOW Order directs a *suspension*, not cancellation. BOEM does not argue that 43 U.S.C. § 1334(a)(1) applies, which provides for suspensions on other narrow grounds that *omit* national security (unlike § 1341(c)). A lease cancellation also requires, among other things, a valid suspension for the prior five years. *Id.* § 1334(a)(2)(B). There is no incongruity as BOEM avers.

BOEM's final merits argument suggesting that this Court should ignore the terms of the CVOW lease fares no better. Dkt. No. 55 at 9-10. BOEM misapprehends DEV's argument, which shows that the CVOW lease reflects BOEM's own long understanding that OCSLA

---

[3] The government does not even cite 43 U.S.C. § 1337(p)(5), which as DEV explained simply directs the Secretary to adopt regulations regarding lease "issuance, transfer, renewal, suspension and cancellation" for renewable energy leases. Dkt. 39 at 17. That paragraph does not create an alternative and broader statutory basis to suspend wind energy leases, which would negate OCSLA's extensive provisions governing lease suspensions in 43 U.S.C. §§ 1334 and 1341.

[4] *See* BOEM CVOW Record of Decision, Appendix B, at 19-20, https://www.boem.gov/renewable-energy/state-activities/cvow-c-record-decision.

Section 12 governs a lease suspension for national security.[5]  DEV has brought no claim for breach of its lease or for money damages within the jurisdiction of the Court of Federal Claims, and the Fourth Circuit has found that claims seeking injunctive relief like here are properly brought in federal district courts like this Court.  *Randall v. United States*, 95 F.3d 339, 347 (4th Cir. 1996) (jurisdiction lies in federal district court, not the Court of Federal Claims, where injunctive relief is "the essence" of the complaint); *Roetenberg v. Sec'y of the Air Force*, 73 F. Supp. 2d 631, 636 (E.D. Va. 1999) (Court of Federal Claims lacks jurisdiction where "any financial ramifications of a favorable decision are subordinate to the equitable relief").

And regardless, BOEM overlooks that OCSLA expressly provides for claims based on violations of lease terms and sets venue in federal district courts like this Court.  43 U.S.C. § 1349(a)(1) (providing for "a civil action" for "any alleged violation" of "the terms of any permit or lease issued by the Secretary under this subchapter"); *id.* § 1349(b)(1) ("the district courts of the United States shall have jurisdiction of cases and controversies arising out of, or in connection with … (B) the cancellation, suspension, or termination of a lease or permit under this subchapter.  Proceedings with respect to any such case or controversy may be instituted in the judicial district in which any defendant resides or may be found, or in the judicial district of the State nearest the place the cause of action arose."); *see Noble Energy, Inc. v. Salazar*, 671 F.3d 1241, 1244 & n.4 (D.C. Cir. 2012).  This Court thus may consider BOEM's failure to follow its lease terms restricting suspensions.

## II.    DEV HAS DEMONSTRATED IMMEDIATE, SEVERE, IRREPARABLE HARM.

BOEM concedes DEV's factual showing of harm, nowhere contesting that the Order is costing DEV $5 million a day in idle vessels, equipment, and personnel, and jeopardizing

---

[5] BOEM's unexplained change in position on available bases for suspensions between its CVOW lease and its CVOW Order further underscores that the Order is arbitrary and capricious.

CVOW itself given its complex and interdependent construction and operation schedule with limited windows to secure and utilize specialized vessels, equipment, and labor. Instead, BOEM misreads Circuit law in an effort to claim these harms do not qualify as irreparable injury, and unsuccessfully seeks to pivot to focus the Order on CVOW operations rather than construction.

### A. DEV's Harm Is Cognizable and Irreparable Under Applicable Law.

The government does not disclaim or refute its sovereign immunity to monetary damages claims, Dkt. No. 39 at 28, and offers no remedy that could begin to address the broad spectrum of harms caused by BOEM's Order. *See also Louisiana v. Biden*, 622 F. Supp. 3d 267, 297 (W.D. La. 2022) (federal oil and gas leasing pause created economic losses that "would be difficult, if not impossible to recover due to sovereign immunity").

