IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

- - - - - - - - - - - - - - - - - - - -
                                    )
VIRGINIA ELECTRIC AND POWER         )
COMPANY, D/B/A DOMINION ENERGY      )
VIRGINIA; OSW PROJECT LLC,          )
                                    )
        Plaintiffs,                 )
                                    )
v.                                  )     CIVIL ACTION NO:
                                    )         2:25cv830
UNITED STATES DEPARTMENT OF         )
THE INTERIOR; BUREAU OF OCEAN       )
ENERGY MANAGEMENT; DOUGLAS          )
BURGUM, Secretary of the            )
Interior, in his official           )
capacity; MATTHEW GIACONA,          )
Acting Director, Bureau of          )
Ocean Energy Management, in         )
his official capacity,              )
                                    )
        Defendants.                 )
- - - - - - - - - - - - - - - - - - - -

TRANSCRIPT OF PROCEEDINGS
**(Motion Hearing)**

Norfolk, Virginia

January 16, 2026

BEFORE:   THE HONORABLE JAMAR K. WALKER
          United States District Judge

Carol L. Naughton, Official Court Reporter

2

APPEARANCES:

       BEVERIDGE & DIAMOND, P.C.
       By:  James Michael Auslander
            Nessa Elise Horewitch Coppinger
            Counsel for the Plaintiffs

       UNITED STATES ATTORNEY OFFICE
       By:  Kent Pendleton Porter
             - and -
       DEPARTMENT OF JUSTICE
       By:  John Kenneth Adams
             - and -
       OFFICE OF THE ASSOCIATE ATTORNEY GENERAL,
       DEPARTMENT OF JUSTICE
       By:  Stanley Edmund Woodward, Jr.
            Counsel for the United States Department of
            the Interior

(Proceedings commenced at 11:09 a.m.)

THE DEPUTY CLERK:  Virginia Electric and Power Company, doing business as Dominion Energy Virginia, et al., versus United States Department of the Interior, et al., in Civil Action 2:25cv830.

Ms. Coppinger, are the plaintiffs ready to proceed?

MS. COPPINGER:  Good morning.  Yes, we are, Your Honor.

THE COURT:  Good morning.

MS. COPPINGER:  Good morning.  Nessa Coppinger on behalf of plaintiffs, and with me is James Auslander, and he will be arguing this morning.

MR. AUSLANDER:  Good morning, Your Honor.

THE COURT:  Good morning.

THE DEPUTY CLERK:  Mr. Porter, are the defendants ready to proceed?

MR. PORTER:  Good morning, Judge Walker.

THE COURT:  Good morning.

MR. PORTER:  Yes, we are ready to proceed.  With a moment, I'd like to introduce who will be presenting. Immediately behind me is Stanley Woodward, Associate Attorney General at the Department, and he will be presenting the government's case today.  To his left is John Adams, a senior counsel with the Environmental and Natural Resources Division, and to his left is Chris Danley, who is with the

Department of Interior, and he's here as the agency representative.

THE COURT: Thank you, Mr. Porter.

And good morning to you all as well.

MR. WOODWARD: Good morning, Your Honor.

THE COURT: We are here for a hearing on Dominion Energy's motion for a preliminary injunction to pause the Bureau of Ocean Energy Management's December 22, 2025, order to stop work on the Virginia Offshore Wind commercial project on the Outer Continental Shelf.

On December 28, 2025, the Court converted Dominion's motion for a temporary restraining order to one for a preliminary injunction.

The stop order states that in November 2025, the government completed an assessment of natural security implications of offshore wind projects and identified new classified information about adversary technologies.

The order asserts these technologies pose a risk of serious, immediate, and irreparable harm to the United States and that those impacts are heightened by offshore wind projects' sensitive locations on the East Coast.

The order further asserts that BOEM has reviewed the classified information and concluded the harm posed by Dominion's offshore wind project can only feasibly be averted by suspending the project's activities.

Accordingly, BOEM directed all work on the project to stop for 90 days, inviting Dominion to meet and confer with the government about how national security risks could be mitigated and provided for the possibility that the suspension of the project could be extended based on the status of those discussions.

Dominion asserts that neither the relevant statutory and regulatory framework, nor the project's lease, permit this kind of action by the government and, separately, that the agency's action is arbitrary and capricious and, therefore, violates the Administrative Procedures Act.

In evaluating the motion for a preliminary injunction, the Court must consider the four factors outlined in *Winter versus Natural Resources Defense Council, Inc.*, 555 U.S. 7, 2008.  Those factors are Dominion's likelihood of success on the merits, the likelihood that it would suffer irreparable harm absent an injunction, the balance of the equities, and the public interests.

The Court is persuaded that Dominion would suffer irreparable harm absent a preliminary injunction.  So I don't need to hear argument on that point today.  Instead, I'd like to focus on whether Dominion can carry its burden to demonstrate that the government's stop work order is illegal and whether the third and fourth *Winter* factors favor granting a preliminary injunction.

Dominion argues that BOEM's order represents an about-face from the agency's position at the time the project was approved so it should have explained its reasoning, either in the order itself or, to the extent that reasoning relies on classified information, at least to Dominion representatives with security clearances.

In support of its position, the government provided the Court with classified information to review *ex parte in camera* as the plaintiffs were not provided this information and thus have had no opportunity to address it.

As the government noted in its opposition to the motion, the Court does not expect any discussion of the classified information here in open court today, and if the Court issues a ruling from the bench today, it will, of course, not provide any details related to the classified information it reviewed.

Does either party have any additional evidence it wishes to put on the record or just argument today?

MR. AUSLANDER:  No additional evidence for the plaintiffs, Your Honor.

THE COURT:  All right.

MR. WOODWARD:  No additional evidence for the government, Your Honor.

THE COURT:  All right.  We'll start by hearing argument from the movant, Dominion.  I'll then give the

government an opportunity to respond and let Dominion have the last word.

Mr. Auslander, whenever you're ready to proceed.

MR. AUSLANDER:  Thank you, Your Honor.  And, first of all, Dominion would like to thank Your Honor for expediting this motion and for your opening remarks to help focus the discussion on the questions that Your Honor has.

As Your Honor noted, we're here today to preliminarily enjoin the December 22nd order and allow CVOW work to continue.  This week two other judges that have received the same information that Your Honor has in front of him *in camera* have separately granted this relief against nearly identical December 22nd suspension orders that BOEM issued to other wind projects that are under construction.

And I want to be clear that this Court is not bound by those decisions, but we do respectfully submit that their reasoning is persuasive, including on the merits, and directly applicable here, and we urge Your Honor to reach the same result here.