Contrary to BOEM's arguments, the Fourth Circuit has expressly found that unrecoverable financial losses can constitute irreparable injury. In both *Mountain Valley Pipeline LLC v. 6.56 Acres of Land,* 915 F.3d 197, 217-19 (4th Cir. 2019) and *E. Tenn. Nat. Gas Co. v. Sage*, 361 F.3d 808, 830 (4th Cir. 2004), the court found that "unrecoverable financial harms" such as "prospective economic injuries flowing from a delay in … construction" constituted irreparable harm. *Mountain Valley Pipeline*, 915 F.3d at 218 (citing *Sage*, 361 F.3d at 828-29 and other decisions). The government claims that those cases involved delays that imperiled the project as a whole. Yet, both cases also separately found that the financial harms caused by the delays, standing alone, constituted irreparable harm. *Mountain Valley Pipeline*, 915 F.3d at 217 (analyzing "significant and unrecoverable financial losses" as "the second form

of irreparable injury found by the district courts"); *Sage*, 361 F.3d at 830 ("increased

construction costs and losses" are irreparable harm).[6]

As to the government's argument that only economic harm involving an "existential"

threat can constitute irreparable harm, Dkt. No. 55 at 13, the Fourth Circuit has rejected any such

requirement in the clearest terms. *Mountain Valley Pipeline,* 915 F.3d at 217-18 ("All three

district courts rejected that argument as inconsistent with our case law, and we agree.").  BOEM

selectively quotes cases that address existential threats in the contest of *compensable* monetary

harm.  Dkt. No. 55 at 12.  Because the harm here is not compensable, those cases are irrelevant.[7]

And in any event, unrefuted evidence demonstrates that the Order places completion and

operation of CVOW itself, OSW Project LLC's sole undertaking, at risk.  Declaration of Grant

Hollett (H.D.) ¶ 22, Dkt. No. 39-2.

---

[6] BOEM cites an unpublished, out-of-Circuit decision for the proposition that "delayed development does not amount to irreparable harm" (Dkt. No. 55 at 14).  That derived proposition is incorrect.  That case found no irreparable harm from state-level environmental review delays occasioned by additional building applications "without more," and pointed to (unlike here) the availability of "monetary damages after a trial on the merits."  *Lost Lake Holdings LLC v. Town of Forestburgh*, No. 22-10656, 2023 WL 8947154, at *8 (S.D.N.Y. Dec. 28, 2023).

[7] BOEM cites *N.C. Growers Association v. Solis*, which actually says that the view that economic losses do not constitute irreparable harm "rests on the assumption that economic losses are recoverable."  644 F. Supp. 2d. 664, 671 (M.D.N.C. 2009).  In *Di Biase*, the sentence of the opinion after the one cited by the government refers to "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date," *De Biase v. SPX Corp*, 872 F.3d 224, 230 (4th Cir. 2017), and cites to *Sampson v. Murray*, 415 U.S. 61, 90 (1974), a case that refers to "the temporary loss of income, ultimately to be recovered."  *O'Brien* likewise refers to "the opportunity to recover money damages," *O'Brien v. Appomattox Cnty*., 213 F. Supp. 2d 627, 631 (W.D. Va. 2002), and cites *Sampson*.  Similarly, *Montgomery County* only says that economic damages are insufficient to establish irreparable harm "because such injuries can be compensated for monetarily," which is not true here.  *Montgomery Cnty. Ass'n of Realtors, Inc. v. Realty Photo Master Corp.*, 783 F. Supp. 952, 958 (D. Md. 1992).  As the court there explained, the compensability of harm becomes irrelevant if "the anticipated economic injury is of such severity that the company will be put out of business altogether."  *Id.*  The present case involves *non-compensable* harms.