Just before diving into the merits -- and the merits and the balance of the factors really rely on this national security interest that the government has asserted -- I'd just like to quickly provide some context.

For more than a decade, CVOW has progressed as a pillar of this region's energy strategy.  After an investment

8

of almost $9 billion to date, it's almost 70 percent complete.  It's created thousands of good-paying jobs for the Hampton Roads region.  It's enjoyed widespread support across the political spectrum, both in Virginia and nationally.

Subject matter experts at defense agencies have exhaustively studied CVOW, and those agencies stand to directly benefit both from the substantial power that CVOW is going to generate but also from the numerous enhancement and mitigation measures incorporated as conditions of this project approval.

The project is now at an advanced stage of construction, and it's scheduled to generate power to Virginia by early 2026 and with full operations by year-end; but that all changed with BOEM orders stopping all CVOW work on the Outer Continental Shelf.  And as Your Honor noted, it's based on purportedly new threats to national security from CVOW that the government appears to be in no rush to even identify, let alone resolve with Dominion.

The government's sole cited authority is a regulation that BOEM has never used before -- we made that assertion, and BOEM did not contest it -- let alone to simultaneously shut down every offshore wind project under construction, five total, including Dominion's here.

Again, I also want to be clear up front.  National security is not something Dominion takes lightly.  Quite the

opposite.  Dominion is a champion of national security as outlined at length in the Adam Lee declaration.

Notably, mere days before the order was issued, Dominion was meeting in regular interactions with defense agencies, including on measures that deconflict offshore wind and radar that have been topics of conversation for years. There was never any indication that a new threat had emerged or that a suspension order was coming until December 22nd when the order hit.

THE COURT:  So that was actually the first question the Court had for you.  So no one, in either the December 2nd meeting or the December 16th follow-up e-mail, I believe, mentioned any threat or the potential for any threat at all. Is that your position?

MR. AUSLANDER:  That is correct.  And the representation is that this assessment was shared with BOEM in November 2025; so, ostensibly, it was under preparation for some time before then.  The declarations state that the BOEM acting director reviewed it on November 26th and then issued the order almost a month later on December 22nd.

During those times, Dominion was actively engaged with all branches of the defense apparatus doing -- including a training exercise specific to CVOW, having biweekly meetings with BOEM and the Department of Defense, and just interacting with DoD on a regular basis because Dominion

operates and supplies power to numerous critical military facilities that require almost daily interaction.  In none of these meetings was there any indication that there was an order coming or there was some new information.

And I want to highlight the Clearinghouse process that Mr. Belote's declaration largely focuses on.  That is the procedure for raising new issues and, even when something new comes up, goes through that; it's vetted with people with security clearance, and it's solved rather than issuing an order and then sitting back for several weeks hoping that the government will resolve it on its own.

So, yes, this was a total surprise, Your Honor, and the same order was issued to every other project.

But I want to say again, national security is elemental to what Dominion does on a day-to-day basis.  But by the same token, the government can't just wave around national security like a magic wand to immunize its actions from scrutiny.  The Supreme Court says as much even in the *Winter* case that Your Honor pointed to, on which BOEM heavily relies.

The Supreme Court said, quote, of course military interests do not always trump other considerations, and we have not held that they do, end quote.  But the government's opposition arguments all share a contrary presumption.

Now, I was going to talk about irreparable harm, but

I'll just skip to the merits, Your Honor.

On the merits, the government defends its authority to issue suspensions for national security, and we don't contest that they can issue those suspensions under requisite conditions and following requisite procedures. But the government fails to identify the legal basis for the CVOW order in particular. It ignored all applicable preconditions and procedures under OCSLA regulations and the lease terms.

THE COURT: Is it accurate to say that they didn't outline the legal basis when the order, I believe, references a specific portion of the Code of Federal Regulations?

MR. AUSLANDER: Well, Your Honor, it identifies one regulation, and I think as we -- and I'm happy to speak about how the regulation and the whole scheme worked -- but identifies that regulation -- again, as I noted, this is the first time since the regulation has been on the books that they've invoked it, and I don't think there's a dispute on that -- but that regulation does not provide free-flowing authority for BOEM to issue a one-page order citing national security and that's the end of it.

That regulation only has the authority that the statute OCSLA confers upon BOEM. That statute has very clear requisite requirements for specifically national security-based suspensions, and that regulation and the provision of OCSLA that allowed wind to be developed on the

12

Outer Continental Shelf did not change that basic framework of OCSLA that's been in place since 1953.

THE COURT:  Before you get into the meat of the likelihood of success on the merits argument, I also wanted to ask about some of the preexisting threat analyses and mitigation that you all have discussed in the briefing.

So in paragraph 34 of the declaration that you submitted that was drafted by Mr. Belote, who I believe the declaration says served as the first executive director of DoD's Military Aviation and Installation Assurance Siting Clearinghouse -- paragraph 34 of his declaration states:

"Resumption of CVOW construction, as over the past two years, in parallel with DoD's, NORAD's, and the Navy's longstanding and effective collaboration with DEV in the Clearinghouse process, presents negligible overall national security risk (and none with respect to radar reference)."

You spent a lot of time in your briefing discussing the significant efforts on the front end that Dominion, in consultation with government agencies, took to ensure that the turbines would not pose a national security risk.

That seems to be the source of that statement from Mr. Belote, but are you able to share anything specific that is public regarding the types of risks or threats those discussions included associated with radar reference?

MR. AUSLANDER:  Well, Your Honor, there are

Carol L. Naughton, Official Court Reporter

13

discussions -- and I think we indicate that these discussions about radar have always been unclassified.  They've been unclassified again, which kind of raises more concerns about why all this information is suddenly secret.

The nature of the discussions has been around mitigation agreements, which, again, are required as part of our conditions of Construction and Operations Plan, or COP, approval -- require us to engage in several mitigations that the Clearinghouse developed and BOEM subsequently adopted and Dominion accepted as conditions to move forward with the project.

Those agreements are multifaceted.  One of them involves the Oceana Naval Base and involves ADAMS radar.  Another one involves NORAD directly, and that agreement is in process on the Clearinghouse side.

We have filed, attached to Mr. Lee's declaration and to Mr. Hollett's declaration, a summary of interactions with the Department of Defense and other agencies.  Specifically, it's Attachment B to -- I'm sorry, Exhibit B to the Hollett declaration, is an internal summary and log of national security items and our discussions with various agencies, what they're about, what the status is, and how the interactions have proceeded over several years, including up through December 2025 when this assessment was being prepared and when BOEM ostensibly was looking at it and deciding to

14

issue the suspension order.

Without giving short shrift to what's in there, I'm looking at Page 2 of Exhibit B which talks about ARSR-4 interactions with NORAD where we have to pay $250,000 for mitigation of radar.