9

BOEM also ignores other harms directly to DEV.  CVOW faces myriad contractual and regulatory deadlines to keep project construction on schedule, with which the Order interferes. DEV is a public service company with an obligation to serve, which the Order impairs.  Further, DEV bears the risk of increased costs until the Virginia State Corporation Commission finds that those costs incurred, or to be incurred, are reasonable and prudent and approved for recovery from ratepaying customers.  *See* Va. Code §§ 56-585.1(A)(6), (D); 56-585.1:11(C)(1).  For CVOW, the Virginia State Corporation Commission imposed a cost sharing mechanism for CVOW's costs under which DEV and ratepaying customers have a 50/50 percent share of approved project costs between $10.3 and $11.3 billion, and ratepaying customers do not bear any costs between $11.3 and 13.7 billion.[8]  The current project investment is $11.2 billion.  H.D. ¶ 10.

The government coyly suggests that the harms here might be compensable, citing 43 U.S.C. § 1341(c), which provides for "just compensation" upon a state of war or a national emergency declared by Congress or the President resulting in suspension of operations under a lease.  But the government has disclaimed reliance on that provision as a basis for the BOEM Order, and expressly "does not concede" the applicability of its compensation remedy.  Dkt. No. 55 at 13.  And as DEV has explained, BOEM has failed to satisfy that provision's requirements many times over, so its compensation remedy is inapplicable.[9]  Nor does the government identify any other remedy for the extensive harms inflicted by BOEM's order to DEV, its customers, its

---

[8] Va. State Corp. Comm'n, *Application of Virginia Elec. and Power Co. for approval and certification of the Coastal Virginia Offshore Wind Commercial Project and Rider Offshore Wind, pursuant to § 56-585.1:11, § 56-46.1, § 56-265.1 et. seq., and § 56-585.1 A 6 of the Code of Virginia*, Case No. PUR-2021-00142, Order on Reconsideration at 5-6, Att. A at 11-12 (Dec. 15, 2022), https://www.scc.virginia.gov/docketsearch/DOCS/7pj901!.PDF.

[9] To DEV's knowledge, that remedy has also never been applied.

employees, and its contractors.  *See Sage*, 361 F.3d at 829-30 (harm analysis for energy infrastructure developer encompassed "negative impacts on its customers and the consumers they serve").

### B.      An Injunction Excluding CVOW Operations Would Not Prevent Irreparable Harm.

BOEM's concession that ongoing construction itself poses no new national security risk highlights the harm needlessly caused by the CVOW Order's stoppage of "all ongoing activities" on the OCS.  Likewise baseless is the government's post hoc suggestion that limiting the Order to operations would not harm DEV.  No such distinction appears on the face of the Order, which should be enjoined in its entirety.  In any event, delaying operation of CVOW indeed would cause DEV irreparable injury.

BOEM argues that CVOW is not scheduled to be fully operational until the end of 2026 and this Court can resolve motions for summary judgment by then.  Dkt. No. 55 at 11.  BOEM thus contemplates the Order, and its associated harms, continuing for *quadruple* the Order's initial 90-day period.  Energizing a complex facility like CVOW is not like turning on a switch. Each of CVOW's 176 wind turbines and their associated power transmission systems require individualized testing and commissioning, a lengthy process.  H.D. ¶ 19, Fig. 5; ¶ 21.[10]  The construction schedule accordingly calls for turbines to be installed and tested over time, and to begin delivering power to customers as that testing process is completed, with earliest power in Spring 2026.  BOEM's order arrived just as the first turbines were being installed to begin the installation and commissioning process.  Because testing and commissioning is time-consuming,

---

[10] The CVOW Construction and Operations Plan (COP) approved by BOEM provides details on the testing and commissioning process, requiring 240 hours (ten days) of continuous testing per turbine, and also addressing additional testing and commissioning steps.  COP at 3-45, https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Public_Sec-1-3.pdf

11

any delay in that process will necessarily generate severe cumulative delays, and CVOW could not become fully operational until after that lengthy, individualized process is completed.