The last step was December 14, 2025.  Department of Defense reported that the draft mitigation agreement had left the Department of Navy and was with the Clearinghouse for review.  No indication that there was some assessment or that this was not going to move forward or there was some holdup or some concern.  The agreement was moving, and this is with the subject matter experts on the ground.

I think another main agreement is on Page 9 of that same Exhibit B where I'm talking about ADAMS, which stands for Advanced Dynamic Aircraft Measurement System.  This latest entry was December 18th, 2025, where we had received an indication that the agreement was in process and was -- basically, we were working out the final details.  I can represent that there are no substantive disagreements among the parties; it just needs to be executed.

These agreements have specific mitigation measures, and one that I wanted to highlight, which I believe Mr. Belote's declaration also talks about, is curtailment.  I want Your Honor to understand that once, even, the entire project is operational, 176 turbines, there's a monitoring

15

center where they can be shut off basically within two minutes, and if there's an emergency situation, they can be put into a standby mode.  Specifically, it's called normal idling or curtailed mode, and that basically is that the blade is rotated so that it's not -- it's parallel with the wind so that it doesn't capture it and spin as broadly.

THE COURT:  I think my initial question is not so much about what you've done to mitigate the risks but what risks are being mitigated.

MR. AUSLANDER:  Yes.  Thank you for the clarification.  Yes.  And the risks that these -- or radar interference from turbines has been a, again, a topic of conversation for several -- and study for several years, and BOEM and the Department of Defense have come to the conclusion repeatedly that they are -- they can co-exist.

The 2024 report that was cited in the press release accompanying the order, as we pointed out -- it is a selective quotation -- but that report that was issued by the WTRIM Group found that with planning and with mitigation measures, that risk had been adequately addressed.

It doesn't mean that the parties still aren't talking about it.  There's still study.  There's still additional implementation that's going on.

But again, we're flying blind here a little, Your Honor, because the government won't even tell us what

16

the threat is, let alone how we can go about mitigating it, and all that we can tell is from the Secretary's statements to Fox News and other -- on X and others where he says that the study has to do with radar issues.

So if that's the concern, we've been addressing that for years, and continue to.  It's not new.  It's not exigent, and it's certainly not specific to or particularized to CVOW.

THE COURT:  All right.  Let's get, then, to the likelihood of success on the merits.  And again, to sort of focus the argument here, I'd like you to focus on the arbitrary and capricious standard here rather than the statutes or regulations in the project documents themselves.

MR. AUSLANDER:  Sure, Your Honor.  Well, again, I would say, first, on the arbitrary and capricious -- and I understand Your Honor's order yesterday -- we would respectfully submit, the government has not waived the *Winter* factor likelihood of success on the merits.  We would submit that the government, however, has waived that it -- argument that it's arbitrary and capricious.

The government's burden, is the way we do briefing, is to not just focus on national security, but to address the arguments that Dominion presented, and it doesn't get a do-over just because it lost in two other courts after not providing that explanation.

Now, Your Honor denied the motion yesterday, so I'm

Carol L. Naughton, Official Court Reporter

not going to get into the improprieties of it, but I do believe that the government's failure to adequately brief that issue should allow the government to -- allow the Court to find that the issue is conceded that it was arbitrary and capricious.

But getting to the merits of it, the government doesn't file -- really doesn't argue anything except generalized and conclusory assertions. As we noted, the order doesn't have any support. We're not saying the government had to put all the classified information into the order, but you can't just say national security, file a secret report, and call it a day.

I think it's notable that in prior -- defending prior actions, the government has said there is no administrative record, we're just following the order of the President. Now the government has shifted somewhat to say, yeah, there is a record, but we can't show you what that record is.

Your Honor has seen it, and Your Honor needs to make a determination based on seeing it. We have not seen it. No one disputes that. But we would say that the fact that we haven't seen it would weigh in favor of a preliminary injunction rather than against it. And let me just say a couple of reasons why.

First, as I mentioned, two other judges have looked

at this information, found it does not outbalance the significant harms to wind energy developers.  How do we know the information is the same?  Well, the government, Mr. Woodward, told the District of Columbia on Wednesday that the Empire Wind's information is the same as what was provided to this Court.

Second, we know that the classified information does not support the CVOW orders claim that -- and I don't want to misstate it -- "that there is particularized harm posed by this project."  How do we know that the information Your Honor is seeing doesn't say that?  Well, if the classified information supported project-specific harm, then the classified information would be different in each case. But again, it's exactly the same.

Third, the order and its stated concerns arrived out of the blue -- and we've been over this -- never to BOEM or any other agency to share national security concerns or that a shutdown was imminent.

Fourth, BOEM has had this new information since November but took no action until December 22nd, and if there was no emergency in the preceding month, why is there an emergency now?  If no new threat was exigent, why is BOEM continuing -- I'm sorry, if there is a new exigent threat, why is BOEM continuing to drag its feet in resolving it?  And we present that the answer is simple:  BOEM doesn't want to

stop a threat, it just wants to stop wind projects.

Fifth, the order ignores its own adverse effects to national security by depriving key defense facilities in Dominion's service area of critically needed near-term power and the extensive package or benefits as conditions of CVOW approval.

Yes, there is national security interest, but there's no discussion about all of the national security interests that will befall the area if this project isn't built.  And I would refer Your Honor to the amici filed by PJM Interconnection, the local grid operator, regional grid operator, as well as the congressional delegation that speak to the reliance on this project coming on board to provide more than 2.5 gigawatts of new power that's needed.

THE COURT:  In the government's opposition to the motion, it submitted a declaration from Mr. Tyner, and in that declaration, he asserts that BOEM determined the project's current mitigation measures do not adequately provide for the protection of national security interests in light of the classified information.

So why wouldn't the government be justified in pausing work while it determined what additional mitigation measures would be required and while Dominion implemented those measures?

MR. AUSLANDER:  Well, Your Honor, I doubt the -- I

Carol L. Naughton, Official Court Reporter

don't want to say veracity, but the rigor in which that determination was made.  Mr. Giacona's declaration that preceded Mr. Tyner's declaration said he looked at the information, he made a determination that all work had to stop, and he issued the order.

Mr. Tyner's, I think, is artfully worded in that he's noting what BOEM did, but he hasn't said he actually participated in any of those discussions.  It's a little strange to us that there's a -- both -- that the PI declaration is from Mr. Tyner rather than Mr. Giacona.

But, you know, regardless of that, it also said that BOEM had only done an initial review.  So how do we know that -- again, these conditions didn't just appear out of the sky.  There were subject matter experts across, you know -- talking scores or hundreds of people across multiple agencies over multiple years to design these conditions that the Department of Defense and BOEM themselves signed off on, and we are actively implementing, and no one has raised any issue of compliance or sufficiency of them, and then a document comes from the acting Director saying that it's no longer okay.