Apart from delaying the full commissioning of CVOW, a continued suspension of operation of CVOW would delay the scheduled delivery of energy to the grid at the end of the first quarter of 2026, requiring that DEV purchase or generate that energy elsewhere. The President has declared an energy emergency premised on the need for additional energy supply, and PJM Interconnection in particular is experiencing a severe energy shortfall. *Amicus Curiae* Brief of PJM Interconnection, LLC, Dkt. No. 42-1. Restricting CVOW's operations will cause irreparable harm to DEV, and in turn its customers, in the form of substantially increased costs to generate or purchase electricity, further supporting DEV's showing of irreparable harm.

## III.    DEV HAS DEMONSTRATED THAT THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST FAVOR PRELIMINARY INJUNCTIVE RELIEF.

The government spends most of its opposition on the balance of equities, and claims that this Court must defer to the Order's stated national security concerns. That is wrong. At bottom, the government just says "trust us, we had good national security reasons for what we did"—precisely what it may not do. *Kirwa v. U.S. Dep't of Def.*, 285 F. Supp. 3d 257, 270 (D.D.C. 2018). At least one other court has already reviewed what appears to be the same classified information, and found that the government had failed to provide "any evidence of a new finding of particularized harm such that the government could order an immediate suspension." Attachment A at 44-45.

The government cannot defend arbitrary or illegal action with bare invocations of national security. The government has no response to any of DEV's cited authorities on point. *See* Dkt. No. 39 at 20-21. Even where a case implicates national security considerations, the government must complete the "critical step [of] connecting the facts to the conclusion."

*Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1405 (D.C. Cir. 1995).  Accordingly, courts have

enjoined illegal governmental action notwithstanding the government's invocation of national

security.  *See, e.g., President and Fellows of Harvard Coll. v. U.S. Dep't of Homeland Sec.*, 788

F. Supp. 3d. 182, 194 (D. Mass. 2025), *appeal docketed*, No. 25-1627 (1st Cir. July 1, 2025).

Importantly, the courts defer only to "the informed judgment of agency officials whose

obligation it is to assess risks to national security," *Olivares v. TSA*, 819 F.3d 454, 462 (D.C. Cir.

2016), not to any agency official who asserts a national security concern.  Here, again, it is not

clear if even DoD believes the Order suspending CVOW is necessary.

BOEM's citation of cases where courts may review classified information *ex parte* and *in

camera* misses the point.   Dkt. No. 55 at 6 n.5.  In none of those cases did an agency take action

to halt its own detailed prior approvals solely based on hidden information.  Here, DEV has a

need to know, and ready means to know without risking unauthorized disclosure of classified

information.  The Order directly affects DEV's multi-billion dollar investment in the CVOW

project, impairs DEV's rights under its approved lease and COP, and disrupts essential energy

supplies.  DEV also has extensive information about the CVOW facility and is well situated to

assist the government in further analyzing and mitigating any actual threats.  It is therefore

mystifying that the government has not shared at least an unclassified summary of the nature of

its concerns with DEV, as has occurred in many other instances, to promptly address any truly

new threat.  Courts have recognized that such summaries play an important role in protecting

due process rights.  *Bello v. Gacki*, 94 F.4th 1067, 1075-76 (D.C. Cir. 2024).

BOEM's arguments about equities also should carry little weight given the abundant

evidence that the Order is not founded in any new national security concern and is instead

arbitrary and pretextual, claims that the government's opposition does not even contest on the

merits.  Neither of the government's declarations suggest otherwise.  The Dale Marks Declaration (Marks Decl.) appears to be identical to declarations by Mr. Marks submitted in other pending cases involving BOEM's December 22 suspension orders, and its unredacted portions contain no information on specific wind energy projects.[11]  This short declaration from a civilian in a policy-making role stands in stark contrast to sober and technical inputs from uniformed military operators to which courts extend broad deference, such as in the *Winter* case on which BOEM relies.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ("the record contains declarations from some of the Navy's most senior officers, all of whom underscored the threat posed by enemy submarines and the need for extensive sonar training to counter this threat").[12] *Winter* is also distinguishable in two important ways: (1) there, the Navy's senior declarants clearly articulated the importance of active sonar training at issue and the threat from adversarial submarines that would manifest if operators could not conduct the challenged active sonar training; (2) it posed the opposite scenario as this case—unlike the environmental plaintiffs in *Winter* asking courts to shut down essential training, DEV is not seeking to stop any agency from doing anything to protect national security.