But again, I think it's also noteworthy, Your Honor, this case is about the CVOW order, but the same order was issued to four other projects that claim particularized harm. How can it be particularized if the information isn't talking

about CVOW, its specific location, its specific components, what is causing the harm, and how the various provisions are not sufficient to address that?

Again, there are procedures for raising these concerns, the Clearinghouse being the chief among them.  But OCSLA -- and I don't want to get into it, but the statute provides certainty for these projects to continue once these large investments have been made, and put safeguards and sideboards on arbitrary actions like this by one official, or coming down from the White House, that stop projects in their tracks on a premise of national security.

These -- the Department of Defense report -- again, I'll say it a few times, but I think it can't be understood, Your Honor, BOEM is careful to say that the Department of Defense report does not say that CVOW has to be suspended. It says that they provided some concerns about some threat about wind projects generally, and BOEM took that and then issued orders to five projects to stop work.

The statute requires there to be a recommendation by the Department of Defense in a state of war or a state of emergency to stop a project in its tracks on national security grounds.  So we submit that those conditions are not present here.

So I know what the declaration says, Your Honor, but I think it's pretty barebones, and I wouldn't call it

22

necessarily evidence.

And again, the order says that in coordination with Department of War, BOEM will determine whether national security threats relating to this project can be mitigated and invite you to meet.

So, again, I think there's some artful wording and shifting in the declaration that, again, just really purports to the government's central premise, which is we can wave national security and the Court must defer to that, which is not the law.

THE COURT:  I'm intrigued by the reference to the pilot turbines that you all referenced in your memorandum. Can you talk a little bit about how the Court should factor that into the determinations it needs to make here?

MR. AUSLANDER:  Yeah.  Your Honor, we submit that if the concern of the government -- and again, we're guessing -- that the concern of the government is with spinning turbines and radar interference with spinning turbines, that the first course of action would have been to address turbines that are spinning.

We have our two pilot turbines, but there are also multiple projects, including South Fork Wind, Vineyard Wind, which did receive an order, but it was allowed -- the turbines were allowed -- that were operational were allowed to keep spinning, Block Island Wind Farm up in Rhode Island.

Carol L. Naughton, Official Court Reporter

So if we're really concerned about spinning, why are we focused on stopping construction for a project that is not going to be in full operation until much later this year?

And I think the government raised a point about, well, they can't -- for those -- there's a different reliance interest by the grid operator about these projects that are already taking electrons off of these projects.  And I would submit that's a false dichotomy.

As mentioned in the PJM amicus, these are planning processes that are done years in advance.  PJM is relying on CVOW coming on board, and the fact that there's -- the electrons are expected in a few months versus already happening is not a differentiator in the harms that happen to the interconnection queue or the provision of power coming to the grid.

Specifically to the pilot project, Your Honor, Dominion obtained a research lease, noncompetitive research lease under the Outer Continental Shelf Lands Act several years ago and built this pilot project for exactly what it is.  It's a pilot to basically gauge wind speeds, gauge the economics, gauge the effectiveness of the resource and whether it would make sense to build a commercial wind farm.

That project has been successful.  There are two turbines out there adjacent, you know, 20-plus miles off of the -- offshore.  We submitted a, I believe in the Hollett

declaration, a map of where the pilot is relative to the lease area.

And there has never been any concern expressed by the Department of -- I'm sorry, it's paragraph 9 of the Hollett declaration.  There's a map that shows the pilot and the commercial.

There's never been any -- to date, including today, from the government that those spinning turbines pose any threat to national security or radar interference.  And it's been a learning moment.  We've learned from that project how to build this project most responsibly and what measures would be required, and we've implemented each and every one of those measures that the government has asked us to, and gone above and beyond.

On the arbitrary and capricious, Your Honor, just one last thing.  You know, we are not conspiracy theorists, but it's hard to get to a different conclusion based on the context, and again, in this circuit the context matters -- engaging in national security.

THE COURT:  Sorry.  I meant to ask this.

MR. AUSLANDER:  Thank you.

THE COURT:  And I'll adopt your pronunciation and put the Eastern Shore away for a little bit.

MR. AUSLANDER:  Sure.

THE COURT:  The two turbines that you're

Carol L. Naughton, Official Court Reporter

25

referencing, would you argue that they are related to the CVOW project, a part of it?  How do they fit into that?

MR. AUSLANDER:  It's a good question, Your Honor. It is a separate project.  It is a pilot that's fully operational, and it's generating power today to the grid. There are separate offshore export cables that will bring the power from the CVOW commercial lease on shore.  There may be -- and I admit I don't know the full logistics of it, but there may be some shared transmission onshore once the commercial project is underway.

THE COURT:  How far away are they from the CVOW project?

MR. AUSLANDER:  From?

THE COURT:  From the location where this project will be.

MR. AUSLANDER:  I believe it's only about a mile or two away.  Again, I think Figure 1 in the Hollett declaration, paragraph 9, there's a picture.  It is, of course, a much smaller lease than the commercial lease, but it's -- I wouldn't say it's adjacent, but it's right nearby. It's the same general area, which is why we did the pilot there.

We deconflicted, you know, species and fisheries and historic artifacts and gauged the viability of the resource in that location.  So that led to BOEM creating this wind

energy area, which again, involved national security considerations and defining what areas should be leased in the first place, and then the development of the COP over several years, and then development of the project conditions and implementation of the project conditions -- all based, you know, on lessons learned from the pilot.

Again, Your Honor, I just wanted again -- I think the context is important.  As the Supreme Court said, the Court doesn't need to display a naivete that an ordinary citizen doesn't have to.

The evidence here is powerful.  The Court can rule without addressing pretext, but the news media has covered it at length.  It's no secret that the President has a longstanding personal animus to wind energy, and consequently, the government has been systematically trying to shut down wind projects nationwide.  CVOW is now caught in that net.

The evidence only continues to mount.  Just last Friday, a week ago at a White House meeting, as reported by *U.S.A. Today,* the president said, "We have not approved one windmill since I've been in office, and we're going to keep it that way."  And he added, "My goal is to not let any windmill be built.  They are losers."

Again, it's not dispositive, Your Honor, but I think it's important context for who this -- both the means and

Carol L. Naughton, Official Court Reporter

procedures and the highly irregular nature of this order, combined with all of the public statements contemporaneous with this order by the Secretary and by the White House, indicate that there's not a good-faith, new threat to national security, and we stand ready to work directly with the government to resolve any concerns it has, but there's no reason that construction should be stopped while that moves on.