For its part, the Declaration of Jacob Tyner (Tyner Decl.) provides no new evidence.  It summarily references "different" yet unnamed national security concerns and undefined "proximity" of offshore wind projects to early warning monitoring systems.  Dkt. No. 55-1 ¶ 4.

---

[11] *Compare* Dkt. No. 55-2 *with Revolution Wind*, Dkt. No. 60-2 (Jan. 8, 2026), *with Empire Leaseholder LLC v. Burgum*, No. 26-0004, Dkt. No. 29-3 (D.D.C. Jan. 13, 2026).

[12] Given that Mr. Marks is in a policy-making role in the Pentagon, it is not clear how any significant new information on adversarial threats would have been transmitted from the intelligence community or the operational community that discovered that information to the Pentagon, before having first been classified by the respective officials with original classification authority in those chains of command.  *See* Declaration of Adam Lee (L.D.) ¶ 9, Dkt. No. 39-3.

And that declarant is not even Acting Director Giacona, who signed the Order and previously attested that he personally conducted the analysis and made the determinations therein. Dkt. No. 19-1 ¶ 12. Neither Mr. Giacona nor Mr. Tyner document that they have a national security background. The Tyner Declaration further states that BOEM plans to resolve the Order "as expeditiously as possible" and "quickly determine" any additional warranted mitigation measures. Tyner Decl. ¶¶ 10, 11. But BOEM has simply stalled and refused to meaningfully engage with DEV. BOEM has now had DoD's report since November 13, Marks Decl. ¶ 7; Mr. Tyner did not review it until November 26, Tyner Decl. ¶ 6; and the Order did not issue until December 22. Since then, BOEM's main interest seems to be perpetuating the Order's suspension, with no steps taken to identify possible mitigations. As the district court observed in *Revolution Wind*, "[g]iven that the Bureau became aware of the new classified information in November of 2025 and did not act until December 22, 2025, I'm not persuaded that any emergency exists in this case." Attachment A at 44.

As DEV has explained, risks of radar interference associated with wind energy are well-understood and have been extensively analyzed and mitigated. Declaration of H. David Belote (B.D.) ¶¶ 25-29, Dkt No. 39-4. DEV has already worked extensively with defense agencies to address concerns about radar effects and has a mitigation agreement in the late stages of development. H.D. ¶¶ 33-40; L.D. ¶¶ 12-18; *cf. Revolution Wind*, Attachment A at 42. BOEM's own approval of the CVOW COP includes a requirement that CVOW work with NORAD to mitigate radar effects as part of the completion of the CVOW project, a process called Radar Adverse-impact Management, or RAM.[13] And funding for RAM execution was to take effect

---

[13] *See* BOEM Conditions of COP Approval, § 4.2 (2024). https://www.boem.gov/renewable-energy/state-activities/cvow-c-conditions-cop-approval-ocs-0483 (COP Conditions).

15

before commissioning of the "last" turbine, not the first turbine as the Order now dictates.[14] DEV of course stands ready to discuss radar interference mitigation at any time, consistent with DEV's ongoing discussions with NORAD.  But there is no reason that such cooperation on mitigation should require a delay in CVOW construction or operations.  Nor should such discussions require BOEM to share any classified information, since BOEM will only have to identify the types of radar system effects and mitigation to address its concerns.

But BOEM does not appear to have any genuine interest in discussing radar interference mitigation with DEV, and indeed on the one occasion on which BOEM met with DEV to discuss the Order, BOEM staff had to inquire about ongoing cooperation between CVOW and defense agencies.  L.D. ¶ 26, Dkt. No. 39-3.  DEV meets regularly with BOEM and with defense agencies, including ongoing work on radar interference mitigation.  L.D. ¶¶ 12-18; H.D. ¶¶ 33-39.  If BOEM's actual goal were mitigation of radar effects, it presumably would have raised its concerns with DEV promptly upon receipt of DoD's report, rather than waiting six weeks and then issuing its baseless Order.