THE COURT:  Focusing on the balance of equities and public interest factors, I believe, as you acknowledge, that the third and fourth *Winter* factors merge --

MR. AUSLANDER:  Yes, sir.

THE COURT:  -- in this case because the government is the defendant.  But this question of whether Dominion can demonstrate that the government's reasoning is pretextual dovetails into that analysis in a way that I don't believe is quite addressed.

From the Court's perspective, if the government has a real national security concern based on classified information, and it really has concluded that Dominion's offshore wind project heightens the risk because of its location off the East Coast, then perhaps the balance of equities and public interest would favor the government here.

So the question is:  Is there a path to prevailing on Factors 3 and 4 that does not depend on the Court

28

concluding that the government's rationale for the stop work order is probably pretextual?  I think you said I don't need to find that, but I just wanted to ask the specifically here.

MR. AUSLANDER:  Yes, Your Honor.  The reason it's -- the pretextual nature of the order is one reason why it's arbitrary and capricious, but all of the other reasons why it's arbitrary and capricious undercut the ability of the government's rely on that basis as supporting its interest on balance of the equities.

There has to be -- when you have an equity that is based on an asserted security interest that -- if that security interest is arbitrary and capricious, it certainly can't support balance of -- it can't be cognizable as an equity basis either.

And the government, I expect, is going to say that this case is just like *Winter*, and it really -- *Winter* is the opposite scenario as in this case.

In *Winter*, the Navy established through declarations that the ability to conduct sonar training was a preeminent U.S. military priority because active sonar is the most effective way to track adversary diesel and electric submarines, and that doing so required extensive training for sonar operators.

There's no specific discussion of military interests in the -- either in the order or in the brief.  What is the

Carol L. Naughton, Official Court Reporter

specific capability?  What is the specific threat?  We don't even know what that is.  So how can we have meaningful discussions with the government to mitigate something that we don't even know what the threat is.

And again, it's not like we're trying to create new lines of communication and means to find out.  We have folks with classified clearances.  We have day-to-day communications with DoD and BOEM.  Why are we not utilizing these means to solve the problem instead of holding it back until the litigation is concluded, as the government has told us it's going to do?

Also in *Winter*, the evidence was provided by multiple declarants of the Navy, at the highest level of the uniform chain of command, and it involved "complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force."

There's obvious contrast here in terms of both how these concerns were addressed as well as the specificity that was assigned to them.

And I just want to also point out the record in *Winter* contains declarations from some of the Navy's most senior officers, including the senior-most uniformed officer, all of whom underscored the threat that is posed by the enemy submarines and the need for extensive sonar training.

Here we have one acting political appointee, who is

not an operator, is not even purporting to apply any military expertise.  And in *Winter*, the Navy actually agreed to several other mitigation measures that they didn't even challenge in order to have co-existing military operations with other uses.

But the nature of the plaintiff's interests is just so different than in *Winter* where the plaintiffs were environmental groups trying to protect marine species, where they were concerned that sonar was going to disturb them, and the Supreme Court said, as I quoted before, national security isn't a talisman that gets a get-out-of-jail-free card, but the facts in that case showed no real -- it wasn't close -- that the balance of the harms -- the need to have a fully equipped Navy outweighed any temporary disturbance of marine mammals.

Here we have billions of dollars invested in a project in reliance on the government's own approvals that the government is turning around and saying no longer matter because they have, quote, national security threats that are new, but we're not going to tell you what they are, we're not going to work with you, and we're just going to allow this to drag out until the project is no longer viable.  That's what we submit is the fact pattern here and should not survive scrutiny by this Court.

THE COURT:  And I want to be clear on this issue.

You've mentioned a couple times about things that the government have not shown in connection with this case, but obviously the burden here for the Motion For Preliminary Injunction is on you as the plaintiff in this case.

And so the Court obviously has received the classified information that the government has put forth in evidence, and understanding that you have not yet reviewed that, but how should the Court square those two things with the fact that the Court has received this evidence with the fact that it's the plaintiff that has the burden here to show success on all four *Winter* factors?

MR. AUSLANDER: Yeah. Your Honor, again, I think this is a little bit of litigation gamesmanship that the government has created. I mean, again, instead of no record, now there's a secret record. But as I mentioned, and kind of ticked through, we know certain things based on what the government has told the public and told the courts about what the nature of that information is, and the information does not support particularized harm against CVOW.

The First District Court in the *Revolution Wind* case said he had not found any particularized harm involving that project. The Court in the Empire Wind case on Wednesday also had not seen anything in the information that changed the balance of harms, and it granted a full preliminary injunction.

As in the Empire Wind case, we are receptive to expedited summary judgment briefing, trying to get this resolved on the merits, but again, I think the whole -- the ploy is to delay, delay, delay until the daily costs -- which are $5 million a day -- jeopardize contracts, jeopardize vessels, you know, one that -- the ORION is going to go off lease in March, and we may not be able to get back for installation of the topsides for the last offshore substation.

All of those weigh in favor of granting the preliminary injunction, and we have identified, I think, enough procedural abnormality, knowledge about what the information says and how this information would have been raised and vetted if it were legitimate and really introduced a new threat.

Just the government's conduct does not match its claims, and we would ask Your Honor to acknowledge that like the other two Courts that have granted preliminary injunctions have.

THE COURT:  Thank you.

MR. AUSLANDER:  Thank you, Your Honor.  I'll just say that we ask that Your Honor grant a preliminary injunction allowing CVOW work on the OCS to resume pending a final merits decision in this case.  And unless Your Honor has further questions, I'll save time for rebuttal.

THE COURT:  I don't.  Thank you.

MR. AUSLANDER:  Thank you, Your Honor.

THE COURT:  Mr. Woodward.

And if you could start where we just ended on this question of how the Court should ensure the burden remains with Dominion on the motion while also considering the classified information that is solely in the government's possession.

MR. WOODWARD:  Sure, Your Honor.  What I'll observe about that is, for virtually my entire professional career, I was in their seat, and I argued that the government was unfairly withholding information from my clients, and made the same complaints.  And all of that changed when, on January 20th, I joined the administration and began receiving the President's daily brief on a daily basis.

And so, you know, I thought Chief Justice Roberts eloquently made the following observation in *Winter*.  Quoting Goldman, he writes:

"We give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest.  As the Court emphasized just last term, neither the members of this court nor most federal judges begin their day with briefings that may describe new and serious threats to our nation and its people."

Carol L. Naughton, Official Court Reporter

And I take issue with any suggestion that somehow we have politicized this process.  With respect to Your Honor, I got on an airplane at 10:00 p.m. last night to come down for this argument, as the third-ranking official at the Department of Justice.  You've seen the classified information, and I know that you take that seriously.