The Tyner Declaration (¶ 11) claims that if CVOW becomes operational before the asserted risks are addressed, DEV may "ignore those risks," a claim that cannot be reconciled either with DEV's longstanding cooperation with the government on issues of national security or with the specific procedures for radar mitigation, both in advance of construction and once CVOW is operational, that BOEM has already put in place.  *Cf. Revolution Wind*, Attachment A at 43 ("Revolution Wind has agreed at every stage of the approval process to work with the government to mitigate national security concerns.  I see no reason why the project will not continue to do so even when construction is complete.").

---

[14] *See id.* § 4.2.3.

BOEM's supposedly urgent concerns about "operation" of wind energy facilities also cannot be reconciled with the existence of multiple operational offshore wind energy facilities, as to which BOEM has taken no action to restrict operations or propose mitigation.  Dkt. No. 39 at 22 n.33.[15]  In short, the goal of BOEM's order appears to have been to stop work on construction of offshore wind facilities as part of a broader Administration agenda, not to address actual national security concerns.

Finally, BOEM's latest brief further shifts the goalposts by stating that the Order was based on the classified information "in part"—without providing any other basis.  Dkt. No. 55 at 4, 15 (emphasis added).  This contradicts the cited Tyner Declaration, which attributes the Order entirely to the "DoW classified material."  Dkt. No. 55-1 ¶ 7.  The Order rests only on the DoD classified assessment, as does the Giacona Declaration.  Dkt. No. 19-1 ¶ 15 ("The information that I relied on to make the decision to send the suspension letter to Virginia Electric regarding the CVOW Project is the classified material with a secret designation received from DOW in November 2025.").  "The basic rule here is clear: An agency must defend its actions based on the reasons it gave when it acted."  *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 20 (2020).

## CONCLUSION

For the reasons above and in its opening brief and submitted evidence, DEV respectfully requests that this Court preliminarily enjoin BOEM's Order and bar further actions by BOEM to enforce the Order while this case proceeds.

---

[15] For example, BOEM's December 22 order issued to Vineyard Wind expressly allowed Vineyard Wind to continue generating power from turbines that were already in operation. https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/BOEM%20Vineyard%20Suspension%20Letter.pdf?VersionId=fjS0RXlwQMRGj._l1DSaZOPTpcvkP6HM&utm_source=chatgpt.com ("Given that this project is partially generating power, you may continue any activities from those wind turbines that are necessary for the current level of power generation.").

Dated: January 14, 2026

Respectfully submitted,

*/s/ Nessa Horewitch Coppinger*
NESSA HOREWITCH COPPINGER,
VA Bar No. 65566
JAMES M. AUSLANDER (*pro hac vice*)
R. JUSTIN SMITH (*pro hac vice pending*)
HILARY T. JACOBS (*pro hac vice*)
JULIUS M. REDD (*pro hac vice*)
TAYLOR N. FERRELL (*pro hac vice*)
Beveridge & Diamond, P.C.
1900 N Street, NW, Suite 100
Washington, D.C. 20036
Telephone: 202-789-6000
Fax: 202-789-6190
ncoppinger@bdlaw.com
jauslander@bdlaw.com
jsmith@bdlaw.com
hjacobs@bdlaw.com
jredd@bdlaw.com
tferrell@bdlaw.com

*Counsel for Virginia Electric and Power Company, d/b/a Dominion Energy Virginia, and OSW Project LLC*

18

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was electronically filed on January 14, 2026.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

*/s/ Nessa Horewitch Coppinger*
NESSA HOREWITCH COPPINGER,
VA Bar No. 65566
Beveridge & Diamond, P.C.
1900 N Street, NW, Suite 100
Washington, D.C. 20036
Telephone: 202-789-6000
Fax: 202-789-6190
ncoppinger@bdlaw.com

*Counsel for Virginia Electric and Power Company, d/b/a Dominion Energy Virginia, and OSW Project LLC*