The so-called acting political appointee, to which the plaintiff refers, is a 24-year veteran of both active duty and National Guard Service with the U.S. Air Force.  He is an Air Force combat fighter pilot who flew over 3,000 hours in an A-10, F-15E, AT-38, and F-16 aircraft.

I'm certainly aware of the public comments that have been made by the President or the Secretary about wind farms.  But I submit, Your Honor, that the Department of War's declarant doesn't care about that.  What he cares about is national security, and what the Supreme Court in *Winter* made clear is that that's what this Court is to consider as well.

And so to answer your question, Your Honor, at this stage, given the limited record that does exist before the Court, the balance of equities weigh in favor of national security.

Now, I take the plaintiff's point.  Again, I readily acknowledge that they're here with one hand tied behind their back.  And I will correct a statement -- well, not correct, I will clarify a statement that I made in court earlier this

week, which is that the information that was provided to Your Honor is the same as the information that was provided to the District Court Judge Nichols in D.C., Judge Lamberth in D.C.

But as Your Honor knows, that information is particularized to this project. It just happens to be that we provided all of the information with respect to the projects, the five projects at issue, to all of the judges who are overseeing legal proceedings in these matters.

And not for nothing, Your Honor, but this pretextual argument, I think, is largely circumvented by the fact that Interior has not shut down active wind farms on the Eastern Seaboard. They have made a particularized decision with respect to this project.

And I'll say it again, not for nothing, Your Honor, but we're not here with regard to the other projects that the plaintiffs reference. We're here with regard to one specific project; the necessity of pausing, Your Honor has had an opportunity to review -- or I should say the basis for the necessity of pausing, Your Honor has had an opportunity to review.

And so with respect to the brethren in D.C., Judge Nichols, as Your Honor may know, I argued that case on Wednesday, and Judge Lamberth, who decided to issue an injunction on Monday -- they have a different record before

36

them.  They have a different project before them.  And I think that's worth mentioning with regard to the question of harm.

The harm that the plaintiffs complain of here is very, very different than the harm that was complained of, for example, with regard to the matter that Judge Nichols ruled on.

There, the plaintiffs came forward with very specific deadlines in the next 30 days that had to be met, and failure to meet those deadlines, the plaintiffs argued, would result in the entire project going belly up, would result in essentially the project failing.

We don't have any argument like that, and I appreciate the Court is concluding that irreparable harm has been met, but I do feel compelled to make an offer of proof, which is to say that the only irreparable harm the plaintiffs complain of here is that there will be money damages associated with pausing this project for 90 days.  But that is not sufficient, we submit, for the Court to conclude there is sufficient irreparable harm that warrants issuing an injunction.

I'll just go back because I know the answer was longwinded.  How does the Court maintain that the burden is the plaintiffs' when there is classified information at issue here?  That is why *Winter* is on all fours with the facts

presented before Your Honor.

*Winter* makes clear that the Court need not decide as a matter of law that the government won't prevail because the national security interests at issue here weigh against issuing a preliminary injunction.  And we welcome expedited briefing on this case.  You know, as the Court is, I'm sure, aware, this is only a 90-day pause, of which I believe there are 65 days left.

THE COURT:  The order gives you the ability to extend that for another 90 days, presumably *ad infinitum* as I read the order on its face.

MR. WOODWARD:  I would say it's maybe a distinction without a difference, but credibility matters.  It's not the order that gives us the ability to add a further extension, it's actually the regulation that gives us the ability to add a further extension.

The regulation itself doesn't pose any temporal restrictions on how long the suspension is.  I think it's, frankly, an indication of good faith that Interior only paused it for 90 days so that we could assess the new information that Interior has.

Interior recognizes that the plaintiffs are arguing with one hand tied behind they back.  It's, frankly, not their determination as to when or whether the plaintiffs get access to the classified information.  They're not the

38

classifying authority of the information.  The Department of War is.

And so I think if you'll note, 30 CFR 585.417 places no temporal restrictions on how long the suspension would last.  Instead, Interior voluntarily limited that suspension to 90 days.

But yes, Your Honor is correct -- Your Honor is correct -- and I'm sure the plaintiffs would argue that, you know, we have not proceeded in going faith, and, therefore, we should presume that this will go on for 90 days.

So let's resolve this matter in 65 days.  Let's fully complete the record.  Let's get it before Your Honor. Let's brief summary judgment, and let's have a decision on the merits as to whether the Interior's decision was arbitrary and capricious.

At this stage, I'm pretty comfortable arguing that it wasn't.  I mean, the notion that there is no record here or that the plaintiffs were surprised is remarkable.  On January 20th, President Trump issued the memorandum that gave rise to the studies that were conducted by the Department of War.

THE COURT:  So you mentioned the 65 days that have occurred, and I think in Mr. Tyner's declaration, there's a reference to the government coordinating with CVOW and discussing mitigation measures, risks that are associated

Carol L. Naughton, Official Court Reporter

39

with the -- these national security risks.  So what, if any, steps have the government taken to date to follow up with Dominion since the issuance of the order to meet and confer about mitigation, as the order suggests is possible?

MR. WOODWARD:  So I'll answer that in two parts, the first being a caveat, which is that I'm not specifically familiar with the interactions that Interior may or may not have had with the plaintiffs, and so I don't want to overrepresent to the Court.  What I do know is that the classification determination is ongoing and that the request for giving access to the plaintiffs is with the Department of War.

As I suspect Your Honor is aware, that need-to-know determination is a very specific process that is undertaken by classification authorities.  And while I don't have visibility into where that is in the process, I know that that's what we're waiting on, is the Department of War's determination as to what of the information Your Honor has can be shared with the plaintiffs.

And then I would submit -- but again, with the caveat that I don't -- I don't know the answer to Your Honor's question, but I would submit that there's not a lot of fruitful discussions that can happen until we can share the classified information with the plaintiffs.

THE COURT:  Well, why not, at least at a minimum, in

40

those December 2nd and December 16th meetings, understanding the Court, obviously, respects the classification process, but why not at least say that there's this issue coming down the pike at that moment?  Because based on what Mr. Auslander said to the Court, it seems like there were no representations made in those interactions about this issue.

MR. WOODWARD:  I'll accept his representation as true.  At the risk of being flippant, I just -- I don't think that's required.  That's not required of the law, right.  To make a determination as BOEM did does not require BOEM to give the plaintiffs a heads-up once, twice, three times before they do it.

And to say, hey, there's classified information out there that we can't tell you about, stay tuned, I'm not sure really moves the needle here either.

THE COURT:  I think the point is more about the deviation from the normal process that was occurring between Dominion and the government throughout the life of the process.  That's at least how I understood that point to be being made.

MR. WOODWARD:  And I don't want to not answer Your Honor's question, but it's difficult to do so without getting into the specifics of the classified information, and so I'll make that insinuation, and then I'll just observe that, yes, it is true that mitigation efforts or discussions

Carol L. Naughton, Official Court Reporter

of mitigation efforts were underway.  All of the things that my colleague on the other side of the aisle highlighted for the Court are true.  But they were ongoing; no final determination as to mitigation had been concluded.

And, you know, what BOEM writes in its December 22nd letter is that they're not sure that there are sufficient mitigation steps that can be taken to completely absolve the national security risks that are presented by the Department of War.

And so, you know, I go back to where I began, which is to say that is it unfair?  Yes.  Do I now have a better sense of why that happens than I did in any of the 15 years that I was suing the government?  Yes, I do.

And so it's incumbent, I submit, on behalf of the United States that Your Honor take seriously the representations that were made in the classified declaration and in the materials that support that classified declaration.

We take the time to more fulsomely complete the record in the sense of getting that before Your Honor so we can make an ultimate APA determination and allow Your Honor to rule as a matter of law, whether -- as I think you posited at the outset of this, was the Secretary's or was BOEM's order illegal?  No, Your Honor.  Right?

And I don't know -- you know, it was curious to me,

42

both in the case earlier this week and today, that no one's really talking about, and I appreciate Your Honor observing, that, of course, Interior cites the authority that the secretary has in issuing this order.  30 CFR 585.417(b) is that authority, and that authority is fairly clear, and it in turn cites the statutory authority that Interior had to promulgate this regulation.

And so while I appreciate the plaintiffs want to debate about whether or not the Secretary should have taken this action, there really should be no question that the Secretary could have taken this action.  He's authorized by statute to do it, and Interior has promulgated the regulation that allows him to issue exactly the order that was issued today.

THE COURT:  Can you address the two pilot turbines and how those factor into the Court's analysis here, if at all?

MR. WOODWARD:  Not at all.

THE COURT:  Why not?

MR. WOODWARD:  I'm pausing to reflect on what I know that is classified and what I know that is not classified.

I will say that as far as the public record is concerned, that is a different project, and there are at least two other additional wind farm projects that Interior is not -- has not issued a stop work order on, and what the

Carol L. Naughton, Official Court Reporter

Director's order specifically says is that there is a, quote, particularized harm posed by this project.

And I was perhaps rushed in saying "not at all," but I am referring to the classified information.

THE COURT: Understood.

MR. WOODWARD: So, Your Honor, I think that the remainder of my outline refers to the Secretary's ability under OCSLA to both promulgate the regulation at issue and to issue the order, but Your Honor didn't have questions about that, so unless there's anything further, I think I've made my points.

THE COURT: I guess the only thing -- and perhaps this is part of what is driving some of the questions -- even if some order regarding the project might have been legal, that the contours of the order that was actually issued were arbitrary and capricious, is there any way that the Court could find in the government's favor if it were to conclude that the order itself was overbroad and not sufficiently tailored to the circumstances of this specific project?

MR. WOODWARD: I don't know. I'd like to say yes, definitively, that Your Honor could tailor the Secretary's order to say what Your Honor thinks it should have said so as to meet the legal standard, but I don't have an authority to cite for Your Honor. I'd like to get back to the Court promptly, if that's okay with Your Honor. I simply don't

want to make that assertion without having the authority to support it.

THE COURT:  All right.  And one other issue that I don't think either party addressed -- and I'll also give Mr. Auslander an opportunity to respond -- at least I can't recall it being addressed -- is the issue of security.

If the Court were to grant the Motion For Preliminary Injunction, does the government have a position on what, if any, security upon the part of Dominion would be appropriate?

MR. WOODWARD:  That I can ask my client about, with the Court's indulgence.

THE COURT:  Yes.

(Pause in the proceedings)

MR. WOODWARD:  So I believe there's an executive order that instructs the Department of Justice to seek a security in all preliminary injunction matters, and so the first thing I'll do is cite that.

And the second request we would make is we didn't talk much about whether or not the plaintiffs would be entitled to damages because of the Court's order.  They say we have sovereign immunity.  We say this is a breach-of-contract claim, and that's a Tucker Act, and the Court doesn't have jurisdiction.

And I've got to be honest, Your Honor, I appreciate

not making me get into those nuances.  But the fact of the matter is the plaintiffs aren't waiving any legal claims that they might have as against the government.  I wouldn't ask them to.  I don't think you would either.

And so to the extent that there are damages for which there are damages associated with the -- let me phrase this carefully -- or maybe "carefully" is not the right word -- articulate it clearly:

We would ask the Court to impose or to ask the plaintiffs to accept responsibility for any damages that come from our ultimately prevailing on the merits.

And so what they're going to do is continue construction of this project between now and whenever the Court ultimately rules on the merits.  Well, the United States shouldn't be liable for any damages associated with their continued construction.  Am I saying that clearly?

THE COURT:  I think I understand your position on that.

MR. WOODWARD:  Okay.

THE COURT:  Thank you, sir.

MR. WOODWARD:  Thank you.

MR. AUSLANDER:  Your Honor, just very briefly, just to move to your last question, Dominion's position is that no bond is necessary requiring -- the government didn't allege that any bond is required.  It's totally discretionary with

46

the Court.  The executive order aside, the rule is -- the issue is governed by Rule 65.  In this instance, Dominion has already paid millions of dollars for mitigation, including for national security-related concerns.

There's never been any assertion that Dominion is violating any aspect of its approvals, its lease, or any other permit that it holds.  So, of course, we remain responsible for following the law in our requirements, and we will continue to do that if the Court grants the injunction.

Just quickly on pretext, opposing counsel spoke about an individual, I believe that's Dale Marks.  The declaration of Dale Marks, from what we can tell from his unredacted, speaks to him being the person who assigns the security classification.  Again, we have some concern about the procedural nature of how that happened.

But Mr. Marks did not make the decision to suspend CVOW.  Matthew Giacona did.  Matthew Giacona joined the Department of the Interior, I believe, in April or May of 2025.  He has none of the background that opposing counsel has discussed for Mr. Marks.  And, again, there's no indication the Department of Defense even sought to suspend CVOW, much less instructed BOEM to make that decision.  So I think that that's a bit of a red herring there.

Regarding Your Honor's question, I do have just a more specific answer.  The pilot project is .6 -- 0.6

Carol L. Naughton, Official Court Reporter

nautical miles away from the commercial CVOW lease.  There is not any shared transmission with CVOW.  And I think this also bears on the security issue.

Your Honor asked about pausing.  You know, we're doing these threat analyses, and the government hasn't said that any construction activities need to be mitigated.  We have all sorts of activities that are happening.  That order was issued stopping all activities on the Outer Continental Shelf.  We're laying undersea cable.  We're putting up offshore substations.  We're putting up turbine transition pieces and then the actual turbines themselves.

None of those things have been identified by the government as posing a national security threat, but the government issued its overbroad order and has not -- it continues to defend the overbroad order, and frankly, respectfully, it's not for this Court to rewrite the agency's decision.  It should be enjoined in its entirety, and the agency should act in accordance with the law.

And I just want to be specific about -- Your Honor asked about the nature of the mitigation that's being discussed.

The RAM mitigation, R-A-M, specifically eliminates false targets and preserves the probability of detection for radar -- that's the nature of what is in the agreement and the actions that are being undertaken -- and allows NORAD,

48

air defense sector headquarters, to surveil the OCS.

Again, we submit that those capabilities of the government are preserved and fully compatible with CVOW as approved and that preliminary injunction allowing construction to resume will not impede those while we decide the merits of this case.

Unless Your Honor has other questions, I'll rest my case.

THE COURT:  I do not.  Thank you.

MR. AUSLANDER:  Thank you.

THE COURT:  The Court is going to take approximately a 10-minute recess and reconvene at 12:30, and I'll inform the parties how we're going to proceed going forward.

So the Court will be in recess until 12:30.

(Recess from 12:18 p.m. to 12:32 p.m.)

THE COURT:  The Court is prepared to rule on the motion.

The Court has carefully reviewed the evidence submitted by both parties, including the declarations attached to the parties' filings, and the classified information the government provided to explain the reason for the stop work order.

At this stage, the Court finds that the national security concerns the government stated exists in the December 22nd, 2025, stop work order -- specifically, that

Carol L. Naughton, Official Court Reporter

49

such concerns have "the potential to cause serious, immediate, and irreparable harm" -- are not particularized to concerns about the Coastal Virginia Offshore Wind commercial project.

That conclusion is bolstered by the evidence Dominion presented regarding the government's failure to raise its concerns through normal channels. Stopping work on a project without any attempt to mitigate the newly discovered risks is likely arbitrary and capricious, at least in circumstances where, like here, mitigation strategies have proven successful in the past.

The Court also notes that while it, of course, cannot reveal the substance of the classified information it received, there appear to be some inconsistencies between the statements contained in the unredacted declaration of Deputy Under Secretary Marks and the classified information that the Court reviewed *ex parte in camera* that further lend support to the Court's conclusion here.

Additionally, the fact that the risks the government is concerned about appear to attend to the operation of the project, not its construction, also supports the Court's finding on the first *Winter* factor.

The order halted progress on turbines that were not yet operating but left two functioning pilot turbines to continue running even if those were viewed as a,

quote/unquote, unrelated project.  Dominion is likely to demonstrate that that is backward and that it supports a finding that the order was arbitrary and capricious.

Dominion has focused much of its argument on comments made by public officials about the reason for the government's order.  Those comments have not factored into this Court's reasoning.

When deciding whether an agency action is arbitrary and capricious, the Administrative Procedures Act requires the Court to look at the evidence before the agency. Statements by officials seeking to explain or contextualize the agency action after it is taken are often not helpful, and the Court did not find them helpful here.

The Court does not find it necessary to wade into the question of whether the government's stated rationale was pretextual because it can adjudicate the motion based on the likelihood that Dominion would demonstrate that the stop work order is arbitrary and capricious because it is ill-fitted to the specific project it seeks to address.

Based on the Court's review of the evidence before it, the Court concludes Dominion is likely to demonstrate that the order was arbitrary and capricious under the APA.

Because it is sufficient to find for Dominion on the first *Winter* factor, the Court will not engage on whether the government's order was likely illegal under a statute, a

regulation, or other project documents.

Dominion demonstrates that it would likely suffer irreparable harm absent a preliminary injunction. It has already taken millions of dollars of losses, and even if it could recoup some of that money from the government pursuant to regulation, the costs associated with the ongoing construction delays would be difficult to calculate.

Furthermore, while harm to Dominion customers does not count directly, only harm to Dominion does, the Court also considers the damage to Dominion's goodwill and reputation associated with delay and completion of a project Virginians are already paying for.

The public interest and balance of equities factors also favor Dominion here for reasons that are related to the Court's arbitrary and capricious finding. Ordinarily, a national security risk would weigh heavily in favor of the government, even when a lot of money is on the line and even when a public utility is involved affecting state policy and many individual consumers.

But here, the evidence the Court has reviewed does not demonstrate that the onset of the national security risk is so imminent that the government needs to stop work on the Dominion project entirely.

By submitting evidence about its participation and ongoing risk assessments and successful mitigation efforts it

has undertaken in collaboration with the very government entities at issue here, Dominion adequately demonstrates that the government can address its national security concerns through the normal channels without an order that shuts down nearly the entire project.

Additionally, the public interest favors enforcement of an agency action that complies with the APA.  Ultimately, the stated purpose of a motion for preliminary injunction, when one is granted, is to preserve the status quo until the Court can adjudicate the case on the merits.

That is appropriate here.  And that rationale applies appropriately here.  Because the Court finds that all four *Winter* factors favor Dominion, the motion for a preliminary injunction will be granted.

The government's December 22nd, 2025, stop work order, as to the Dominion offshore wind project, is hereby stayed until further order of this Court.

The government has not demonstrated that it would suffer costs or damages if it were wrongfully enjoined, which is the standard under Federal Rule of Civil Procedure 65(c), so the Court finds that a nominal security is appropriate.

Dominion is ordered to pay security in the amount of $100.  Payment can be made to the Clerk of the Court.

The Court will issue a written order that memorializes this grant of the preliminary injunction on

specific terms.

Is there anything else the Court needs to address at this time, Mr. Auslander?

MR. AUSLANDER:  No, Your Honor.  Thank you very much.

THE COURT:  Mr. Woodward?

MR. WOODWARD:  Your Honor, I think we'd like to set a briefing schedule on the merits.

THE COURT:  I would prefer you file a motion as it relates to that.

MR. WOODWARD:  Very good, Your Honor.

THE COURT:  All right.  Thank you.

I'm going to direct the parties to order the transcript of the hearing.  I want to thank counsel for both sides for your time today.

The Court stands adjourned.

(Proceedings adjourned at 12:38 p.m.)

Carol L. Naughton, Official Court Reporter

CERTIFICATION


     I certify that the foregoing is a correct transcript

from the record of proceedings in the above-entitled matter.



                    _____/s/_____

                         Carol L. Naughton

                         January 16, 2026